## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NICHOLAS MORENO, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> v.<br><br>COMPASS GROUP DIVERSIFIED HOLDINGS LLC, ELIAS J. SABO, RYAN J. FAULKINGHAM, STEPHEN KELLER, and PATRICK MACIARIELLO,<br><br>     Defendants. | Case No. 3:25-cv-00758<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Nicholas Moreno ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by Compass Group Diversified Holdings LLC ("Compass" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Compass' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Compass' securities between May 1, 2024 to May 7, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class")

2.      Compass is a private equity firm specializing in add on acquisitions, buyouts, industry consolidation, recapitalization, late stage, and middle market investments.

3.      On September 7, 2021, Compass acquired all of the issued and outstanding shares of Lugano Diamonds & Jewelry, Inc., a California luxury jewelry company, for an enterprise value of $256 million. Compass has stated that bringing Lugano, "a trusted jewelry advisor" into the Company's portfolio of niche-branded consumer subsidiaries "has a sustainable business model capable of generating significant revenues and growth in both the near and long-term."

4.      Throughout the Class Period, Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and/or misleading statements, as well as concealing material adverse facts about Compass' financial reporting. Specifically, Defendants failed to disclose to investors that Compass lacked effective internal controls over its financial reporting; that Compass failed to disclose critical information regarding Lugano which kept undisclosed financing arrangements and exhibited irregularities in its sales, cost of sales, inventory and accounts receivable; and that, as a result of the foregoing, Defendants' positive statements about the Company's financial reporting were materially misleading.

5.      The truth emerged on May 7, 2025, after the market closed, the Company announced that its financial statements for fiscal 2024 could no longer be relied upon due to an ongoing internal investigation into its subsidiary, Lugano Holding, Inc. ("Lugano"). Specifically,

Compass reported that its Audit Committee launched an investigation over "concerns about how Lugano was potentially financing inventory." Further, the Company announced that it intends to delay the filing of its first quarter 2025 Form 10-Q.

6.      Also on May 7, 2025, the Company revealed that Lugano's founder and CEO, Moti Ferder, resigned from all his Lugano positions and "will not receive any severance compensation." Additionally, Compass appointed Josh Gaynor, as interim CEO at Lugano.

7.      Investors and analysts reacted immediately to Compass' revelation. The price of Compass' common stock declined dramatically. From a closing market price of $17.25 per share on May 7, 2025 to $6.55 per share on May 8, 2025.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

9.      The claims asserted herein arise under and pursuant to §§10(b) and 18 of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Compass is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

13.     Plaintiff purchased Compass's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Compass is attached hereto.

14.     Compass is a Delaware corporation with its principle executive offices located at 301 Riverside Avenue, Second Floor, Westport, Connecticut 06880. During the Class Period, the Company's common stock traded on the NYSE under the symbol "CODI".

15.     Defendant Elias J. Sabo ("Sabo") was at all relevant times, the Partner and Chief Executive Officer of Compass.

16.     Defendant Ryan J. Faulkingham ("Faulkingham") was at all relevant times, the Chief Financial Officer of Compass.

17.      Defendant Stephen Keller ("Keller") was at all relevant times, the Executive Vice President and Chief Financial Officer of Compass.

18.     Defendant Patrick Maciariello ("Maciariello") was at all relevant times, the Partner and Chief Operating Officer of Compass.

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Compass's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions

4

and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.    Compass is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Compass under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Company Background

22.    Compass is a private equity firm specializing in add on acquisitions, buyouts, industry consolidation, recapitalization, late stage, and middle market investments.

### The Defendants Materially Misled Investors Concerning Compass' Financial Reporting

#### May 1, 2024

23.    On May 1, 2024, Defendants issued a press release announcing its first quarter 2024 financial results. full year 2024 financial results. CEO Elias Sabo, stating, in pertinent part:

> We started 2024 on a strong note especially when you look at the performance of our Branded Consumer businesses, which only underscores the effectiveness of our well-defined, strategic pivot to own and manage companies at the forefront of innovation and disruptive growth. Lugano Diamonds and BOA both had great first quarters and The Honey Pot Co., a company we only acquired in the first quarter, is already integrated with a newly appointed, world-

class board of directors, and we are looking forward to the rest of the year. Given our first quarter results and the momentum we see in many of our businesses, we are feeling optimistic and raising our outlook.

24.     The press release also highlighted an increase in Lugano's net sales for the first quarter:

First Quarter 2024 Financial Results

***Net sales in the first quarter of 2024 were $524.3 million, up 8% compared to $483.9 million in the first quarter of 2023. This was driven by a 61% increase in Lugano net sales and the acquisition of The Honey Pot Co.*** On a pro forma basis, assuming CODI had acquired The Honey Pot Co. on January 1, 2023, net sales were up 4%.

(Emphasis added.)

25.     During opening remarks on the same day earnings call, Defendant Sabo touted Lugano's positive performance for the quarter, stating, in part:

This quarter, we saw the strongest performance from our branded consumer vertical, which reported 11% growth in pro forma revenue and 22% growth in pro forma adjusted EBITDA. Pat and Ryan will, of course, go into greater detail, but ***I will tell you, Lugano produced another quarter of remarkable results, and the company currently shows no signs of slowing down. With the opening of its new London salon earlier this week, we believe international expansion will be a huge opportunity for this business.***

\*\*\*

***Thanks to the strong performances at Lugano, BOA and the acquisition of The Honey Pot Company, adjusted earnings for this quarter were above our expectations and up significantly over Q1 of last year.***

(Emphasis added.)

26.     Defendant Faulkingham highlighted Compass' increase in adjusted earnings, pointing out Lugano's strong performance, stating, in pertinent part:

On a consolidated basis, revenue for the quarter ended March 31, 2024, was $524.3 million, up 8% compared to $483.9 million for

the prior year period. ***This increase was primarily a result of The Honey Pot Company and strong growth at Lugano and BOA***, which was partially offset by lower revenue at Sterno, Altor and Velocity.

Consolidated net income for the first quarter of 2024 was $5.8 million compared to net income of $109.6 million in the prior year. The first quarter of 2024 included an $8 million goodwill impairment charge at our Velocity Outdoor subsidiary. Net income in 2023 included a $98 million gain on the sale of Advanced Circuits.

***Adjusted EBITDA in the first quarter was $94.8 million, up 28% compared to $74.1 million in the prior year. The increase was due to the acquisition of The Honey Pot Company and strong growth at Lugano and BOA. Included in adjusted EBITDA in the first quarter of 2024 and 2023 were management fees and corporate costs of $21.4 million and $19.4 million, respectively.***

***Adjusted earnings for the first quarter were above our expectations, coming in at $34.3 million. This is up significantly from $19.8 million in the prior year quarter due to strong performances at Lugano and BOA.***

<center>***</center>

Turning now to cash flow provided by operations. During the first quarter of 2024, we used $13 million of cash flow from operations. Lugano used $65 million in cash flow from operations to support its continued extraordinary growth. Outside of Lugano, our subsidiaries produced $52 million in cash flow from operations in the first quarter, allowing us to reduce our leverage, as stated earlier.

<center>***</center>

For the full year of 2024, we anticipate total CapEx of between $50 million and $60 million. We continue to see strong returns on invested capital at several of our growth subsidiaries and believe they will have short payback periods. Capital expenditures in 2024 will primarily be at Lugano for new retail salons.

(Emphasis added.)

27.    During the question-and-answer segment of the call, Defendants were asked whether some of Compass' companies were offsetting the Company's outlook for the year:

<Q: Lawrence Scott Solow - CJS Securities, Inc. - Analyst> Fair enough, and I appreciate all that color. And just the second point just on sort of the outlook. It sounds like maybe the macro -- I think,

<center>7</center>

obviously, interest rates are staying up longer than, I guess, some had hoped. So maybe from a macro level, things are slightly worse for you guys, but it sounds like you have some specific offshoots at a bunch of your companies that are basically offsetting that all in. ***And then you have Lugano, which is still kicking it -- kicking a\*\* there, and that's why the guidance is going off. Is that kind of a good way to sort of summarize the outlook in a broad-brush?***

<A: Defendant Sabo> Yes. I mean we all thought Q1 GDP came in kind of disappointing, with inflation increasing a little bit. So I think that was kind of -- needs to be taken into consideration. And frankly, we're seeing it a little bit. In our industrial businesses, there is a little bit of weakness, but over 70% of our EBITDA comes from consumer. And we aren't seeing that same weakness there, Larry. I mean the consumer remains very strong and resilient.

\*\*\*

<Q: Matthew Butler Koranda – Roth MKM Partners - Analyst> ***I guess on the Lugano front, obviously, it was not an issue this quarter to lap some pretty big 2-year sort of stack comps there. But just wondering, as we progress through this year, why the confidence level is so high that we sort of continue to see the large growth rate that Lugano has been on for the last several quarters?*** Maybe just unpacking the drivers of that growth a little bit more clearly for us would be helpful, like how much is related to kind of salon expansion and some of the international expansion that you're alluding to versus just kind of like-for-like growth at existing salons and maybe AOV growth?

<A: Defendant Maciariello> So first and foremost, I think the market penetration is incredibly low at Lugano. Particularly, we think we're converting non-jewelry buyers to jewelry buyers as well. So the market penetration when you include that is even lower, right, number one.

Number two, we're investing significantly in inventory as you can see and as we told you. And we're more and more getting the right pieces in the right places at the right time to be sold.

Number three, I think you will still see some maturation of some of the stores that we invested in, in the last couple of years, be that DC, particularly the Palm Beach flagship salon, particularly Newport Beach. I think you'll still see continued growth there as those stores -- salons, excuse me, just continue to mature.

And then I'd say, lastly, there will be geographic growth. Obviously, having a London salon now open will drive growth. There are a

couple more areas or cities we're looking in, though I wouldn't expect any announcements probably until the fourth quarter at the earliest. So I think it's a combination of all of the things you said, plus investing in the right products.

(Emphasis added.)

39.    Also on May 1, 2024, Defendant filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2024 (the "Q1 2024 10-Q). Appended to the Q1 2024 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants attesting that the "[i]nformation contained in the [Q1 2024 10-Q] Report fairly presents, in all material aspects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the [Q1 2024 10-Q]."

*July 31, 2024*

40.    On July 31, 2024, Defendants issued a press release announcing its second quarter 2024 financial results. CEO Elias Sabo, stating, in part:

> I'm pleased to announce another strong quarter with results that exceeded our expectations, driven by continued strength in our consumer businesses. While Q2 saw deteriorating economic conditions that negatively impacted our industrial vertical, our branded consumer businesses performed exceptionally well with net sales up close to 20%, or 11% on a pro forma basis, offsetting any weaknesses in our industrial businesses. As expected, destocking headwinds subsided this past quarter, which meant both BOA and PrimaLoft performed exceptionally well and Lugano continued to grow at an extraordinary pace.

41.    The press release also noted Lugano's continued strong sales growth for the second quarter:

> Second Quarter 2024 Financial Results

Net sales in the second quarter of 2024 were $542.6 million, up 11% compared to $486.9 million in the second quarter of 2023. ***This was driven by CODI's acquisition of The Honey Pot Co. in January 2024 and continued strong sales growth at Lugano and BOA.***

(Emphasis added.)

42.    During opening remarks on the same day earnings call, Defendant Sabo touted the strong performance of its "branded consumer vertical" specifically noting Lugano's "remarkable growth":

While the current business environment has had a negative impact on our industrial businesses, our branded consumer vertical performed extremely well this quarter. ***Led by BOA, PrimaLoft and Lugano, the strong performance of our consumer vertical more than offset any weakness we saw in our industrial businesses.***

\*\*\*

***In addition, Lugano continued its trend of remarkable growth. Last quarter, we opened our first international salon in London. And in just a few short months, like many of our Lugano salons, it has vastly exceeded our expectations.***

***Combined, Lugano, BOA and PrimaLoft represent approximately half of our EBITDA. With all 3 of these businesses performing so well this past quarter and with them positioned so strongly for the rest of the year, we are feeling bullish about the second half of 2024 and beyond.*** As I mentioned earlier, despite our overall outperformance this quarter, a weakening global macro economy made for a challenging quarter for our industrial businesses.

(Emphasis added.)

43.    Defendant Faulkingham reiterated that Compass' positive performance was the result of several acquisitions which included Lugano, stating, in pertinent part:

On a consolidated basis, revenue for the quarter ended June 30, 2024, was $542.6 million, up 11% compared to $486.9 million for the prior year period. ***This increase was primarily a result of the acquisition of the Honey Pot Co. and strong growth at Lugano, BOA and PrimaLoft,*** which was partially offset by lower revenue at Altor, 5.11 and at Velocity as a result of the sale of its Crosman division.

***

Adjusted EBITDA in the second quarter was $105.4 million, up 27% compared to $82.9 million in the prior year. ***The increase was due to the acquisition of the Honey Pot Co. and strong growth at Lugano, BOA and PrimaLoft.*** Included in adjusted EBITDA in the second quarters of 2024 and 2023 were management fees and corporate costs of $21 million and $19.3 million, respectively.

***Adjusted earnings for the second quarter were above our expectations, coming in at $39.8 million. This was up significantly from $29.2 million in the prior year quarter due to strong performances at Lugano and BOA.***

(Emphasis added.)

44.     During the question-and-answer segment of the call, Defendants were asked about

Lugano's contribution to Compass' revenue and its sustainability:

> <Q: Matthew Butler Koranda – Roth MKM Partners - Analyst> And if I could just do one more on one of the fundamental businesses. So on Lugano, I wanted to hear if you guys had any sort of preliminary learnings you can share from the London salon opening. Like if you have quantifiable metrics, that's great, but just any learnings around that and how that sort of informs the additional expansion plans you may have for the rest of Europe.
>
> And also, I guess I noticed that the incrementals there just continue to be really strong, and it's kind of hard to model this thing, given you're punching above 40% in terms of incrementals. How sustainable is that? Sort of how should we think about modeling that going forward? I would assume you're probably going to try to temp us down on that front, but it was impressive. So I just wanted to hear a little bit more on that.
>
> <A: Defendant Maciariello> ***I mean the company does a great job -- you said some of the learnings that we take from London, the company does a great job of sort of seeding the market with a lot of deep relationships before they enter a market. And they did the same thing here in London. We had a smaller business working with European equestrian customers that we spent some time with and that helped us seed this market when we went into London. So that would be point one.***
>
> Point #2 would be that our sort of -- the way we do business, which is sort of deep relationships and good value on really amazing

product works over there as well. And so there was some sort of you work a buyer who buys differently, you work with customers who purchase differently. We're learning that it works there as well, and we're optimistic that there are several more at least European locations that it could work to. So it only made us more bullish on sort of growth internationally and growth within Europe.

(Emphasis added.)

45.     Also on July 31, 2024, Defendant filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2024 (the "Q2 2024 10-Q). Appended to the Q2 2024 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants attesting that the "[i]nformation contained in the [Q2 2024 10-Q] Report fairly presents, in all material aspects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the [Q2 2024 10-Q]."

### *October 30, 2024*

46.     Defendants issued a press release on October 30, 2024 announcing third quarter 2024 financial results, reiterating Lugano's continued strong sales growth:

Third Quarter 2024 Financial Results

Net sales in the third quarter of 2024 were $582.6 million, up 11.8% compared to $521.1 million in the third quarter of 2023. This was driven by the Company's acquisition of The Honey Pot Co. in January 2024 and continued strong sales growth at Lugano and BOA. On a pro forma basis, assuming CODI had acquired The Honey Pot Co. on January 1, 2023, net sales were up 6.6%.

***

Income from continuing operations in the third quarter of 2024 was $31.5 million compared to a loss from continuing operations of $14.0 million in the third quarter of 2023, primarily driven by strong growth at Lugano and BOA and the Company's acquisition of The Honey Pot Co. in January 2024. In the prior year, the

Company recognized an impairment charge of $32.6 million at Velocity that drove the loss in the third quarter.

*\*\*\**

Adjusted EBITDA (see "Note Regarding Use of Non-GAAP Financial Measures" below) in the third quarter of 2024 was $114.0 million, up 28% compared to $89.0 million in the third quarter of 2023. The increase was primarily due to strong results at Lugano and BOA, and the addition of The Honey Pot Co. in the first quarter of 2024. Management fees incurred during the third quarter were $18.8 million.

47.     During the same day earnings call, Defendant Keller noted that Compass' positive performance was due to its branded consumer business:

> ***As mentioned, growth in the quarter was primarily driven by our branded consumer businesses with Lugano, BOA, PrimaLoft and Honey Pot all delivering double-digit growth.*** This growth was partially offset by the divestiture of Velocity's Crosman airgun business as well as more modest growth in our industrial businesses.
>
> Our consolidated net income in the third quarter was $31.5 million, which compares favorably to a net loss of $3.8 million we recorded in Q3 of 2023. Adjusted EBITDA in the quarter was $114 million, representing a 28% increase over the same period in 2023. ***While our year-over-year performance benefited from the acquisition of Honey Pot, growth in our adjusted EBITDA was primarily driven by strong operational performance across most of our subsidiaries, with Lugano, BOA, PrimaLoft and Arnold all significantly expanding adjusted EBITDA margins in the quarter.***
>
> *\*\*\**
>
> Turning to our cash flow. In the third quarter, we used $29 million of consolidated cash flow from operations. ***Our cash usage was primarily driven by the extraordinary growth of Lugano, where we used around $60 million in cash in the quarter to support this highly profitable, fast-growing business.*** Outside of Lugano, our other subsidiaries generated greater than $30 million in operating cash.
>
> (Emphasis added.)

48.     During the question-and-answer segment, analysts asked Defendants about Lugano's ability to produce consistent positive results:

<Q: Lawrence Scott Solow- CJS Securities, Inc - Analyst> Just on Lugano, sort of the highest of the high end in luxury and clearly another amazing quarter. I think this business has been incredible. Just do you see this continuing?

<A: Defendant Maciariello>   *But I think the growth at Lugano continues to be broad. We don't anticipate potential changes in capital expenditures to -- or excuse me, in cap gains tax rates to have an effect. It continues to be broad geographically. The number of transactions as well as the transaction side continues to increase. And we continue to grow geographically. We just announced, and it is in several papers, that we'll be opening on the Gold Coast in Chicago. We have a great location there that we're excited about, and that will be sort of the first quarter, maybe spring of next year, and we're considering other locations.*

*And the new locations are doing well. I mean, we're having pretty good success internationally after opening our London salon. So, everything is kind of doing really well at Lugano and we are excited to continue to invest in the business.*

<Q: Matthew Butler Koranda – Roth MKM Partners - Analyst> Just wanted to start off with Lugano. Maybe any way to unpack the kind of the key drivers of growth there? I mean it just continues to sort of defy expectations on the top line?

<A: Defendant Maciariello> We do continue to see a march up in sort of our average transaction value which is driving a decent chunk of growth. We also see an increase in our number of transactions per quarter. So it's a little of each, if that makes sense. And I'm sorry I can't be more in-depth than that. But it's a little of each.

*And really, it goes to -- we believe Lugano fundamentally has a different business model, and we believe it's disruptive. I mean we are offering more value to the consumers than are any of Lugano's competitors. And we believe that that's important whether you're dealing with -- whether you're dealing with people of any demographic, right? And so that's important for people of the highest demographic as well.*

We're creating long-term relationships and we're really allowing them to look at jewelry as more of a store of wealth. So we think it's a combination of all those things, right? And clearly, you see our investments in inventory. You need to have diamonds in order to sell diamonds, right? And that's part of what we're doing as well. And we're getting turns on that, and we're getting a very good return on our investment. But it's really a combination of all of those, Matt.

<Q: Robert James Dodd – Raymond James - Analyst> And then I've got to ask the requisite Lugano question. I mean on store openings next year, I mean, what -- do you have any preliminary -- I mean it takes a while to open them, right? I mean if you're open one by the middle of next year, you've got to have the location already picked out, right?

So what's kind of the -- any color on how many you think might be opened next year? Do you think you'll do a second international? I mean London seems to be [ doing ] quite well, but nothing has been -- you can sell internationally without having a salon, obviously. But do you think there's going to be more international footprint expansion and expand the potential customer base even further, right?

<A: Defendant Maciariello> Yes. ***So the Board hasn't -- the Board of Lugano, and we haven't reviewed with them sort of the strategic plan for 2025. That being said, as you would expect us to and as you want us to, we always have irons in the fire. And there's several locations that we're evaluating any -- not at any point in time, but lately, and there are several locations now, and one of the several is international and more than one of the several are not. Is that a good sort of summary?***

***I'd say we -- there is room for growth. We've identified a lot of markets that we think are attractive and that this Lugano model would fit into. And absent something happening, we would envision incremental store openings next year. Call it maybe 2, if I had to guess. I mean if I -- you want me to roll out a number, right? I mean, maybe 2, probably...***

<Unknown Analyst> With the decreasing of rates with -- it seems to be a good quarter and you raised guidance.

<Defendant Sabo> We would anticipate, as long as that product is available to us at reasonable cost, which it is right now, that we would continue to raise that as a form of equity capital that can be used to either invest in Lugano, it could be used theoretically to buy back shares, right? Money is fungible. So wherever the highest return on invested capital is. I can tell you, in our opinion right now, nothing is as attractive as investing in Lugano, because the returns that gives are really exceptional.

(Emphasis added.)

49.    Also on October 30, 2024, Defendant filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2024 (the "Q3 2024 10-Q). Appended to the Q3 2024 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants attesting that the "[i]nformation contained in the [Q3 2024 10-Q] Report fairly presents, in all material aspects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the [Q3 2024 10-Q]."

*January 16, 2025*

50.    On January 16, 2025, Defendants held an Analyst/Investor Day during which Defendant Sabo discussed Compass' ongoing investment in Lugano as it becomes a bigger part of its business, stating, in relevant part:

> ***I'll touch briefly on Lugano. And I think as Lugano grows and becomes a bigger part of our business, we have decided that we're going to provide additional disclosure, a little bit more than some of our other businesses. And hopefully, that's appreciated. We truly believe this is a disruptive business. It disrupts in multiple ways.*** The 2 most fundamental ways, and I know Stuart is here from Lugano, who's a big part of it, is how they go and where they meet their customer. They go into the community to meet their customer where they are at and it expands the market massively, we believe.
>
> ***Second is how they source and how they find their product. And they're able to do that in a way that allows them to convey a lot more value to the highest of high-end buyers, and we're very excited about continuing to invest. You'll see this year, they'll grow from roughly $110 million of EBITDA to, we believe, over $180 million of EBITDA in 2024, so really strong growth.***
>
> And given this competitive positioning and given this sort of -- I'm just really -- the appetite for their product and for their value offering in the economy, we're going to continue to invest in this business. And we'll have several store openings over the next 12 to 18 months. We've heard one of the worries is what does this do to liquidity. You're buying a lot of diamonds, you're buying a lot of jewels,

you're building a lot of salons. So we took the opportunity to just map out a potential scenario in 2024 and go through sort of a couple of illustrative sort of scenarios. Just as it relates to liquidity.

And the punchline here -- and I'll go through the math with you, the punchline here is if you take our target EBITDA leverage ratio of about 3.5x. Based on our investment in Lugano, the growth is so significant that it has a negligible to positive sort of impact on that 3.5x overall leverage ratio. So first, if you say -- if you take a few scenarios on the top on possible growth in 2024 and then you look at our target leverage that we've talked about, call it, 3.5x, I know there's a range, and you adjust it for what's in our credit agreement for some of the minority interest we have at Lugano that gets you to roughly $212 million to $230 million more of liquidity.

***If you then say, okay, well, how much are you going to invest in working capital in a given year? This year, it's going to be around that $300 million number. If you then say, well, Lugano creates a lot of cash. And so if you just take EBITDA less cash taxes, less CapEx, you get to that cash created at Lugano. And then if you take all the corporate costs at Compass, including management fees, including dividends, including interest on our debt, and you allocate that based on adjusted net assets that gets you to that roughly $65 million number.***

What does all of this mean is that the net liquidity contribution or leakage is slightly negative to slightly positive. And we get a lot of growth for that and a lot of enterprise value for that. It means that the impact on CODI leverage does not go from 3.5x to 3.6x, but from 3.5x to 3.11x or from 3.5x to 3.47x. So we believe continued investments in Lugano is the right way to -- both to manage leverage, but also to maximize shareholder value.

(Emphasis added.)

51.    During the question-and-answer portion of the conference, Defendants were asked about Compass' outlook given the current economic environment:

                &lt;Q: Lawrence Scott Solow – CJS Securities – Analyst&gt; …I know this is more about long term and not 2025, but could you just give us a quick sort of state of the union? I think at the start of '24, you thought things were good but were going to slow down a little bit. It didn't really happen too much. What's sort of your outlook today across your businesses?

<A: Defendant Sabo> ***So as we look into '25, I would say, it feels really robust to us. I would think that this should be a year that is going to perform extremely well. Clearly, Lugano, we almost have to look at separately because Lugano is growing so fast and it's so large. And so if I take all of the business ex Lugano, it feels like '25 should be a better year than '24.***

***And then the question on Lugano comes. Does it continue to grow at this pace? Do we continue to fund the capital in? Our current plans are to say, yes and yes. We're going to fund the capital that's needed for it to continue to support growth. So therefore, putting the 2 together should yield a really good outlook for 2025.***

<Q: Lawrence Scott Solow – CJS Securities – Analyst> And then the second question, just on Lugano, you mentioned it's sort of somewhat become outsized. You clearly don't have any timelines on selling your business, which is a great positive. But as Lugano becomes like 35%, 40% of your EBITDA, does that give you any agita as you look forward?

<A: Defendant Sabo> ***And with respect to Lugano, we get a lot of questions on it because it is becoming an increasingly large concentration with our portfolio.*** That being said, if I said to any of you, the company that is becoming larger is a really disruptive business that gets a 30% return on invested capital every time we plunk down another dollar and we can just continue to fund into this, I've talked to some shareholders who have said, "Well, why would you ever sell that?" I don't care if it's 90% of your business. My job is to diversify. That's not your job. Understanding that management sits in a different position, right?

\*\*\*

***So today, the limitation on us thinking about possibilities with it is just further infrastructure build, process creation in the company. Lugano today relies a lot on Compass as all of our companies do in order to comply with a lot of the regulatory and public requirements. As that gets built out, we think Lugano will have a couple of different options including an IPO, which is, I think, a reasonable path, and it's one where it kind of is a hybrid model, right?***

(Emphasis added.)

<u>February 27, 2025</u>

52.     Defendants issued a press release on February 27, 2025 announcing fourth quarter 2024 financial results, that once again showed strong sales at Lugano. The press release, stating, in relevant part:

> Fourth Quarter and Full Year 2024 Financial Results
>
> Net sales in the fourth quarter of 2024 were $620.3 million, up 13.8% compared to $544.9 million in the fourth quarter of 2023. For the full year 2024, net sales were $2.2 billion, up 11.9% compared to $2.0 billion a year ago. Growth was driven by the Company's acquisition of The Honey Pot Co. in January 2024 and continued strong sales growth at Lugano and BOA.
>
> ***
>
> For the full year 2024, Adjusted EBITDA was $424.8 million, up 30% compared to $326.5 million a year ago. The increases were primarily due to strong results at Lugano. Management fees incurred during the fourth quarter and full year were $19.5 million and $74.8 million, respectively.

53.     During the same day earnings call, Defendant Maciariello touted Lugano's continued exceptional results for 2024, stating, in pertinent part:

> ***Lugano continues to post exceptional results with annual sales growth of more than 50%.*** For the full year 2024, Lugano delivered adjusted EBITDA of $195 million, an increase of 76.4% versus the prior year. This performance is a direct result of the company's disruptive business model, redefining the greater than $160 billion luxury collectibles market.
>
> ***As we've discussed, Lugano continues to consume significant amounts of working capital as they invest in their long-term growth. Lugano plans to open 1 new salon in the first half of the year and 2 more in the second half of 2025. We are excited about the continued growth potential at Lugano and believe the momentum will continue.***
>
> (Emphasis added.)

54.     During the question-and-answer segment, analysts asked Defendants about Lugano's rapid growth and Compass' 2025 guidance:

<Lawrence Scott Solow- CJS Securities- Analyst> …I know you don't guide by holding, but I know Lugano, if we take from what you said at the Analyst Day, it sounds like that's still going to grow very rapidly. So is that really driving the majority of that growth in branded as you look at '25? Or how should we kind of look at that?

<Defendant Sabo> …I would say that with Lugano, as we said, we are funding Lugano and expect Lugano to grow consistent with sort of the growth rates we've experienced over the last couple of years. But we don't forecast that. We have a much more modest expectation for growth that we forecast. And then as Lugano hopefully exceeds and kind of meets growth rates that are consistent with the past couple of years, we're able to beat and raise guidance. So I would say, some of the growth is coming from Lugano, but a good portion of growth is coming from other companies as well.

55.     Also on February 27, 2025, Defendant filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended December 31, 2024 (the 2024 10-K). Appended to the 2024 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants attesting that the "[i]nformation contained in the [2024 10-K] Report fairly presents, in all material aspects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the [2024 10-K].

56.     The above statements in Paragraphs 23 to 55 were materially false and/or misleading, as Defendants made false and/or materially misleading statements, as well as concealing material adverse facts about Compass' financial reporting. Specifically, Defendants failed to disclose to investors that Compass lacked effective internal controls over its financial reporting; that Compass failed to disclose critical information regarding Lugano which kept undisclosed financing arrangements and exhibited irregularities in its sales, cost of sales, inventory and accounts receivable; and that, as a result of the foregoing, Defendants' positive statements about the Company's financial reporting were materially misleading.

**The Truth Emerges**

*May 7, 2025*

57.     On May 7, 2025, Compass issued a press release announcing its financial statements for fiscal 2024 could no longer be relied upon due to an ongoing internal investigation into its subsidiary, Lugano. Specifically, Compass reported that its Audit Committee launched an investigation over "concerns about how Lugano was potentially financing inventory." Further, Compass announced it intends to delay the Company's quarterly earnings and filing of 2025 Q1 Form 10-Q. The press release stated, in pertinent part:

> The Audit Committee of CODI's Board of Directors promptly launched an investigation after CODI's senior leadership was made aware of concerns about how Lugano was potentially financing inventory. The investigation, led by outside counsel and a forensic accounting firm, is ongoing but has preliminarily identified irregularities in Lugano's non-CODI financing, accounting, and inventory practices. After discussing with senior leadership and investigators, the Audit Committee of CODI's Board has concluded that the previously issued financial statements for 2024 require restatement and should no longer be relied upon.

> Effective May 7, 2025, Lugano's founder and CEO, Moti Ferder, resigned from all of his positions at Lugano and will not receive any severance compensation. These issues are limited to Lugano, of which CODI owns approximately 60%, and the investigation is not focused on CODI's other subsidiaries.

58.     Defendant Sabo commenting, in relevant part:

> What has been uncovered through the investigation thus far does not reflect who we are as a business and the values we uphold. Our priority is to support the Audit Committee's investigation and to fully understand what happened. CODI's other eight subsidiary companies have strong balance sheets and cash flow, and we are, as always, fully focused on protecting our stakeholders and maximizing value.

59.     Also on May 7, 2025, Compass filed a Form 8-k disclosing "Non-reliance on Previously Issued Financial Statements" reporting that in April 2025, the Audit Committee of

Compass' Board of Directors commenced an internal investigation into the "financing, accounting,

and inventory practices of Lugano Holding, Inc., stating, in relevant part:

> The investigation, which remains ongoing, focuses on certain
> unrecorded financing arrangements and irregularities identified in
> sales, cost of sales, inventory, and accounts receivable recorded by
> Lugano. The investigation is limited to Lugano and the Audit
> Committee presently has no reason to believe the investigation
> affects or will involve any of the Company's other operating
> segments. There have been no limitations imposed on the
> investigation's scope or timing, or the Advisors' access to
> information or personnel.
>
> <div align="center">***</div>
>
> In connection with the ongoing investigation, on May 7, 2025,
> Mordechai Haim "Moti" Ferder, resigned from his position as Chief
> Executive Officer of Lugano, and from all offices and directorships
> previously held with Lugano and its subsidiaries and affiliates. Mr.
> Ferder's resignation constitutes a voluntary termination of his
> employment for which he will not receive any severance or
> additional compensation. Together with his resignation, Mr. Ferder
> waived certain contractual rights, including his right to serve as a
> director of Lugano and its affiliates and subsidiaries.

60.    Further, the 8-K stated, in relevant part, that, as a result of the foregoing non-

reliance on previously issued financial statements:

> Given the ongoing investigation by the Audit Committee and its
> Advisors, the Company does not anticipate holding an earnings
> conference call for the quarter ended March 31, 2025, and intends
> to delay the filing of its Quarterly Report on Form 10-Q for the
> quarter ended March 31, 2025 to provide for additional time to
> complete the investigation. Accordingly, the Company expects to
> file a Form 12b-25, Notification of Late Filing, with the Securities
> and Exchange Commission on or about May 12, 2025.

61.    The aforementioned press release and statements made by the Individual

Defendants were misleading and in direct contrast to Defendants' prior statements, including those

made during the May 1, 2024, July 31, 2024, October 30, 2024, January 16, 2025, February 27, 2025

earnings and special investor calls. During these calls, Compass executives continually promoted the

<div align="center">22</div>

Company's positive financial outlook, specifically touting Lugano's consistent sales and revenue growth despite deteriorating economic conditions.

62.    William Blair analyst commented "The development is disappointing as Compass management has a long-term record of strong investment performance, while providing good disclosure and lowering its cost of capital; consider that the company has generated over 20% gross unleveraged returns and cumulative distributions have exceeded $21 per share since the IPO in 2006."

63.    As a result, investors and analysts reacted immediately to Compass' revelations. The price of Compass' common stock declined dramatically. From a closing market price $17.25 per share on May 7, 2025 to $6.55 per share on May 8, 2025.

**Loss Causation and Economic Loss**

64.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Compass' common stock and operated as a fraud or deceit on Class Period purchasers of Compass' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Compass' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Compass' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

65.    Compass' stock price fell in response to the corrective event on May 7, 2025, as alleged *supra*. On May 7, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Compass' financial reporting. Specifically, Defendants failed to disclose to investors that Compass lacked effective internal controls over its financial reporting; that Compass failed to disclose critical information regarding Lugano

which kept undisclosed financing arrangements and exhibited irregularities in its sales, cost of sales, inventory and accounts receivable.

## **Presumption of Reliance; Fraud-On-The-Market**

66.     At all relevant times, the market for Compass' common stock was an efficient market for the following reasons, among others:

(a)     Compass' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     Compass communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Compass was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Compass was reflected in and incorporated into the Company's stock price during the Class Period.

67.     As a result of the foregoing, the market for Compass' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Compass' stock price. Under these circumstances, all purchasers of Compass'

common stock during the Class Period suffered similar injury through their purchase of Compass' securities at artificially inflated prices, and a presumption of reliance applies.

68.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

69.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with financial statements while at the same time failing to maintain adequate internal controls over financial reporting.

70.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

71.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Compass who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by

Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

<u>**CLASS ACTION ALLEGATIONS**</u>

72.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Compass' securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Compass' securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Compass or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 24, 2025, there were approximately 75,235,966 common shares of trust stock without par value outstanding. Upon information and belief, these shares are held by thousands, if not millions,

of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Compass;

    (c)     whether the Individual Defendants caused Compass to issue false and misleading financial statements during the Class Period;

    (d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    (e)     whether the prices of Compass' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

77.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

78.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Compass common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Compass' securities at

28

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

81.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Compass' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

82.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

83.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Compass' internal affairs.

84.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants

were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Compass' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Compass' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Compass' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

85.    During the Class Period, Compass' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Compass' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Compass' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Compass' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

86.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Compass' misstatements.

90.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Compass which had become materially false or misleading.

91.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Compass disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Compass to engage in the wrongful acts complained of herein. The Individual

Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Compass' common stock.

92.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Compass to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93.     By reason of the above conduct, the Individual Defendants and/or Compass are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 12, 2025                    Respectfully submitted,

                                       **LEVI & KORSINSKY, LLP**


                                       s/ Shannon L. Hopkins
                                       Shannon L. Hopkins
                                       1111 Summer Street, Suite 403
                                       Stamford, CT 06905
                                       Tel.: (203) 992-4523
                                       Fax: (212) 363-7171
                                       Email: shopkins@zlk.com

                                          -and-

                                       Adam M. Apton (*pro hac vice forthcoming*)
                                       LEVI & KORSINSKY, LLP
                                       33 Whitehall Street, 17th Floor
                                       New York, New York 10004
                                       Tel.: (212) 363-7500
                                       Fax: (212) 363-7171
                                       Email: aapton@zlk.com

                                       *Attorneys for Plaintiff Nicholas Moreno*

33