# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

IN RE COMPASS DIVERSIFIED
HOLDINGS SECURITIES LITIGATION

Civil No. 3:25-cv-00758 (AWT)

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

<u>JURY TRIAL DEMANDED</u>

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION AND OVERVIEW ........................................2

II.   JURISDICTION AND VENUE .................................................................12

III.  PARTIES .................................................................................................13
      a.    Plaintiff .......................................................................................13
      b.    Defendants...................................................................................14
      c.    Relevant Non-Parties...................................................................18
            i.    Current and Former Employees of Defendant Compass ..........18
            ii.   Current and Former Employees of Lugano .............................20

IV.   SUBSTANTIVE ALLEGATIONS OF FRAUD ........................................24
      a.    Compass's Background................................................................24
      b.    Lugano's Background .................................................................29
      c.    In 2021, Compass Acquired Lugano and Attempted to Integrate
            Lugano into Compass's Operations ......................................................32
      d.    Fueled by Cash Infusions from Compass, Lugano Recorded
            "Monster" Growth, Leading Compass to Consider Divesting
            from Its Seemingly Profitable Subsidiary ...........................................36
      e.    Unknown to Investors, Compass Failed to Address and Correct
            Lugano's Financial Irregularities Before and After the
            Acquisition ...................................................................................44
            i.    Compass Failed to Conduct Adequate Due Diligence
                  During the Lugano Acquisition, Ignoring Ample Signs of
                  Lugano's Irregular Financial Practices .....................................45
            ii.   Throughout the Class Period, Compass's Inadequate
                  Oversight of Lugano Enabled a Dysfunctional Workplace
                  Rife with Nepotism and Conflicts of Interest That
                  Impaired the Company's Ability to Act on Red Flags .............52
                  (1)   With Compass's Acquiescence, Lugano Operated
                        a Dysfunctional, Siloed Workplace Where Moti's
                        Allies Occupied Key Roles and Employees Faced
                        Retaliation................................................................53
                  (2)   Compass Executives Enjoyed the Perks of
                        Affiliation with Lugano, Blinding the Company to
                        Lugano's Obvious Financial Irregularities....................55
            iii.  Despite Compass Executives' Involvement with Lugano,
                  the Company Overlooked Obvious Red Flags in

i

Lugano's Practices, Causing the Company to Materially Misstate Lugano's Financial Performance ...............................56

    (1)    Under Compass's Ownership, Lugano Pursued Aggressive Sales Tactics, Chasing the Appearance of Growing Sales Above All Else ...................................57

    (2)    Lugano's Reported Sales Outpaced Actual Customer Traffic, Causing Lugano Employees—and Compass Insiders—to Develop Concerns ...............58

    (3)    Behind Closed Doors, Compass Confronted Lugano Over Lugano's Deficient Inventory Controls, Aggressive Capital Consumption, and Resistance to SOX Compliance.......................................60

    (4)    Lugano's Revenues Were Inflated by Improperly Recorded Investment Diamond Transactions.................66

    (5)    In Addition to Lugano's Improperly Recorded Investment Diamond Transactions, Lugano Operated—and Compass Oversaw—a Culture of Rampant Accounting Violations .....................................79

    (6)    Compass Failed to Act on Multiple Whistleblower Reports Detailing Lugano's Financial Irregularities ......81

f.    Defendant Grant Thornton Violated Its Duties as Compass's Independent External Auditor .......................................................88

    i.    GT Was Responsible for Auditing Compass's Financial Statements and Interim Quarterly Reports to Determine Whether They Materially Complied with GAAP ....................92

    (1)    GT Was Obligated to Follow Public Company Accounting Oversight Board Auditing Standards in Conducting Its Audits of Compass............................92

    (a)    GT Was Responsible for Planning and Performing Its Compass Audits to Obtain Reasonable Assurance That Compass's Financial Statements Were Fairly Presented in Conformity with GAAP ....................................93

    (b)    GT Was Required to Apply Due Professional Care and Exercise Professional Skepticism ...........................................................94

    (c)    GT Was Responsible for Understanding Compass's Business and Identifying and Responding to Risks of Material

Misstatements Affecting Compass's
Financial Statements ............................................96

(d) GT Was Required to Consider That
Compass and Lugano Were Engaged in
Fraud....................................................................99

(e) GT Was Responsible for Obtaining
Sufficient Appropriate Evidence to Afford a
Reasonable Basis for Its Audit Report ..............105

(2) GT Was Required to Respond to Information
Demonstrating That Compass's Interim Financial
Information Did Not Comply with GAAP ..................109

ii. GT Was Responsible For Auditing Compass's ICFR to
Determine Whether They Complied with the COSO
Framework ...........................................................110

iii. GT Recklessly Conducted Its Audits by Failing to Plan
Audits Tailored to Compass's Corporate Structure,
Secure the Necessary Audit Evidence to Support Its
Clean Opinions, and Conduct Testing of Lugano's
Financial Reporting with Skepticism.....................................116

iv. Compass's Violations of GAAP Were Violations of
Basic, Straightforward, and Longstanding Accounting
Principles That GT Should Have Easily Detected.................119

v. During the Class Period, PCAOB's Annual Inspections
of GT Identified the Same Auditing Deficiencies That
Resulted in GT Improperly Issuing Clean Audits for
Compass ..............................................................126

V. THE TRUTH IS GRADUALLY REVEALED .........................................128

a. First Loss Causing Event: May 7, 2025 ............................128

b. Second Loss Causing Event: May 27, 2025.......................130

c. Final Loss Causing Event: December 4, 2025 ...................131

d. Additional Revelations Concerning Defendants' Fraud ..................134

e. Lugano's Customers and Creditors Have Filed Lawsuits
Against Moti, Lugano, and Compass, Alleging Rampant Fraud ......139

f. After a Months-Long Investigation, Compass Restated Its 2022,
2023, and 2024 Financial Statements, Confirming That
Defendants Materially Misstated Lugano's Revenues and
Concealed Certain Material Weaknesses in Compass's
Disclosure Controls and Procedures .................................144

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMISSIONS ..........................................................150

    a.    The Compass Defendants' Materially False and Misleading
Statements and Omissions..................................................150

        i.    Fourth Quarter and Year-End 2021 Financial Results –
February 24, 2022 ....................................................151

        ii.    False and Misleading Statements Made in the 2022
Quarterly Forms 10-Q and 2022 Form 10-K Filings..............153

            (1)    Additional False and Misleading Statements Made
Concerning Compass's First Quarter 2022
Financial Results..........................................................163

            (2)    Additional False and Misleading Statements
Concerning Compass's Second Quarter 2022
Financial Results..........................................................167

            (3)    Additional False and Misleading Statements Made
Concerning Compass's Third Quarter 2022
Financial Results..........................................................170

            (4)    Additional False and Misleading Statements
Concerning Compass's Fourth Quarter and Year-
End 2022 Financial Results ..........................................174

        iii.    False and Misleading Statements Made in the 2023
Quarterly Forms 10-Q and 2023 Form 10-K Filings..............177

            (1)    Additional False and Misleading Statements
Concerning Compass's First Quarter 2023
Financial Results..........................................................186

            (2)    Additional False and Misleading Statements
Concerning Compass's Second Quarter 2023
Financial Results..........................................................189

            (3)    Additional False and Misleading Statements
Concerning Third Quarter 2023 Financial Results.......191

            (4)    Additional False and Misleading Statements
Concerning Compass's Fourth Quarter and Year-
End 2023 Financial Results ..........................................195

        iv.    False and Misleading Statements Made in the 2024
Quarterly Forms 10-Q and 2024 Form 10-K Filings..............197

            (1)    Additional False and Misleading Statements
Concerning Compass's First Quarter 2024
Financial Results..........................................................207

iv

(2) Additional False and Misleading Statements Concerning Compass's Second Quarter 2024 Financial Results ............................................................. 211

(3) Additional False and Misleading Statements Concerning Compass's Third Quarter 2024 Financial Results ............................................................. 215

(4) Additional False and Misleading Statements Concerning Compass's Fourth Quarter and 2024 Year-End Financial Results ........................................... 218

b. Defendant Grant Thornton's Materially False and Misleading Statements and Omissions .................................................................. 220

VII. SUMMARY OF SCIENTER ALLEGATIONS ......................................... 224

a. Scienter Allegations Against the Compass Defendants ................... 224

b. Scienter Allegations Against Defendant Grant Thornton ................ 235

VIII. LOSS CAUSATION ......................................................................... 239

IX. PRESUMPTION OF RELIANCE ......................................................... 241

X. CLASS ACTION ALLEGATIONS ......................................................... 243

XI. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ...................................... 246

XII. CLAIMS .......................................................................................... 247

XIII. PRAYER FOR RELIEF ...................................................................... 253

XIV. JURY DEMAND ............................................................................... 254

The Eastern Atlantic States Carpenters Pension Fund and Eastern Atlantic States Carpenters Annuity Fund (collectively "EAS Carpenters" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Lead Plaintiff's own acts and upon information and belief as to all other matters based on the ongoing investigation conducted by and through counsel, which includes, among other things, a review and analysis of: (i) the public U.S. Securities and Exchange Commission ("SEC") filings of Compass Diversified Holdings and Compass Group Diversified Holdings LLC (collectively "Compass" or "CODI" or the "Company"); (ii) Company press releases; (iii) transcripts of the Company's conference calls with analysts and investors; (iv) investor presentations; (v) research reports issued by securities and financial analysts; (vi) news and media reports and other public reports and information regarding the Company and Defendants; (vii) legal filings in lawsuits to which Compass and/or Compass's subsidiary Lugano Diamonds ("Lugano") is a party; (viii) filings in Lugano's Chapter 11 bankruptcy proceeding, *In re Lugano Diamonds & Jewelry Inc.*, No. 25-12056-BLS (Bankr. D. Del. Nov. 16, 2025) ("the Lugano bankruptcy"); (ix) inspection reports published by the Public Company Accounting Oversight Board ("PCAOB") concerning the auditing practices of Defendant Grant Thornton LLP ("GT"); and (x) interviews with former employees of Compass and Lugano (referred to herein as "FE-__"). Lead Counsel's investigation is ongoing and

many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of persons and entities that purchased or otherwise acquired Compass securities during the period from February 24, 2022 through December 4, 2025, inclusive (the "Class Period"). Lead Plaintiff brings this action to recover damages caused by violations of the federal securities laws, namely Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, committed by Defendants Compass, current Compass CEO Elias J. Sabo ("Defendant Sabo" or "Sabo"), current Compass CFO Stephen Keller ("Defendant Keller" or "Keller"), former Compass CFO Ryan J. Faulkingham ("Defendant Faulkingham" or "Faulkingham"), former Compass COO Patrick Maciariello ("Defendant Maciariello" or "Maciariello") (collectively, the "Compass Defendants"), and Compass's independent registered public accounting firm Grant Thornton LLP ("Defendant GT" or "GT").

2.    Compass operates as a private equity company that invests in middle-market businesses. The Company's business model is to acquire subsidiaries, invest

in subsidiaries' growth, and then divest subsidiaries at a profit. In September 2021, Compass's cycle of acquisitions and divestments appeared to be playing out as normal when the Company announced its acquisition of Lugano Diamonds ("Lugano"), a manufacturer and seller of high-end jewelry founded by Mordechai "Moti" Ferder ("Moti").

3.      With Moti continuing on as Lugano's CEO under Compass's management, Lugano reported massive, apparently organic growth and quickly became Compass's most profitable subsidiary. During the Class Period, Lugano's share of Compass's reported operating income more than doubled from 24% in 2022 to approximately 57% in 2024. Indeed, by 2024, Lugano made up 26.5% of Compass's total assets—nearly double the share of Compass's second-largest subsidiary, which accounted for only 13.9% of the Company's total assets.

4.      Compass's financial statements during the Class Period conveyed to investors that Compass was outperforming expectations because of Lugano's ostensible growth. For example, in 2024, Lugano reported an operating income of approximately $183 million, accounting for ***more than half*** (57.62%) of Compass's yearly operating income.  As another example, in 2022, Compass narrowly maintained a positive income from continuing operations of just $16.2 million, thanks in large part to Lugano's reported operating income of approximately $53 million.

5.    In their remarks to investors during the Class Period, Compass's senior management further emphasized Lugano's apparent contributions to Compass's balance sheet, depicting Lugano as a rapidly growing and innovative brand. For example, Defendant Sabo told investors that Lugano was performing "significantly" and "dramatically" ahead of Compass's expectations. Compass's senior management also made multiple statements concerning the Company's increasingly large infusions of cash into Lugano, which Defendants maintained were justified due to purported demand for Lugano's products and Lugano's "disruptive"[1] business model.

6.    Any questions investors might have had about the Lugano acquisition or Lugano's operations were further answered by Compass's representation to the market, made in Compass's 2021 Form 10-K filed on February 24, 2022, that the Company performed "rigorous due diligence" into acquisitions. In other words, the Company represented that it had conducted a thorough investigation into Lugano's management and operations before acquiring Lugano—and, indeed, forking over hundreds of millions of dollars to fund Lugano's purported expansion.

---

[1] In the business context, the term "disruptive" has favorable connotations, referring to innovative practices that defy industry norms. *See* Alexandra Twin, *What is Disruptive Innovation? Definition & Examples Explained*, Investopedia (Oct. 3, 2025), https://www.investopedia.com/terms/d/disruptive-innovation.asp.

7.     Investors relied on Compass's financial statements because they were endorsed by the Company's independent accountant, Defendant GT. Compass's Forms 10-K for the years 2022, 2023, and 2024 were each accompanied by "clean" audit reports prepared by GT. Each of GT's audit reports during the Class Period represented that Compass "maintained, in all material respects, effective internal control over financial reporting . . . ." GT's audit reports during the Class Period further represented that Compass's consolidated financial statements "present[ed] fairly, in all material respects, the financial position of the Company . . . and the results of its operations and its cash flows . . . in conformity with accounting principles generally accepted in the United States of America."

8.     Investors trusted Defendants' representations concerning Lugano's contributions to Compass's financial performance and Compass's financial results. For example, one analyst described Lugano's apparent success as the "engine" driving Compass's "outperformance" in a dismal economic climate. Another analyst report called Lugano a "monster" that drove Compass's "substantial sales and adj[usted] EBITDA growth." Indeed, Compass's own management conceded that Lugano had become integral to Compass's operations and investment narrative, with Defendant Faulkingham telling investors that Lugano was "obviously . . . a pretty, pretty significant percentage of our business now."

**9.**    Unbeknownst to investors, however, Lugano was not the fast-growing success presented in Defendants' representations. As Compass subsequently acknowledged in its restated 2022, 2023, and 2024 financial statements filed December 8, 2025 ("the Restatement"), Lugano was a hotbed of financial irregularities, where Moti and other employees manipulated or outright disregarded accounting principles and standards to create the appearance of rapid, continuing growth combined with remarkable profitability. Indeed, the Restatement acknowledged that Compass's and Lugano's controls over internal reporting during the Class Period were compromised by at least 10 previously undisclosed material weaknesses, including "Incomplete Risk Assessments [by Compass management] Concerning Lugano," "Inadequate Monitoring Controls and Control Environment for Lugano," and an inappropriate "[d]eference" to Moti that "allowed Lugano to operate with elevated autonomy . . . ."

**10.**    At the heart of Lugano's culture of financial irregularities was Lugano's reliance on investment diamond transactions: that is, transactions wherein an investor would contribute funds for Moti to purchase a diamond, in exchange for a share in Lugano's profits from the diamond's eventual sale. Crucially, the terms of Lugano's investment diamond transactions allowed Lugano's investors to demand the return of their investments, with interest, without any significant preconditions. According to former Lugano employees, Lugano recorded the funds received in

these transactions as pure revenue without acknowledging Lugano's obligation to repay the investor, thereby inflating Lugano's apparent revenues and operating income as well as obscuring the extent of Lugano's debts. These accounts are corroborated by lawsuits that have been filed by Lugano and Lugano's former customers against Moti, which similarly allege that Moti utilized investment diamond transactions to inflate Lugano's apparent financial performance. As disclosed in the Restatement, Lugano's improper recording of investment diamond transactions as revenue without corresponding liabilities led Compass to omit at least $318 million in unrecorded debt from its financial statements during the Class Period. The Restatement further disclosed that Compass had misstated the Company's net income by more than $750 million between 2022 and 2024.

11. Lugano's financial irregularities, as well as their corresponding inflationary effect on Compass's Class Period financial statements, came to light over a series of disclosures beginning on May 7, 2025. On May 7, Compass disclosed that an ongoing investigation into Lugano had uncovered "irregularities in Lugano's non-CODI financing, accounting, and inventory practices," such that Compass's 2024 financial statements could no longer be relied upon. In the same press release, Compass revealed that Moti had resigned, effective immediately and without severance, from his position as Lugano's CEO. This news rocked the market for

Compass's securities, with the price of Compass's common stock crashing from $17.25 per share at close of trading on May 7 to $6.55 per share on May 8, 2025.

12.    Further details of Defendants' fraud came to light on May 27, 2025, when Compass disclosed it had entered into a Forbearance Agreement with certain of its lenders. The terms of the Forbearance Agreement imposed multiple restrictions on Compass, including limiting the Company's investment into Lugano to no more than $5 million in the aggregate. In the same press release, Compass further announced it had suspended the Company's "quarterly cash distribution historically paid to common shareholders in order to preserve cash and protect long-term value." On this news, the price of Compass's securities once again fell, with the price of Compass's common stock dropping from $7.52 per share at close of trading on May 27 to $6.61 per share on May 28.

13.    The full truth regarding Defendants' fraud was finally revealed on December 4, 2025, when Compass hosted an investor call to discuss the Company's soon-to-be-filed Restatement. On the call, Defendant Sabo confirmed at last that Lugano's financial reporting was distorted by "deliberate and systemic fraud" that "persisted for multiple reporting periods and increased in magnitude." Later on the call, Defendant Keller conceded the impact of Lugano's financial irregularities on Compass's overall performance, acknowledging that "the Lugano business was significantly smaller than initially reported" and that "the cost of the Lugano fraud

will by a wide margin represent the most significant loss [Compass] has experienced since its inception." This revelation caused yet another drop in the price of Compass's securities, with the price of Compass's common stock falling from $7.38 per share at close of trading on December 4 to $5.73 when trading re-opened on December 5.

14.    Compass and its senior management were not unwitting victims to Lugano's financial irregularities; rather, the Compass Defendants knew or recklessly disregarded that Lugano's contribution to Compass's overall financial performance was drastically less than what investors believed. Most directly, Compass received at least two whistleblower reports concerning Lugano's financial irregularities. As reflected in screenshots shared with Lead Counsel by a former Lugano employee, one of these reports was submitted directly to Compass via the Company's own third-party service for whistleblower submissions. Despite receiving formal reports of Lugano's irregularities as early as June 2024, Compass failed to investigate Lugano's operations, and indeed continued to depict Lugano as a runaway success in its statements to investors.

15.    Additionally, Compass's executives had a direct and concrete motive to ignore red flags concerning Lugano's financial irregularities. Because Compass's executives were compensated by management fees calculated based on Compass's adjusted net assets, Compass's executive management benefited from Lugano's

apparent financial performance, which increased Compass's adjusted net assets and by extension Compass's management fees. As another financial motive, multiple Compass executives—including Defendants Sabo, Keller, and Faulkingham—owned shares in an entity, Sostratus LLC ("Sostratus"), that received a portion of Compass's profits whenever the Company sold a subsidiary or retained a subsidiary for five years. As reported by *Forbes* during the Class Period, Compass planned to "spin off or sell" Lugano during the Class Period; had this sale occurred, or had Compass held Lugano until the acquisition's five-year anniversary in September 2026, Compass's executives would have received a share of the Company's profits through their interests in Sostratus.

16.    Multiple other pieces of information further support the inference that the Compass Defendants knew or recklessly disregarded Lugano's financial irregularities and their effect on Compass's financial reporting. For example, former employees of Compass and Lugano note that Compass repeatedly sparred with Moti over Lugano's integration into Compass's operations, most notably with regards to Lugano's implementation of internal controls that complied with the Sarbanes-Oxley Act of 2002 ("SOX"). Additionally, multiple members of Compass's senior management served on Lugano's Board of Directors, including Defendant Maciariello, who was the Chair of Lugano's Board. Given their access to and visibility into Lugano's operations, Compass's senior management knew or

recklessly disregarded that Lugano's reported sales were inconsistent with Lugano's actual sales traffic. Indeed, Moti himself has asserted in legal filings that Compass "knew of the financing and inventory practices that Lugano was using from the beginning . . . but left them in place."[2]

17.      Furthermore, the revelation of Lugano's financial irregularities led to the departure of at least two employees involved in Compass's oversight of Lugano. One of these employees, Defendant Maciariello, quietly ceased to perform his duties as Compass's COO in August 2025, even though Compass did not announce Defendant Maciariello's "retirement" until December 2025. The other departed employee was a member of Compass's internal audit team who oversaw Lugano's implementation of SOX procedures, and who received (but failed to act on) a whistleblower report from Lugano's Controller regarding Lugano's financial irregularities. These suspicious departures further bolster the inference that the Compass defendants knew of or recklessly disregarded Lugano's financial irregularities.

18.      Similarly, Defendant GT overlooked ample signs of financial irregularities at Lugano that would have been visible had GT adhered to PCAOB[3] Auditing

---

[2] Mot. for Relief ¶ 41, *In re Lugano Diamonds & Jewelry Inc.*, No. 25-12055-BLS (Bankr. D. Del. Jan. 27, 2026), ECF No. 312.

[3] The Public Company Accounting Oversight Board ("PCAOB") is a nonprofit corporation established by Congress through SOX to oversee the audits of public

Standards. Moreover, Compass's violations of generally accepted accounting principles ("GAAP") were of a significant magnitude and concerned basic, straightforward, and longstanding accounting principles, such that GT knew or recklessly disregarded the likelihood that these violations were ongoing. Indeed, during the Class Period, GT was the subject of a PCAOB investigation finding numerous "significant" instances of deficient auditing practices resembling the deficient practices that GT employed in its audits of Compass, further supporting the inference that GT knew or recklessly disregarded the likelihood that its audits of Compass were marred by similar errors.

19.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities pursuant to the revelation of the fraud, Lead Plaintiff and other members of the Class (defined herein) have suffered significant damages.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

---

companies and SEC-registered brokers/dealers. In this role, the PCAOB establishes auditing, quality control, ethics, and independence standards for auditors of public companies and brokers.

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant Compass is headquartered in this District. Substantial acts in the furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Defendants' wrongful acts also arose in, emanated from, and caused harm in this District. Such acts include the dissemination of false and misleading statements from and into this District.

23.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

## III.    PARTIES

### a.    Plaintiff

24.    Lead Plaintiff **EAS Carpenters** purchased or otherwise acquired Compass stock during the Class Period, as reflected in the certification attached to its motion for appointment as lead plaintiff in this Action (ECF No. 30-1), and lost over $2 million as a result of Defendants' false and misleading statements and omissions. EAS Carpenters is a defined benefit pension plan based in Philadelphia,

Pennsylvania that provides benefits to union carpenters, including retirement benefits.

**b.    Defendants**

25.    Defendant **Compass** operates as a private equity firm that invests in high-growth, middle-market companies. Compass consists of two entities: Defendant **Compass Diversified Holdings**, a publicly traded statutory trust, and Defendant **Compass Group Diversified Holdings, LLC**, which is the holding company used to house the various operating companies that form Compass. The Company's principal executive offices are located at 301 Riverside Avenue, Second Floor, Westport, Connecticut 06880.

26.    Non-party **Compass Group Management LLC** ("CGM"), a Delaware limited liability company, manages the day-to-day operations and oversees the management and operations of Compass pursuant to a management services agreement (the "Management Services Agreement" or "MSA") between Compass and CGM in place since 2006. Under the MSA, Compass pays management fees to CGM, which includes the compensation paid to Compass's executive management—including the Individual Defendants, all of whom are employees of CGM. Pursuant to the MSA applicable during the Class Period, Compass paid CGM a quarterly management fee equal to 0.5% (2% annually) of the Company's consolidated adjusted net assets. As disclosed in Compass's Form 10-Q for the

quarter ended June 30, 2025, that was filed on December 29, 2025, Compass currently estimates that Lugano's financial irregularities led CGM to be overpaid $43 million in management fees during the Class Period.

27.    Non-party **Sostratus** is an additional LLC contained within Compass's corporate structure. Sostratus is owned by current and former Compass executives, including Defendant Sabo, Defendant Keller, and Defendant Faulkingham. Sostratus is entitled to receive profit allocation payments whenever Compass maintains a subsidiary for five years and whenever Compass divests from a subsidiary. These payments are calculated based on the subsidiary's aggregate contribution to the Company's profit.

28.    The following chart from Compass's 2024 Form 10-K depicts the Compass entities' corporate structure, including Compass's various subsidiaries, as of February 27, 2025:



29.    Defendant **Sabo** is and was, at all relevant times during the Class Period, the Chief Executive Officer ("CEO"), as well as a director, of Compass. Sabo is also the managing member of CGM. In his role as Compass's CEO, Sabo signed Compass's Forms 10-K and spoke publicly on behalf of the Company, including on its earnings calls, at presentations to its investors, to analysts, and to the press.

30.    Defendant **Faulkingham** served as the Chief Financial Officer ("CFO") of Compass and the underlying trust's Regular Trustee at all relevant times during

the Class Period until he stepped down effective August 30, 2024. Like Compass's other executives, Faulkingham was employed by and received compensation from CGM. In his role as Compass's CFO, Faulkingham signed Compass's Forms 8-K, 10-Q, and 10-K, and spoke publicly on behalf of the Company, including on its earnings calls, at presentations to its investors, to analysts, and to the press.

31.    Defendant **Keller** has served as Compass's Chief Financial Officer and the underlying trust's Regular Trustee since August 31, 2024. Like Compass's other executives, Keller is employed by and receives compensation from CGM. In his role as CFO, Keller signed Compass's Forms 8-K, 10-Q, and 10-K, and spoke publicly on behalf of the Company, including on its earnings calls.

32.    Defendant **Maciariello** was, at all relevant times during the Class Period, the Chief Operating Officer ("COO") of Compass. As a member of Compass's Investment Committee, Maciariello was responsible for recommending companies for acquisition by Compass, including the acquisition of Lugano. In his role as COO, Maciariello spoke publicly on behalf of the Company, including on its earnings calls and at presentations to its investors. He also served as Chairman of Lugano's Board of Directors. In the fallout from the public disclosure of Lugano's financial irregularities, Defendant Maciariello was pushed out of the Company, ceasing to perform his duties as COO in August 2025 and officially leaving his position at Compass in December 2025.

33.    Defendants Sabo, Faulkingham, Keller, and Maciariello are collectively referred to as the "Individual Defendants." Defendants Compass, Sabo, Faulkingham, Keller, and Maciariello are collectively referred to as the "Compass Defendants."

34.    Defendant **Grant Thornton LLP** ("GT") is one of the world's largest accounting firms, with 59 offices and over 8,500 employees in the United States alone. GT is headquartered in Chicago, Illinois.

35.    GT has served as the Company's outside auditor since 2005. GT issued unqualified reports on Compass's financial statements for the years ending December 31, 2022, December 31, 2023, and December 31, 2024, certifying that it had audited those statements in accordance with auditing standards promulgated by the PCAOB (the "PCAOB Standards" or "PCAOB Auditing Standards") and that the statements presented Compass's final position fairly and in conformity with GAAP. As subsequently disclosed by Compass and as reflected in the Restatement, each of GT's reports certifying Compass's financial statements during the Class Period were materially false and misleading.

     **c.    Relevant Non-Parties**

       **i.    Current and Former Employees of Defendant Compass**

36.    **Raj Dalal** ("Dalal") is a Partner at Compass and the leader of Compass's West Coast Investment Team. As the Partner assigned to Lugano, Dalal played a key

role in Compass's oversight of Lugano, including serving as a member of Lugano's Board of Directors. He also participated in Compass's due diligence into the Lugano acquisition. Lugano's Statement of Financial Affairs, filed in the Lugano bankruptcy, identifies Dalal as a member of Lugano's Board of Directors and as Lugano's "Treasurer" and "Secretary" from September 3, 2021 to May 7, 2025. Official Form 207 at 9, *In re Lugano*, No. 25-12055-BLS (Dec. 12, 2025), ECF No. 179-1. Additionally, Dalal shopped at Lugano salons and was a member and frequent visitor of Lugano Privé ("Privé"), a members-only club operated by Lugano that opened after Compass's acquisition of Lugano.

37.    **Larry Enterline** ("Enterline") is the Chair of Compass's Board of Directors. During the Class Period, Enterline was a frequent shopper at Lugano's salons and was a member and frequent visitor of Privé.

38.    Members of Compass's Internal Audit Team worked with Lugano's employees to implement SOX procedures at Lugano. During the Class Period, members of Compass's internal audit team responsible for implementing SOX procedures at Lugano included **Ami Vearrier**, Compass's then-Senior Director of Internal Audit & SOX who led the team's meetings with Lugano staff; **Barbara Anderson**, who held the title of Manager, Internal Audit; and **Nicolette Nguyen**, who held the title of Senior Manager, Internal Audit. Vearrier left her role at Compass in November 2025.

39.    FE 1 was an employee at Compass from 2024 to 2025. He[4] worked with other employees who had direct involvement with Compass's oversight of Lugano.

### ii.    Current and Former Employees of Lugano

40.    **Mordechai Haim "Moti" Ferder** ("Moti") founded Lugano and served as its CEO until his resignation on May 7, 2025. As alleged herein, Defendants permitted and enabled Moti to engage in rampant fraud, leading Lugano—and, by extension, Compass—to report dramatically inflated financial figures. Today, Moti is a defendant in at least a dozen lawsuits brought by former Lugano clients and business partners, as well as a lawsuit brought by Lugano itself, concerning Moti's role in Lugano's financial irregularities; additionally, Moti's misconduct is under investigation by the Federal Bureau of Investigation ("FBI") and the SEC. At present, Moti is believed to be residing in his birth country, Israel.

41.    **Idit Ferder** ("Idit") is Moti's wife and Lugano's former COO. Former employees of Lugano describe Idit as an active participant in Moti's misconduct who played an influential role in Lugano's operations.

---

[4] Individuals referenced herein as "FEs" or "Former Employees" refer to former Compass and Lugano employees interviewed as part of Lead Counsel's investigation of Plaintiff's claims. In order to protect their identities, the FEs are referred to with male pronouns regardless of their gender. The exact titles and reporting structure of certain FEs have been made less specific in deference to those FEs' concerns regarding identification and retaliation.

42. **Tom Ferder** ("Tom") is the son of Moti and Idit Ferder and a former Lugano employee. Tom was repeatedly promoted to higher positions at Lugano, despite concerns about Tom's work ethic.

43. **Josh Gaynor** ("Gaynor") is Lugano's current Interim CEO, appointed to the position after Moti's May 2025 resignation. He previously served as Lugano's President.

44. **Moshe Partouche** ("Moshe") was Lugano's Vice President of Information Technology; his wife, **Hagit Partouche** ("Hagit"), was Lugano's Vice President of Operations. Former Lugano employees describe Moshe and Hagit as longtime friends of the Ferders who played a crucial role in Lugano's operations.

45. **Dan Perushek** ("Perushek") was Lugano's Controller during the Class Period until his resignation in Fall 2024. With FE 12, Perushek uncovered startling irregularities in Lugano's financial operations, including multiple instances of Moti recording investment diamond transactions as revenue without a corresponding liability. Ultimately, Perushek reported his concerns to Compass's internal audit team in 2024; however, Compass did not act on Perushek's concerns, leading Perushek to resign from his position at Lugano.

46. FE 2 served as Director of a Lugano salon from September 2022 to October 2023.

47.    FE 3 was engaged by Lugano as a SOX compliance consultant from 2022 to 2023, as Lugano was transitioning from a private company to a subsidiary in a publicly traded company. FE 3 worked with Lugano's controller, Dan Perushek, and FE 12 to control, design, and understand Lugano's SOX compliance requirements.

48.    FE 4 worked at Lugano as a Senior Accountant from August 2020 to February 2021, when he resigned. His supervisor was Lugano's then-CFO, Scott Sussman.

49.    FE 5 worked as a Sales Executive at Lugano from June 2024 until June 17, 2025, when he was laid off alongside approximately 53 other Lugano colleagues.

50.    FE 6 was Lugano's first Chief Financial Officer. Hired in September 2014, ostensibly to modernize Lugano's financial reporting, he departed in 2016 after noticing multiple disturbing irregularities in Lugano's financial practices.

51.    FE 7 served as an Operations Manager at Lugano from March 2014 to December 2021. He was initially supervised by Lugano's Chief Experience Officer, Stuart Winston. After FE 7 raised concerns about Winston's conduct, Lugano reassigned his supervision to Idit; Idit acted as his supervisor until 2017, when he was reassigned again to Lugano's then-Senior Operations Manager, Heather Manning. FE 7's role involved managing various aspects of Lugano's operations, including inventory, shipping, and receiving.

52.    FE 8 worked at Lugano from 2019 to 2022 in several roles, ending his employment with the title of Event Operations Manager. Each of his roles at Lugano involved managing Lugano's sales installations at equestrian events. FE 8 described himself as a "dual-purpose" employee who handled the nitty-gritty of managing Lugano's installations while also selling jewelry to event attendees.

53.    FE 9 worked at Lugano as a Privé Member Specialist from April 2023 through June 2025. His role entailed coordinating events at Privé, including arranging meetings, planning private events, and ensuring personalized service to Privé members during visits.

54.    FE 10 worked as an Operations Manager at a Lugano salon from October 2023 through November 2025. In addition to supporting the salon's sales activities, he oversaw the salon's training, shipping and receiving, inventory support, event management, and operational logistics. FE 10 discovered a host of irregularities in Lugano's sales, inventory, and documentation practices, which FE 10 anonymously reported to Compass in June 2024 via the Company's third-party whistleblower service. In August 2024, Compass replied to FE 10's submission, dismissing his concerns and marking his complaint as "dismissed" in the Company's files.

55.    FE 11 worked in sales at a Lugano salon from winter 2024 until summer 2025.

23

56.     FE 12 was Lugano's CFO from April 2022 through April 2024. FE 12 was fired from Lugano after confronting Moti regarding Lugano's financial irregularities.

## IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD

### a.    Compass's Background

57.     Founded in 1998 and headquartered in Westport, Connecticut, Compass specializes in acquiring and managing middle-market businesses across various industries. The Company holds itself out as acquiring businesses with defensible market positions, strong leadership teams, and long-term growth opportunities. Compass's business model is to acquire these businesses, provide the capital investment to further grow the businesses, and then eventually sell the businesses at a profit.

58.     At present, Compass's portfolio consists of eight operating subsidiaries, exclusive of Lugano, which it groups into "branded consumer" and "niche industrial" segments. Holdings in the branded consumer segment include Velocity Outdoor, a designer and manufacturer of crossbows; PrimaLoft, a designer and manufacturer of synthetic insulation for consumer outerwear; BOA, a sports gear manufacturer; 5.11, a designer and marketer of tactical apparel and gear; and The HoneyPot Company, a manufacturer of feminine care products. Holdings in the niche industrial segment include Sterno, a manufacturer of portable food warming

systems; Arnold Magnetic Technologies, a manufacturer and engineer of magnets, magnet assemblies, and alloy products; and Altor Solutions, a manufacturer of custom packaging and insulation.

59.    Compass differentiates itself from traditional private-equity firms by providing both debt and equity capital for its subsidiaries. This model supports the subsidiaries' financial stability and operating flexibility, while also allowing Compass to invest subsidiaries' cash flow in the Company's long-term growth. Another difference is that Compass invests in subsidiaries directly rather than through private-equity funds, which enables the Company to hold subsidiaries for longer periods and to capture more long-term gains than would a conventional private equity firm.

60.    Compass's Investment Committee evaluates acquisition opportunities for the Company. FE 1 recalled that Defendant Maciariello was a member of Compass's Investment Committee and was responsible for recommending acquisitions to Compass's CEO and CFO. FE 1 also recalled that due diligence for Compass's acquisitions was generally handled by an associate, a VP, and a partner. If red flags emerged during Compass's due diligence, they would be elevated by the associate up the chain to the VP, to the partner, and, ultimately, to Defendant Maciariello and the other members of Compass's Investment Committee.

61.    As Defendant Sabo told *Barron's* for an article published November 2, 2023, the Company's "basic business model is buying businesses, helping them improve, and then ultimately finding the right home for them through divestiture."

62.    Consistent with its self-described business model of seeking out profitable divestiture opportunities, Compass typically looks to sell holdings after roughly four years of ownership. For example, Compass acquired a hemp-based food company, Manitoba Harvest, for $103 million in July 2015; it sold the company in February 2019 for $294 million. Similarly, Compass purchased Clean Earth, an environmental services company, for $251 million in August 2014, and sold its stake for $625 million in June 2019. Compass took a similar tack with its investment in FOX Factory, a maker of suspension products for off-road vehicles; Compass acquired FOX Factory in January 2008 for $80 million, then completed an initial public offering for the holding in August 2013. Compass realized total proceeds of over $527 million when it ultimately divested FOX Factory. Certain of Compass's current and former officers—including Defendants Sabo, Faulkingham, and Keller—are paid compensation every time Compass divests a subsidiary at a profit. *See infra* ¶¶ 66–67.

63.    Compass pays management fees to CGM which is a separate entity under the Compass umbrella. These fees include the compensation paid to Compass's executive management, all of whom are employees of CGM. Under the MSA in

effect between CGM and Compass during the Class Period, Compass paid CGM a quarterly management fee equal to 0.5% of its consolidated adjusted net assets, or 2% annualized.

64.    In addition to managing Compass's operations, CGM advises the Company's portfolio companies. CGM's relationship with each Compass portfolio company is formalized via an integration services agreement ("ISA"). According to Compass's 2022 Proxy Statement, services provided by CGM to portfolio companies pursuant to these agreements include "reviewing, evaluating and otherwise familiarizing itself with the [portfolio company's] business, operations, properties, financial condition and prospects; familiarizing the [portfolio company's] management team with the Company's periodic reporting, corporate governance and Sarbanes Oxley Act of 2002, as amended ("SOX") obligations; reviewing the [portfolio company's] policies and procedures and, where appropriate, aligning such policies and procedures with other of the Company's subsidiaries; and assisting in establishing a new board of directors, including identifying and engaging outside and independent director resources, if appropriate."

65.    As part of integrating portfolio companies into Compass's operations, Compass contracts with a technology company, Notified, to provide whistleblower services to the employees of Compass's portfolio companies. Specifically, employees of Compass's portfolio companies can anonymously report suspected

misconduct via a third-party website, whistleblowerservices.com. Employees that report misconduct through whistleblowerservices.com receive an acknowledgement of receipt when Compass receives their submission.

66.    As noted above, separate from Compass's payment of management fees to CGM, certain Compass insiders—including Defendants Sabo, Keller, and Faulkingham—receive contribution-based profit allocation payments out of the Company's overall revenues pursuant to their ownership of shares in Sostratus LLC ("Sostratus"), a separate entity in Compass's corporate structure. *See supra* ¶ 27. Sostratus' owners are entitled to receive payments whenever Compass maintains a subsidiary for five years and whenever Compass divests from a subsidiary. While Compass has not disclosed the exact formula used to calculate profit allocation payments, Compass's agreement with Sostratus dictates that the amount of payments should factor in the subsidiary's "aggregate contribution to the Company's profit" and "the Company's cumulative gains and losses to date." Accordingly, the more profit a Compass subsidiary reports, the more Compass's senior executives stand to gain from profit allocation payments on the fifth anniversary of the subsidiary's acquisition and/or when Compass divests from the subsidiary.

67.    Pursuant to the terms of the LLC Agreement, the incomes of Sostratus's owners (including Defendants Sabo, Keller, and Faulkingham) vary widely depending on whether Compass divests from a subsidiary or reaches the fifth

anniversary of a subsidiary's acquisition in a particular fiscal year. These profit allocation payments totaled $60.4 million in 2019; $9.1 million in 2020; $34.1 million in 2021; $0 in 2022; $26.5 million in 2023; and $48.9 million in 2024.

68.    Compass's corporate governance further consists of an Audit Committee composed of three members of the Company's Board of Directors. Per Compass's Proxy Statement filings on Form 14A during the Class Period, the Audit Committee's responsibilities included: (a) retaining and overseeing Defendant GT; (b) reviewing and approving the plan and scope of Compass's internal and external audit; and (c) reviewing the adequacy and effectiveness of Compass's internal controls with the Company's CEO, CFO, and independent auditors.

### b.    Lugano's Background

69.    Compass's cycle of acquisitions continued on September 3, 2021, when the Company acquired a 60% interest in Lugano Diamonds & Jewelry, Inc. ("Lugano")—described in the Company's press release announcing the deal as a "designer, manufacturer, and marketer of one-of-a-kind jewelry"—for $265.1 million. At the time, Defendant Sabo heralded the transaction as a gamechanger for Compass, telling investors that Lugano was "ideally positioned to benefit from the resources and access to capital that CODI will provide and build on [Lugano's] vision and capabilities to become the next major jewelry brand." In the same press

release, Compass announced that Lugano would continue to be led by its existing team, most notably Lugano's co-founder and then-CEO, Moti.

70.    Moti founded Lugano in 2004 and immigrated from Israel to Orange County, California shortly thereafter. Lugano quickly grew, thanks in part to the understated, elegant jewelry pieces that Moti designed and sold. But what set Lugano apart from peer companies was Moti's unique marketing strategy. Moti and his wife, Lugano's COO Idit (together, "the Ferders"), ingratiated themselves with the Southern California business community by donating to and participating in local philanthropies. The Ferders also sponsored charity galas where Lugano jewelry was showcased for the gala's affluent attendees and events on the international equestrian circuit, both potential sources of high-value customers. Leveraging the personal relationships the Ferders formed through these engagements, Lugano positioned itself as a premier purveyor of luxury jewelry for millionaires and billionaires, with its jewelry selling for an average of $115,000 per piece in 2021.

71.    Lugano was also known for its intimate retail locations, which Lugano referred to as "salons" rather than stores or boutiques. Unlike traditional jewelry stores, which are designed to emphasize the visibility of store merchandise, Lugano's salons were designed to resemble private living rooms, replete with custom furniture, cozy fireplaces, and stylish artwork. The layout of these salons

further cultivated Lugano's air of exclusivity, with the Ferders seeking out—and often forming—personal relationships with their upper-class clientele.

72.    Lugano further distinguished itself from other jewelry companies by focusing heavily on sales to repeat customers. Indeed, at Compass's January 17, 2024 Investor Day, Compass presented the following slide reporting that 80% of Lugano's recorded revenues derived from sales to repeat customers—a startlingly high percentage, given that most jewelry companies depend on sales to low-frequency purchasers, *e.g.*, engaged couples looking to purchase wedding rings.



73.    Moti further described this aspect of Lugano's business model in his remarks to Compass investors at the Company's January 17, 2024 Investor Day:

> People buy – especially high net worth individuals, buy
> luxury because they want it, not because they [need it].
> Whether it's shoes, handbags, clothes, cars, art and

everything else is just because I want – I can and therefore I will. . . . These industries are really built where they have eight collections a year. They keep creating inspiration as to why do you need the newer model of a Bentley or a Mercedes or whatever it is, or another pair of shoes. Obviously, you can go with three pairs of shoes, one for running, one for high heels and another one for work. And – but yet people have 20, 30, 50 pairs of shoes.

. . .

We track every step of the movement of the sales funnel, the momentum that you create in a sale, both on the small scale of individual sale and also on a big sale. And the most important part is the 80% retention of clients year-over-year. One of the big challenges in the jewelry industry – and kind of like this is what I said, that momentous occasion buying is bad business is, obviously, the bigger the ticket is, the more effort you need to make to build a better rapport. . . . And for us, the repeat is really the fact that we are able to get our customer to buy 80%, to buy again and again and again, creates a really, really strong model that allows the constant growth, those of you who track like you see that every year in a very significant way. Our average ticket price is going up. And the reason for that is here, is the 80% retention.

74.    Lugano opened its first location in Newport Beach in 2005. By the time Compass acquired Lugano in 2021, Lugano consisted of four salons—Newport Beach, plus stores in Aspen, Palm Beach, and Houston—as well as a pop-up boutique operating out of different stops on the equestrian circuit.

   c.    **In 2021, Compass Acquired Lugano and Attempted to Integrate Lugano into Compass's Operations**

75.    In the press release announcing Compass's acquisition of Lugano, Defendant Sabo presented Lugano as a fast-growing brand that would bring value to Compass's investors, stating:

> "We are excited to bring a growing, luxury goods brand like Lugano to the CODI portfolio of niche-branded consumer subsidiaries," said Elias Sabo, CEO of CODI. "Lugano's deep commitment to product design and authentic connection with its target clientele differentiates it from its competitors. We believe that Lugano, as a trusted jewelry advisor offering a rare combination of exclusivity and service, has a sustainable business model capable of generating significant revenues and growth in both the near- and long-term."

> Mr. Sabo continued: "From our perspective, Lugano is ideally positioned to benefit from the resources and access to capital that CODI will provide and build on the Company's vision and capabilities to become the next major jewelry brand. The Company has demonstrated impressive growth, particularly over the past several years, and is in the process of expanding its talented team. CODI intends to support further growth as Lugano invests in its merchandising strategy, including continuing its retail rollout and expanding its event-driven marketing efforts. We look forward to partnering with the Lugano team to achieve new levels of success for the business in order to deliver value for our shareholders."

76.    Compass's press release also quoted Moti, who described the acquisition as "the culmination of years of work from the entire Lugano team . . . ." Compass's "support," Moti further explained, would "provide us the resources to introduce more clients to Lugano's model."

77.    The terms of Compass's acquisition of Lugano were disclosed to investors in Exhibit 99.2 to the Company's Form 8-K announcing the agreement, filed with the SEC on September 7, 2021. Under the terms of the acquisition, the Company received a majority stake of 60% in Lugano, held through a shell company, Lugano Buyer, Inc. The agreement required Lugano to "afford [Compass] and its Representatives reasonable access, during normal hours and upon reasonable prior notice, to the personnel, properties, books and records of [Lugano] and to any other information reasonably requested for purposes of preparing and reviewing the calculations contemplated by [the acquisition]." The agreement further required Lugano to disclose to Compass the names of customers and suppliers with aggregate purchases of $500,000 or higher over a single year. The agreement also required Lugano to provide Compass a "true and complete list of Inventory all . . . the value thereof and the address at which such Inventory is located."

78.    Despite acquiring a controlling interest in Lugano's ownership, Compass left intact Lugano's management team, including Moti, Lugano's CEO, and Idit, Lugano's COO, both of whom retained shares in Lugano. Other key members of Lugano's management team remained in key roles following Compass's acquisition, including Winston, Lugano's Chief Experience Officer; Moshe, Lugano's Vice President of Information Technology; and Hagit, Lugano's Vice President of Operations.

79.     While Compass left Lugano's management team intact, it installed Compass insiders to key positions on Lugano's Board of Directors. Specifically, Compass ensured the appointment of Defendant Maciariello (who recommended Compass acquire Lugano) and Compass Partner Dalal—the leader of Compass's West Coast Investment Team and a key player in the Lugano acquisition—as Chairman and as a member, respectively, of Lugano's Board of Directors. Compass further recruited two other jewelry industry professionals, former Tiffany & Co. CEO Frederic Cumenal and *Robb Report* vice chair David Arnold, to join Lugano's Board of Directors.

80.     Over the next year, Compass and CGM worked with Lugano's employees to integrate Lugano into the Company's portfolio of subsidiaries. These integration services were governed by the terms of an ISA between Lugano and CGM. Pursuant to the terms of this ISA, Lugano paid CGM $2.3 million in fees each fiscal quarter of 2022, amounting to $9.2 million in total payments to CGM in 2022.

81.     In addition to integration services, CGM and Compass also provided what the Company calls "management services" to Lugano. In exchange for these management services, Lugano paid CGM a yearly fee of $750,000. In addition, Compass paid CGM quarterly management fees equal to 0.5% of Compass's net assets, which then included assets from Compass's shares in Lugano. As disclosed in Compass's Form 10-Q for the quarter ended June 30, 2025, that was filed on

December 29, 2025, Compass currently estimates that Lugano's financial irregularities led CGM to be overpaid $43 million in management fees during the Class Period.

### d. Fueled by Cash Infusions from Compass, Lugano Recorded "Monster" Growth, Leading Compass to Consider Divesting from Its Seemingly Profitable Subsidiary

82. With Lugano ostensibly integrated into the Company's operations, Compass poured millions of dollars of cash into expanding Lugano. These substantial infusions of capital required Compass to repeatedly amend its intercompany credit agreement with Lugano. As disclosed in the Company's Q2 2025 10-Q, filed on December 29, 2025, "[a]mendments were made to the Lugano intercompany credit agreement in the first quarter of 2025 and the first, second, third and fourth quarter of 2024."

83. Compass told investors that Moti was using the Company's capital infusions to expand Lugano's workforce, inventories, and retail footprint. *See infra* Section VI.a. Indeed, the number of Lugano salons more than doubled during the Class Period, with Lugano opening new locations in Greenwich, Connecticut; Ocala, Florida; Miami, Florida; Washington, District of Columbia.; Chicago, Illinois; and London, United Kingdom. Lugano also planned to open—but never publicly announced—a second international location which was going to be in Toronto, Canada.

84.    Compass also oversaw the 2023 opening of Lugano Privé, a members-only club located in Newport Beach's prestigious Fashion Island. Privé functioned as a high-end restaurant and venue, hosting nonprofit meetings, cultural events, and other private gatherings. Membership was limited to existing Lugano clients and extended by personal invitation only.

85.    To investors, Lugano's contribution to Compass's overall financial performance was immediate and significant. For example, Lugano's share of Compass's reported operating income more than doubled over the Class Period from 24% in 2022 to more than 57% in 2024. Furthermore, by the end of 2024, Lugano made up 26.5% of Compass's total assets—nearly double the share of 5.11 (Compass's second-largest subsidiary by total assets), which accounted for 13.9% of total assets. Lugano's success was particularly notable in comparison to the generally disappointing performance of Compass's other portfolio subsidiaries, which struggled due to inflation, tariffs, and other macroeconomic headwinds facing companies during the Class Period.

86.    In its 2024 Form 10-K, Compass reported that Lugano generated more than $162 million in additional year-over-year revenue, accounting for over 21% of Compass's total net sales in 2024. Compass's 2024 Form 10-K also reported that Lugano generated $471 million and $183 million of net revenue and operating

income in fiscal year 2024, respectively, an increase of 52.7% and 82.7% from the previous year, respectively.

87.    Lugano's rapid growth made it the most profitable business in Compass's portfolio and led to a substantial increase in the management fees Compass paid to CGM. In 2022, the first full year after the acquisition, Compass paid nearly $63 million in management fees, compared to approximately $35 million in 2020. Lugano's strong performance in 2024 contributed to Compass paying CGM nearly $75 million in management fees. Indeed, a *Forbes* analysis of Compass's SEC filings found that Lugano's reported assets were responsible for $14 million of the $75 million in management fees Compass received from its nine subsidiaries in 2024—almost one fifth of Compass's total management fees for that year.[5] This increase in CGM fees provided for an increase in the Individual Defendants' compensation. *See supra* ¶ 63.

88.    Analysts noted Lugano's apparent runaway success. For instance, on Compass's Q2 2023 earnings call, an analyst from CJS stated that "we're getting a lot of questions [about] Lugano" and asked Defendant Sabo "what makes this business so different, special from other high-end jewelers?" As another example,

---

[5] Christopher Helman, *The Collapse Of Lugano Diamonds And How It Tarnished Compass Diversified*, Forbes (Feb. 2, 2026, 6:30 AM), https://www.forbes.com/sites/christopherhelman/2026/02/02/theft-fraud-scandal-inside-the-collapse-of-lugano-diamonds/.

on Compass's Q1 2023 earnings call, an analyst from CJS Securities, Inc. highlighted Lugano's "rapid growth" and described Lugano's growth trajectory as "amazing going forward." Similarly, in a report published October 31, 2024, Roth MKM described Lugano as a "[m]onster" that "continues to drive substantial sales and adj[usted] EBITDA growth." On Compass's Q3 2024 earnings call, an analyst from Raymond James & Associates pointed out the frequency of analyst questions regarding Lugano, jokingly framing his inquiry about Lugano's salon expansion as the call's "requisite Lugano question." Encapsulating the market's bullish view on Lugano's contributions to Compass's operations, a March 1, 2024 Roth MKM analyst report described Lugano as the "engine driving CODI's outperformance."

89.    What is more, Compass's own executives publicly acknowledged that Lugano had become integral to the Company's operations. On Compass's February 28, 2024 earnings call, for example, Defendant Faulkingham stated that Lugano "obviously is a pretty, pretty significant percentage of our business now." On Compass's Q2 2023 earnings call, Defendant Sabo called Moti "one of the most visionary CEOs that I've ever had the pleasure of working with" and touted that Lugano could "grow to multiple size of what it is today because it's such a unique mousetrap and so differentiated from everybody else in the industry." On the Company's Q4 2024 earnings call, Defendant Sabo went so far as to frame Lugano as an invaluable hedge against broader macroeconomic trends, saying, regarding

Lugano's affluent customer base: "If the economy does well, they buy. If the economy doesn't do well, they buy."

90.    Further demonstrating Lugano's importance to Compass's operations, Compass hosted its January 17, 2024 Investor Day at Lugano Privé. At the Investor Day event, Defendant Maciariello introduced Moti as "our partner and my friend." In his remarks, Maciariello also described Moti and Idit as "amongst the most generous people I think I have ever met with both their time and their treasure." Moti then addressed Compass's Investor Day attendees, describing Lugano's history, business model, and expansion plans. Moti also took questions from Investor Day attendees.

91.    Lugano's apparent growth culminated in a profile of Moti and Lugano published by *Forbes* on April 11, 2025, entitled: "Inside Lugano Diamonds, Where High Jewelry Has a Higher Purpose."[6] The article raved about Lugano's charitable commitments and "stunning" jewelry, and described Lugano's ostensible growth since its acquisition by Compass. *Forbes* also published a video piece on Lugano's

---

[6] Christopher Helman, *Inside Lugano Diamonds, Where High Jewelry Has A Higher Purpose*, Forbes (Apr. 11, 2025, 6:00 AM), https://www.forbes.com/sites/christopherhelman/2025/04/10/inside-lugano-diamonds-moti-ferder-interview/.

operations, featuring an interview of Defendant Sabo.[7] In the *Forbes* video, Sabo

again called Moti "the most visionary CEO that I've ever met," stating:

> Compass Diversified Holdings made an investment in
> Lugano in 2021 and we've been partners with Moti ever
> since. Moti is probably the most visionary CEO that I've
> ever met. I never would have myself understood how a
> social club [Lugano Privé] could be part of this business
> and how that would make sense, but opportunities like this
> Moti is able to come up with.
>
> . . .
>
> Lugano's growth has been really amazing. It's been the
> fastest growing company we've ever had in our first 3
> years of ownership of a business. I think that Lugano will
> continue to grow because its value proposition and . . .
> what it represents to its customers is outstanding.

92.    Indeed, Lugano appeared so profitable during the Class Period that

Compass executives considered selling it. For example, the April 11, 2025 *Forbes*

profile of Lugano stated that Compass would divest from Lugano if Lugano

"continue[d] to grow at this pace":

> Lugano thrived in Newport, but Ferder knew that if he
> really wanted to build the business, he needed outside
> capital. In 2021, he sold 60% of the company to Compass
> Diversified, a Connecticut-based publicly traded holding
> company, for $200 million. At the time Lugano was
> generating $30 million a year of operating income (Ebitda)
> with an average sale price of $79,000. Since then, Lugano
> has grown to $192 million in Ebitda with an average sale
> of $450,000. Some pieces surpass $10 million. **If Lugano
> continues to grow at this pace, it will soon unbalance**

---

[7] High Jewelry, High Impact: How Lugano Diamonds Is Redefining Retail | Forbes
(YouTube, Apr. 23, 2025), https://www.youtube.com/watch?v=MmcStXdKDdY.

> **Compass' balance sheet, and the diversified holding company will look either to spin it off or sell to a luxury giant such as LVMH**.

93.     Similarly, a lawsuit filed by one of Lugano's former suppliers, Champion Force Industrial Limited ("Champion"), alleges that Moti met at Lugano's headquarters with a Champion representative on January 27 and 28, 2025, to discuss Lugano's outstanding debt to Champion. In these meetings, Ferder told Champion's representative that "CODI was either going to sell Lugano and pay off the debt owed to Champion, or simply kick in the funds to do so if the company was not sold." Compl. ¶ 23, *Champion Force Indus. Ltd. v. Lugano Diamonds & Jewelry Inc.*, No. 30-2025-01499613-CU-BC-CJC (Cal. Super. Ct. Cnty. Orange July 24, 2025). Ferder later told Champion's representative that "Lugano would be sold for somewhere between $1.5 billion and $1.8 billion," and "showed [the representative] messages that Ferder exchanged with CODI regarding the potential sale of Lugano." *Id.* ¶ 25.

94.     Similar allegations appear in a lawsuit brought by another of Lugano's former business partners, Avina LLC ("Avina"), against Lugano, Moti, Idit, and other alleged co-conspirators. Specifically, Avina's complaint alleges that "[i]n or around May of 2024," Moti told Avina he had "hired Goldman Sachs as [Lugano's] investment banker for [a] potential sale, and that Goldman Sachs was targeting a valuation of $2-2.5 billion for Lugano." Compl. ¶ 50, *Avina LLC v. Lugano*

*Diamonds & Jewelry, Inc.*, No. 30-2025-1495834-CU-FR-WJC (Cal. Sup. Ct., Cnty.

Orange July 9, 2025). Avina's allegation is corroborated by the Statement of

Financial Affairs Lugano filed in the Lugano bankruptcy, which acknowledges that

Lugano "issued a financial statement" to "Goldman Sachs" within two years of

December 2025—corresponding to the time period during which Compass and Moti

were allegedly considering a Lugano sale. Official Form 207 at 8, *In re Lugano*, No.

25-12055-BLS (Dec. 12, 2025), ECF No. 179-1.

95.    Compass's own representations to investors further indicate that the

Company was considering selling Lugano during the Class Period. For example, on

Compass's November 2, 2023 investor call, an analyst noted the unusually high

amounts of capital the Company was expending on Lugano, asking, "is there a point

at which that doesn't become ideal, given how much working capital that business

can consume and utilize?" Defendant Sabo's response conceded that the Company

was considering a partial divesture from Lugano:

> [Lugano] is going to continue at these growth rates.
> Clearly, we would be all ecstatic if it can continue at these
> growth rates. And given the return on invested capital,
> we're enjoying, we would love to fund that. But your point
> is very well taken. And what we don't want to do is
> essentially be a proxy for any one company. And so to the
> extent that its growth was starting to overwhelm us, that
> potential opportunity to kind of seek alternative financing
> and outside financing while still being part of the CODI
> portfolio clearly exists for us.

96.     Similarly, on the Company's May 1, 2024 investor call, an analyst asked whether Compass was considering "sell[ing] a minority interest" in Lugano. Defendant Sabo denied any explicit plans to divest from Lugano but acknowledged that such divesture options "exist[ed]" for the Company. As an example of possible options, he cited the Company's former subsidiary Fox Factory, which Compass guided through an initial public offering in 2013.

97.     At Compass's next earnings call on July 31, 2024, Defendant Sabo again acknowledged that Lugano would "become a bigger part of CODI unless we do something creatively with it." Sabo went on to explain that this could entail "anything from a divestiture, which clearly, that is part of our strategy . . . [or] continuing to own it and financing it in a more creative way."

98.     Had Compass divested from Lugano, certain members of Compass's executive management—including Defendants Sabo, Keller, and Faulkingham—would have received a portion of Compass's profits from the divestiture through their shares in Sostratus.

### e.    Unknown to Investors, Compass Failed to Address and Correct Lugano's Financial Irregularities Before and After the Acquisition

99.     As Compass itself has acknowledged, Lugano's financial irregularities—and Defendants' corresponding fraud—were enabled by previously undisclosed material weaknesses in Compass's and Lugano's internal controls over financial reporting ("ICFR"). Indeed, Compass recklessly disregarded red flags concerning

Lugano's financial irregularities that were visible to it. As former employees of Compass and Lugano recall—and as news articles, court filings, and Compass's and Lugano's own disclosures all corroborate—the Compass Defendants (i) failed to conduct adequate due diligence into the Lugano acquisition, ignoring ample signs of Lugano's financial irregularities; (ii) implemented inadequate monitoring controls, leading to oversight of Lugano that enabled conflicts of interest and nepotism; and (iii) either ignored, overlooked, or did not seriously investigate obvious deficiencies in Lugano's financial reporting and practices after the acquisition, including at least two whistleblower reports disclosing financial irregularities presented directly to Compass by then-employees of Lugano, causing the Company to consistently and dramatically overstate Lugano's and thus Compass's revenues.

### i. Compass Failed to Conduct Adequate Due Diligence During the Lugano Acquisition, Ignoring Ample Signs of Lugano's Irregular Financial Practices

100. Lugano's financial irregularities did not suddenly spring into existence after Compass acquired Lugano; rather, they were long-time practices of Lugano, emblematic of a corporate culture inappropriately focused on the appearance of high sales at the expense of compliance with longstanding and widely accepted accounting rules and norms. Defendants' inadequate due diligence during the Lugano acquisition contradicted Compass's statement to investors that it had

performed "rigorous" due diligence into potential acquisitions. *See infra* Section VI.a.i.

101.   Prior to Compass's acquisition of Lugano, Lugano routinely engaged in transactions wherein Moti or another Lugano salesperson would solicit an investor—typically, a preexisting Lugano client—to contribute funds to the purchase of a diamond for Lugano to resell or turn into jewelry. In exchange, the investor received a partial ownership interest in the purchased stone. In addition, the investor received an option to obtain full repayment of their share in the initial purchase price. Lugano called these transactions "investment diamond transactions." While such investment diamond transactions are not necessarily illicit, accounting rules and standards obliged Lugano to record the investor's repayment option as a liability.

102.   FE 6 recalled that, during his tenure, Moti openly discussed engaging in investment diamond transactions with staff, but these transactions were not recorded in Lugano's financial reports. In addition, FE 6 suspected that Lugano promised the same stone to different investors in multiple investment diamond transactions, even further compromising the validity of these recorded sales.

103.   FE 8 also recalled that Lugano engaged in investment diamond transactions during his tenure, which overlapped with Compass's acquisition of Lugano. FE 8 recounted that the terms of these investment diamond transactions were suspicious on their face, as Moti promised clients that the transactions would

46

generate returns as high as 20% in as little as six months. FE 8 likened these transactions to a "get-rich-quick-scheme" where the "math never matched." Lugano asked FE 8 to identify and approach clients for potential investment diamond transactions, but he refused, feeling "uncomfortable" with the arrangement.

104.   FE 6 believes that Lugano's apparent sales growth prior to the Compass acquisition was due in part to Lugano's improper recording of these investment diamond transactions entirely as sales revenue. When FE 6 left Lugano in 2016, Lugano reported around $10 million in annual sales revenue. A mere five years later, as reported in Compass's 2021 10-K, Lugano recorded over $125 million in net sales and over $29 million in income from operations, a massive increase that FE 6 thought to be highly suspicious.

105.   Further corroborating his belief that Lugano "cooked" its books prior to Compass's acquisition of Lugano, FE 6 recalled that Idit contacted him after FE 6's departure from Lugano, seeking information about Lugano's financial statements. During their conversation, Idit remarked to FE 6 that Lugano's books for 2015 and 2016 would "have to be redone." FE 6 interpreted Idit's remarks as confirmation that Lugano's records were reconstructed to inflate revenues.

106.   These improperly recorded investment diamond transactions were not the only red flags Compass failed to detect during its due diligence into the Lugano acquisition. As FE 6, FE 4 and FE 7 recall, in the period leading up to Compass's

acquisition, Lugano maintained inadequate inventory controls, inappropriately comingled personal and business spending, and even orchestrated a complex scheme to evade California sales tax.

107.   Presaging Compass's own difficulties implementing inventory controls at Lugano, *see infra* Section IV.e.iii.(3), FE 6 recalled attempting to implement a formal inventory system during his tenure at Lugano. However, FE 6 quickly discovered that Moti personally dictated inventory values as a matter of opinion, not cost, virtually guaranteeing that Lugano's inventory values were inflated. In FE 6's view, this subjective valuation approach, combined with Moti's exclusive control over Lugano's loose diamond safe and the absence of formal counts, meant Lugano lacked effective controls to prevent inventory manipulation.

108.   On the rare occasions that independent third parties examined Lugano's inventory, they found troubling and systematic misrepresentations. FE 6 recalled that, in 2015, an Orange County bank offered Lugano a $500,000 credit line, on the condition that Moti present six of Lugano's pieces for appraisal by a third party. The independent appraiser debunked Lugano's assessment of the merchandise, asserting that Lugano had misstated the size of a strand of pearls and that it had concealed the true grade of a purportedly valuable yellow diamond.

109.   FE 6 also recalled that Moti extensively commingled personal and business spending. For example, when FE 6 could not substantiate Lugano's American

Express charges, FE 6 booked them to capital, reasoning, "where else was I going to put it?" FE 6 repeatedly told Moti to follow formal processes for expenses, telling him, with respect to his check-writing practices, "you can't do this." In response, Moti made concerted efforts to avoid FE 6 when he was writing checks.

110.    Similarly, FE 4 recalled coming across "two or three wire transfers" Lugano had made to the Israeli Defense Force. He told his supervisor, then-CFO Scott Sussman, about these suspicious transfers; Sussman replied that they were legitimate charitable donations, and Lugano recorded them on Lugano's books as owner draws. While FE 4 does not recall the precise amounts of these transfers, he characterized them as "not small."

111.    Also troubling to employees was Lugano's elaborate use of fake shipping labels to avoid California sales tax. FE 7 explained that, from approximately 2014 until roughly 2018, Moti would summon FE 7 to his office, close the door, and dictate out-of-state residential addresses for FE 7 to use on outbound shipping labels. Lugano then used these labels to record sales to California-based customers as sales to customers based outside of California, thus avoiding California's 7.25% sales tax.

112.    FE 7 recalled that Lugano's sales tax evasion scheme became more complicated over time. At first, Lugano created the appearance of out-of-state sales by affixing the labels to empty boxes that it shipped to the out-of-state addresses provided on the labels. As the practice evolved, Moti would circulate the labels to

Lugano's accounting department, which would in turn readdress invoices to create the appearance of sales to the listed out-of-state addresses; Lugano would then void the labels so that no box ever shipped.

113.   This practice raised alarm bells with Lugano's secure shipper, Malca-Amit. FE 7 recalled that Malca-Amit noticed Lugano's high rate of voided labels and reached out to Lugano, asking why Lugano was cancelling so many shipments.

114.   FE 6 became aware of Lugano's practice of creating false shipment documentation to avoid California sales tax in 2015. Incensed, FE 6 refused to sign any sales tax returns or other government filings that he perceived as distorted by this practice. Ultimately, these returns were instead signed by the assistant of Lugano's outside accountant. The fact that many of Lugano's sales tax returns were signed by a low-level employee of Lugano's outside accountant should have been a red flag prompting additional investigation by Compass's due diligence team.

115.   As detailed above, in the period leading up to Compass's acquisition, Lugano engaged in conspicuous financial irregularities, such that adequate due diligence would have revealed that Lugano's financial reporting could not be trusted. Yet Compass's due diligence failed to act on or even investigate multiple red flags revealing the dubious quality of Lugano's financial representations.

116.   For example, Dalal—the Compass partner who spearheaded the Lugano acquisition and later served on Lugano's board—spoke with one of Compass's

creditors, Champion, during the due diligence period. According to Champion, "before CODI bought Lugano in September 2021, CODI partner Raj Dalal invited Champion's contact person with Lugano, David Patish, to a virtual Zoom meeting titled 'Supplier Diligence – Lugano.'" Compl. ¶ 14, *Champion Force*, (July 24, 2025). By the time of Dalal's meeting with Patish, Lugano had already racked up a balance owed to Champion, a key supplier, for unpaid goods. *Id.* at ¶ 2. Had Compass conducted adequate due diligence, it would have detected and followed up on Lugano's balance of unpaid goods to Champion.

117.    Indeed, Compass even failed to contact FE 6 during the acquisition process, even though FE 6's involvement as Lugano's first-ever CFO would have been essential to fulfilling Lugano's due diligence obligations. The very terms of FE 6's departure from Lugano should have been a red flag to Compass's due diligence team, as FE 6's separation agreement explicitly indemnified him in the case that Lugano was sued for misusing FE 6's signature on financial documents—a highly suspicious stipulation for a former employee as senior as FE 6.[8] FE 6 expressed that,

---

[8] Specifically, FE 6's separation agreement contained a clause stating: "Company [Lugano] and [Moti] Ferder represent and warrant that Employee shall have no responsibility or liability for any subsequent reviews, audits, adjustments, or other actions that may be taken with respect to Company or Ferder or any taxing or regulatory agency. Ferder agrees to indemnify and hold employee harmless from any liability, demands, damages, expenses, and attorney's fees incurred as a result of any person or entity asserting any claim against employee with respect to any actions or omissions by employee with respect to any accounting issues or decisions

had he been contacted by Compass's due diligence team during the acquisition process, he would have informed them of Lugano's improper recording of investment diamond transactions as revenue, efforts to avoid sales tax, and other suspicious practices.

####    ii.    Throughout the Class Period, Compass's Inadequate Oversight of Lugano Enabled a Dysfunctional Workplace Rife with Nepotism and Conflicts of Interest That Impaired the Company's Ability to Act on Red Flags

118.    Before and after the acquisition of Lugano, Compass represented to investors that there had been no changes in the Company's ICFR. However, as the Company admitted in the Restatement, Compass's oversight of Lugano was marked by systemic failures, such that Compass ultimately disclosed ten material weaknesses in Compass's internal controls during the Class Period. These material weaknesses went hand-in-hand with the corporate cultures of Lugano and Compass. Lugano was a dysfunctional work environment, marked by retaliation, conflicts of interest, nepotism, and information silos. Meanwhile, the perks of Compass's affiliation with Lugano brought Compass's executive management into Moti's inner circle, such that Compass's executive management were proximate to—yet, because

---

while employee occupied the position of Chief Financial Officer." FE 6's separation agreement was signed by Moti both in his personal capacity and in his capacity as Lugano's then-Owner. FE 6's separation agreement is dated February 24, 2016.

of the conflicts of interest presented by the perks of Lugano ownership, willfully blind to—Lugano's financial irregularities.

> **(1)    With Compass's Acquiescence, Lugano Operated a Dysfunctional, Siloed Workplace Where Moti's Allies Occupied Key Roles and Employees Faced Retaliation**

119.   Former employees described Lugano as a heavily siloed workplace marked by favoritism and secrecy. For example, FE 11 described Lugano as a cliquey workplace where only favored employees were trusted with sensitive dealings. FE 9 agreed that Moti's "extreme secrecy" was a "red flag." For example, he recalls being instructed never to ask the names of Moti's guests at Privé.

120.   Former employees also described Lugano as a toxic workplace where dissenting employees faced retaliation. For example, FE 2 recalled that he repeatedly expressed concerns to Moti about Lugano's sales practices and business model. However, Moti avoided answering his questions. Instead, Moti would answer with a business story about a successful sale Moti had made and say, "I need you to be a leader. I need you to lead." FE 2 believes that he was fired in retaliation for repeatedly raising concerns to Moti. He recalled that Lugano's workplace culture favored "true believers" who accepted Moti's statements at face value without raising concerns about Lugano's financial irregularities.

121.  Similarly, after FE 8 raised questions about Lugano's financial irregularities, management repeatedly shuffled him into new roles, a move he

interpreted as management's deliberate effort to sideline him. FE 8 likened Lugano's mistreatment of dissenting employees to an "abusive family."

122.   Former employees also noted the suspicious involvement of Moshe and Hagit Partouche, longtime family friends of the Ferders, in high-level roles as Lugano's Vice President of Information Technology and Vice President of Operations, respectively. FE 5 recalled that Moshe and Hagit were "best friends" of the Ferders. FE 10 agreed that the Partouches worked closely with the Ferders and were deeply involved in Lugano's operations and compliance. FE 9 suspected that the Partouches were complicit in Lugano's financial irregularities, given Moshe's lifelong friendship with Moti and Hagit's finance-related role.

123.   In addition to the Partouches, Moti's wife Idit and his son Tom held key positions at Lugano. FE 7 described Idit, his supervisor for several years, as "openly abusive" and "complicit in Lugano's image-making." He further believed that Idit was aware of or at a minimum suspected Lugano's financial irregularities, as she often cautioned Moti not to do things that might "get [them] in trouble." FE 9 agreed that Idit played a key role in Lugano's operations, noting that, if Moti was Lugano's "head," Idit was Lugano's "neck," advising and influencing Moti's business decisions.

124.   FE 10 recalled that Tom was young and inexperienced, and believed that Tom advanced rapidly through Lugano because of his parents' influence.

### (2)   Compass Executives Enjoyed the Perks of Affiliation with Lugano, Blinding the Company to Lugano's Obvious Financial Irregularities

125.   Affiliation with Lugano entitled Compass's executives and members of Compass's Board of Directors to special deals on Lugano jewelry. FE 5 recalled that Defendant Sabo, Defendant Keller, Enterline and Dalal visited his salon, and that these executives purchased Lugano jewelry at discounted rates and placed special orders. Similarly, FE 11 recounted that he sold roughly $500,000 in jewelry to a member of Compass's Board of Directors in the span of a year. FE 11 also recalled that Defendant Sabo was a frequent Lugano client, although FE 11 never sold jewelry to him personally. FE 1 confirmed that certain members of Compass's upper management received discounts on Lugano jewelry.

126.   Another perk of Compass's ownership of Lugano was Compass executives' access to Privé, Lugano's exclusive members-only club. As a Privé employee, FE 9 frequently observed Defendant Sabo, Defendant Maciariello, and Dalal at Privé events. All three men were Privé members. When FE 9 began his employment at Lugano in August 2023, these Compass executives visited Privé roughly once a week; by the end of his tenure in 2025, they visited Privé approximately once a month. He further recalled seeing Defendant Sabo purchase Lugano jewelry for his girlfriend. FE 9 believed that these visits were personal rather

than business-related, as he only observed the executives discussing personal topics like children and marriage anniversaries rather than Compass or Lugano matters.

### iii. Despite Compass Executives' Involvement with Lugano, the Company Overlooked Obvious Red Flags in Lugano's Practices, Causing the Company to Materially Misstate Lugano's Financial Performance

127.    As Compass admitted in the Restatement, Lugano's financial irregularities caused Compass to materially misstate Compass's revenues, earnings, and other key financial figures across twelve consecutive financial quarters, from the first quarter of 2022 to the fourth quarter of 2024. Yet Lugano's financial irregularities were far from hidden. As former employees of Lugano and Compass recall, Compass struggled with Lugano over Lugano's consumption of working capital and inadequate compliance with SOX. Former employees of Compass and Lugano further recall that Lugano engaged in rampant financial irregularities, including but not limited to the recording of investment diamond transactions as revenue without a corresponding liability. Similar allegations appear in lawsuits brought against Moti and Lugano by Lugano's customers and suppliers, which claim that Lugano routinely pocketed the funds contributed by investors in investment diamond transactions without intending to repay the investors. Defendants knew or recklessly disregarded these irregularities and their effect on Lugano's financial reporting. Indeed, Compass received but, unfortunately for investors, failed to act on at least two whistleblower reports detailing Lugano's financial irregularities.

### (1) Under Compass's Ownership, Lugano Pursued Aggressive Sales Tactics, Chasing the Appearance of Growing Sales Above All Else

128.   As Compass admitted in the Restatement, Moti's actions and business practices

> created a culture focused on financial performance at all costs in order to satisfy (or not disobey) [Moti], as opposed to creating the culture of commitment to ethics and compliance expected of a subsidiary of a publicly traded corporation.

Former Lugano employees confirm that this focus on financial performance at all costs was a feature of Lugano's corporate culture, apparent to anyone involved in Lugano's operations.

129.   Indeed, this inappropriate tone at the top was already a hallmark of Lugano's operations when Compass acquired Lugano. As FE 7, a Lugano employee from March 2014 to December 2021, put it, Moti was an aggressive salesman whose avowed goal was to move money from wealthy clients "into [Moti's] wallet." He summarized Moti's sales philosophy as "there's no relationship unless they buy something," such that Moti's intense relationships with Lugano's repeat customers often blurred the lines between the personal and the professional.

130.   Lugano's aggressive approach to jewelry sales continued after Lugano was acquired by Compass. FE 5 described Lugano's sales environment as unusually high-pressure, built on aggressive and sometimes coercive tactics. Moti, he recalled,

instructed staff to urge that clients liquidate stocks or even sell their homes to purchase multi-million-dollar jewelry.

131.   FE 5 further recalled that Lugano sales staff were expected to attend galas, cultivate relationships, and enter sales prospects into Lugano's Customer Relationship Management ("CRM") system. Lugano's salespeople also searched potential clients' wealth status through Thomas Reuters' CLEAR software. If the potential client was sufficiently wealthy, Moti and other Lugano sales staff would "relentlessly pressure" the potential client to "purchase high-value stones."

132.   Similarly, FE 11 recalled Lugano's Newport Beach salon positioning a $300,000 piece to a client. When a salesperson questioned whether the client could realistically afford to purchase additional Lugano jewelry in the near future, Moti responded, in all sincerity, that the client could "sell her house." FE 11 said this response reflected Lugano's culture of aggressive sales tactics and disregard for clients' circumstances.

133.   FE 5 recounted an incident at a Privé Christmas party in 2024 where Moti instructed him to remove a gold chain and place it around a client's neck, telling the client to try it on. The client did not want it and removed the chain, but Moti pressured FE 5 to do it anyway. FE 5 stated instances like these were a common practice.

> **(2)    Lugano's Reported Sales Outpaced Actual Customer Traffic, Causing Lugano**

**Employees—and Compass Insiders—to Develop Concerns**

134.   For a time, it appeared to outsiders that Lugano's aggressive sales tactics were successful, as Lugano reported continuous sales growth from 2022 to 2024. But within Lugano, employees scratched their heads at Lugano's sales numbers, which seemed grossly disproportionate to Lugano's meager on-the-ground sales traffic.

135.   FE 5 recalled that Lugano's sales staff, including himself, were confused by the rapid sales growth numbers Lugano projected internally and externally. Within FE 5's salon, FE 5 and a colleague "speculated that Moti was overinflating sales numbers." FE 5 even recalled Compass board chair Larry Enterline expressing suspicion about Lugano's numbers during a store visit in April 2025. Enterline candidly commented that in light of the recently published *Forbes* article, *see supra* ¶ 91, Lugano's reported figures seemed "crazy high" and overblown.

136.   FE 10 recalled that Lugano routinely circulated sales reports that consisted of two separate spreadsheets—one including only the sales generated by Lugano's retail sales staff, and another incorporating Moti's personal sales in addition to retail sales. Moti's sales were often extremely large and would appear late in reporting periods, effectively making up for shortfalls and ensuring that monthly or quarterly targets were met.

137.   FE 10 further noted that sales were sometimes added to store or territory figures even when the local sales team had no involvement in or knowledge of the transactions. For example, FE 10 noticed large sales to clients of his particular salon that no one at that salon had worked on or even been aware of. When the salon's staff questioned these sales, they were told that the sales were handled exclusively by Moti and instructed not to contact the client.

138.   FE 10 further stated that multi-million-dollar sales would sometimes appear in Lugano's sales figures suddenly without explanation. This reinforced FE 10's belief that Lugano's financial reporting did not reflect Lugano's actual operational activity.

139.   FE 8 agreed that the math behind Lugano's business model "never matched." For example, he recalled being stationed for a year at Lugano's salon in Ocala, Florida. Sales at the Ocala salon were "relatively small" and "heavily dependent on a handful of multi-million-dollar purchases from Moti's personal clients."

140.   Despite the conspicuously slow traffic at salons, Lugano continued to report massive sales growth, enriching both the Ferders and, through the increased management fees CGM received based on Lugano's contribution to Compass's total assets, Compass's senior management.

(3)    **Behind Closed Doors, Compass Confronted Lugano Over Lugano's Deficient Inventory**

**Controls, Aggressive Capital Consumption, and Resistance to SOX Compliance**

141.  Throughout the Class Period, Compass clashed with Lugano's leadership regarding Lugano's aggressive capital consumption and resistance to implementing improved ICFR. Yet, despite these repeated confrontations, Compass did not follow through and chose to ignore or recklessly disregard Lugano's financial irregularities while representing to investors that Compass's investment in Lugano was a runaway success.

142.  FE 1 recalled "disagreements" between Moti and Compass's management in or around the second half of 2024 regarding Lugano's additional financing requests. According to FE 1, Moti initially framed these additional financing requests as necessary to fund Lugano's continued growth and inventory expansion. However, Compass became increasingly resistant to supplying such financing, in part because Compass's other subsidiaries also required capital. These disputes, which FE 1 learned about through colleagues at investment team meetings, involved Moti as well as Defendants Sabo, Keller, and Maciariello.

143.  Compass also fought with Lugano over Lugano's resistance to implementing SOX procedures. Specifically, FE 3 recalled that he, Perushek, and FE 12 worked with Compass's internal audit team to test Lugano's SOX controls in 2022 and 2023. Compass's audit team included Ami Vearrier (who led the group's meetings), Barbara Anderson, and Nicolette Nguyen. According to FE 3, Moti

stymied the group's efforts by failing to provide the transaction documentation necessary to test Lugano's controls. This annoyed the members of Compass's internal audit team, who frequently expressed frustration regarding Moti's documentation practices in the group's weekly status meetings.

144.    FE 3 further recalled that, during these weekly status meetings, Compass's internal audit team noted that the Company's Head of Risk and Controls had directly confronted Moti on several occasions regarding his failure to provide adequate documentation. This occurred during Lugano's SOX-testing phase, in late-quarter 2022 into the first quarter of 2023.

145.    Despite the intervention of Compass's Head of Risk and Controls and constant reminders from Compass's internal audit team, Moti continued to delay providing supporting documentation for transactions. FE 3 recalled that Moti's responsiveness in providing supporting documentation was consistently bad throughout FE 3's entire tenure.

146.    FE 3 recalled asking Perushek, Compass's Controller, why this documentation was difficult for Lugano to produce. Perushek provided the excuse that Moti conducted business informally, relying on handshake deals and verbal contracts. Perushek further explained to FE 3 that Moti attributed his use of these practices to purported industry norms, in particular the concern that excessive

paperwork would ruin the "curated experience" for Moti's clients and negatively impact his longtime cultivated relationships in the jewelry business.

147.    According to FE 3, Compass and Lugano "tried hard" to change Moti's sales documentation practices, but these efforts were never successful and Compass executives never stepped in. Moti would not change and Compass tolerated it. FE 3 understood that, eventually, Compass's internal audit team relented and "reached a comfort level sufficient to close out testing items" despite Moti's failure to timely produce supporting documentation. Nevertheless, Compass's internal audit team still seemed uneasy with Moti's practices. For example, FE 3 recalled that Vearrier "grew frustrated as deadlines neared and testing remained open, particularly where documentation for some of [Moti's] transactions was outstanding." A recurring trend in weekly meetings of Compass's internal audit team was that, whenever the team actually located documentation materials, these materials were found "somewhere on Moti's desk"—hardly the formality one would expect at the largest subsidiary of a publicly-traded company like Compass.

148.    FE 12 confirmed that obtaining Lugano's sales documentation, particularly shipping labels, was a challenge in 2022 and 2023 as FE 12, FE 3, and Perushek worked with Compass's internal audit team to implement new SOX procedures. FE 12 recalled that Moti and Lugano's sales team were slow in, and resistant to, providing the requested supporting documents. By the end of 2023,

Lugano was generally complying with audit timelines, yet Moti and Lugano's sales team still dragged their feet in providing supporting documentation.

149.   By virtue of their roles at Compass and responsibilities with respect to Compass's management of Lugano, each of the Individual Defendants knew or recklessly disregarded the existence of the tensions between Compass's internal audit team and Lugano regarding Lugano's deficient implementation of SOX procedures. As noted in his description on Compass's website, "[a]s CFO [Defendant] Stephen [Keller] is responsible for the firm's financial controls, accounting and reporting, as well as risk assessment on a public company level." Thus, Defendant Keller knew or recklessly disregarded that Compass's internal audit team was struggling to implement adequate financial controls and reporting at Lugano, the Company's most important subsidiary. The same is true of Defendant Faulkingham for the period in which he served as Compass's CFO and thus had authority over the Company's financial controls, accounting, and reporting and of the Audit Committee as well.

150.   As noted in his description on Compass's website, "[a]s COO, [Defendant] Pat[rick] [Maciariello] [was] responsible for the financial and strategic oversight of the firm's portfolio companies." Accordingly, Defendant Maciariello had responsibility over and visibility into Lugano's financial operations and thus knew or recklessly disregarded that Lugano's financial operations were struggling to

implement adequate financial controls and reporting due to Moti's resistance and obfuscation. Moreover, Defendant Maciariello also served as Chair of Lugano's Board of Directors, which gave him further visibility into Lugano's financial operations, including Lugano's ongoing struggle to implement adequate financial controls and reporting yet did not take effective steps to rein in Moti.

151.   As Compass's CEO, Defendant Sabo had final authority over Compass's relationships with its subsidiaries, including Compass's relationship with its most important subsidiary, Lugano. Moreover, Defendant Sabo repeatedly spoke to investors regarding the topic of Lugano's profits and operations with authority, saying, for instance, that Moti was "one of the most visionary CEOs that I've ever had the pleasure of working with." Accordingly, Defendant Sabo knew or recklessly disregarded that Lugano's financial operations were struggling to implement adequate financial controls and reporting.

152.   Although FE 2 did not work directly with CODI's audit team in his capacity as salon director, he recalled understanding that CODI's audit team was actively reviewing Lugano's finances during and after his tenure. In particular, he recalled a conversation with a former Lugano colleague in Spring 2024, in which the former colleague told him that "CODI people" were "in the salons doing audits."

153.   Despite the red flags raised by Lugano's resistance to implementing SOX procedures—and, indeed, Perushek's Autumn 2024 whistleblower report presenting

Lugano's financial irregularities to Compass's internal audit team, *see infra* Section IV.e.iii.(4)—Compass did not begin investigating until Spring 2025.

> **(4)    Lugano's Revenues Were Inflated by Improperly Recorded Investment Diamond Transactions**

154.   Despite its acquisition by Compass, a publicly traded company governed by SOX, Lugano continued its pre-acquisition practice of improperly recording investment diamond transactions. As FE 12 explained, these investment diamond transactions contained at least two troubling elements. First, the terms of the transactions were absurdly generous to Lugano's clients, with Lugano guaranteeing a minimum return on the stone as well as an option for the client to demand full repayment of their investment. Second, the transactions were recorded as standard sales with ordinary invoices, shipping documents, and payment records. Speaking from his experience and knowledge as a CFO, FE 12 emphasized that this approach constituted improper revenue recognition because the diamond's title did not transfer, and because Lugano's obligation to repay the client's investment was an unrecorded contingent liability.

155.   FE 12's account of Lugano's diamond transactions is corroborated by Lugano's own allegations in Lugano's lawsuit against Moti. According to the most recently amended version of Lugano's complaint against Moti, Moti "***concealed and mis[re]presented the nature of numerous financing transactions he entered into***

with third party, high net worth individuals . . . ." Am. Compl. ¶ 2, *Lugano*

*Diamonds & Jewelry Inc. v. Mordechai Ferder*, No. 30-2025-01492210-CU-CO-

CJC (Cal. Sup. Ct., Cnty. Orange Nov. 26, 2025) (emphasis added). Lugano's

Complaint further alleges that these transactions "***created potential liabilities for***

***Lugano, but Moti disguised them as direct sales***." *Id.* (emphasis added).  Lugano's

Complaint elaborates:

> ¶ 17. Notwithstanding Lugano's 2021 agreement with
> Compass Diversified, ***Moti entered into numerous***
> ***unauthorized transactions . . . outside of Lugano's***
> ***ordinary retail business, with high-net-worth individuals***
> ***in California, Florida, and other states***.
>
> ¶ 18. Although the specific terms of each of these
> [investment diamond transactions] varied, they adhered to
> a common scheme orchestrated by Moti. In each instance,
> Moti represented to the third party that Lugano already
> owned or intended to acquire a specific diamond—
> purportedly verified by a unique identification number—
> and expected to sell it at a significant profit. Moti proposed
> that Lugano and the third party would each contribute a
> percentage of the purchase price or that the third party
> could purchase a percentage interest in the diamond
> purportedly already owned by Lugano. Moti further
> represented that the anticipated profits from the sale of the
> diamond would be shared *pro rata* with the third party.
> ***Alternatively, if the third party chose not to wait for***
> ***resale, Moti promised that Lugano would return the***
> ***third party's funds, plus a guaranteed, and substantially***
> ***above market, interest rate***.
>
> . . .
>
> ¶ 20. To sustain the illusion that Lugano had completed
> legitimate diamond sales, Moti forged invoices and other
> documentation purporting to evidence arms-length

transactions. In some cases, Moti arranged for empty boxes to be shipped to addresses across the United States, including, for example, to Montana, so that he could point to shipping records as false proof that the transactions had been fulfilled. These fictitious documents and shipping records were then presented to auditors and others as legitimate proof of sales, when in fact, they were manufactured to complete the illusion of sales.

. . .

¶ 22. Moti used Lugano funds to repay some of the third parties. In at least some instances, Moti concealed these outgoing repayments to the third parties as payments to vendors. ***But Moti did not repay all the third-party investors, which potentially exposed Lugano to over $100 million in liability.*** Several third parties have already sued Lugano in relation to the [investment diamond transactions].

(emphasis added).

156.   A *Forbes* exposé of Lugano and Compass, published February 2, 2026, further explained the deceptive nature of Lugano's investment diamond transactions and how these transactions were inaccurately reported in Compass's financial statements:[9]

The core of [Lugano's] alleged scam, according to copies of contracts included in court filings, seemed to involve selling stakes in specific diamonds to rich clients by promising them hefty profit splits when the stones were fitted into jewelry and ultimately sold to a different rich client. While they waited for someone to buy the piece, Ferder promised to pay interest on their capital.

---

[9] Helman, *supra* note 5.

One such plaintiff, Kristoffer Winters, claims he's owed $9 million for diamond investments he made in 2023 and 2024. Contracts show he paid Ferder $3 million to buy 50% of three diamonds. While Ferder worked to find a buyer he allegedly promised to pay Winters interest of 10% of principal *per month*. After one interest payment, Winters says he received nothing and now believes Ferder may not have owned the diamonds at all.

**According to Compass's SEC filings, Lugano's books reflected cash inflows from such sales as ordinary revenues. Nowhere did it note that Lugano was obligated to repay the principal or share any profits.**

(emphasis added).

157.    Some of Lugano's investment diamond transactions have been published as exhibits in lawsuits brought against Moti and Lugano by Lugano's former investors. As one example, Raymond Cohen's lawsuit against Moti cites a December 27, 2024 agreement between Lugano and Cohen, setting out that Lugano would purchase a diamond for $4.5 million, which Lugano certified was 30% to 35% below the wholesale market value for a diamond of similar specifications. The agreement further provided that Lugano and Cohen would both contribute $2.2 million to the diamond's purchase, and that Lugano and Cohen would own equal 50% interests in the diamond. Crucially, the agreement also provided that Lugano would "pay Cohen his $2,200,000 investment (in cash), plus interest at a rate of 9% per annum[,]" if Cohen wished to "cash out" his investment, so long as Cohen provided "2 months prior notice to Lugano." Similarly, the agreement permitted Cohen to demand his $2.2 million investment plus interest "[i]n the event that the value of the Diamond is

not as represented, or falls within the time frame between purchase and eventual sale[.]" Compl. ¶ 14, *Cohen v. Lugano Diamonds & Jewelry, Inc.*, No. 30-2025-01490111-CU-BC-NJC (Cal. Sup. Ct., Cnty. Orange June 16, 2025), ROA No. 2.

158.   Similarly, a complaint filed by another former Lugano client, Ken Kraus, alleges that Kraus and Lugano engaged in "more than a dozen" investment diamond transactions "[d]uring the period from 2017 through Ferder's abrupt departure in May 2025." Compl. ¶ 2, *Kraus v. Lugano Diamonds & Jewelry, Inc.*, No. 30-2025-01490165-CU-BC-CJC (Cal. Sup. Ct., Cnty. Orange June 16, 2025). The terms of Kraus's investment diamond transactions with Lugano mirror those of Cohen's.

159.   Another Lugano claimant, Barry Aronoff, alleges that Lugano approached him "over 15 more times" between June 2020 and November 2023 regarding potential investment diamond transactions. Compl. ¶ 16, *Aronoff v. Ferder*, No. 30-2025-01490509-CU-FR-NJC (Cal. Sup. Ct., Cnty. Orange June 17, 2025). The terms of Aronoff's investment diamond transactions with Lugano mirror those of Cohen's.

160.   Likewise, another set of Lugano claimants, Cassanda and Paul Hazen, allege that they engaged in three investment diamond contracts with Lugano, taking place in February 2021, February 2022, and January 2023. Compl. ¶¶ 13–15, *Hazen v. Lugano Diamonds & Jewelry Inc.*, No. 8:25-cv-01931-FWS-KES (C.D. Cal. Aug. 28, 2025), ECF No. 1. In its Answer filed in the *Hazen* litigation, Lugano admitted that it received payments from the Hazens on dates corresponding to some of the

alleged investment diamond transactions, without admitting to the nature of these payments. Answer ¶¶ 14–15, 26, 28, *Hazen*, No. 8:25-cv-01931-FWS-KES (Nov. 6, 2025), ECF No. 17. The terms of the Hazens' investment diamond transactions with Lugano mirror those of Cohen's.

161.    In addition to contracting with Lugano's wealthy clients, Lugano also entered into investment diamond contracts with other corporate entities. For example, on September 11, 2024, Lugano entered into an investment diamond contract with Sydney Holdings Limited ("Sydney Holdings"), a company incorporated in the Cayman Islands. The contract between Sydney Holdings and Lugano represented that Lugano had purchased a diamond for $5.36 million and that Sydney Holdings had agreed to contribute half of the purchase price ($2.68 million), in exchange for a 50% interest in the purchased diamond. The agreement further represented that Lugano had lined up a purchaser to buy the diamond for $6.55 million. Per the agreement, if Lugano failed to sell the diamond within a four-month period, Lugano would pay Sydney Holdings its initial investment plus 25% yearly interest; if Lugano succeeded in selling the diamond during this period, Lugano would pay Sydney Holdings 50% of the sale proceeds or Sydney Holdings' investment amount plus 25% yearly interest, whichever was greater. In addition to these already favorable terms, the agreement provided that Sydney Holdings could "cash out" of the agreement at its "sole and absolute discretion," upon five days

written notice to Lugano, and still receive its initial investment amount plus 25% yearly interest. Compl. Ex. A, *Sydney Holdings Ltd. v. Lugano Diamonds & Jewelry Inc.*, No. 8:25-cv-01879-cv-FWS-KES (C.D. Cal. Aug. 22, 2025), ECF No. 1-1.

162.  These are just a few examples of the investment diamond transactions that Lugano entered into during the Class Period. On information and belief, Lugano and Compass improperly recognized revenue for these and other investment diamond transactions, ignoring both the nature of these transactions as investments and Lugano's responsibility to repay the investor's contribution with interest.

163.  FE 12 personally witnessed at least two such improperly recorded investment diamond transactions—and, indeed, worked with Perushek to collect evidence of Lugano's financial irregularities that Perushek ultimately reported to Compass's internal audit team.

164.  FE 12 first detected an improperly recorded investment diamond transaction in April 2022, almost immediately after joining Lugano. When FE 12 confronted Moti about the transaction, Moti admitted to the deal, but claimed he had already reversed the transaction. Moti further told FE 12 that Lugano would not engage in investment diamond transactions going forward, stating, "we don't do those anymore." FE 12 explained to Moti that these transactions were improper under revenue recognition rules, and Moti assured FE 12 again that no further investment diamond transactions would occur.

165.    Moti did not keep his word. FE 12 learned of a second improperly recorded investment diamond transaction in January 2024, when a letter containing the terms of the transaction was accidentally circulated to Lugano's accounting department. Irate, FE 12 and Perushek confronted Moti, who admitted to the transaction and offered what FE 12 characterized as a *mea culpa*. FE 12 told Moti plainly that the transaction could not be recorded. Lugano then obtained written confirmation from the client stating that the deal had been nullified and substituted with a normal transaction without guarantees.

166.    In March 2024, FE 12 and Perushek learned about another potential improper investment diamond transaction. FE 12 instructed Perushek to pull documentation and prepare an investigative plan so that they could report the transaction to Compass's internal audit team. FE 12 was fired before he and Perushek could put their investigative plan into action. Perushek, however, continued to investigate Lugano's financial irregularities, ultimately presenting his findings to Compass's internal audit team. *See infra* Section IV.e.iii.(6).

167.    FE 12 was not the only former Lugano employee to witness improperly recorded investment diamond transactions; indeed, these transactions were widely known to employees of Lugano's salons. For example, FE 9 explained that Moti would approach longtime Lugano clients for "one-time" investment diamond deals with outrageous terms, such as promising to purchase a $1 million diamond and then

sell it for $2 million if the client contributed half the initial purchase price. To assuage clients' doubts about these transactions, Moti would show photos and Gemological Institute of America ("GIA") paperwork ostensibly substantiating the diamond's existence. FE 9 believed that many of these documents were false or fraudulent. FE 9 added that Moti used the funds contributed by a client in one investment diamond transaction to repay a different client's investment in a separate investment diamond transaction. In this way, Lugano resembled a classic Ponzi scheme, wherein Lugano siphoned off funds from new investment diamond transactions to pay off the sums Lugano owed to earlier investors.

168.   FE 2 recalled that, when Lugano distributed monthly summaries of his salon's transactions, the salon's investment diamond transactions were presented as direct sales without corresponding liabilities, even though, by industry norms, such transactions did not constitute direct sales. FE 2 further recounted that Lugano's use of investment diamond transactions was common knowledge among employees. He recalls colleagues telling him that the way to make "real money" at Lugano was through getting close to Moti so that Moti could offer their clients these deals. While other Lugano directors participated in these transactions, FE 2 avoided direct involvement, as he worried about the ethical and legal consequences of these transactions. Indeed, speaking from his decades of experience in the jewelry industry, FE 2 found it suspicious that Lugano found it necessary to offer investment

diamond transactions to begin with, given the high quality of Lugano's jewelry and the large spending capacity of Lugano's ultra-wealthy customers.

169.   FE 10 also recalled that Lugano engaged in investment-style transactions for loose stones that were not always transparent to staff. He recalled a Lugano director, Dana Presutti, openly bragging that she drafted contracts for Moti related to these deals.

170.   Clients eventually realized they had been defrauded and demanded repayment. For example, FE 9's Lugano clients told him about the investment diamond transactions and that Moti owed them large sums of money. These clients further explained to FE 9 that, initially, Moti made excuses for not repaying their investments, claiming he was traveling abroad or caring for a sick relative. Eventually, however, Moti stopped responding to the clients' requests for repayment altogether.

171.   Multiple of the Lugano claimants allege that, after Lugano refused to pay back the claimants' investments pursuant to the terms of the investment diamond transactions, Lugano interim CEO Gaynor emailed the claimants on May 30, 2025 regarding Lugano's then-ongoing investigation into the investment diamond transactions. In his email, Gaynor acknowledged the scope of the pending claims against Lugano and signaled that Lugano would be unable to pay back claimants' investments pursuant to the investment diamond transactions. For example, attached

to Cohen's complaint as an exhibit is a copy of an email from Gaynor to Cohen,

dated May 30, 2025, stating in pertinent part:

> Dear Ray,
>
> I am sending this update to you and others whom we understand have entered into inventory financing arrangements with Lugano through our former CEO. I appreciate the patience that you have shown over the last several weeks.
>
> Although the investigation into the inventory financing arrangements and other matters is very much ongoing, and leaving aside any legal defenses that Lugano may have, I wanted you to be aware of the following information in the interest of transparency:
>
> ***We have heard from close to 40 individuals now asserting very substantial claims for the return of principal and interest under inventory financing arrangements apparently entered into through our former CEO.*** There may be others who have yet to contact the company.
>
> We also have had occasion to investigate whether Lugano has possession of specific diamonds that some people have asked to view, as appears to be permitted under certain inventory financing documents. ***To date, we've found no evidence of the company holding those diamonds in its inventory***.
>
> In addition to these inventory financing claims, we have learned of significant claims by certain Lugano suppliers, the extent of which was unknown to Lugano's current management team until recently.
>
> Pending a fuller understanding of the circumstances, the company is not currently in a position to make payments on these claims. I'm sure this is not what you hoped to hear—and that it may run contrary to assurances you may

have received in the past—but it is the reality of the situation in which Lugano now finds itself.[10]

(emphasis added).

172.   All told, according to a filing in the Lugano bankruptcy, Lugano has "heard from close to sixty (60) persons asserting substantial claims relating to alleged" investment diamond transactions, and "approximately a dozen parties have commenced lawsuits against Lugano Diamonds, Mr. Ferder, and/or other parties" concerning Lugano's investment diamond transactions. Decl. of J. Michael Issa Supp. Chapter 11 Pets. ¶ 31, *In re Lugano*, No. 25-12055-BLS (Dec. 12, 2025), ECF No. 2.

173.   For its part, Compass acknowledged the existence and breadth of Lugano's investment diamond transactions, as well as the investment diamond transactions' impact on Lugano's and therefore Compass's financial reporting, in the Restatement:

> ***Lugano, through its former chief executive officer, entered into various financing arrangements with third parties that were not previously recorded in the historical financial statements of Lugano as debt***. Pursuant to some of these agreements, the third-party investors agreed to provide a specific amount of cash to purportedly jointly invest with Lugano in a specified jewel or piece of jewelry. The arrangements provided that Lugano would be responsible for purchasing, holding and insuring the jewelry until Lugano found a buyer or the third-party investor otherwise requested a return of their cash

---

[10] Compl. Ex. C, *Cohen*, No. 30-2025-01490111-CU-BC-NJC (June 16, 2025).

contribution. According to the terms of the arrangement, the third-party investors made an upfront payment to Lugano in exchange for the right to receive a return of their initial investment plus either (i) a portion of the profit when the jewelry was sold to a buyer, or (ii) interest on their invested cash if the third-party requested to liquidate their investment prior to the sale of the specified jewelry to a buyer. Lugano also entered into financing arrangements that were not specific to the acquisition of a specified jewel or piece of jewelry. These arrangements involved cash receipts that were recorded as payment of accounts receivable balances or customer deposits and cash payments that were recorded as inventory purchases or purchase deposits. Other financing arrangements with third parties involved the receipt of cash by Lugano from third parties and repayment of cash to those third parties that was not associated with purported investment in a specified jewel or piece of jewelry.

In connection with the Lugano Investigation, the Company determined that the inventory and sales transactions recorded in connection with these financing agreements were invalid because they were inconsistent with the underlying substance of the agreements. ***These financing arrangements represent debt and the financing arrangements and related interest expense have been recorded in the restated consolidated financial statement***s.

(emphasis added).

174. According to the Restatement, Lugano's improper recording of the investment diamond transactions as revenue without a corresponding liability led Compass to omit at least $318,666,000 in unrecorded debt in its financial reporting during the Class Period, as detailed in the chart below (in thousands of dollars):

| | December 31, 2024 | | December 31, 2023 | | December 31, 2022 | |
| | (As Restated) | | (As Restated) | | (As Restated) | |
| | Effective Interest Rate | Amount | Effective Interest Rate | Amount | Effective Interest Rate | Amount |
| Lugano financing arrangements | 11.43 % | $ 169,765 | 6.15 % | $ 100,741 | 4.34 % | $ 48,160 |

### (5)    In Addition to Lugano's Improperly Recorded Investment Diamond Transactions, Lugano Operated—and Compass Oversaw—a Culture of Rampant Accounting Violations

175.   Lugano's financial irregularities extended beyond the improperly reported investment diamond transactions. For example, FE 10 observed troubling irregularities in Lugano's accounting practices. The first significant irregularity occurred in December 2023, shortly after FE 10 began working at Lugano. FE 10 recalled that a client purchased a jewelry piece from his salon and later returned it. Despite the client returning the piece and requesting appropriate return documentation, FE 10 was instructed not to process the return as such; instead, he was told to re-invoice the item and memo the piece back into inventory, even though the client did not retain ownership of the jewelry.

176.   Following this incident, FE 10 noticed what he described as a broader pattern of irregular inventory and sales documentation practices. For example, it was not uncommon for high-value jewelry to arrive at the salon with no accompanying paperwork. When this happened, FE 10 would contact Lugano corporate, who would instruct him to receive the items into inventory even though they lacked supporting documentation. This merchandise would then appear in the salon's inventory system

despite the lack of formal paperwork supporting the merchandise's origin and ownership.

177.   FE 10 described similar practices involving Rolexes and other luxury watches Lugano sold in its salons. FE 10's salon received watches into inventory without documentation and logged the watches under prospective clients' names without having sold them.

178.   FE 10 recalled that Moti frequently arrived at the salon where FE 10 worked carrying millions of dollars' worth of jewelry, some of which lacked paperwork. FE 10 noted that accepting such items into inventory without proper documentation was highly irregular and inconsistent with accounting and compliance practices.

179.   Drawing on his substantial experience at other jewelry companies, FE 2 also observed that Lugano's approach to revenue recognition differed from accepted standards in the industry. Typically, luxury retail establishments do not recognize a sale on installment terms as revenue until full payment has been received. However, at Lugano, FE 2 observed that installment sales were booked before final payment, particularly on the last days of the month, and often for large transactions that were credited to Moti personally. These late-breaking, high-value sales allowed salons to consistently make their targets. FE 2 recalled that he and other Lugano employees raised concerns about these practices.

180.   To further illustrate what he regarded as Lugano's suspicious accounts receivable practices, FE 2 recalled his salon making a $2 million installment sale that was entered into his salon's sale records. However, FE 2 never received his expected commissions from the sale. His superior told FE 2 that this was because the sale was not yet fully collected from the client. Yet the revenue from FE 2's transaction had still been recorded as a sale on his salon's books.

181.   Additionally, FE 8 recalled deals where Lugano clients returned jewelry in exchange for credit on new purchases. Internally, Lugano described these transactions as sales of new jewelry, without acknowledging the client's jewelry return. Based on how these transactions were described internally, FE 8 suspected that Lugano was booking these transactions as sales without also booking the client's return of their initial jewelry purchase.

### (6)   Compass Failed to Act on Multiple Whistleblower Reports Detailing Lugano's Financial Irregularities

182.   By 2024, FE 10 was increasingly concerned about Lugano's financial irregularities. However, FE 10 feared he would be retaliated against if he raised his concerns internally. Instead, FE 10 decided to anonymously report Lugano's activities to Compass using Compass's compliance reporting system, which FE 10 learned about through a display on a poster in the employee area of his salon.

183.   On June 4, 2024, FE 10 submitted an anonymous whistleblower complaint through Compass's compliance reporting system via a third-party website called whistleblowerservices.com, using a VPN to conceal his location.

184.   The following screenshots are of FE 10's whistleblower complaint, as well as the confirmation notice FE 10 received after filing the complaint:

9:03

# Message Summary

**Subject**
LUGANO SALES

**Type**
Secure Web Form

**Documents**
None

**Created**
Tue, 06/04/2024 - 11:37

# Original Message

The sales reported by Lugano are not accurate. Most of the sales are done by the owner and not the sales staff at all. No one is able to pull those numbers. There is always two sales sheets provided. One that shows sales team and one retail which includes owners sales. Some territories get sales added that weren't done by sales team. Makes the store figures look extremely good but it is not the sales team making these sales.

# Comments



Displaying 1 - 3 of 3

**Created**

whistleblowerservices.com — Private



SECURE WEBFORM

COMPASS DIVERSIFIED

# Secure Web Form

*Thank-you.*

Please save your Confirmation Number before closing this window.

**Confirmation Number: YGYRJTPPHGREVS**

IMPORTANT: Do not lose this Confirmation Number -- it cannot be recovered once lost. You will need this Number to check the status of your message at the following secure website: https://www.whistleblowerservices.com/codiwb/login?language=en

Your message will be reviewed within two business days.

After printing this page for your records, please close all browser windows to ensure the anonymity of your message.

your concern, question or complaint.

To anonymously follow up on your message, please click here.

Thank you. Integrity is everyone's responsi

Privacy - Terms

🔒 whistleblowerservices.com — Private

185.   FE 10 received a receipt acknowledging his complaint submission on June 12, 2024. Over the following weeks, FE 10 did not receive any interview or document requests, nor did he detect any signs that an investigation was underway. Lugano's operations continued as usual.

186.   On August 26, 2024, FE 10 received a follow-up response from Compass through whistleblowerservices.com. The following screenshot depicts Compass's response to FE 10's whistleblower complaint:

**From**
Compass Diversified Representative

**Created**
Mon, 08/26/2024 - 10:35

Dear Sir or Madam,
We have conducted an internal evaluation of the concerns you raised on [DATE] regarding Lugano Diamonds &amp; Jewelry, Inc. Based on our evaluation we have concluded that the concern you raised does not adversely impact or call into question the company's internal accounting controls, accounting, or auditing practices. Accordingly, we consider this issue resolved and have marked it as "dismissed" in our files. We appreciate you bringing your concerns to our attention.

Very truly yours, Compass Diversified Holdings Financial Concern Hotline Administrator



**From**
Compass Diversified Representative

whistleblowerservices.com — Private

187. FE 10 found Compass's response troubling, as the very issues Compass dismissed in its response to FE 10's complaint were not only known by Lugano and Compass employees but were publicly disclosed in May and June of 2025 when Compass announced the unreliability of Lugano's financial statements. Given his experiences, FE 10 believes that Compass leadership was aware of issues at Lugano well before Compass's public disclosures and failed to act or disclose them in a timely manner.

188. Perhaps not coincidentally, Defendant Faulkingham stepped down as Compass's CFO in August 2024, the same month in which Compass "dismissed" FE 10's whistleblower complaint.

189. To support his belief that Compass leadership was aware of Lugano's financial irregularities, FE 10 pointed to his June 2024 whistleblower complaint, as well as FE 10's experience at Compass's Investor Day in New York City in January 2025. FE 10 oversaw the logistics of this event for Lugano, which participated as one of Compass's subsidiaries. FE 10 recalls that Compass executives instructed Lugano personnel not to answer any questions from investors regarding Lugano's financial statements and to direct any such inquiries to Compass executives instead. FE 10 found this directive unusual.

190.   FE 10 was not the only Lugano employee to take concerns about Lugano's financial irregularities directly to Compass. In Fall 2024, FE 12 had lunch with Perushek, Lugano's former Controller and FE 12's partner in confronting Moti over the January 2024 investment diamond transaction. During lunch, Perushek relayed to FE 12 that he had continued the pair's investigation into Lugano's financial irregularities, ultimately reporting their findings to Compass's internal audit team.

191.   Perushek further told FE 12 that Compass's response was "inadequate" and "did not go anywhere." Disappointed in Compass's reaction, Perushek resigned from his position as Lugano's Controller.

### f.    Defendant Grant Thornton Violated Its Duties as Compass's Independent External Auditor

192.   GT has served as Compass's "independent auditor" for more than 20 years, beginning in 2005 and continuing throughout the Class Period. During the Class Period, Compass paid more than $18 million to GT for its auditing services.

193.   As GT is well aware, an audit is conducted for the benefit of the stakeholders of a company, like Lead Plaintiff EAS Carpenters. An independent auditor adds credibility to financial statements of a publicly traded company by communicating that the quantitative and qualitative information conveyed in financial statements and related disclosures is relevant and reliable. The goal and objective of the audit is to provide the users of the financial statements with reasonable assurance that the financial statements are fairly presented in accordance

with GAAP.[11] If financial statements filed with the SEC are not prepared in conformity with GAAP, they are presumed to be misleading and inaccurate.[12]

194.    The auditing profession's Center for Audit Quality explains the gatekeeping role of an auditor this way:

> Independent audits are a core component of the U.S. financial system and help give investors, and the capital markets, the confidence to invest in public companies. Although clearly not a guarantee of the performance of such investments (which is affected by many factors), the close scrutiny provided by audits reduces "information risk"—the possibility that investment decisions will be based on inaccurate data. Without independent audits, investors would have to rely on management's word that its financial statements are accurate. Many investors likely would be less willing to risk their assets on data that has not withstood independent scrutiny.[13]

195.    An audit entails, for example, "examining, on a test basis, evidence supporting the amounts and disclosures in the company's financial statements, an assessment of the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation to

---

[11] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures that define accepted accounting practice at a particular time. In the United States, GAAP are established through accounting standards issued by the Financial Accounting Standards Board ("FASB").

[12] Regulation S-X (17 C.F.R. § 210.4-01(a)(1)).

[13] Center for Audit Quality, *Guide to Public Company Auditing* (2011).

form an opinion on whether the financial statements taken as a whole are free of material misstatement."[14]

196. Auditors perform independent audits as a double check on the managers of the company. Accordingly, auditors are prohibited from simply accepting management's representations for the information contained in a company's financial statements. Instead, auditors are required to perform independent procedures and tests to verify the reported information so they can communicate to the company's board of directors or management committee—and investors—if there are inadvertent mistakes or intentional misstatements by management. Auditors also consider whether the financial statements faithfully represent the substance of the company's economic activity, not just its legal form.[15]

197. Even if a certain transaction is recorded accurately under GAAP, the disclosure(s) describing the transaction could be incomplete or misleading to readers of the financial statements, in which case the auditor is obligated to require the company to provide additional information so that readers of the financial statements can understand the substance of the company's activities.

---

[14] Center for Audit Quality, *In-Depth Guide to Public Company Auditing: The Financial Statement Audit*, at 3 (May 2011).

[15] PCAOB, AS 2810, *General Responsibilities of the Auditor in Conducting an Audit* ("AS 2810"); Financial Accounting Standards Board, *Conceptual Framework for Financial Reporting*, Chapter 3, *Qualitative Characteristics of Useful Financial Information*, B.C. 3.26.

198.   If the auditor finds the financial statements to be materially correct and presented fairly in accordance with GAAP, the auditor issues what is commonly referred to as an "unqualified" or "clean" opinion/report, and no exceptions are noted. However, when the auditor determines that the financial statements have a material deviation from GAAP, such as materially incorrect amounts and/or insufficient disclosures, the auditor is prohibited from issuing a clean opinion, and is also required to note the material deviation in the auditor's report.[16] In doing so, the auditor alerts investors, lenders, and other users of the financial statements that the credibility of the financial statements is in question. Failure on the part of the auditor in such circumstances to state that GAAP has not been complied with by a company is a serious violation by the auditor of professional standards.

199.   As set forth below, GT was responsible for auditing Compass's 2022, 2023, and 2024 financial statements included in the Company's Forms 10-K, and also for conducting interim reviews of Compass's quarterly financial information presented in Compass's Forms 10-Q filed with the SEC during the Class Period in accordance with PCAOB auditing standards. GT issued clean auditing reports for each and every one of these annual financial statements. However, each of these annual financial statements, as well as each of the interim financial statements, was

---

[16] PCAOB AS 3105, *Departures from Unqualified Opinions and Other Reporting Circumstances* ("AS 3105").

ultimately restated, revealing massive accounting errors in Compass's inventory reporting and revenue recognition. GT could have identified these errors had it properly conducted its audits of Compass and Lugano during the Class Period in accordance with the required PCAOB standards.

i.    **GT Was Responsible for Auditing Compass's Financial Statements and Interim Quarterly Reports to Determine Whether They Materially Complied with GAAP**

(1)    **GT Was Obligated to Follow Public Company Accounting Oversight Board Auditing Standards in Conducting Its Audits of Compass**

200.   Enacted in response to the massive WorldCom accounting scandal, the Sarbanes-Oxley Act of 2002 established the Public Company Accounting Oversight Board ("PCAOB"). The PCAOB is responsible for establishing professional auditing standards (the "PCAOB Auditing Standards")[17] applicable to audits and interim reviews of publicly traded companies, including Compass.

201.   As Compass's independent auditor, GT is required by law and SEC regulations to conduct its audits and interim reviews in accordance with PCAOB Standards in order to "enhance the confidence of investors and other financial statement users in the company's financial statements and . . . ICFR."[18]

_____

[17] The various reorganized PCAOB Auditing Standards are referred to as "AS" followed by a four-digit number.

[18] SEC, *Notice of Filing of Proposed Rules on General Responsibilities of the Auditor in Conducting an Audit and Amendments to PCAOB Standards*, 89 FR 49730 (June 11, 2024).

(a)    **GT Was Responsible for Planning and Performing Its Compass Audits to Obtain Reasonable Assurance That Compass's Financial Statements Were Fairly Presented in Conformity with GAAP**

202.    One of the objectives of a financial statement audit under PCAOB Standards is to express an opinion on the fairness with which the financial statements in all material respects are presented in conformity with GAAP.[19] PCAOB Standards recognize that the auditor must exercise professional judgment when conducting audits.[20]

203.    Accordingly, GT's audit reports during its 2022, 2023, and 2024 Compass audits were to be based on its judgment that (a) Compass's financial statements are informative of matters that may affect their use, understanding, and interpretation; (b) the information in the financial statements is presented and classified appropriately and in a manner that is not misleading; (c) the accounting principles selected and applied by management are appropriate; and (d) the financial statements contain the information essential for a fair presentation of the financial statements in conformity with GAAP.[21] With respect to the last point, GT was required to consider "the form, arrangement, and content of the financial statements (including the

---

[19] AS 1001.03.
[20] AS 1000.12.
[21] AS 2810.31.

93

accompanying notes)" to evaluate whether Compass's financial statement disclosures were in compliance with GAAP.

204.  To express a clean opinion on Compass's 2022, 2023, and 2024 financial statements, GT was required to plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide "reasonable assurance" (which generally means a "high level" of assurance) that such financial statements were free of material misstatement, whether caused by error or fraud.[22] GT, however, did not undertake sufficient audit procedures to justify the "reasonable assurance" it conveyed to investors when it issued clean audit reports on Compass's 2022, 2023, and 2024 financial statements. *See infra* Section IV.f.iii. Had GT done so, it would have identified the red flags and irregularities that were rampant at Compass during the Class Period and the resultant financial statement misstatements.

>          **(b)    GT Was Required to Apply Due Professional Care and Exercise Professional Skepticism**

205.  PCAOB Standards require an auditor to obtain "reasonable assurance" by reducing audit risk[23] to an appropriately "low" level through the application of due

---

[22] AS 1000.13, .14.

[23] Audit risk is the risk that the auditor expresses an inappropriate audit report when the financial statements are materially misstated, *i.e.*, the financial statements are not presented fairly in conformity with the applicable financial reporting framework. Audit risk is a function of the risk of material misstatement and detection risk. AS 1101, *Audit Risk* ("AS 1101"), .04.

professional care, including obtaining sufficient appropriate audit evidence.[24] Due professional care required that GT act "with reasonable care and diligence, exercising professional skepticism, acting with integrity, and complying with applicable professional and legal requirements."[25]

206.    Due professional care also required that GT apply "professional skepticism" during its 2022, 2023, and 2024 audits and reviews of Compass's interim financial information included in the Company's Forms 10-Q.[26] Professional skepticism is generally defined under PCAOB Standards as "an attitude that includes *a questioning mind and a critical assessment of audit evidence and other information that is obtained*."[27] Accordingly, GT's "responses to the assessed risks of material misstatement, particularly fraud risks, should involve the application of professional skepticism in gathering and evaluating audit evidence."[28]

207.    In auditing Compass's financial statements for 2022, 2023, and 2024, GT did not exercise professional due care and skepticism because it either ignored or failed to detect blatant accounting irregularities that Lugano had engaged in and Compass allowed through its own oversight failures. *See infra* ¶ 243.

---

[24] AS 1000.14; AS 1101.03.
[25] AS 1000.09.
[26] AS 1015.07–.09.
[27] AS 1000.11.
[28] AS 2301, *The Auditor's Responses to the Risks of Material Misstatement* ("AS 2301), .07.

(c)    **GT Was Responsible for Understanding Compass's Business and Identifying and Responding to Risks of Material Misstatements Affecting Compass's Financial Statements**

208.   GT was required to perform risk assessment procedures that were "sufficient to provide a reasonable basis for identifying and assessing the risks of material misstatement" affecting Compass's 2022, 2023, and 2024 financial statements, whether due to error or fraud.[29] In this regard, GT was first required to obtain a sufficient understanding of Compass, its environment, and its ICFR.[30] This included understanding the following:[31]

a.    relevant industry, regulatory, and other external factors affecting Compass;[32]

b.    the nature of Compass, including the organizational structure, management personnel, key personnel, key supplier and customer relationships, significant investments, joint ventures, and the Company's operating characteristics, including its size and complexity;[33] and

c.    Compass's objectives and strategies and those related business risks that might reasonably be expected to result in risks of material misstatement. Examples of situations in which business risks might result in material misstatement of the financial statements most relevant to Compass include expansion of the business, current and prospective

---

[29] AS 2110, *Identifying and Assessing Risks of Material Misstatement* ("AS 2110"), .04, .74.
[30] AS 2110.05.
[31] AS 2110.07.
[32] AS 2110.09.
[33] AS 2110.10.

financing requirements, and regulatory requirements (including increased legal exposure).[34]

209.  GT was also required to gain an understanding of the regulatory environment and the implications of illegal acts that had a material effect on Compass's financial statements, including, for example, any misrepresentations made to regulators that would have implications for the financial statements, such as violations of U.S. securities laws and regulations with respect to compliance with GAAP and SEC disclosure requirements.

210.  The purpose of gaining this understanding was so that GT could assess or "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement" affecting Compass's 2022, 2023, and 2024 financial statements.[35]

211.  After obtaining an appropriate understanding of Compass's business and identifying applicable risks of material misstatement, regulatory risks, and legal risks, PCAOB Standards required GT to "design and implement audit responses that address the [assessed] risks of material misstatement" and reduce "audit risk to an appropriately low level."[36] In simple terms, an "audit response" is the procedure, work step, or action the auditor performs to adequately address the identified risks

---

[34] AS 2110.15.
[35] AS 2110.07.
[36] AS 1101.03; 2301.03.

of material misstatement so that the auditor can assess whether a material misstatement exists.[37] Audit responses recognized by PCAOB Standards to address risks of material misstatement include: (1) "[r]esponses that have an overall effect on how the audit is conducted" (*e.g.*, evaluating the company's "selection and application of significant accounting principles" and "[p]roviding the extent of supervision that is appropriate for the circumstances, including, in particular, the assessed risks of material misstatement")[38]; and (2) "responses involving the nature, timing and extent of audit procedures to be performed."[39] For significant risks,[40] including the risk that Compass's revenue was overstated in violation of GAAP, PCAOB Standards required GT to "perform substantive procedures, including tests of details, that are specifically responsive to the assessed risks."[41] In this regard, PCAOB Standards recognize that as risk of material misstatement increases, "the amount of evidence that the auditor should obtain also increases. For example, ordinarily more evidence is needed to respond to significant risks."[42]

212.  GT failed to design and conduct its audit of Compass to gather enough evidence to fully assess the risk that Compass management made material

---

[37] AS 2301.04–.05, .08–.10.

[38] AS 2301.04.

[39] AS 2301.04.

[40] The PCAOB defines a significant risk as a "risk of material misstatement that requires special audit consideration." AS 2110.A5.

[41] AS 2301.11.

[42] AS 1105.05, Audit Evidence ("AS 1105").

misstatements that undermined the accuracy of Compass's financial statements. *See infra* Section IV.f.iii.

### (d)    GT Was Required to Consider That Compass and Lugano Were Engaged in Fraud

213.   During its audits of Compass, GT was required to "plan and perform the audit to obtain sufficient appropriate audit evidence to obtain reasonable assurance about whether the financial statements are free of material misstatement whether due to error or fraud."[43] The factor that differentiates whether a misstatement is caused by error or fraud is whether the underlying action of the misstatement is intentional or unintentional. The auditor's interest related to a company's act(s) of fraud relates to the impact such act(s) has on the information contained in financial statements.

214.   The PCAOB states that "[b]ecause of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks . . . Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred."[44]

215.   Auditors consider the impact of fraudulent acts on financial statements in two ways: (1) misstatements arising from fraudulent financial reporting and (2)

---

[43] AS 2401, *Consideration of Fraud in a Financial Statement Audit* ("AS 2401"), .01

[44] AS 2401.13.

misstatements arising from misappropriation of assets. Misstatements arising from fraudulent financial reporting reflect "intentional misstatements or omissions of amounts or disclosures in financial statements designed to deceive financial statement users."[45] Such misstatements or omissions may be caused by (a) manipulation, falsification, or alteration of accounting records or supporting documents from which financial statements are prepared; (b) misrepresentation or intentional omission from the financial statements of events, transactions, or other significant information; and/or (c) intentional misapplication of accounting principles relating to amounts, classification, manner of presentation, or disclosure.

216.    Misstatements arising from misappropriation of assets involve the theft of an entity's assets where the effect of the theft causes the financial statements not to be presented, in all material respects, in conformity with GAAP.[46] This can be accomplished by "embezzling receipts, stealing assets, or causing an entity to pay for goods or services that have not been received."[47]

217.    The presence of certain conditions may suggest to the auditor the possibility that fraud may exist. The PCAOB provides examples of factors that external auditors should be aware of during an audit with respect to the risk of misstatements arising from fraudulent acts. Such risk factors are classified into the

---

[45] AS 2401.06.
[46] AS 2401.06.
[47] AS 2401.06.

"three conditions generally present when material misstatements due to fraud occur: (a) incentives/pressures, (b) opportunities, and (c) attitudes/rationalizations."[48] The following is a list of such risk factors that are relevant to this matter:[49]

### Risk Factors Relating to Misstatements Arising From Fraudulent Financial Reporting

### Incentives/Pressures

a. Financial stability or profitability is threatened by economic, industry, or entity operating conditions, such as (or as indicated by):

. . .

- Rapid growth or unusual profitability, especially compared to that of other companies in the same industry

. . .

b. Excessive pressure exists for management to meet the requirements or expectations of third parties due to the following:

- Profitability or trend level expectations of investment analysts, institutional investors, significant creditors, or other external parties (particularly expectations that are unduly aggressive or unrealistic), including expectations created by management in, for example, overly optimistic press releases or annual report messages

. . .

---

[48] AS 2401.85 (A.1).
[49] AS 2401.85 (A.2 and A.3).

- Perceived or real adverse effects of reporting poor financial results on significant pending transactions, such as business combinations or contract awards

c. Information available indicates that management or the board of directors' personal financial situation is threatened by the entity's financial performance arising from the following:

- Significant financial interests in the entity

- Significant portions of their compensation (for example, bonuses, stock options, and earn-out arrangements) being contingent upon achieving aggressive targets for stock price, operating results, financial position, or cash flow

d. There is excessive pressure on management or operating personnel to meet financial targets set up by the board of directors or management, including sales or profitability incentive goals.

## **Opportunities**

a. The nature of the industry or the entity's operations provides opportunities to engage in fraudulent financial reporting that can arise from the following:

. . .

- Assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate

- Significant or highly complex transactions, especially those close to period end that pose difficult "substance over form" questions

102

b. There is ineffective monitoring of management as a result of the following:

- Domination of management by a single person or small group (in a nonowner-managed business) without compensating controls

- Ineffective board of directors or audit committee oversight over the financial reporting process and internal control

. . .

d. Internal control components are deficient . . . .

**Attitudes/Rationalizations**

- Ineffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards

**Risk Factors Relating to Misstatements Arising From Misappropriation of Assets**

. . .

**Incentives/Pressures**

. . .

a. Personal financial obligations may create pressure on management or employees with access to cash or other assets susceptible to theft to misappropriate those assets.

. . .

**Opportunities**

103

a.  Certain characteristics or circumstances may increase the susceptibility of assets to misappropriation. For example, opportunities to misappropriate assets increase when there are the following:

- Large amounts of cash on hand or processed

- Inventory items that are small in size, of high value, or in high demand

- Easily convertible assets, such as bearer bonds, **diamonds**, or computer chips

. . .

b.  Inadequate internal control over assets may increase the susceptibility of misappropriation of those assets. For example, misappropriation of assets may occur because there is the following:

- Inadequate segregation of duties or independent checks

- Inadequate management oversight of employees responsible for assets, for example, inadequate supervision or monitoring of remote locations

. . .

- Inadequate recordkeeping with respect to assets

- Inadequate system of authorization and approval of transactions . . .

- Inadequate physical safeguards over cash, investments, inventory, or fixed assets

- Lack of complete and timely reconciliations of assets

104

- Lack of timely and appropriate documentation of transactions . . . .

**Attitudes/Rationalizations**

. . .

- Disregard for the need for monitoring or reducing risks related to misappropriations of assets

- Disregard for internal control over misappropriation of assets by overriding existing controls or by failing to correct known internal control deficiencies

. . .

(emphasis added).

218. Considering the remarkable reported growth of Lugano from the time Compass acquired it through the end of the Class Period, especially in contrast to the Company's other subsidiaries, GT should have planned for and strongly considered that Lugano's performance was caused by fraudulent acts. In auditing Compass's financial statements for 2022, 2023, and 2024, GT did not adequately consider the risk that fraudulent acts may have resulted in material misstatements in Compass's financial statements and material weaknesses in the Company's ICFR because GT failed to obtain sufficient appropriate audit evidence that such fraudulent acts did not occur during the Class Period.

(e) **GT Was Responsible for Obtaining Sufficient Appropriate Evidence to Afford a Reasonable Basis for Its Audit Report**

105

219.   GT was required to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis" for the opinion it expressed in its audit report during the 2022, 2023, and 2024 audits of Compass.[50]

220.   Under PCAOB Standards, auditors should not be satisfied with evidence that is less than persuasive or "assum[e] that management is honest . . . ."[51] In developing its audit report, GT should have "take[n] into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."[52]

221.   When the auditor obtains audit evidence during the course of the audit that contradicts or is inconsistent with the audit evidence on which the auditor originally based his or her risk assessment, PCAOB Standards state that the auditor "should revise the related risk assessments and modify the planned nature, timing, or extent of substantive procedures covering the remaining period as necessary," in response to the revised risk assessments.[53] To the extent GT obtained audit evidence from one

---

[50] AS 1105.04.
[51] AS 1000.11.
[52] AS 2810.03.
[53] AS 2301.46. *See also* AS 2110.74 ("The auditor's assessment of the risks of material misstatement, including fraud risks, should continue throughout the audit. When the auditor obtains audit evidence during the course of the audit that contradicts the audit evidence on which the auditor originally based his or her risk assessment, the auditor should revise the risk assessment and modify planned audit procedures or perform additional procedures in response to the revised risk assessments.").

source that was inconsistent with that obtained from another, or if GT had doubts about the reliability of information to be used as audit evidence during the 2022, 2023, and 2024 audits, PCAOB Standards note that GT "should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit."[54]

222.    Consistent with this understanding, PCAOB Staff Practice Alert No. 10, *Maintaining and Applying Professional Skepticism in Audits*, states:

> **PCAOB standards require auditors to design and perform audit procedures in a manner that addresses the assessed risks of material misstatement and to obtain more persuasive evidence the higher the assessment of risk. The auditor is required to apply professional skepticism, which includes a critical assessment of the audit evidence.** Substantive procedures generally provide persuasive evidence when they are designed and performed to obtain evidence that is relevant and reliable. When discussing the characteristics of reliable audit evidence, PCAOB standards observe that generally, among other things, evidence obtained from a knowledgeable source independent of the company is more reliable than evidence obtained only from internal company sources and evidence obtained directly by the auditor is more reliable than evidence obtained indirectly.
>
> Taken together, this means that in higher risk areas, ***the auditor's appropriate application of professional skepticism should result in procedures that are focused on obtaining evidence that is more relevant and reliable, such as evidence obtained directly and evidence obtained from independent, knowledgeable sources.[] Further, if audit evidence obtained from one source is inconsistent***

[54] AS 15.29; AS 1105.29.

> *with that obtained from another, the auditor should*
> *perform the audit procedures necessary to resolve the*
> *matter and should determine the effect, if any, on other*
> *aspects of the audit.*

(emphasis added) (footnotes omitted).

223. Here, GT's evaluation of audit results was presumptively required to include an evaluation of several items, including the following:

    a.    the presentation of the financial statements, including disclosures therein;

    b.    misstatements accumulated during the audit, including, in particular, uncorrected misstatements;

    c.    conditions identified during the audit that relate to the assessment of the risk of material misstatement due to fraud ("fraud risk"); and

    d.    the sufficiency and appropriateness of the audit evidence obtained.[55]

224. Importantly, PCAOB Standards recognize that management representations are "not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."[56] PCAOB Standards further recognize that "if a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made."[57] In other words, GT should not have accepted Compass

---

[55] AS 2810.04.
[56] AS 2805, Management Representations ("AS 2805"), .02.
[57] AS 2805.04.

management's representations as reliable unless and until GT had fully developed the audit evidence necessary to test the accuracy of management's representations. GT failed to do this. *See infra* Section IV.f.iii.

### (2) GT Was Required to Respond to Information Demonstrating That Compass's Interim Financial Information Did Not Comply with GAAP

225.  During the Class Period, GT also conducted interim reviews of Compass's quarterly financial information presented in the Company's quarterly reports on Forms 10-Q. The objective of a review of interim financial information differs from that of an audit. The purpose of such objective reviews was to provide GT with a basis for communicating to Compass's management and Audit Committee whether it was aware of any material modifications that should be made to the interim financial information for it to conform with GAAP.[58]

226.  To satisfy this objective, PCAOB Standards required that GT perform certain analytical procedures and make inquiries of persons responsible for financial and accounting matters.[59] To the extent GT became aware of information that led it to conclude that the interim financial information may not be presented in accordance with GAAP, it was required to make additional inquiries or perform other procedures to provide a basis for communicating whether it was aware of any

---

[58] AS 4105, Reviews of Interim Financial Information, .07.
[59] AS 4105.07.

material modifications that should have been made to the interim financial information.[60]

227. Either GT failed to undertake analytical procedures, make inquiries, and interview responsible Compass personnel on a quarterly basis, or GT ignored the findings of such efforts because it would have been readily apparent that Compass's oversight of Lugano was failing given the gaps and irregularities in Lugano's inventory and revenue reporting.

### ii. GT Was Responsible For Auditing Compass's ICFR to Determine Whether They Complied with the COSO Framework

228. Compass management was responsible for establishing and maintaining effective ICFR and disclosure controls pursuant to SOX. SOX required Compass management to perform annual assessments of the Company's ICFR and disclosure controls and to issue a report on whether the Company's ICFR were effective and free from material weaknesses. A material weakness is defined as a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."[61]

---

[60] AS 4105.22.
[61] PCAOB AS 2201, *An Audit of Internal Control Over Financial Reporting That Is Integrated with an Audit of Financial Statements* ("AS 2201"), .A7.

229.    Control deficiencies that are determined to be material weaknesses must be disclosed in management's annual report on its assessment of the effectiveness of ICFR. Management may not disclose that it has assessed ICFR as effective if there are one or more control deficiencies determined to be a material weakness in ICFR.[62]

230.    During the Class Period, Compass made repeated assurances that its internal controls functioned properly to prevent or detect material misstatements. In each of Compass's quarterly reports on Form 10-Q and annual reports on Form 10-K in 2022, 2023, and 2024, the Company asserted that its ICFR were effective and that it had no material weaknesses. Compass expressed this assertion by stating that it assessed the effectiveness of its ICFR based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control-Integrated Framework* (the "COSO Framework").

231.    In addition to auditing Compass's financial statements, GT was also required to audit the Company's ICFR as of December 31, 2022, 2023, and 2024 in accordance with PCAOB Standards. The objective of an audit of ICFR "is to express an opinion on the effectiveness of the company's internal control over financial reporting."[63] The PCAOB asserts that "a company's internal control cannot be considered effective if one or more material weaknesses exist" and that the auditor's

---

[62] Exchange Act Release No. 34-54976 (Dec. 20, 2006).
[63] AS 2201.03.

responsibility in an audit of ICFR is to "plan and perform the audit to obtain appropriate evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment."[64] In fact, the PCAOB states that "[i]f there are deficiencies that, individually or in combination, result in one or more material weaknesses, the auditor must express an adverse opinion on the company's internal control over financial reporting, unless there is a restriction on the scope of the engagement."[65]

232.   In each of Compass's 2022, 2023, and 2024 annual financial reports, GT issued a clean opinion on Compass's ICFR, stating that the Company's ICFR were effective based on the criteria established in the COSO Framework. In each report, GT further stated that its opinion was based on an audit that had been conducted in accordance with PCAOB Standards. GT's audit reports thus provided reasonable assurance to Compass's stakeholders, including its investors, that the Company's ICFR did not contain any material weaknesses.

233.   When planning an audit of a company's ICFR, the auditor should use a top-down approach, which "begins . . . with the auditor's understanding of the overall risks to internal control over financial reporting" and "then focuses on entity-level controls and works down to significant accounts and disclosures and their

---

[64] AS 2201.03 (footnote omitted).
[65] AS 2201.90 (footnote omitted).

relevant assertions."[66] One type of the entity-level controls identified by the PCAOB that the auditor must evaluate is the control environment, which is also one of the integrated components of ICFR identified by the COSO Framework.[67] Such evaluation includes "[w]hether management's philosophy and operating style promote effective internal control over financial reporting" and "[w]hether sound integrity and ethical values, particularly of top management, are developed and understood . . . ."[68]

234.   To test a control, the auditor must test both the design and the operating effectiveness of a control using a mix of procedures, including "inquiry of appropriate personnel, observation of the company's operations, inspection of relevant documentation, and re-performance of the control."[69]

235.   When assessing whether the audit evidence obtained regarding the effectiveness of a control is effective, the auditor should consider various factors that affect the risk associated with a control, including:

      a.    the nature and materiality of misstatements that the control is intended to prevent or detect;

      b.    the inherent risk associated with the related account(s) and assertion(s);

---

[66] AS 2201.21.

[67] AS 2201.24–.25; COSO, *Internal Control – Integrated Framework Executive Summary*, at 4 (May 2013).

[68] AS 2201.25.

[69] AS 2201.43–.45.

c.      whether there have been changes in the volume or nature of transactions that might adversely affect control design or operating effectiveness;

d.      the degree to which the control relies on the effectiveness of other controls (*e.g.*, the control environment or information technology general controls);

e.      the competence of the personnel who perform the control or monitor its performance and whether there have been changes in key personnel who perform the control or monitor its performance; and

f.      the complexity of the control and the significance of the judgments that must be made in connection with its operation.[70]

236.  If an auditor identifies "deviations from the company's controls," the auditor is required to "determine the effect of the deviations on his or her assessment of the risk associated with the control being tested and the evidence to be obtained, as well as on the operating effectiveness of the control."[71]

237.  GT was required to evaluate all control deficiencies to determine whether the severity[72] of such deficiencies "individually or in combination, are material weaknesses as of the date of management's assessment."[73] The PCAOB states that indicators of material weaknesses in ICFR include (a) "[i]dentification of fraud,

---

[70] AS 2201.47.

[71] AS 2201.48.

[72] The severity of a deficiency depends on (a) whether there is a reasonable possibility that the company's controls will fail to prevent or detect a misstatement of an account balance or disclosure and (b) the magnitude of the potential misstatement resulting from the deficiency or deficiencies. AS 2201.63.

[73] AS 2201.62.

whether or not material, on the part of senior management"; and (b) "[i]neffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee."[74]

238.   The severity of a control deficiency depends on (a) "[w]hether there is a reasonable possibility that the company's controls will fail to prevent or detect a misstatement of an account balance or disclosure" and (b) "[t]he magnitude of the potential misstatement resulting from the deficiency or deficiencies."[75] As part of this evaluation, the auditor is required to consider risk factors related to the control deficiency and whether the deficiency, or a combination of deficiencies, will result in a misstatement of an account balance or disclosure, including:

a.    the nature of the financial statement accounts, disclosures, and assertions involved;

b.    the susceptibility of the related asset or liability to loss or fraud;

c.    the subjectivity, complexity, or extent of judgment required to determine the amount involved;

d.    the interaction or relationship of the control with other controls, including whether they are interdependent or redundant;

e.    the interaction of the deficiencies; and

f.    the possible future consequences of the deficiency.[76]

---

[74] AS 2201.69.
[75] AS 2201.63.
[76] AS 2201.65.

239.   GT failed to design and conduct its audit of Compass's ICFR to gather sufficient appropriate evidence to support its opinions that Compass's ICFR had no material weaknesses and were effective during the Class Period. *See infra* Section IV.f.iii. Indeed, in the Restatement Compass admitted that at least ten previously undisclosed material weaknesses existed at Compass and Lugano during the Class Period.

       **iii.**    **GT Recklessly Conducted Its Audits by Failing to Plan Audits Tailored to Compass's Corporate Structure, Secure the Necessary Audit Evidence to Support Its Clean Opinions, and Conduct Testing of Lugano's Financial Reporting with Skepticism**

240.   Given the PCAOB Standards referenced herein, GT should have designed its audit of Compass based upon the fact that Compass's financial operations and results are driven by its subsidiaries. Thus, to determine whether Compass's financial statements were fairly stated, GT needed to audit Compass's subsidiaries or, at a minimum, audit those subsidiaries that were primarily responsible for Compass's net revenues, operating income, and assets. During the Class Period, Lugano was purportedly Compass's highest performing subsidiary. Thus, GT should have tested Lugano's financial reporting that Compass used to prepare its financial statements.

241.   To properly test Lugano's financial reporting, GT should have planned and performed its audit so that it gathered sufficient audit evidence with respect to

Lugano's inventory, sales, key personnel's influence over financial reporting, and effectiveness of internal controls to ensure accounting procedures in accordance with GAAP.

242.  If GT had adhered to PCAOB Standards, GT would have conducted interviews of Lugano accounting and other personnel, interviewed Moti, made site visit(s) to Lugano, reviewed documentation and financial reporting of large sales transactions, and tested Lugano's accounting processes to gather sufficient audit evidence. Either GT performed all of these procedures and avoided or recklessly disregarded the obvious errors in the accounting and reporting of revenue and liabilities, or it did not perform the necessary audit procedures to properly test the material accuracy of the reported financials.

243.  Appropriate audit procedures would have readily gathered the following auditing evidence:

a.  Moti withheld inventory and sales transaction documentation from Lugano's internal accounting personnel, and at the end of reporting periods Moti would spontaneously provide information that made up for shortfalls to ensure that financial targets were satisfied;[77]

b.  Moti devised and executed diamond transactions with aggressive terms that were not recorded in Lugano's financial reports as a liability but rather only as revenue;[78]

---

[77] *See supra* ¶¶ 136–138, 143–148.
[78] *See supra* Section IV.e.iii.(4).

c.    Lugano personnel suspected that Moti was using the same inventory, *i.e.*, diamond, for multiple diamond transactions;[79]

d.    Moti was secretive about sales and inventory and bullied Lugano personnel when they requested this information for accounting purposes;[80]

e.    Lugano's reported sales outpaced actual customer interactions and Lugano personnel suspected that Moti was inflating sales numbers;[81]

f.    Moti retaliated against Lugano personnel who raised concerns about sales and inventory reporting;[82]

g.    Compass and Lugano accounting personnel were concerned that the Company was not in compliance with SOX;[83]

h.    Compass personnel were frustrated by Moti's failure to provide documentation to substantiate sales transactions;[84]

i.    Compass made insufficient efforts to force Moti to adhere to financial controls concerning financial reporting;[85] and

j.    at least two whistleblower complaints were made concerning Lugano's financial irregularities but there was no readily apparent corrective action taken by Compass to change Moti's practices.[86]

244.    If GT gathered at least some of this auditing evidence and followed its auditing obligations set forth in PCAOB Standards, GT would have detected the GAAP violations and changed the outcome of its audits so that investors would not

---

[79] *See supra* ¶ 102.
[80] *See supra* ¶¶ 119–121.
[81] *See supra* Section IV.e.iii.(2).
[82] *See supra* ¶¶ 120–121, 166.
[83] *See supra* ¶¶ 142–148.
[84] *See supra* ¶¶ 142–144.
[85] *See supra* ¶ 147.
[86] *See supra* Section IV.e.iii.(6).

have been misled about the true nature of Compass's internal controls and financial condition.

      **iv.**    **Compass's Violations of GAAP Were Violations of Basic, Straightforward, and Longstanding Accounting Principles That GT Should Have Easily Detected**

245.    When Compass filed its Restatement for 2022, 2023, and 2024, Defendants disclosed that the same pattern of accounting fraud persisted (and, indeed, increased in magnitude) throughout the Class Period. The systemic nature of the accounting fraud and its impact on Compass's overall financial reporting is so striking that no independent auditor should have missed it. GT's failures are only magnified by Perushek's and FE 10's whistleblower complaints that sounded the alarms regarding these exact accounting irregularities more than a year before Compass issued the Restatement. If in compliance with SOX Section 301, the complaints would have been routed to Compass's Audit Committee and then to GT. Given the scope of the Restatement, however, there is no indication that GT recommended any corrective action.

246.    SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "*will be presumed to be misleading or inaccurate*, despite footnote of other disclosures . . . ." 17 C.F.R. § 210.4-01(a)(1) (emphasis added). Violations of GAAP, therefore, equate to violations of SEC regulations (for publicly traded companies). The misstatements in

Compass's financial statements primarily concern two areas of GAAP: revenue recognition and internal controls and procedures.

247. For example, under GAAP Compass is required to record revenue during a reporting period only when it determines that the promised goods or services have been transferred to a customer in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To perform such evaluation, a company is required to consider the following five-step model of revenue recognition described by GAAP:

- Step 1 – Identify the contract with the customer.

- Step 2 – Identify the performance obligations in the contract.

- Step 3 – Determine the transaction price.

- Step 4 – Allocate the transaction price.

- Step 5 – Recognize revenue when or as the entity satisfies a performance-related obligation.

248. According to this model, revenue may only be recognized when control of the goods or services is passed along to the customer. Determination regarding whether control of the goods or services has been passed to the customer is based on criteria such as whether the customer or the company holds legal rights to titles or whether the physical possession of the goods or services has been passed along to the customer.

249.   With respect to side agreements and other such contract terms that effectively amend the parties' sales contract (such as the provisions in Lugano's investment diamond transactions permitting Lugano's counterparty to unilaterally demand the withdrawal of their investment sum with interest), the SEC cautioned companies in SEC Staff Accounting Bulletin, Topic 13: Revenue Recognition ("Topic 13") to ensure that appropriate policies, procedures, and internal controls exist and are properly documented so as to provide reasonable assurances that the sales transaction is properly accounted for in accordance with GAAP. The SEC stated that side agreements could include cancellation, termination, or other provisions that affect revenue recognition, and that the existence of a side agreement may indicate that recognition of revenue was not appropriate. This is especially true of the terms Moti included in Lugano's investment diamond transactions, which, among other contingencies, permitted Lugano's counterparty to demand the return of their investment with interest. *See supra* Section IV.e.iii.(4).

250.   Here, by consistently recognizing revenue throughout the Class Period with respect to certain investment diamond transactions even though an investor in such diamonds could demand the return of their investment, control over the diamond was not transferred from Lugano to its customers, meaning that GAAP prohibited Lugano from recognizing revenue from such side agreements. In this, the Company—and, by issuing "clean" audit reports vouching for the accuracy of

Compass's financial statements, GT—violated the most basic principles of revenue recognition. The effect of these errors was to make the Company's revenues (as well as net income and accounts receivable, among other financial statement metrics) appear to be materially greater than they actually were.

251.  FASB Codification 250-10-45 ("ASC 250-10-45") states that any error in the financial statements of a prior period discovered after the financial statements are issued or are available to be issued shall be reported as an error correction, by restating the prior-period financial statements. ASC 250-10-45 further states that in determining materiality for the purpose of reporting the correction of an error, amounts shall be related to the estimated income for the full fiscal year and also to the effect on the trend of earnings. If an error is material relative to the estimated income for the full fiscal year or relative to the effect on the trend of earnings, then GAAP requires that it be restated. Although the Company's Restatement on its face was material, such restatement by the Company is also an admission that the financial statements, as originally reported, were materially misstated.

252.  GT should have identified Lugano's and Compass's improper revenue recognition at multiple points during its interim and annual audits. *See supra* Section IV.f.iii.

253.  During the Class Period, GT filed "clean" audit reports for financial statements stating that Lugano achieved net sales of approximately $202 million in

2022, approximately $308 million in 2023, and approximately $471 million in 2024. As subsequently disclosed in the Restatement, however, Lugano's true net sales during the Class Period never exceeded $61 million in a single year, ultimately requiring Compass to restate Lugano's net sales by approximately $164 million, approximately $275 million, and approximately $410 million in 2022, 2023, and 2024, respectively—a correction of almost $850 million across a mere three years. These disparities correspond in time with Lugano's improper recording of funds received in investment diamond transactions as revenue, which was rampant throughout the Class Period. *See supra* Section IV.e.iii.(4).

254.    Had GT undertaken audit procedures to provide reasonable assurance that Compass's financial statements were presented in conformity with GAAP, it would have detected that Compass's net sales were misstated by almost $850 million over a mere three years of financial statements.

255.    Had GT applied "professional skepticism" during its 2022, 2023, and 2024 audits, it would have detected that Compass's net sales were misstated by almost $850 million over a mere three years of financial statements.

256.    Had GT performed risk assessment procedures sufficient to provide a reasonable basis for identifying and assessing the risks of material misstatement affecting Compass's 2022, 2023, and 2024 financial statements, it would have

detected that Compass's net sales were misstated by almost $850 million over a mere three years of financial statements.

257.   Had GT performed audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for its 2023, 2023, and 2024 audit reports, it would have detected that Compass's net sales were misstated by almost $850 million over a mere three years of financial statements.

258.   Had GT performed audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for its 2023, 2023, and 2024 audit reports, it would have identified several material weaknesses in Compass's ICFR that allowed Lugano to improperly recognize such net sales and, thus, concluded that the Company's ICFR were ineffective during the Class Period in contrast to the Company's representations.

259.   Moreover, given the magnitude of the disparity between Compass's reported and restated net sales over the Class Period, GT's interim reviews of Compass's quarterly financial information presented in the Company's Forms 10-Q were also deficient. Had GT undertaken the analytical procedures and completed the inquiries required by PCAOB Standards, GT would have detected that the total net sales in Compass's quarterly reports during the Class Period were misstated by almost $850 million over a mere three years of financial statements. Indeed, former Lugano employees recall that Lugano's widespread use of improperly recorded

investment diamond transactions was common knowledge among employees during the Class Period. *See supra* Section IV.e.iii.(4). Had GT made inquiries of Lugano's employees responsible for financial and accounting matters, and reviewed the financial transactions at Lugano, as required by PCAOB Standards, it would have detected Lugano's financial irregularities. Indeed, GT could have detected Lugano's financial irregularities by interviewing the person most responsible for Lugano's financial and accounting matters: FE 12, who directly observed Lugano improperly record at least two investment diamond transactions. *See supra* ¶¶ 163–166. If GT did in fact interview these employees or review the records underlying the financial transactions, then GT recklessly disregarded obvious red flags and erroneous entries that were made and overlooked the massive misreporting of revenue by Lugano and Compass.

260.   Compass's accounting misstatements that necessitated the Restatement violated basic, longstanding, and straightforward provisions of GAAP—provisions that even GT's most junior auditor associates should know backward and forward. Further, had GT exercised its auditor duties in accordance with each of the PCAOB Standards set forth above, *see* Section IV.f.i.(1), GT would have readily identified the accounting irregularities and alerted Compass to the need to correct the errors rather than issue clean audits that ultimately misled investors and caused financial harm.

       **v.**     **During the Class Period, PCAOB's Annual Inspections of GT Identified the Same Auditing Deficiencies That Resulted in GT Improperly Issuing Clean Audits for Compass**

261.   The PCAOB annually inspects accounting firms to assess their compliance with PCOAB Standards and rules and other applicable regulatory and professional requirements. During the Class Period, the PCAOB inspected a sample of integrated audits that GT had conducted of public companies. In both its 2023 and 2024 inspections of GT, the PCAOB found "significant" instances of the same deficient auditing practices that compromised GT's "clean" audit reports concerning Compass's financial statements.

262.   In the 2024 inspection report and the 2023 inspection report which included historical findings from 2022, the PCAOB made several findings relevant to GT's audit practices during the Class Period. Specifically, the PCAOB found:[87]

      a.    in the 2022 sampled audits, a 54% deficiency rate in "Part 1.A" audit functions indicating that the audit "deficiencies . . . were of such significance that we believe the firm, at the time it issued its audit report(s), had not obtained sufficient appropriate audit evidence to support its opinion(s) on the issuer's financial statements and/or internal control over financial reporting ICFR)";

      b.    in the 2023 sampled audits, a 31% deficiency rate in "Part 1.A" audit functions indicating that the audit "deficiencies . . . were of such significance that we believe the firm, at the time it issued its audit report(s), had not obtained sufficient appropriate audit evidence to

---

[87] PCAOB, *2024 Inspection Grant Thornton LLP*, PCAOB Release No. 104-2025-038 (Feb. 26, 2025); PCAOB, *2023 Inspection Grant Thornton LLP*, PCAOB Release No. 104-2024-084 (May 23, 2024).

support its opinion(s) on the issuer's financial statements and/or internal control over financial reporting (ICFR)"; and

c.    in the 2024 sampled audits, a 48% deficiency rate in "Part 1.A" audit functions indicating that the audit "deficiencies . . . were of such significance that we believe the firm, at the time it issued its audit report(s), had not obtained sufficient appropriate audit evidence to support its opinion(s) on the issuer's financial statements and/or internal control over financial reporting (ICFR)."

263.    As to the Part 1.A deficiencies in GT's audited financial statements, the PCAOB noted that in some of the sampled audits, GT:

a.    "[d]id not perform sufficient testing related to a significant account or disclosure or to address an identified risk";

b.    "[d]id not perform sufficient testing of data or reports used in the firm's substantive testing";

c.    "[d]id not sufficiently evaluate the appropriateness of the issuer's accounting method or disclosure for one or more transactions or accounts"; and

d.    "[d]id not obtain sufficient evidence as a result of overreliance on controls (due to deficiencies in testing controls) . . . ."

264.    As to the Part 1.A deficiencies in ICFR, the PCAOB noted that in some of the GT audits it sampled from 2022, 2023, and 2024, GT:

a.    "[d]id not perform sufficient testing of the design and/or operating effectiveness of controls selected for testing";

b.    "[d]id not identify and test any controls that addressed the risks related to a significant account or relevant assertion";

c.    "[d]id not appropriately evaluate control deficiencies"; and

d.    "[d]id not identify and/or sufficiently test controls over the accuracy and completeness of data or reports that the issuer used in the operation of controls . . . ."

265.    In its 2023 and 2024 inspection reports, the PCAOB also found in years 2022–2024 that GT had as many as 13 different types of "Part 1.B" deficiencies. Notable deficiencies that PCAOB found in some of the sample GT audits include:

a.    non-compliance with AS 1105 (Audit Evidence), failure to perform sufficient procedures to test whether journal entries were complete;

b.    non-compliance with AS 2110 (Identifying and Assessing Risks of Material Misstatement), failure to evaluate certain factors when determining that there were no risks of material misstatements to one or more accounts and/or disclosures; and

c.    non-compliance with AS 3101 (The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion), failure to perform procedures to determine whether or not matters were critical audit matters.

266.    Each of these identified "Part 1.A" and "Part 2.B" deficiencies in GT's auditing practices during 2022-2024 is consistent with GT's failures in its audits of Compass that did not detect Lugano's rampant financial irregularities. *See supra* Section IV.f.iii. The PCAOB noted that these auditing deficiencies correlated to several PCAOB Standards, including AS 1105, AS 2110, AS 2201, AS 2301, and AS 2810.

## V.    THE TRUTH IS GRADUALLY REVEALED

### a.    First Loss Causing Event: May 7, 2025

267.   For a time, Lugano—and, by extension, Compass—seemed destined for continued explosive growth and potentially a lucrative sale. But then things faltered. On May 7, 2025, Compass disclosed that an ongoing investigation into Lugano had uncovered "irregularities in Lugano's non-CODI financing, accounting, and inventory practices," including "unrecorded financing arrangements and irregularities identified in sales, cost of sales, inventory, and accounts receivable recorded by Lugano." Accordingly, based on the advice of outside legal counsel, a forensic accounting firm, and Defendant GT, Compass announced that its 2024 financial statements should no longer be relied upon in light of "the materiality of the preliminary findings of the investigation."

268.   The press release further quoted chairman of the board Enterline, who stated that Compass "and its employees reacted swiftly and decisively to a concern regarding Lugano, elevating it immediately to our Audit Committee."

269.   That same day, Moti resigned, effective immediately and without severance, from his role as Lugano's CEO and from his seat on Lugano's Board of Directors. Compass appointed Josh Gaynor, Lugano's recently hired President, to serve as Lugano's interim CEO.

270.   These revelations caused a precipitous drop in the price of Compass's securities, as the price of Compass's common stock plummeted from $17.25 per share at close of trading on May 7 to $6.55 per share on May 8, 2025—a catastrophic

decline of approximately 62%. Similarly, the price of Compass's Series A preferred shares dropped approximately 29% from $22.81 per share at close of trading on May 7 to $16.23 per share on May 8, 2025.

### b. Second Loss Causing Event: May 27, 2025

271. The truth was further partially revealed on May 27, 2025, when Compass published an "update on steps it is taking to enhance liquidity and reduce costs in the wake of its announcement that it is investigating, and has preliminarily identified irregularities in, the financing, accounting, and inventory practices at its subsidiary, [Lugano]." In pertinent part, Compass's press release announced that the Company had entered into a Forbearance Agreement with various of its lenders. The terms of the Forbearance Agreement imposed multiple restrictions on Compass, including: (i) a reduction of Compass's aggregate borrowing amount for revolving commitments to $100 million; (ii) limiting the management fees paid by Compass and Compass's subsidiaries to CGM to $10.5 million and $2.0 million per fiscal quarter, respectively; and (iii) restricting Compass's investment in Lugano by no more than $5 million in the aggregate.

272. The press release further announced that Compass was "suspend[ing] the quarterly cash distribution historically paid to common shareholders in order to preserve cash and protect long-term value."

273.    The press release quoted Defendant Sabo, stating that Compass was "taking decisive action to enhance liquidity, reduce costs, and preserve value for all stakeholders[.]" The press release further quoted Defendant Sabo as stating that Compass was "encouraged by the support of our lenders as we take the necessary steps to reduce leverage and restore compliance with our debt covenants."

274.    On this news, Compass's stock price fell even further, with the Company's share price falling from $7.52 per share at close of trading on May 27 to $6.61 on May 28, a decline of approximately 12%.

275.    Compass subsequently entered into four additional Forbearance Agreements, dated July 28, 2025; October 10, 2025; November 10, 2025; and November 24, 2025. These additional Forbearance Agreements imposed further restrictions on Compass's operations, such as restricting Compass's total cash disbursements in any calendar week to a specified amount

### c.    Final Loss Causing Event: December 4, 2025

276.    The truth was fully revealed after the close of trading on December 4, 2025, when Compass hosted an investor call to discuss the Company's soon-to-be-filed Restatement.

277.    At the start of the call, Defendant Sabo announced that Compass's investigation into Lugano "has now concluded." Describing the results of Compass's

investigation as "deeply troubling," Defendant Sabo went on to disclose the

shocking nature and magnitude of Lugano's financial irregularities:

> ***What the Audit Committee discovered was deliberate and systemic fraud. The former Lugano CEO engaged in a scheme to significantly overstate Lugano's sales and profits, misrepresent the existence and value of Lugano's inventory and keep potential financial liabilities off Lugano's books and records***. His efforts to hide his fraud were extensive. He created fake sales transactions to inflate Lugano's reported revenues, claimed inventory that either didn't exist or didn't belong to Lugano and entered into numerous unreported financing arrangements with third parties that he kept off Lugano's balance sheet.
>
> These arrangements directly violated multiple CODI policies as well as the terms of CODI's intercompany credit agreement with Lugano. In support of his fraud, he relied on a complex network of undisclosed counterparties and financing arrangements, and prepared false documents and records to support these transactions and evade detection by CODI's management and auditors. Importantly, the Audit Committee's investigation found no evidence that this fraud extended beyond Lugano to CODI or to any of CODI's other subsidiaries.
>
> Further, the Audit Committee's investigation makes clear that the former Lugano CEO's actions were not mistakes or errors in judgment. This was intentional fraud carried out through a deliberate scheme to bypass controls that were put in place to prevent this type of misconduct. ***This fraud persisted for multiple reporting periods and increased in magnitude.***

278. Defendant Sabo then turned the call over to Defendant Keller, who

confirmed the devastating impact of Lugano's fraud on Compass's financial

performance:

*At a high level, the restatement significantly reduced our reported inventory. Consolidated inventory for 2024 was reduced by greater than $375 million or nearly 40%. All of this is related to Lugano. It also brought into our balance sheet additional short-term debt related to previously undisclosed financing arrangements at Lugano. And further, Lugano's revenue declined by more than 85% from previously recorded levels following the removal of the fraudulent revenue*.

All of these adjustments will be reflected in our financial statements. And again, they are all driven by changes in Lugano's financials. *Ultimately, the Lugano business was significantly smaller than initially reported.*

*As a result, its cost structure was misaligned with its true scale and it generated significant losses. Inventory levels were materially below what we had previously understood*. Lugano at the direction of the independent Board of Directors filed for Chapter 11 protection on November 16, 2025 and commenced a Section 363 sale process.

Lugano expects recovery from the sale of existing inventory, refunded taxes as well as potential insurance claims, civil recoveries and other sales of assets. Lugano's recoveries, net of expenses, will be distributed to Lugano's creditors. CODI is Lugano's senior secured creditor, but all recovery is subject to court approval. *Regardless of what we ultimately recover from Lugano bankruptcy, the cost of the Lugano fraud will by a wide margin represent the most significant loss CODI has experienced since its inception.*

279. Defendant Keller also conceded that, as early as Compass's 2021 acquisition of Lugano, Lugano "was a departure from [the] capital-light cash flow-positive professionally managed businesses that have driven our success for over two decades. Uniquely, we partnered with a founder who retained significant

133

ownership, continued to serve as CEO and was instrumental in most aspects of the business. While we took steps to address this after the acquisition, *[Moti] exploited the ownership structure and concentrated key man risk to circumvent our controls.* Based on these learnings, we are refining our acquisition criteria and governance expectations, so overreliance on a founder CEO, coupled with atypical industry-specific practices will be avoided in future acquisition decisions."

280.   In confirming the "deliberate and systemic" nature of Lugano's financial irregularities as well as the irregularities' comprehensive effect on Compass's financial reporting, Compass's December 4 investor call revealed the final details of Defendants' fraud and marked the end of the Class Period. On this news, the price of Compass's common stock dropped from $7.38 per share at close of trading December 4 to $5.73 per share on December 5, a decline of approximately 22%.

281.   Although Defendants Sabo and Keller blamed Moti for the securities fraud, Defendants failed in every way to act on obvious and persistent red flags concerning Lugano's financial operations. Defendants could have stopped Lugano's financial irregularities and prevented the harm caused to Compass's shareholders. Instead, they did nothing.

### d.    Additional Revelations Concerning Defendants' Fraud

282.   Additional announcements supplied further details regarding the impact of Lugano's previously undisclosed financial irregularities on Compass's financial health.

283.   In the months following the May 2025 initial announcement regarding Lugano's financial irregularities, Lugano reduced its workforce by 25%, cutting its headcount by approximately 140 employees across the United States and the United Kingdom. Lugano also announced the closures of its salons in London, Greenwich, and Washington, D.C.

284.   Further context regarding the potential magnitude of Compass's Restatement emerged on June 18, 2025, when Compass filed a Form 8-K disclosing that the ongoing internal investigation of Lugano had revealed similar financial irregularities across fiscal years 2022 and 2023, such that the previously issued financial statements for those fiscal years should also no longer be relied upon. Compass reiterated that it was "continuing to evaluate the impact of these matters on internal control over financial reporting" for all three fiscal years and that the Company "expects to report one or more material weaknesses in internal control over financial reporting."

285.   The storm clouds facing Lugano (and, by extension, Compass) darkened even further on November 16, 2025, when Lugano and its subsidiaries filed for protection under Chapter 11 of the U.S. Bankruptcy Code. In connection with

Lugano's bankruptcy filing, Compass agreed to provide up to $12 million in debtor-in-possession financing to Lugano. Lugano's bankruptcy filings acknowledged that, pursuant to Lugano's and Compass's investigation into Lugano's financial irregularities, Lugano's new management had "heard from close to sixty (60) persons asserting substantial claims related to alleged transactions ('Investment Contracts') entered into by Mr. Ferder. . .which were outside Lugano Diamond's ordinary course of business." Decl. of J. Michael Issa Supp. Chapter 11 Pets. ¶ 31, *In re Lugano*, No. 25-12055-BLS Nov. 16, 2025), ECF No. 2.

286.    The disclosure of Lugano's financial regularities also had a devastating effect on Compass's operations. For example, Compass announced on December 9, 2025 that it had hired investment bank Raymond James to sell one of the Company's highest-performing subsidiaries, the Honey Pot. In its article on the planned sale, Reuters explicitly connected Compass's plan to the Company's Lugano-related financial misfortune, noting that "[s]elling the Honey Pot could help alleviate some of Compass's debt load."

287.    Compass also cut ties with Defendant Maciariello due to his perceived responsibility for the Company's failure to detect and act on Lugano's financial irregularities both during pre-acquisition due diligence and after the acquisition. According to FE 1, in August 2025, Compass circulated an internal communication announcing that Maciariello would be retiring from his position as COO, and that

his responsibilities would be handled on an interim basis by another employee. Maciariello officially left the Company in December 2025, but according to FE 1, he ceased performing duties for Compass in August 2025. FE 1 believed that Compass put Maciariello "on the backseat" to avoid questions about Compass's potential failure to detect and act on red flags during the Lugano acquisition.

288.   The tale of Defendants' fraud took a further dramatic turn on December 8, 2025, when *Bloomberg* reported that the FBI was investigating Lugano's financial irregularities. According to *Bloomberg*, FBI agents had "interviewed individuals who struck deals with Lugano founder and former chief executive officer Mordechai 'Moti' Ferder."[88] *Bloomberg* further cited a June email from Lugano's interim CEO Gaynor to the counterparty to one of the investment diamond transactions, in which Gaynor encouraged the counterparty to contact an FBI agent regarding "any parallel criminal investigations[.]" The article quoted Compass and Lugano spokespeople acknowledging the FBI investigation and stating that the companies were cooperating with the probe. The article further quoted Moti's personal lawyer, stating that Moti was "focused on defeating the civil claims brought against him as

---

[88] Jonathan Randles, *FBI is Probing Diamond Deals Struck by Founder of Jeweler Lugano, Bloomberg* (Dec. 8, 2025, 4:38 PM), https://www.bloomberg.com/news/articles/2025-12-08/fbi-is-probing-diamond-deals-struck-by-founder-of-jeweler-lugano//.

well as prosecuting the counterclaims he intends to file against Compass Diversified, Lugano, and others." *See infra* Section V.e.

289.   Lugano's financial irregularities also attracted attention from financial regulators. As disclosed in the Company's Form 10-Q filed December 29, 2025 for the fiscal quarter ended June 30, 2025 (the "2025 Q2 10-Q), Lugano's financial irregularities are subject to "ongoing investigations initiated by the United States Securities Exchange Commission[.]" The 2025 Q2 10-Q further disclosed that the Financial Industry Regulatory Authority ("FINRA") "initiated a routine review of trading activity in the Company's securities following the public announcement of the restatement," and that FINRA, upon completing its review, "referred the matter to the SEC for whatever actions the SEC deems appropriate." As of February 6, 2026, no employee of Compass or Lugano has been formally charged with misconduct by the FBI or the SEC.

290.   On December 18, 2025, Compass filed its Form 10-Q as of and for the fiscal quarter ended March 31, 2025 (the "2025 Q1 10-Q"). The 2025 Q1 10-Q revealed additional details about the effect of the fallout from Lugano's financial irregularities on Compass's ability to continue doing business. Specifically, the 2025 Q1 10-Q disclosed that Compass's financial condition "raise[d] substantial doubt about the Company's ability to continue as a going concern":

> Because there can be no assurance that amendments to the Company's debt instruments or any other relief will be

obtained before an acceleration remedy would become available to the 2022 Credit Facility lenders or the holders of the 2029 Notes and 2032 Notes, management has concluded, applying the going-concern guidance under U.S. GAAP, that these conditions raise substantial doubt about the Company's ability to continue as a going concern within one year after the date the consolidated financial statements included in this Form 10-Q are issued. Although the Company is actively negotiating an amendment to the 2022 Credit Facility that would include a waiver of ongoing noncompliance, that amendment has not been executed, is not fully within the Company's control, and therefore cannot be considered a probable mitigating plan for purposes of alleviating substantial doubt.

e.    **Lugano's Customers and Creditors Have Filed Lawsuits Against Moti, Lugano, and Compass, Alleging Rampant Fraud**

291.   While investors waited for Compass to file its restated 2022, 2023, and 2024 financial statements, numerous of Lugano's creditors and former customers sued Moti, Lugano, and Compass, alleging a host of improprieties related to Lugano's previously undisclosed financial irregularities. The allegations in these lawsuits corroborate the accounts of former Compass and Lugano employees regarding Lugano's financial irregularities, *see supra* Section IV.e.iii.(4), as well as the publicized results of Compass and Lugano's own investigations into these irregularities.

292.   Many of these lawsuits allege that Moti solicited customers, suppliers, and other business associates to engage in so-called investment diamond transactions, consistent with the investment diamond scheme described by Lugano's former

employees. *See supra* Section IV.e.iii.(4). The lawsuits further allege that Moti failed to acquire and/or sell the stones as required by the investment diamond contracts; yet, when the counterparties requested repayment pursuant to each contract's Put Right clause, Moti refused to pay back the counterparty's investment. The alleged dates of the investment diamond transactions documented in these complaints range from as early as February 2021—during or shortly before Compass's supposedly rigorous due diligence into Lugano's operations ahead of the September 2021 acquisition—to throughout Compass's ownership of Lugano as late as March 2025, mere weeks before Compass finally disclosed Lugano's financial irregularities to the market.

293.    Another lawsuit was filed by one of Lugano's longtime suppliers, Champion. According to Champion's complaint, Lugano failed to pay Champion over $52 million in goods between 2018 and 2025. Compl. ¶ 2, *Champion Force* (July 24, 2025), ROA No. 2. Champion's complaint further alleges that, to obscure his debt to Champion within Lugano's accounting system, Moti personally manipulated Lugano's sales records to "zero[] out [Lugano's] accounts with Champion on a yearly basis with supposed barter entries." *Id.* at ¶ 28. Champion's complaint alleges that Compass "would and did actively supervise and directly control Lugano's accounting, inventory, and customer accounts." *Id.* at ¶ 15.

294.   Additionally, on June 30, 2025, Lugano's new management sued Moti for fraud, concealment, civil theft, and similar causes of action. On November 26, 2025, an amended complaint was filed in the action. Am. Compl., *Lugano v. Ferder* (Nov. 26, 2025), ROA No. 53. The allegations in Lugano's complaint mirror the allegations in the complaints filed by Lugano's customers and creditors. Specifically, Lugano's amended complaint alleges:

a.   that Moti conspired with his son, Tom Ferder, to conceal Lugano's investment diamond transactions and other off-the-books deals;

b.   that these transactions should have been recorded in Lugano's financial statements as liabilities totaling more than $100 million, yet Moti disguised the money coming from counterparties as revenue from direct sales;

c.   that Moti concealed these transactions by forging invoices and shipping empty boxes to create the appearance of legitimate sales; and

d.   that Moti stole millions from Lugano by authorizing fraudulent wire transfers to his personal trust account. *Id.* ¶¶ 2–3.

295.   In a Case Management Statement filed November 14, 2025, Moti alleged the following regarding Compass's complicity in Moti's actions:

> [Moti] denies these allegations and contends this case was filed to scapegoat [Moti] and divert attention from [Lugano's] own culpability. [Moti] contends that (i) 100% of the funds generated by the third party contracts went to

[Lugano], none of the contract proceeds went to [Moti] or any entity associated with him; (ii) both [Lugano] and Compass Diversified Holdings, Inc. (record owner of 60% of [Lugano's] shares) were aware of the allegedly unauthorized contracts; (iii) [Moti] and Compass each knowingly profited from these contracts; and (iv) individual executives of both Lugano and Compass have defamed [Moti].[89]

296.    Similarly, in a filing in the Lugano bankruptcy case, Moti alleged the following regarding Compass's complicity in Moti's actions:

> Claims of ignorance by Compass, the 60% controlling shareholder of Lugano[,] are simply not credible. **Compass knew of the financing and inventory practices that Lugano was using from the beginning. Compass was aware of the practices it now conveniently calls "misconduct" but left them in place.** Lugano was content to profit from the [investment diamond transactions], but as soon as [the investment diamond counterparties] began filing actions, Lugano and Compass faced a choice: they could either work with Ferder to manage the alleged shared liability or scapegoat the founder of Lugano – Ferder. Unfortunately, Lugano chose the latter, filing a public complaint – the State Court Action – filled with inflammatory and false allegations, which only made matters worse, raised more red flags, and provided more incentive for [investment diamond counterparties] to sue.[90]

---

[89] Case Management Statement at Attachment 4b, *Lugano v. Ferder*, No. 30-2025-01492210-CU-CO-CJC (Cal. Super. Ct. Cnty. Orange Nov. 14, 2025), ROA No. 44.
[90] Mot. for Relief ¶ 41, *In re Lugano*, No. 25-12055-BLS (Jan. 27, 2026), ECF No. 312.

297.   Likewise, a *Forbes* exposé of Lugano and Compass, published February 2, 2026, quotes Moti's attorney alleging that Compass and Defendant Sabo knowingly benefited from Lugano's financial irregularities:[91]

> How could Compass and Sabo miss all these signs [of Lugano's financial irregularities]? They didn't, insists Ferder's attorney Jeff Reeves, who says Ferder is being scapegoated and the allegations are "a sad and obvious attempt at deflecting blame."

> Reeves claims the financing arrangements were common practice in the luxury jewelry industry, and Compass with its audit committee, internal auditors and external auditors had to know what was happening. **"Compass missed nothing. It was aware of what was happening," says Reeves.** "There was no fraud here."

> . . .

> Furthermore, he claims Compass is now engaging in a cover up. "The decline in revenue that Compass is asserting is fiction" and part of a false narrative to obscure Compass's own culpability for failing to adequately oversee Lugano's financial reporting. **Compass knew about the deals and "they left them in place so they could enjoy the operational benefits," says Reeves**.

> Sabo, 54, declined through a spokesperson to speak to *Forbes* on Lugano's collapse or whether he's fired anyone over it. For now Compass alleges Ferder "relied on a complex network of undisclosed counterparties" and "took exceptional actions to ignore or override the controls" put in place by Compass "to evade detection." Lugano also alleges that his son Tom Ferder, formerly a business development executive at Lugano, was involved in the scheme, using his connections to arrange off-the-books diamond deals. In SEC filings it also alleged that

---

[91] Helman, *supra* note 5.

Ferder manipulated Lugano employees "who exhibited a lack of due care."

Ferder's attorney says this alleged "complex network" included virtually everyone at Lugano including interim CEO Josh Gaynor (who is not giving interviews) and confirms that his client, who faces no criminal charges, intends to file counterclaims. **"None of what Compass is now alleging, if it were true, could have occurred without the knowledge and involvement of numerous people," says Reeves.** In its response to *Forbes*, Compass says "CODI rejects the suggestion that we participated in, condoned, or benefitted from Mr. Ferder's conduct."

f.    **After a Months-Long Investigation, Compass Restated Its 2022, 2023, and 2024 Financial Statements, Confirming That Defendants Materially Misstated Lugano's Revenues and Concealed Certain Material Weaknesses in Compass's Disclosure Controls and Procedures**

298.    Finally, on December 8, 2025, Compass filed restated audited consolidated financial statements for fiscal years 2022, 2023, and 2024 in a Form 10-K/A (the "Restatement"). The Restatement admitted that Defendants had consistently and dramatically overstated Lugano's revenues, resulting in a correspondingly consistent and dramatic misrepresentation of Compass's overall financial health. *See infra* Section VI.a.

299.    Compass also disclosed a total of ten material weaknesses in Compass and Lugano's disclosure controls and procedures. The Company identified three control deficiencies at Compass:

1.    Incomplete Risk Assessments Concerning Lugano

Due to the Company's lack of prior specific experience with the diamond industry, Company management did not conduct an effective risk assessment of Lugano, resulting in an incomplete understanding of the risks and the manner and means of fraud and loss associated with the industry, including the practice of inventory sharing and the loaning of high-value diamonds among vendors. As a result of the incomplete risk assessment, the Company failed to develop and implement internal controls that adequately addressed the risk that existed at Lugano.

2.    Inadequate Monitoring Controls and Control Environment for Lugano

Compensating and monitoring controls implemented by the Company's management over Lugano lacked the necessary precision and rigor to effectively mitigate the risk of material misstatement. In addition, enhancements of these controls that were implemented at Lugano by the Company were insufficient due to, among other things, the circumvention of Lugano's controls, collusion by [Moti] with third parties, and the lack of due care by Lugano employees in the execution of their internal control responsibilities.

3.    Deference to the Former Lugano Chief Executive Officer

Company management too often deferred to [Moti] and allowed Lugano to operate with elevated autonomy, weakening the overall tone of compliance at Lugano, creating a perceived lack of support for the internal audit team, and creating an environment where Lugano could fail to fully implement, adhere to, or enforce SOX controls.

300.  Compass further disclosed seven control deficiencies at Lugano:

1.    Tone at the Top

145

The actions and business practices of [Moti] created a culture focused on financial performance at all costs in order to satisfy (or not disobey) [Moti], as opposed to creating the culture of commitment to ethics and compliance expected of a subsidiary of a publicly traded corporation. [Moti] took exceptional actions to ignore or override the controls designed by CODI management, or otherwise leverage his significant knowledge of the diamond business and his personal connections within it, to circumvent Lugano controls, including among other actions: disregarding directives from the Company and the Audit Committee; deliberately delaying responses to audit requests; manipulating systems and records, disregarding delegations of authority controls; entering into and not disclosing unauthorized financing transactions; receiving and making inappropriate payments; colluding with third parties; overriding revenue recognition policies; convincing suppliers to provide fraudulent attestations concerning "memoed out" inventory; and intentionally failing to adhere to or monitor expense controls.

## 2.    Segregation of Duties at the Lugano Management Level

[Moti] had the ability to create customer invoices, approve customer pricing and credit terms, collect receivables, edit customer files within Lugano's jewelry store management software, and, for certain transactions, controlled product receipt and delivery and directed the application of cash receipts. Despite the implementation of compensating controls (including a three-way match process, inventory reconciliation controls, and new customer approval controls) and installing additional staff to mitigate segregation of duties issues, [Moti] was able to override these controls. Further, certain Lugano employees exercised a lack of due care in the execution of those compensating controls.

## 3.    Security Access Rights for Lugano's Former Chief Executive Officer

146

[Moti] retained broad access to several functions within Lugano's jewelry store management software, allowing him to manipulate or create inventory and customer information and records and other information and records that would be incorporated into the Company's financial statements. Compensating controls implemented to account for [Moti's] system failed to operate as designed due the issues discussed above.

### 4. Inadequate Skillsets Among Key Lugano Employees

Employees in key roles at Lugano who were in a position to detect the actions of [Moti] often lacked necessary skills for their responsibilities, the ability to implement and execute effective controls, or sufficient professional maturity to resist [Moti's] authority, raise concerns with Company management, or set an appropriate "tone at the top" for other employees.

### 5. Revenue Controls

Revenue controls did not operate effectively during the period, due to circumvention and override by [Moti], lack of sufficient review and validation procedures over the completeness and accuracy of key revenue inputs (including contract terms, customer acceptance criteria, and delivery confirmations), and failures to maintain adequate documentation or evidence to demonstrate Lugano management's review of revenue transactions in accordance with accounting standards.

### 6. Inventory Controls

Inventory, cost of sales, and purchase-to-pay controls to identify issues with respect to Lugano's diamond and jewelry inventories did not operate effectively due to circumvention and override by [Moti] and his collusion with third parties, and failures to maintain adequate documentation or evidence to demonstrate the acquisition, ownership, existence, or value of inventory. Controls were not adequately designed to inform management of

Lugano's rights, obligations, and ownership with respect to Lugano's inventory.

8. [*sic*] Expense Controls

Business expense controls (including travel and entertainment, corporate credit card usage, and employee reimbursement processes) were inadequate or did not sufficiently prevent or detect improper, unsupported, or misclassified business expenses on a timely basis by Lugano executives.

301.   The Restatement also disclosed the Company's current and planned efforts to remediate the control deficiencies identified at Compass. Specifically, Compass disclosed that it had "undertaken and [was] continuing to undertake" the following actions to "reemphasize [the Company's] commitment to integrity and ethical values in our control environment":

- Ensuring that individuals responsible for internal controls possess appropriate expertise specific to the industries in which future acquisition targets and current and future operating subsidiaries conduct their business, providing targeted training or engaging qualified specialists as needed to support control implementation and effectiveness;

- Conducting a full review of the Company's compliance and governance policies and procedures in order to assess and recommend potential changes, as appropriate, for the Board's review and approval. Key initial considerations designed to enhance the Company's compliance program include implementing a dedicated corporate ethics and compliance office with appropriate resources, refreshing compliance policies and procedures, including the code of conduct, and establishing management steering committees tasked with oversight over functions associated with the identified material weaknesses,

including compliance, risk assessment, credit, and investment;

- Reevaluating investment processes, parameters, risk assessment, and governance requirements in respect of potential acquisitions, providing for increased visibility and oversight of acquired companies, and enhancing post-acquisition onboarding processes including an assessment of the processes and controls of the acquired entity and support for designing new, or redesigning existing, processes and controls for the acquired entity;

- As of August 27, 2025, retaining an external expert to lead the Company's internal audit function;

- Evaluating the risk and compliance functions, including enhancing the effectiveness of the implementation and monitoring of risk and controls at the subsidiary level and of the whistleblower program;

- Evaluating the internal audit function, including evaluation of its composition and structure, alignment of roles and responsibilities to individuals who possess appropriate skillsets and industry knowledge, including the use of external experts, when necessary; updating the internal audit charter, reporting lines and scope of responsibilities, ongoing and periodic self-assessments, and providing for an external quality assessment at least once every five years in accordance with International Standards for the Professional Practice of Internal Auditing; and

- Ensuring proper tone at the top which mandates and supports clear, regular, and unambiguous reporting to senior management and the Audit Committee, which in turn will increase transparency and oversight with respect to audit findings, remediation state and control effectiveness metrics.

149

302. Additionally, Compass disclosed four remediation actions it had planned to implement at Lugano, but was no longer implementing in light of Lugano's bankruptcy, which removed Lugano from the Company's internal control environment:

- Assessing the skillset of Lugano employees, including within the Lugano finance and accounting functions, to evaluate necessary organizational changes;

- Evaluating roles and responsibilities / job functions across Lugano's finance, accounting, and operations to ensure there is sufficient and adequate separation over authorization, custody of assets, recordkeeping, and reconciliation controls and responsibilities;

- Strengthening monitoring controls with the assistance of the Lugano finance function that considers financial and accounting metrics, including cash flow results, as well as operational results and metrics; and

- Strengthening internal controls over inventory to ensure accurate recording and safeguarding of assets. Enhancing procedures to ensure the existence and value of, and title to, inventory.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### a. The Compass Defendants' Materially False and Misleading Statements and Omissions

303. During the Class Period, Defendants Compass, Sabo, Maciariello, Faulkingham, and Keller made false and misleading statements and omissions about Lugano's financial results, growth and internal controls, and, by extension, Compass's own fiscal health and internal controls. In reality, Compass (1) failed to

disclose its failure to perform adequate due diligence during the Company's 2021 acquisition of Lugano; (2) overlooked rampant irregularities in Lugano's financial reporting, causing Compass to overstate Lugano's and, by extension, the Company's financial performance; and (3) failed to disclose at least ten material weaknesses in Compass's and Lugano's ICFR.

304.    Only the speakers/authors of the statements alleged to be false and misleading herein are liable for those statements, although the Company is liable for all false and misleading statements. The specific statements alleged to be false and misleading are set forth below.

i.      **Fourth Quarter and Year-End 2021 Financial Results – February 24, 2022**

305.    On February 24, 2022, the Company filed its Annual Report for 2021 on Form 10-K ("2021 10-K"), which was signed by Defendants Faulkingham and Sabo. This was the Company's first Form 10-K following Compass's acquisition of Lugano in September 2021.

306.    In Item 1 of the 2021 10-K, under the header "Our Strategy" and the sub-header "Valuation and Due Diligence," Compass stated:

> When evaluating businesses or assets for acquisition, **our management team performs rigorous due diligence** and a financial evaluations process including an evaluation of the operations of the target business and the outlook for its industry. While valuation of a business is a subjective process, we define valuations under a variety of analyses...

. . .

A further critical component of the evaluation of potential target businesses is the assessment of the capability of the existing management team, including recent performance, expertise, experience, culture and incentives to perform. Where necessary, and consistent with our management strategy, we actively seek to augment, supplement or replace existing members of management who we believe are not likely to execute our business plan for the target business. Similarly, we analyze and evaluate the financial and operational information systems of target businesses and, where necessary, we enhance and improve those existing systems that are deemed to be inadequate or insufficient to support our business plan for the target business.

307.    Defendants' statement that Compass's management team "perform[ed] rigorous due diligence" into subsidiary acquisitions was false and misleading, and lacked a reasonable basis when made. In reality, Compass failed to perform "rigorous" or even adequate due diligence into the Lugano acquisition, as demonstrated by the Company's failure to detect or act on ample evidence of Lugano's rampant financial irregularities and unethical corporate culture, including, *inter alia*, (1) FE 6's suspicious resignation from his position as Lugano's first CFO after refusing to facilitate Lugano's sales tax avoidance and improper recording of investment diamond transactions; (2) Lugano's debt to key supplier Champion, whom Compass Partner Raj Dalal had interviewed during the due diligence process; and (3) various financial irregularities, including reported sales inconsistent with slow salon traffic and the absence of FE 6's signature on certain sales tax forms, that

152

should have been apparent to Compass during the due diligence process. Indeed, despite representing that its "rigorous" due diligence encompassed an "assessment of the capability of the existing management team, including recent performance, expertise, experience, culture and incentives to perform," Compass failed to even interview Lugano's former CFO, FE 6, who would have disclosed the financial irregularities he observed during his time at Lugano. Defendants knew or recklessly disregarded Compass's failure to perform "rigorous" due diligence because of, *inter alia*, (1) the above-mentioned financial irregularities, visible during Compass's due diligence; (2) Compass Partner Dalal's direct engagement during the due diligence process with Champion, a key Lugano supplier to whom Lugano was already indebted for unpaid merchandise; and (3) the post-Class Period forced early retirement of Defendant Maciariello due to Maciariello's perceived failure to detect and act on red flags during the Lugano acquisition process and thereafter.

### ii.    False and Misleading Statements Made in the 2022 Quarterly Forms 10-Q and 2022 Form 10-K Filings

308.   On May 5, 2022, Compass issued a press release reporting its financial results for the fiscal quarter ended March 31, 2022 (the "2022 Q1 Release"), and also filed its Form 10-Q as of and for the quarter ended March 31, 2022 (the "2022 Q1 10-Q") with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter:

a.    Compass's net sales were up 25% to $510.5 million;[92]

b.    Compass's net income was up 35% to $29.7 million;

c.    Compass's adjusted earnings were up 38% to $36.0 million; and

d.    Compass's income from continuing operations was up 41% to $18.4 million.

309.    On August 3, 2022, Compass issued a press release reporting its financial results for the quarter ended June 30, 2022 (the "2022 Q2 Release") and also filed its Form 10-Q as of and for the fiscal quarter ended June 30, 2022 (the "2022 Q2 10-Q") with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter:

a.    Compass's net sales were up 13% to $515.6 million;[93]

b.    Compass's net income was up to $31.0 million, from a previous loss of $11.3 million;

---

[92] The net sales, net income, adjusted earnings, and income from continuing operations figures that Compass reported in the 2022 Q1 Release and the 2022 Q1 Form 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

[93] The net sales, net income, adjusted earnings, and income from continuing operations figures that Compass reported in the 2022 Q2 Release and the 2022 Q2 Form 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

    c.      Compass's adjusted earnings were up 41% to $39.3 million; and

    d.      Compass's income from continuing operations was up to $26.5 million, from a previous loss of $21.6 million.

310.  On November 3, 2022, Compass issued a press release reporting its financial results for the fiscal quarter ended September 30, 2022 (the "2022 Q3 Release"), and also filed its Form 10-Q as of and for the fiscal quarter ended September 30, 2022 (the "2022 Q3 10-Q") with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter:

    a.      Compass's net sales were up 22% to $597.6 million;[94]

    b.      Compass's operating income was up 16% to $48.7 million; and

    c.      Compass's adjusted earnings were up 28% to $46.0 million.

311.  On March 1, 2023, Compass issued a press release reporting its financial results for the quarter and year ended December 31, 2022 (the "2022 Q4 Release"), and also filed its Form 10-K as of and for the quarter and year ended December 31, 2022 (the "2022 10-K") with the SEC, which was signed by Defendant

---

[94] The net sales, operating income, and adjusted earnings that Compass reported in the 2022 Q3 Release and the 2022 Q3 Form 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

Faulkingham. The Company reported on both documents that Compass's net sales for the quarter were up 6% to $594.9 million.[95]

312.   Each of the 2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results represented that "[t]he condensed consolidated financial statements and notes are prepared in accordance with accounting principles generally accepted in the United States of America ('U.S. GAAP' or 'GAAP')[.]"

313.   The statements in ¶¶ 308–312 relating to Compass's quarterly 2022 results and the representation that the financial statements were prepared in conformity with GAAP were each false and misleading when made because, as the Company admitted in the Restatement, the Company's financial results materially misstated net sales, net income, adjusted earnings, Compass's income from continuing operations, and other financial figures in violation of GAAP. Specifically, according to the Restatement, Compass's relevant financial statements for 2022 were materially misstated by at least the following amounts:

| Quarter Ended March 31, 2022 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |

---

[95] The net sales figure and other financial figures that Compass reported in the 2022 Q4 Release and the 2022 Form 10-K differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

| | | | |
|---|---|---|---|
| Net revenues | 438,211 | (37,997) | 400,214 |
| Cost of revenues | 272,919 | (19,187) | 253,732 |
| Gross profit | 165,292 | (18,810) | 146,482 |
| Operating income (loss) | 36,993 | (20,610) | 16,383 |
| Income (loss) from continuing operations before income taxes | 18,938 | (44,687) | (25,749) |
| Income (loss) from continuing operations | 11,367 | (42,309) | (30,942) |
| Net income | 29,740 | (42,309) | (12,569) |

| Quarter Ended June 30, 2022 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 461,455 | (34,198) | 427,257 |
| Cost of revenues | 279,105 | (17,054) | 262,051 |
| Gross profit | 182,350 | (17,144) | 165,206 |
| Operating income (loss) | 48,198 | (15,975) | 32,223 |
| Income (loss) from continuing operations before income taxes | 30,543 | (27,820) | 2,723 |
| Income (loss) from continuing operations | 24,060 | (26,752) | (2,692) |
| Net income | 30,957 | (26,752) | 4,205 |

| Quarter Ended September 30, 2022 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 511,526 | (37,586) | 473,940 |
| Cost of revenues | 319,993 | (18,914) | 301,079 |
| Gross profit | 191,533 | (18,672) | 172,861 |
| Operating income (loss) | 35,490 | (17,504) | 17,986 |
| Income (loss) from continuing operations before income taxes | 9,240 | (30,292) | (21,052) |
| Income (loss) from continuing operations | (10,054) | (29,835) | (39,889) |
| Net income | 2,585 | (29,835) | (27,250) |

| Year Ended December 31, 2022 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 1,920,695 | (163,886) | 1,756,809 |
| Cost of revenues | 1,192,073 | (84,695) | 1,107,378 |
| Gross profit | 728,622 | (79,191) | 649,431 |
| Operating income (loss) | 147,653 | (103,209) | 44,444 |
| Income (loss) from continuing operations before income taxes | 57,584 | (171,520) | (113,936) |
| Income (loss) from continuing operations | 16,217 | (159,646) | (143,429) |
| Net income | 51,441 | (159,646) | (108,205) |

158

314.    Defendants knew or recklessly disregarded that the statements regarding Compass's financial performance in ¶¶ 308–312 were false and misleading because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Compass's executive management on notice of the unreliability of Lugano's financial reporting (and, by extension, Compass's own financial reporting); (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Compass's executive management lacked a reasonable basis to trust that Lugano's financial reporting (and, by extension, Compass's own financial reporting) accurately reflected Lugano's financial operations; (3) inconsistencies between Lugano's purported growth (and, by extension, Compass's own financial performance) and traffic at Lugano's salons, which key members of Compass's senior management—including Defendant Sabo, Defendant Maciariello, Raj Dalal, and Larry Enterline—would have noticed due to their frequent visits to Lugano salons; (4) the presence of Compass executives Defendant Maciariello and Dalal on Lugano's Board of Directors, providing Compass a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements, as, after the Restatement, every one of Compass's income figures in every quarter of 2022 was decreased by at least $10

million, with, of particular note, Compass restating its income from continuing operations by 372.21%, 91.08%, 296.75%, and 984.44% for Q1, Q2, Q3, and in the 2022 Form 10-K, respectively.

315.   Attached as exhibits to the 2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results were certifications of the Company's CEO and CFO pursuant to Sections 302 and 906 of SOX, executed by Defendants Sabo and Faulkingham.

316.   The certifications pursuant to Section 302 each represented that "based on" each Defendant's "knowledge, **the [2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results] does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading** with respect to the period covered by this report[.]" Similarly, the certifications pursuant to Section 906 each represented that the **"[i]nformation contained in the [2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results] Report fairly presents, in all material aspects, the financial condition and results of operations of the Company** as of the dates and for the periods expressed in the [2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results]."

317.    Defendant Sabo's and Defendant Faulkingham's statements in ¶¶ 315–316 that the 2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results did not "contain any untrue statement[s] of a material fact necessary to make the statements . . . not misleading" and that these filings "fairly present[] . . . the financial condition and results of operations of the Company" were false and misleading when made, for the reasons described in ¶ 314.

318.    Defendant Sabo's and Defendant Faulkingham's certifications pursuant to SOX Section 906 also represented that Sabo and Faulkingham had "**disclosed, based on our most recent evaluation of internal control over financial reporting . . . all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; **and . . . any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**."

319.    Defendant Sabo's and Defendant Faulkingham's statements in ¶ 318 that the 2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results "disclosed . . . all significant deficiencies and material weaknesses" in Compass's ICFR were false and misleading when made because, as the Company admitted in the Restatement, Compass's 2022, 2023, and 2024

financial statements failed to disclose at least ten material weaknesses, present across Compass and Lugano, that were reasonably likely to—and, in fact, did—affect Compass's ability to record, process, summarize, and report financial information. *See supra* ¶¶ 299–300.

320.   Additionally, Defendant Sabo's and Defendant Faulkingham's statements in ¶ 318 that the 2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results disclosed all fraud involving "employees who have a significant role in the registrant's internal control over financial reporting" were false and misleading. In reality, the 2022 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2022 fourth quarter financial results failed to disclose the fraud committed by Moti—an individual with a "significant role" in Compass's ICFR, given his position as CEO of Compass's key subsidiary—and this fraud's resulting inflationary effect on Lugano's (and, in turn, Compass's) financial results.

321.   Defendant Sabo's and Defendant Faulkingham's statements in ¶ 318 knowingly or recklessly disregarded the presence of material weaknesses and fraud affecting Compass's ICFR because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendants Sabo and Faulkingham on notice of material weaknesses in Lugano's financial reporting (and, by extension, Compass's own financial reporting) that were not disclosed until the Restatement; (2) the Company's

inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Compass's executive management lacked a reasonable basis to trust that Lugano's ICFR (and, by extension, Compass's internal controls) were free of material weaknesses; (3) inconsistencies between Lugano's purported growth (and, by extension, Compass's own financial performance) and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons, highlighting Compass's and Lugano's deficient internal controls as well as the presence of fraud in Lugano's financial reporting; and (4) the sheer magnitude of Compass's restated financial statements, *see supra* ¶ 313.

> **(1)    Additional False and Misleading Statements Made Concerning Compass's First Quarter 2022 Financial Results**

322.   In conjunction with the filing of the 2022 Q1 Form 10-Q on May 5, 2022, Compass hosted an earnings call (the "2022 Q1 Call"). During the 2022 Q1 Call, Defendant Sabo stated:

> **Lugano continues to perform significantly ahead of our expectations**. And as mentioned on our Q4 call, **we had seen a historical relationship between inventory investment and highly profitable revenue growth** pay dividends.

323.   Defendant Sabo's statements in ¶ 322 that Lugano was "perform[ing] significantly ahead of our expectations," and that Lugano's numbers reflected a "historical relationship between inventory investment and highly profitable revenue

growth," were false and misleading and lacked a reasonable basis when made. As the Company admitted in the Restatement, Lugano's financial irregularities caused the Company's financial results to materially misstate Lugano's net sales, cost of sales, gross profit, and operating income. Thus, in reality, Lugano was performing far below, rather than "significantly ahead" of, Compass's projections, and Lugano was not experiencing profit, let alone "highly profitable revenue growth."

324.    Also during the 2022 Q1 Call, an analyst asked Defendant Sabo for "a little bit more detail[] on Lugano," noting that the analysts "don't have a history with [Lugano]" and inquiring how analysts should think about Lugano's "run rate" "going forward." In response, Defendant Sabo stated:

> So I mean, I think Q2 -- or Q1, excuse me, is seasonally a bit high. We have [a] location in Aspen that is a heavy Q1. All that being said, the business has seen a noticeable uptick in sort of run rate. And so I would say, can you say you can multiply Q4, no -- or excuse me, Q1 by Q4 to get to our current run rate, no. **But the business has seen significant, significant growth in underlying demand, and we see that continuing**.

325.    Defendant Sabo's statement in ¶ 324 attributing Lugano's apparent run rate to "significant growth in underlying demand" was false and misleading and lacked a reasonable basis when made. As the Company admitted in the Restatement, Lugano's apparent growth was due to Lugano's financial irregularities, which caused the Company to materially misstate Lugano's net sales, cost of sales, gross profit, and operating income. Thus, Lugano's apparent run rate was not attributable

to a "significant growth in underlying demand" for Lugano's products, but rather reflected Lugano's rampant financial irregularities which Compass failed to prevent.

326.  Defendant Sabo's statements in ¶ 322 and ¶ 324 were knowingly or recklessly false and misleading because of, *inter alia*, (1) the tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendants Sabo on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Sabo lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons; and (4) the sheer magnitude of Compass's restated financial statements for the first fiscal quarter of 2022, *see supra* ¶ 313, underscoring the blatant disparity between the "growth" trumpeted in Sabo's statement and Lugano's true financial state.

327.  Later in the 2022 Q1 Call, Defendant Maciariello stated:

> **Lugano grew *pro forma* adjusted EBITDA by over 46%**. As stated, **we are seeing a direct correlation at Lugano between inventory purchases and revenue**. **We believe the team at Lugano has created a better business model to serve the needs of their clients**. We will continue to support Lugano as they grow and open new salons in the back half of the year, which will continue

to require intelligent investments and relatively liquid
inventory.

328.   Defendant Maciariello's statement in ¶ 327 that Lugano "grew *pro forma*
adjusted EBITDA by over 46%" was false and misleading when made. As the
Company admitted in the Restatement, Lugano's financial irregularities caused the
Company to materially misstate Lugano's adjusted EBITDA. Additionally,
Defendant Maciariello's statements in ¶ 327 that Compass was seeing a "direct
correlation" between Lugano's inventory purchases, and that Lugano's apparent
growth was due to Lugano's "better business model to serve the needs of . . . clients,"
were false and misleading and lacked a reasonable basis when made. As the
Company admitted in the Restatement, Lugano's financial irregularities caused the
Company to materially misstate Lugano's net sales, cost of sales, gross profit, and
operating income. Thus, in reality, Lugano was not seeing any positive revenue
growth, let alone growth tied to an ostensible "correlation" with inventory purchases,
and Lugano's apparent growth was due to financial irregularities rather than
Lugano's "business model." Indeed, as Compass subsequently disclosed in the
Restatement, Lugano's "business model" was tainted by a host of undisclosed
material weaknesses that Compass failed to prevent, including an inappropriate
"tone at the top" that, instead of "serv[ing] the needs . . . of clients," "focused on
financial performance at all costs."

329.    Defendant Maciariello knew or recklessly disregarded that his statements regarding Lugano's financial performance in ¶ 328 were false and misleading because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Maciariello on notice of the unreliability of Lugano's financial reporting (and, by extension, Compass's own financial reporting); (2) the Company's inadequate due diligence, overseen by Maciariello, during the Lugano acquisition, such that Maciariello lacked a reasonable basis to trust that Lugano's financial reporting (and, by extension, Compass's own financial reporting) accurately reflected Lugano's financial operations; (3) inconsistencies between Lugano's purported growth (and, by extension, Compass's own financial performance) and traffic at Lugano's salons, which Maciariello would have noticed through his frequent visits to Lugano salons; (4) Maciariello's status as Chairman of Lugano's Board of Directors, providing Maciariello a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements, *see supra* ¶ 313.

> **(2)    Additional False and Misleading Statements Concerning Compass's Second Quarter 2022 Financial Results**

330.  In conjunction with the filing of the 2022 Q2 Form 10-Q on August 3, 2022, Compass hosted an earnings call (the "2022 Q2 Call"). During the 2022 Q2 Call, Defendant Sabo stated:

> During the quarter, **we again delivered double-digit sales growth in both our branded consumer and niche industrial businesses**. **Our growth this quarter was led by BOA Technology and Lugano Diamonds, which each had excellent quarters**.
>
> . . .
>
> **We believe Lugano continues to offer its customers a better value proposition than other ultrahigh-end jewelers**. In addition, the company has benefited from geographic expansion and CODI's continued inventory investments following our acquisition late last year. **Due to these investments and the hard work of the Lugano team, EBITDA has grown by over 60% in the year-to-date period**.

331.  Defendant Sabo's statements in ¶ 330 that Lugano had an "excellent quarter[]" and contributed to Compass's "growth this quarter" were false and misleading when made because, as Compass admitted in the Restatement, Lugano's financial irregularities which Compass failed to prevent caused the Company to materially misstate figures pertaining to Lugano's apparent growth, including Lugano's net sales, cost of sales, gross profit, and segment operating income. Defendant Sabo knew or recklessly disregarded that Lugano's financial irregularities caused Compass to overstate Lugano's and the Company's financial performance because of, *inter alia*, (1) the tensions between Compass's internal audit team and

Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendants Sabo on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Sabo lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons; and (4) the sheer magnitude of Compass's restated financial statements for the second fiscal quarter of 2022, *see supra* ¶ 313, underscoring the blatant disparity between the "excellent quarter" trumpeted in Sabo's statement and Lugano's true financial state.

332.    Additionally, Defendant Sabo's statement in ¶ 330 that Lugano's EBITDA had "grown by over 60% in the year-to-date period" because of Compass's investment "and the hard work of the Lugano team" was false and misleading when made because, as Compass admitted in the Restatement, Lugano's financial irregularities caused the Company to materially misstate figures pertaining to Lugano's apparent EBITDA growth, including but not limited to Lugano's net sales, cost of sales, gross profit, and segment operating income. Indeed, Compass's 2022 financial statements failed to disclose an impairment expense of $28,602,000—a significant undisclosed expense that undoubtedly affected Lugano's true EBITDA

growth. Moreover, far from being the result of Compass's "investments" and the Lugano team's "hard work," Lugano's apparent EBITDA growth was in fact due to Lugano's rampant use of irregular financial practices to inflate Lugano's financial numbers, including but not limited to Lugano's use of improperly recorded investment diamond transactions. *See supra* Section IV.e.iii.(4). Defendant Sabo knew or recklessly disregarded that Lugano's apparent EBITDA growth was fictitious and fueled by fraud for the reasons described in ¶ 331.

> ### (3) Additional False and Misleading Statements Made Concerning Compass's Third Quarter 2022 Financial Results

333.   In conjunction with the filing of the 2022 Q3 Form 10-Q on November 3, 2022, Compass hosted an earnings call (the "2022 Q3 call"). During the 2022 Q3 call, Defendant Maciariello stated:

> **Lugano's growth accelerated in the third quarter, and the company has now grown both revenue and *pro forma* adjusted EBITDA for the year-to-date period by close to 70%**. We benefited in the quarter from both the opening of our new Houston salon and from an increase in average transaction size.
>
> Lugano is starting the fourth quarter well, and we plan on opening our new flagship Newport salon before year-end to continue -- and to continue expanding geographically in 2023. We believe that Lugano possesses a disruptive business model, and we will continue to support the company with investments in inventory, people and new salons.

334. Defendant Maciariello's statements in ¶ 333 that Lugano's growth "accelerated in the third quarter [of 2022]," and that Lugano had grown "both revenue and *pro forma* adjusted EBITDA for the year-to-date period by close to 70%," were false and misleading when made. As Compass admitted in the Restatement, Lugano's financial figures for 2022—including Lugano's revenue and other elements of Lugano's EBITDA—were materially misstated, such that Lugano's growth did not "accelerate" or grow by "close to 70%" year-to-date. Defendant Maciariello knew or recklessly disregarded that Lugano's revenues—and, by extension, Compass's revenues—for the third quarter of 2022 were markedly less than reported, because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which FE 3 recalled becoming particularly intense in late quarter 2022, that put Defendant Maciariello on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Maciariello, the Compass executive responsible for (and later phased out of the Company because of) Compass's inadequate due diligence, lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Maciariello would have noticed through his frequent visits to

171

Lugano salons; (4) Maciariello's status as Chairman of Lugano's Board of Directors, providing Maciariello a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements for the third fiscal quarter of 2022, *see supra* ¶ 313, underscoring the blatant disparity between the "accelerated" growth trumpeted in Maciariello's statement and Lugano's true financial state.

335.   Later in the 2022 Q3 Call, Defendant Faulkingham stated:

> On a consolidated basis, **third quarter revenue was up 22% to $597.6 million** compared to $488.2 million in the prior year period. **This increase reflects the company's acquisition of PrimaLoft in July 2022 and as well as the strong double-digit revenue growth from BOA, Lugano, Marucci, 5.11 and Altor**. On a *pro forma* basis, assuming we had acquired Lugano and PrimaLoft on January 1, 2021, **net sales were up 15% compared to the prior year period**.

336.   Defendant Faulkingham's statement in ¶ 335 that Compass's third quarter revenue was "up 22% to $597.6 million" was false and misleading when made. As Compass admitted in the Restatement, Compass's revenue for the third quarter was approximately $474 million, tens of millions less than the quarterly net revenue figures cited in Defendant Faulkingham's remarks and published in Compass's 2022 Q3 Form 10-Q and 2022 Form 10-K. Defendant Faulkingham knew or recklessly disregarded that Compass's revenue figures had not grown to $597.6 million due to

the impact from Lugano's financial irregularities because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which FE 3 recalled becoming particularly intense in late quarter 2022, that put Defendant Faulkingham on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Faulkingham lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; and (3) the sheer magnitude of Compass's restated financial statements for the third fiscal quarter of 2022, *see supra* ¶ 313, underscoring the blatant disparity between the ostensible revenue increase described in Faulkingham's statement and Compass's true financial state.

337.  Additionally, Defendant Faulkingham's statement in ¶ 335 was false and misleading when made because it credited Compass's apparent revenue growth to "strong double-digit revenue growth from . . . Lugano." In reality, Lugano's reported financial statements were distorted by Lugano's financial irregularities that Compass failed to prevent, such that Lugano's performance was actually detracting from— rather than propelling—Compass's apparent revenue growth. Defendant Faulkingham knew or recklessly disregarded that Lugano's financial statements were distorted by financial irregularities for the reasons described in ¶ 336.

(4)   **Additional False and Misleading Statements Concerning Compass's Fourth Quarter and Year-End 2022 Financial Results**

338.   In conjunction with the filing of the 2022 Form 10-K on March 1, 2023, Compass hosted an earnings call for the fourth quarter of 2022 (the "2022 Q4 Call"). During the 2022 Q4 Call, Defendant Maciariello stated:

> **Lugano's growth continued in the fourth quarter and for the year as both revenue and EBITDA grew by over 45% and 60%, respectively**. In the quarter, we benefited from the recent openings of Lugano's Houston salon and its flagship salon at Fashion Island in Newport Beach. In addition, the company continued to benefit from increases in average transaction size. In 2023, the company will open locations in Washington, D.C. [and] in Greenwich, Connecticut and is considering other avenues for geographic expansion and additional new flagship salons.

339.   Defendant Maciariello's statements in ¶ 338 that Lugano's growth "continued in the fourth quarter and for the year," and that Lugano's "revenue and EBITDA grew by over 45% and 60% respectively," were false and misleading when made because, as Compass admitted in the Restatement, Lugano's financial irregularities caused the Company to materially misstate figures pertaining to Lugano's apparent revenue and EBITDA growth in 2022, including Lugano's net sales, cost of sales, gross profit, and segment operating income. Indeed, Compass's 2022 financial statements failed to disclose an impairment expense of $28,602,000—a significant undisclosed expense that undoubtedly affected Lugano's true EBITDA growth. Defendant Maciariello knew or recklessly disregarded

Lugano's financial irregularities and their effect on Lugano's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which FE 3 recalled were particularly intense in the first quarter of 2023, that put Defendant Maciariello on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Maciariello, the Compass executive responsible for (and later phased out of the Company because of) Compass's inadequate due diligence, lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Maciariello would have noticed through his frequent visits to Lugano salons; (4) Maciariello's status as Chairman of Lugano's Board of Directors, providing Maciariello a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements for the fourth quarter of 2022, *see supra* ¶ 313, underscoring the blatant disparity between the purported growth trumpeted in Maciariello's statement and Lugano's true financial state.

340.   Later in the call, an analyst from Raymond James & Associates asked Defendants whether Compass would remain "heavily invested" in Lugano. Defendant Sabo responded:

> Yes. Robert, yes. The answer is yes. I would tell you, and I mentioned this earlier, we have planned for a much more conservative growth plan with Lugano, and that has embedded in the overall guidance of the company. **They're currently running dramatically ahead of where our growth plan would be so** -- and what we've embedded in our guidance. That requires us to invest capital.
>
> What we've seen and what we experienced over the course of our ownership is that if we invest $1 in inventory, that yields about an additional dollar of revenue. And that's sort of an incremental 40% margin, right, EBITDA margin. And as long as that trend continues, and we're able to get a 40% pretax return on invested capital on that inventory, we're going to continue to do it because we can't find opportunities like that very often to deploy our capital into.
>
> So the question will -- and what we look at on, frankly, a weekly and monthly basis is, are inventory investments continuing to yield the sales growth and are the relationships remaining consistent? And so far they are and they have over the course of our ownership. So we will continue to invest in the growth of Lugano. And so right now, our forecast is that we're not going to put a lot of capital in, and there's not going to be kind of a huge amount of EBITDA growth.

341.  Defendant Sabo's statement in ¶ 340 that Lugano was "running dramatically ahead of where our growth plan would be" was false and misleading when made because, as Compass admitted in the Restatement, Lugano's financial

irregularities caused the Company to materially misstate figures pertaining to Lugano's apparent growth, including Lugano's net sales, cost of sales, gross profit, and segment operating income. Thus, far from running "dramatically ahead" of Compass's projections, Lugano was in fact performing significantly beneath Compass's projections. Defendant Sabo knew or recklessly disregarded the effect of Lugano's financial irregularities on Lugano's actual growth because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which FE 3 recalled becoming particularly intense in the first quarter of 2023, that put Defendant Sabo on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Sabo lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons; (4) the sheer magnitude of Compass's restated financial statements for the fourth fiscal quarter of 2022, *see supra* ¶ 313, underscoring the blatant disparity between the purported growth trumpeted in Sabo's statement and Lugano's true financial state.

### iii. False and Misleading Statements Made in the 2023 Quarterly Forms 10-Q and 2023 Form 10-K Filings

342.   On May 3, 2023, Compass issued a press release reporting its financial results for the quarter ended March 31, 2023 (the "2023 Q1 Release"), and also filed its Form 10-Q as of and for the quarter ended March 31, 2023 (the "2023 Q1 10-Q") with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that:

    a.      Compass's net sales were up 6% to $542.2 million;[96] and

    b.      Compass's net income was up to $109.6 million, from a previous gain of $29.7 million.

343.   On August 2, 2023, Compass issued a press release reporting its financial results for the quarter ended June 30, 2023 (the "2023 Q2 Release"), and also filed its Form 10-Q as of and for the quarter ended June 30, 2023 (the "2023 Q2 10-Q") with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter, Compass's net sales were up 2% to $524.2 million.[97]

---

[96] The net sales, net income, and other financial figures that Compass reported in the 2023 Q1 Release and the 2023 Q1 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

[97] The net sales and other financial figures that Compass reported in the 2023 Q2 Release and the 2023 Q2 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

344.    On November 2, 2023, Compass issued a press release reporting its financial results for the quarter ended September 30, 2023 (the "2023 Q3 Release") and also filed its Form 10-Q as of and for the quarter ended September 30, 2023 (the "2023 Q3 10-Q") with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter, Compass's Adjusted EBITDA was up 13% to $103.9 million.[98]

345.    On February 28, 2024 Compass issued a press release reporting its financial results for the quarter and year ended December 31, 2023 (the "2023 Q4 Release"), and also filed its Form 10-K as of and for the fiscal year ended 2023 (the "2023 10-K") with the SEC, which was signed by Defendants Sabo and Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter:

    a.    Compass's net sales were up 7% to $567.0 million;[99]

    b.    Compass's net income was up to $139.4 from $8.7 million; and

---

[98] The adjusted EBITDA and other figures that Compass reported in the 2023 Q3 Release and the 2023 Q2 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

[99] The net sales, net income, adjusted earnings, and other figures that Compass reported in the 2023 Q4 Release and the 2023 Form 10-K differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

c.    Compass's adjusted earnings were up to $38.1 million from $16.3
million.

346.  Each of the 2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K
represented that "[t]he condensed consolidated financial statements and notes are
prepared in accordance with accounting principles generally accepted in the United
States of America ('U.S. GAAP' or 'GAAP')[.]"

347.  The statements in ¶¶ 342–346 relating to Compass's 2023 quarterly and
year-end results and the representation that the financial statements were prepared
in conformity with GAAP were each false and misleading when made because, as
the Company admitted in the Restatement, the Company's financial results
materially misstated net sales, net income, adjusted earnings, and Compass's income
from continuing operations, in violation of GAAP. Specifically, according to the
Restatement, Compass's relevant financial statements for 2023 were materially
misstated by at least the following amounts:

| Quarter Ended March 31, 2023 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 461,515 | (55,458) | 406,057 |
| Cost of revenues | 270,566 | (25,001) | 245,565 |
| Gross profit | 190,949 | (30,457) | 160,492 |
| Operating income (loss) | 34,169 | (29,251) | 4,918 |
| Income (loss) from continuing | 8,144 | (45,482) | (37,338) |

| | | | |
|---|---|---|---|
| operations before income taxes | | | |
| Income (loss) from continuing operations | 673 | (42,099) | (41,426) |
| Net income | 109,601 | (42,099) | 67,502 |

| Quarter Ended June 30, 2023 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 460,740 | (55,241) | 405,499 |
| Cost of revenues | 260,903 | (23,020) | 237,883 |
| Gross profit | 199,837 | (32,221) | 167,616 |
| Operating income (loss) | 39,587 | (31,016) | 8,571 |
| Income (loss) from continuing operations before income taxes | 11,875 | (50,258) | (38,383) |
| Income (loss) from continuing operations | 7,454 | (47,612) | (40,158) |
| Net income | 17,123 | (47,612) | (30,489) |

| Quarter Ended September 30, 2023 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 497,947 | (70,884) | 427,063 |
| Cost of revenues | 287,573 | (28,566) | 259,007 |
| Gross profit | 210,274 | (42,218) | 168,056 |
| Operating income (loss) | 16,085 | (41,013) | (24,928) |
| Income (loss) from continuing operations before income taxes | (11,435) | (78,462) | (89,897) |

| Income (loss) from continuing operations | (15,892) | (74,305) | (90,197) |
|---|---|---|---|
| Net income | (3,760) | (74,305) | (78,065) |

| Year Ended December 31, 2023 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 1,965,017 | (275,097) | 1,689,920 |
| Cost of revenues | 1,132,014 | (116,814) | 1,015,200 |
| Gross profit | 833,003 | (158,283) | 674,720 |
| Operating income (loss) | 85,249 | (154,658) | (69,409) |
| Income (loss) from continuing operations before income taxes | (22,189) | (244,264) | (266,453) |
| Income (loss) from continuing operations | (44,828) | (229,823) | (274,651) |
| Net income | 262,405 | (229,823) | 32,582 |

348.    Defendants knew or recklessly disregarded that the statements regarding Compass's financial performance in ¶¶ 342–346 were false and misleading because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Compass's executive management on notice of the unreliability of Lugano's financial reporting (and, by extension, Compass's own financial reporting); (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Compass's executive management lacked a reasonable basis to trust that Lugano's financial reporting (and, by extension, Compass's own

financial reporting) accurately reflected Lugano's financial operations; (3) inconsistencies between Lugano's purported growth (and, by extension, Compass's own financial performance) and traffic at Lugano's salons, which key members of Compass's senior management—including Defendant Sabo, Defendant Maciariello, Raj Dalal, and Larry Enterline—would have noticed due to their frequent visits to Lugano salons; (4) the presence of Compass executives Defendant Maciariello and Dalal on Lugano's Board of Directors, providing Compass a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements across the 2023 fiscal quarters, with, for example, Compass misstating its yearly net income by nearly $230 million, necessitating an 87.58% negative adjustment in the Restatement.

349. Attached as exhibits to the 2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K were certifications of the Company's CEO and CFO pursuant to Sections 302 and 906 of SOX, executed by Defendants Sabo and Faulkingham.

350. The certifications pursuant to Section 302 each represented that "based on" each Defendant's "knowledge, **the [2023 Q1, Q2, and Q3 Forms 10-Q and the 2022 Form 10-K with 2023 fourth quarter financial results] does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not**

**misleading** with respect to the period covered by this report[.]" Similarly, the certifications pursuant to Section 906 each represented that the **"[i]nformation contained in the [2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K with 2023 four quarter financial results] fairly presents, in all material aspects, the financial condition and results of operations of the Company** as of the dates and for the periods expressed in the [2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K with 2023 four quarter financial results]."

351.    Defendant Sabo's and Defendant Faulkingham's statements in ¶¶ 349–350 that the 2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K with fourth quarter financial results did not "contain any untrue statement[s] of a material fact necessary to make the statements. . .not misleading" and that the 2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K with fourth quarter financial results "fairly present[]. . .the financial condition and results of operations of the Company" were false and misleading when made, for the reasons described in ¶ 348.

352.    Defendant Sabo's and Defendant Faulkingham's certifications pursuant to SOX Section 906 also represented that Sabo and Faulkingham had "**disclosed, based on our most recent evaluation of internal control over financial reporting . . .all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and**

**report financial information**; **and . . . any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**."

353.    Defendant Sabo's and Defendant Faulkingham's statements in ¶ 352 that the 2023 Q1, Q2 and Q3 Forms 10-Q and the 2023 Form 10-K with fourth quarter financial results "disclosed*. . .*all significant deficiencies and material weaknesses" in Compass's ICFR were false and misleading when made because, as the Company admitted in the Restatement, Compass's 2022, 2023, and 2024 financial statements failed to disclose at least ten material weaknesses, present across Compass and Lugano, that were reasonably likely to—and, in fact, did—affect Compass's ability to record, process, summarize, and report financial information. *See supra* ¶¶ 299–300.

354.    Additionally, Defendant Sabo's and Defendant Faulkingham's statements in ¶ 352 that the 2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K with fourth quarter financial results disclosed all fraud involving "employees who have a significant role in the registrant's internal control over financial reporting" were false and misleading. In reality, the 2023 Q1, Q2, and Q3 Forms 10-Q and the 2023 Form 10-K with fourth quarter financial results failed to disclose the fraud committed by Moti—an individual with a "significant role" in Compass's ICFR,

given his position as CEO of Compass's key subsidiary—and this fraud's resulting inflationary effect on Lugano's (and, in turn, Compass's) financial results.

**355.** Defendant Sabo's and Defendant Faulkingham's statements in ¶¶ 351–352 knowingly or recklessly disregarded the presence of material weaknesses and fraud affecting Compass's ICFR because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendants Sabo and Faulkingham on notice of material weaknesses in Lugano's financial reporting (and, by extension, Compass's own financial reporting) that were not disclosed until the Restatement; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Compass's executive management lacked a reasonable basis to trust that Lugano's ICFR (and, by extension, Compass's internal controls) were free of material weaknesses; (3) inconsistencies between Lugano's purported growth (and, by extension, Compass's own financial performance) and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons, highlighting Compass's and Lugano's deficient internal controls as well as the presence of fraud in Lugano's financial reporting; and (4) the sheer magnitude of Compass's restated financial statements, *see supra* ¶ 347.

> **(1)   Additional False and Misleading Statements Concerning Compass's First Quarter 2023 Financial Results**

356.   Also on May 3, Compass hosted an earnings call for the first quarter of 2023 (the "2023 Q1 Call"). During the 2023 Q1 Call, Defendant Maciariello stated:

> Turning to our consumer businesses. For the first quarter of 2023, revenues increased by 2%, and adjusted EBITDA declined by 5% as excess inventory in the supply chains at BOA, PrimaLoft and Velocity, **offset strong growth at Lugano**, Marucci and 5.11.
>
> . . .
>
> **Lugano once again had a strong quarter as revenues, and adjusted EBITDA grew by 36% and 38%, respectively**. The company saw strong growth in multiple salons, including Newport Beach, Palm Beach and its newly-opened Houston salon. Subsequent to quarter end, Lugano officially opened its Washington, D.C. salon, along with its exclusive Privé membership club and Newport Beach. The company is currently building out its Greenwich, Connecticut location with a target completion date in the third quarter of this year. Lugano was also targeting a second flagship location, similar to the company's Newport Beach salon, and potentially its first international salon in early 2024.

357.   Defendant Maciariello's statements in ¶ 356 that Lugano exhibited "strong growth" and "had a strong quarter" were false and misleading when made because, as disclosed in the Restatements, Lugano's financial irregularities caused Compass to materially misstate Lugano's 2023 financial statements, including figures relevant to Lugano's growth like net sales, cost of sales, gross profit, and segment operating income. Defendant Maciariello knew or recklessly disregarded Lugano's financial irregularities and their effect on Lugano's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's

187

failure to implement adequate SOX procedures, which FE 3 recalled becoming particularly intense in the first quarter of 2023, that put Defendant Maciariello on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Maciariello, the Compass executive responsible for (and later phased out of the Company because of) Compass's inadequate due diligence, lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Maciariello would have noticed through his frequent visits to Lugano salons; (4) Maciariello's status as Chairman of Lugano's Board of Directors, providing Maciariello a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements for the first fiscal quarter of 2023, *see supra* ¶ 347, underscoring the blatant disparity between the "strong growth" described in Maciariello's statement and Lugano's true financial state.

358. Later in the call, a CJS Securities analyst asked Defendants whether Lugano's growth was "driven by the salon openings," referring to Lugano's recent opening of additional salons with the help of Compass's capital investment. Defendant Maciariello responded in the affirmative, stating:

Yes. **The growth is partially driven by salon openings. It's also driven by increases in sort of average order size, which continues to increase materially, right?** And so those -- and new customers, and we're adding a lot of new customers. And not all of those come from salons. Some of them may come from our equestrian operations, or they may come from other relationships and other events.

359.  Defendant Maciariello's statement in ¶ 358 that Lugano's growth was driven by "salon openings" and "increases in . . . average order size" was false and misleading when made because, as the Company admitted in the Restatement, Lugano was not actually growing in the first quarter of 2023; in reality, Lugano posted consistent losses during in 2023 and throughout the Class Period, including an  operating loss of approximately $54 million in 2023 that contributed to Compass's overall $69.41 million operating loss for the year. Additionally, Defendant Maciariello's statement was false and misleading in that it implied that Lugano's apparent growth was due to "salon openings" and "average order size" when, in reality, Lugano's apparent growth was attributable to Lugano's rampant financial irregularities that Compass failed to prevent. Defendant Maciariello knew or recklessly disregarded that Lugano's apparent growth was fictitious and attributable to financial irregularities for the reasons described in ¶ 357.

        (2)    **Additional False and Misleading Statements Concerning Compass's Second Quarter 2023 Financial Results**

360.    In conjunction with the filing of the 2023 Q1 10-Q on August 2, Compass

hosted an earnings call (the "2023 Q2 Call"). During the 2022 Q2 Call, Defendant

Maciariello stated:

> **Lugano once again had a strong quarter**. **And for the year-to-date June period, revenues and adjusted EBITDA grew by 45% and 41.5%, respectively, as compared to the prior year**. The company saw strong growth in multiple salons, including Newport, Aspen and Houston and experienced strong sales in the second quarter in its newly opened Washington, D.C. salon.
>
> Looking ahead, our Greenwich, Connecticut salon is scheduled to open by the end of August, and we've made progress in the quarter on construction of our second flagship salon in Palm Beach. In addition, we are pleased to announce that we recently executed a lease for a salon in London, which, when opened in mid to late 2024, will mark Lugano's first international salon.
>
> We believe Lugano's bespoke approach to ultra-high-end jewelry will have success internationally, just as it has domestically.

361.    Defendant Maciariello's statement in ¶ 360 that Lugano had a "strong

quarter" with revenue and adjusted EBITDA growth of 45% and 41.5%,

respectively, was false and misleading when made because, as disclosed in the

Restatement, Lugano did not grow or experience a "strong" quarter but rather posted

a restated operating loss of $54,352,000 in fiscal year 2023 due to Lugano's financial

irregularities. Defendant Maciariello knew or recklessly disregarded Lugano's

financial irregularities and their effect on Lugano's financial reporting because of,

*inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding

Lugano's failure to implement adequate SOX procedures, which put Defendant Maciariello on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Maciariello, the Compass executive responsible for (and later phased out of the Company because of) Compass's inadequate due diligence, lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Maciariello would have noticed through his frequent visits to Lugano salons; (4) Maciariello's status as Chairman of Lugano's Board of Directors, providing Maciariello a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements for the second fiscal quarter of 2023, *see supra* ¶ 347, underscoring the blatant disparity between the "strong quarter" described in Maciariello's statement and Lugano's true financial state.

> **(3)** **Additional False and Misleading Statements Concerning Third Quarter 2023 Financial Results**

362.  In conjunction with the filing of the 2023 Q3 10-Q on November 2, Compass hosted an earnings call (the "2023 Q3 Call"). During the 2023 Q3 Call,

Defendant Maciariello stated: "**Lugano continue[s] to perform extremely well, driven by new salon openings, a strong management team and a disruptive business model**." Defendant Maciariello continued:

> Lugano's growth accelerated further in the third quarter. **And for the year-to-date period, revenues and adjusted EBITDA grew by 48% and over 56%, respectively, compared to prior year**. **The company benefited from a solid increase in average transaction size in the quarter and saw strong growth in many of its salons**, including Washington, D.C. and its new Greenwich, Connecticut salon. Progress continues to be made on our second flagship salon in Palm Beach, and we anticipated opening in the fourth quarter. Similarly, construction of the company's London salon is scheduled to begin prior to year-end, and we anticipate opening in the first half of 2024. The management team at Lugano continues to execute at an incredibly high level, and we look forward to 2024.

363.  Defendant Maciariello's statements that Lugano "continue[d] to perform extremely well" and that Lugano's year-over-year revenues and adjusted EBITDA grew by 48% and over 56%, respectively, were false and misleading when made because, as disclosed in the Restatements, Lugano was actually hemorrhaging money in 2023, when it posted a restated operating loss of approximately $54 million. In addition, Maciariello's statements attributing Lugano's purported growth to "new salon openings," "a strong management team," "a disruptive business model," "a solid increase in average transaction size," and "strong growth" at salons were false and misleading and lacked a reasonable basis when made. In reality, as

the Company admitted in the Restatement, Lugano's apparent growth in 2023 was driven by Lugano's rampant financial irregularities that Compass failed to prevent, rather than by salon openings, an increase in average transaction size, or some other factor. Defendant Maciariello knew or recklessly disregarded Lugano's financial irregularities and their effect on Lugano's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Maciariello on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* IV.e.i, such that Defendant Maciariello, the Compass executive responsible for (and later phased out of the Company because of) Compass's inadequate due diligence, lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Maciariello would have noticed through his frequent visits to Lugano salons; (4) Maciariello's status as Chairman of Lugano's Board of Directors, providing Maciariello a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements for the third fiscal quarter of 2023, *see supra*

¶ 347, underscoring the blatant disparity between the "strong quarter" described in Maciariello's statement and Lugano's true financial state.

364.   Later in the call, Defendant Faulkingham stated:

> **Adjusted EBITDA in the third quarter was $103.9 million, up 13% compared to $91.9 million in the third quarter of '22**. The increase was due to an expansion in EBITDA margin at a consolidated level as our industrial companies expanded margins significantly, as Pat highlighted earlier. **EBITDA margin expansion at our consumer businesses were primarily due to Lugano and Marucci. Adjusted earnings for the third quarter was significantly above our expectations at $41 million**. This was down from $41.6 million in the prior year quarter, primarily due to increased interest expense, but up sequentially by over 15%. **Adjusted earnings were above our expectations, also due to the strong performance at Lugano and Marucci.**

365.   Defendant Faulkingham's statements describing Compass's adjusted EBIDTA, EBITDA margin expansion, and adjusted earnings for the third quarter of 2023 were false and misleading when made because, as the Company admitted in the Restatement, Lugano's financial irregularities caused Compass to materially misstate the Company's EBITDA and earnings figures for the third fiscal quarter of 2023. Additionally, Faulkingham's statement that Compass's better-than-expected EBITDA and earnings performance was "due to strong performance at Lugano" was false and misleading and lacked a reasonable basis when made. As the Company admitted in the Restatement, Lugano's financial irregularities concealed Lugano's true negative impact on Compass's business, such that Compass's ostensible

EBITDA and earnings gains were not due to Lugano's "strong performance," but rather Lugano's financial irregularities that Compass failed to prevent. Defendant Faulkingham knew or recklessly disregarded Lugano's financial irregularities and their effect on Compass's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Faulkingham on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Faulkingham lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; and (3) the sheer magnitude of Compass's restated financial statements for the third fiscal quarter of 2023, *see* [earlier para on the restatement for this quarter], underscoring the blatant disparity between the "strong performance" described in Faulkingham's statement and Lugano's true financial state.

### (4)    Additional False and Misleading Statements Concerning Compass's Fourth Quarter and Year-End 2023 Financial Results

366.    In conjunction with the filing of the 2023 10-K on February 28, Compass hosted an earnings call (the "2023 Q4 Call"). On the call, Defendant Faulkingham stated:

> In our branded consumer vertical, inventory destocking issues masked the underlying strength of most of the

brands we own throughout 2023. **Lugano once again delivered remarkable growth, producing 53% annual revenue growth and 65% adjusted EBITDA growth.**

As we have repeatedly mentioned, **Lugano has created a very innovative and disruptive business model within the high jewelry industry**. **We continue to fund capital investment to expand the company's footprint and inventory position, realizing exceptionally strong returns on invested capital that is fueling the company's rapid growth.**

367.  Defendant Faulkingham's statements in ¶ 366 that Lugano delivered "remarkable growth," realized "exceptionally strong returns on invested capital," and produced annual revenue growth and adjusted EBITDA growth of 53% and 65%, respectively, were false and misleading when made. As Compass admitted in the Restatement, Lugano was neither growing nor achieving positive returns on Compass's investment in the fourth quarter of 2023, but rather lost $274,651,000 from continuing operations in 2023. In addition, Faulkingham's statement that Lugano had "created a very innovative and disruptive business model" was false and misleading and lacked a reasonable basis when made, in that it implied that Lugano's ostensible growth was due to Lugano's supposedly innovative business model. In reality, Lugano's apparent growth was due to Lugano's rampant financial irregularities that Compass failed to prevent, including but not limited to Lugano's improper recording of investment diamond transactions as revenue without a corresponding liability. The Restatement further disclosed that, far from being

"innovative" or "disruptive," Lugano's business model was marked by a host of material weaknesses, including an inappropriate tone at the topic "focused on financial performance at all costs[.]" Defendant Faulkingham knew or recklessly disregarded Lugano's financial irregularities and their effect on Compass's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Faulkingham on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Faulkingham lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; and (3) the sheer magnitude of Compass's restated financial statements for the fourth fiscal quarter of 2023, *see* [earlier para on the restatement for this quarter], underscoring the blatant disparity between the "strong returns" described in Faulkingham's statement and Lugano's true financial state

### iv.    False and Misleading Statements Made in the 2024 Quarterly Forms 10-Q and 2024 Form 10-K Filings

368.   On May 1, 2024, Compass issued a press release reporting its financial results for the quarter ended March 31, 2024 (the "2024 Q1 Release"), and also filed its Form 10-Q as of and for the quarter ended March 31, 2024 (the "2024 Q1 10-Q")

with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter:

    a.    Compass's net sales were up 8% to $524.3 million;[100]

    b.    Compass's income from continuing operations was up to $2.4 from $1.6 million; and

    c.    Compass's adjusted earnings were up 73% to $34.3 million from $19.8 million.

369.   On July 31, 2024 Compass issued a press release reporting its financial results for the quarter ended June 30, 2024 (the "2024 Q2 Release") and also filed its Form 10-Q as of and for the quarter ended June 30, 2024 (the "2024 Q2 10-Q") with the SEC, which was signed by Defendant Faulkingham. The Company reported on both documents that, compared to the same year-ago quarter:

    a.    Compass's net sales were up 11% to $542.6 million; and[101]

---

[100] The net sales, income from continuing operations, adjusted earnings, and other figures that Compass reported in the 2024 Q1 Release and the 2024 Q1 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

[101] The net sales, adjusted earnings, and other figures that Compass reported in the 2024 Q2 Release and the 2024 Q2 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

    b.    Compass's adjusted earnings were up 36% to $38.9 million from $29.2 million.

370.   On October 30, 2024, Compass issued a press release reporting its financial results for the quarter ended September 30, 2024 (the "2024 Q3 Release"), and also filed its Form 10-Q as of and for the quarter ended September 30, 2024 (the "2024 Q3 10-Q") with the SEC, which was signed by Defendant Keller. The Company reported on both documents that, compared to the same year-ago quarter:

    a.    Compass's net sales were up 11.8% to $582.6 million; [102]

    b.    Compass's income from continuing operations was up to $31.5 from a prior year loss of $14.0 million;

    c.    Compass's net income was up to $31.5 million from a prior year loss of $3.8 million; and

    d.    Compass's adjusted earnings were up 65% to $48.7 million from $29.6 million.

371.   On February 27, 2025 Compass issued a press release reporting its financial results for the quarter and year ended December 31, 2024 (the "2024 Q4

---

[102] The net sales, income from continuing operations, net income, adjusted earnings, and other figures that Compass reported in the 2024 Q3 Release and the 2024 Q3 10-Q differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

Release"), and also filed its Form 10-Q as of and for the quarter and year ended December 31, 2024 (the "2024 10-K") with the SEC, which was signed by Defendant Keller. The Company reported on both documents that, compared to the same year-ago quarter, Compass's net sales were up 13.8% to $620.3 million.[103]

372.    Each of the 2024 Q1, Q2, and Q3 Forms 10-Q and the 2024 Form 10-K with fourth quarter financial results represented that "[t]he condensed consolidated financial statements and notes are prepared in accordance with accounting principles generally accepted in the United States of America ('U.S. GAAP' or 'GAAP')[.]"

373.    The statements in ¶¶ 368–372 relating to Compass's quarterly 2024 results and the representation that the financial statements were prepared in conformity with GAAP were each false and misleading when made because, as the Company admitted in the Restatement, the Company's financial results materially misstated net sales, net income, adjusted earnings, and Compass's income from continuing operations, in violation of GAAP. Specifically, according to the Restatement, Compass's relevant financial statements for the first quarter of 2024 were materially misstated by at least the following amounts:

| Quarter Ended March 31, 2024 |
| --- |

---

[103] The net sales and other figures that Compass reported in the 2024 Q4 Release and the 2024 10-K differ from those listed as "Reported" in the Restatement. Nevertheless, regardless of Compass's precise reported figures for the quarter, Compass's financial reporting for the quarter was materially misstated, as admitted by the Company in the Restatement.

| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
|---|---|---|---|
| Net revenues | 503,072 | (92,246) | 410,826 |
| Cost of revenues | 275,203 | (39,329) | 235,874 |
| Gross profit | 227,869 | (52,917) | 174,952 |
| Operating income (loss) | 39,574 | (51,681) | (12,107) |
| Income (loss) from continuing operations before income taxes | 12,115 | (97,936) | (85,821) |
| Income (loss) from continuing operations | 2,119 | (91,050) | (88,931) |
| Net income | 5,781 | (91,050) | (85,269) |

| Quarter Ended June 30, 2024 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 514,038 | (87,333) | 426,705 |
| Cost of revenues | 273,317 | (34,797) | 238,520 |
| Gross profit | 240,721 | (52,436) | 188,285 |
| Operating income (loss) | 58,781 | (51,301) | 7,480 |
| Income (loss) from continuing operations before income taxes | 5,235 | (93,603) | (88,368) |
| Income (loss) from continuing operations | (14,595) | (89,366) | (103,961) |
| Net income | (13,723) | (89,366) | (103,089) |

| Quarter Ended September 30, 2024 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 560,868 | (104,315) | 456,553 |
| Cost of revenues | 300,115 | (40,195) | 259,920 |

| Gross profit | 260,753 | (64,120) | 196,633 |
| Operating income (loss) | 71,203 | (62,883) | 8,320 |
| Income (loss) from continuing operations before income taxes | 43,168 | (104,854) | (61,686) |
| Income (loss) from continuing operations | 32,549 | (97,007) | (64,458) |
| Net income | 31,461 | (97,007) | (65,546) |

| Year Ended December 31, 2024 | | | |
|---|---|---|---|
| | As Reported (in thousands) | Adjustments (in thousands) | As Restated (in thousands) |
| Net revenues | 2,198,233 | (410,220) | 1,788,013 |
| Cost of revenues | 1,197,873 | (160,279) | 1,037,594 |
| Gross profit | 1,000,360 | (249,941) | 750,419 |
| Operating income (loss) | 230,130 | (244,998) | (14,868) |
| Income (loss) from continuing operations before income taxes | 91,309 | (400,519) | (309,210) |
| Income (loss) from continuing operations | 42,297 | (370,119) | (327,822) |
| Net income | 47,349 | (370,119) | (322,770) |

374. Defendants knew or recklessly disregarded that the statements regarding Compass's financial performance in ¶¶ 368–372 were false and misleading because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put

Compass's executive management on notice of the unreliability of Lugano's financial reporting (and, by extension, Compass's own financial reporting); (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Compass's executive management lacked a reasonable basis to trust that Lugano's financial reporting (and, by extension, Compass's own financial reporting) accurately reflected Lugano's financial operations; (3) inconsistencies between Lugano's purported growth (and, by extension, Compass's own financial performance) and traffic at Lugano's salons, which key members of Compass's senior management—including Defendant Sabo, Defendant Maciariello, Raj Dalal, and Larry Enterline—would have noticed due to their frequent visits to Lugano salons; (4) the presence of Compass executives Defendant Maciariello and Dalal on Lugano's Board of Directors, providing Compass a further window into Lugano's actual operations (and, thus, the disparity between Lugano's purported growth and Lugano's actual financial state); and (5) the sheer magnitude of Compass's restated financial statements across the 2024 fiscal year, with, for example, Compass initially reporting a positive yearly net income of approximately $47 million when it actually achieved a yearly net *loss* of nearly $323 million, necessitating an approximately $370 million negative adjustment in the Restatement..

375.   Attached as exhibits to the 2024 Q1 and Q2 Forms 10-Q were certifications of the Company's CEO and CFO pursuant to Sections 302 and 906 of SOX, executed by Defendants Sabo and Faulkingham. Such certifications were also attached to the 2024 Q3 10-Q and the 2024 10-K, executed by Defendants Sabo and Keller.

376.   The certifications pursuant to Section 302 each represented that "based on" each Defendant's "knowledge, **the [2024 Q1, Q2, and Q3 Forms 10-Q and the 2024 Form 10-K with fourth quarter financial results] does not contain any untrue statement or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading** with respect to the period covered by this report[.]" Similarly, the certifications pursuant to Section 906 each represented that the **"[i]nformation contained in the [2024 Q1, Q2, and Q3 Forms 10-Q and Form 2024 10-K] with fourth quarter financial results] fairly presents, in all material respects, the financial condition and results of operations of the Company** as of the dates and for the periods expressed in the [2024 Q1, Q2, and Q3 Forms 10-Q and the 2024 Form 10-K with fourth quarter financial results]."

377.   Defendants' statements in ¶¶ 375–376 that the 2024 Q1, Q2, and Q3 Forms 10-Q and the 2024 Form 10-K with fourth quarter financial results did not "contain any untrue statement[s] of a material fact necessary to make the statements . . . not misleading" and that the 2024 Q1, Q2, and Q3 Forms 10-Q and the 2024 Form 10-

K with fourth quarter financial results "fairly present[] . . . the financial condition and results of operations of the Company" were false and misleading when made, for the reasons described in ¶ 374.

378.   Defendants' certifications pursuant to SOX Section 906 also represented that Sabo and Faulkingham had "**disclosed, based on our most recent evaluation of internal control over financial reporting, ... all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and . . . **any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**."

379.   Defendants' statements in ¶ 378 that the 2024 Q1, Q2, and Q3 Forms 10-Q and the Form 2024 10-K with fourth quarter financial results "disclosed . . . all significant deficiencies and material weaknesses" in Compass's ICFR were false and misleading when made because, as the Company admitted in the Restatement, Compass's 2022, 2023, and 2024 financial statements failed to disclose at least ten material weaknesses, present across Compass and Lugano, that were reasonably likely to—and, in fact, did—affect Compass's ability to record, process, summarize, and report financial information. *See supra* ¶¶ 299–300.

380.    Additionally, Defendant Sabo's and Defendant Faulkingham's statements in ¶ 378 that the 2024 Q1, Q2 and Q3 Forms 10-Q and the 2024 Form 10-K disclosed all fraud involving "employees who have a significant role in the registrant's internal control over financial reporting" were false and misleading. In reality, the 2024 Forms 10-Q and Form 10-K failed to disclose the fraud committed by Moti—an individual with a "significant role" in Compass's ICFR, given his position as CEO of Compass's key subsidiary—and this fraud's resulting inflationary effect on Lugano's (and, in turn, Compass's) financial results.

381.    Defendant Sabo's and Defendant Faulkingham's statements in ¶ 378 knowingly or recklessly disregarded the presence of material weaknesses and fraud affecting Compass's ICFR because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendants Sabo and Faulkingham on notice of material weaknesses in Lugano's financial reporting (and, by extension, Compass's own financial reporting) that were not disclosed until the Restatement; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Compass's executive management lacked a reasonable basis to trust that Lugano's ICFR (and, by extension, Compass's internal controls) were free of material weaknesses; (3) inconsistencies between Lugano's purported growth (and, by extension, Compass's own financial performance) and traffic at Lugano's salons,

which Defendant Sabo would have noticed through his frequent visits to Lugano salons, highlighting Compass's and Lugano's deficient internal controls as well as the presence of fraud in Lugano's financial reporting; and (4) the sheer magnitude of Compass's restated financial statements, *see supra* ¶ 373.

**(1)    Additional False and Misleading Statements Concerning Compass's First Quarter 2024 Financial Results**

382.   In conjunction with the filing of the 2024 Q4 10-Q on May 1, Compass hosted an earnings call (the "2024 Q1 Call"). In his opening remarks, Defendant Sabo stated:

> As we saw this past quarter, the diversification of our subsidiaries mean that if a few of our companies lag in growth, others may be able to compensate resulting in a more consistent and reliable growth engine. **This quarter we saw the strongest performance from our branded consumer vertical, which reported 11% growth in *pro forma* revenue and 22% growth in *pro forma* adjusted EBITDA**. Pat and Ryan will, of course go into greater detail but I will tell you, **Lugano produced another quarter of remarkable results, and the company currently shows no signs of slowing down**. With the opening of its new London salon earlier this week, we believe international expansion will be a huge opportunity for this business. You will remember, we were expecting both BOA and PrimaLoft to rebound against the inventory destocking headwinds of the recent past and we believe they are now through the worst of it. I am pleased to announce BOA, had a great first quarter, better than expected.
>
> . . .

>          Thanks to the strong performances of Lugano, BOA and
>          the acquisition of The Honey Pot Company. Adjusted
>          earnings for this quarter were above our expectations and
>          up significantly over Q1 of last year.

383.    Defendant Sabo's statements in ¶ 382 that Lugano had "produced another

quarter of remarkable results" and "show[ed] no signs of slowing down" were false

and misleading and lacked a reasonable basis when made. As Compass admitted in

the Restatement, far from growing or producing "remarkable results," Lugano was

actually hemorrhaging money at the time of Sabo's statements, with Lugano posting

a restated $61,841,000 operating loss in 2024 contributing to Compass's yearly

operating loss of approximately $15 million. Moreover, Defendant Faulkingham's

statement that Compass's adjusted earnings were "above our expectations" was false

and misleading when made. As disclosed in the Restatement, Compass's true

adjusted earnings in the first fiscal quarter of 2024 were materially misstated due to

Lugano's financial irregularities that Compass failed to prevent. Moreover, to the

extent Compass's adjusted earnings actually exceeded the Company's expectations,

any overperformance was not and could not be due to Lugano's purported "strong

performance" as, far from adding to Compass's earnings, Lugano's losses detracted

from Compass's overall growth in the first quarter of 2024, as demonstrated by the

Restatement's massive negative adjustment of Compass's financial statements for

the quarter. Defendant Sabo knew or recklessly disregarded the effect of Lugano's

financial irregularities on Lugano's and Compass's financial reporting because of,

*inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Sabo on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Sabo lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons; and (4) the sheer magnitude of Compass's restated financial statements for the first fiscal quarter of 2024, *see supra* ¶ 373, underscoring the blatant disparity between the "remarkable" results acclaimed in Sabo's statement and Lugano's true financial state.

384. Later in the 2024 Q1 Earnings Call, Defendant Faulkingham stated:

> On a consolidated basis, **revenue for the quarter ended March 31, 2024 was $524.3 million**, up 8% compared to $483.9 million for the prior year period. **This increase was primarily a result of The Honey Pot Company and strong growth at Lugano and BOA**, which was partially offset by lower revenue at Sterno, Altor and Velocity.
>
> . . .
>
> **Adjusted EBITDA in the first quarter was $94.8 million, up 28% compared to $74.1 million in the prior year**. **The increase was due to the acquisition of The Honey Pot Company and strong growth at Lugano and BOA.** Included in adjusted EBITDA, in the first quarter of

209

2024 and 2023, were management fees and corporate costs of $21.4 million and $19.4 million, respectively. **Adjusted earnings for the first quarter were above our expectations coming in at $34.3 million. This is up significantly from $19.8 million in the prior year quarter due to strong performances at Lugano and BOA**.

385. Defendant Faulkingham's statements in ¶ 384 describing Compass's ostensible revenue, adjusted EBITDA, and adjusted earnings for the first quarter of 2024 were false and misleading when made. As Compass admitted in the Restatement, Lugano's financial irregularities that Compass failed to prevent caused the Company to materially misstate Compass's financial performance for the first quarter of 2024, including Compass's quarterly revenue, adjusted EBITDA, and adjusted earnings. Additionally, Defendant Faulkingham's statements in ¶ 384 attributing Compass's supposedly strong performance in these financial measures to Compass's "strong growth" and "strong performance" were false and misleading and lacked a reasonable basis when made. Rather than contributing to Compass's supposedly strong performance, Lugano was actually detracting from Compass's overall financial performance in the first quarter of 2024, as indicated by Lugano's restated negative operating income of $61,841,000 for 2024. Defendant Faulkingham knew or recklessly disregarded Lugano's financial irregularities and their effect on Compass's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to

implement adequate SOX procedures, which put Defendant Faulkingham on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Faulkingham lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; and (3) the sheer magnitude of Compass's restated financial statements for the first quarter of 2024, *see supra* ¶ 373, underscoring the blatant disparity between the "strong performance" and "strong growth" described in Faulkingham's statement and Lugano's true financial condition

### (2) Additional False and Misleading Statements Concerning Compass's Second Quarter 2024 Financial Results

386. In conjunction with the filing of the 2024 Q2 10-Q on July 31, Compass hosted an earnings call (the "2024 Q2 Call"). On the call, Defendant Sabo stated:

> While the current business environment has had a negative impact on our industrial businesses, **our branded consumer vertical performed extremely well this quarter, led by BOA, PrimaLoft and Lugano the strong performance of our consumer vertical more than offset any weakness we saw in our industrial businesses**.
>
> . . .
>
> In addition, **Lugano continued its trend of remarkable growth**. Last quarter, we opened our first international salon in London. And in just a few short months, like many of our Lugano salons, it has vastly exceeded our expectations.

> **Combined Lugano, BOA and PrimaLoft represent approximately half of our EBITDA**. **With all three of these businesses performing so well this past quarter** and with them positioned so strongly for the rest of the year, we are feeling bullish about the second half of 2024 and beyond.

387.   Defendant Sabo's statements in ¶ 386 that subsidiaries in Compass's consumer vertical exhibited "strong performance" and "perform[ed] so well this past quarter," and that Lugano "continued its trend of remarkable growth," were false and misleading when made because, as disclosed in the Restatement, Lugano—the supposedly top-performing subsidiary in Compass's consumer vertical—actually lost money in the second quarter of 2024, as indicated by Lugano's negative operating income of approximately $61 million in 2024. Defendant Sabo knew or recklessly disregarded the effect of Lugano's financial irregularities on Lugano's actual growth because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Sabo on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Sabo lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons; (4) FE 10's June 2024 whistleblower report

detailing Lugano's financial irregularities; and (5) the sheer magnitude of Compass's restated financial statements for the second quarter of 2024, *see supra* ¶ 373, underscoring the blatant disparity between the "remarkable growth" trumpeted in Sabo's statement and Lugano's true financial state.

388.   Later in the call, Defendant Faulkingham stated:

> **On a consolidated basis, revenue for the quarter ended June 30, 2024, was $542.6 million, up 11% compared to $486.9 million for the prior year period. This increase was primarily a result of the acquisition of the HoneyPot company and strong growth at Lugano**, BOA and PrimaLoft, which was partially offset by lower revenue at Altor, 5.11 and at Velocity as a result of the sale of its Crosman division.
>
> . . .
>
> **Adjusted EBITDA in the second quarter was $105.4 million, up 27% compared to $82.9 million in the prior year**. **The increase was due to the acquisition of the HoneyPot company and strong growth at Lugano, BOA and PrimaLoft**. Included in adjusted EBITDA in the second quarter of 2024 and 2023 were management fees and corporate costs of $21 million and $19.3 million, respectively. **Adjusted earnings for the second quarter were above our expectations**, coming in at $39.8 million. **This was up significantly from $29.2 million in the prior year quarter due to strong performances at Lugano and BOA**.

389.   Defendant Faulkingham's statements in ¶ 388 that Compass's quarterly revenue and adjusted EBITDA were $542.6 million and $105.4 million, respectively, were false and misleading when made because, as disclosed in the Restatement, Compass's initially reported revenues and adjusted EBITDA for the

second quarter of 2024 were materially misstated due to Lugano's financial irregularities. Moreover, Defendant Faulkingham's statement that Compass's purported adjusted earnings growth was due to "strong performances at Lugano" was false and misleading when made because, rather than contributing to Compass's supposed earnings growth, Lugano was actually detracting from the Company's overall earnings, as indicated by Lugano's negative 2024 operating income of $61,841,000 in 2024. Defendant Faulkingham knew or recklessly disregarded Lugano's financial irregularities and their effect on Compass's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Faulkingham on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Faulkingham lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) FE 10's June 2024 whistleblower report detailing Lugano's financial irregularities; and (4) the sheer magnitude of Compass's restated financial statements for the second quarter of 2024, *see supra* ¶ 373, underscoring the blatant disparity between the "strong growth" described in Faulkingham's statement and Lugano's true financial state.

214

>            **(3)    Additional False and Misleading Statements Concerning Compass's Third Quarter 2024 Financial Results**

390.    In conjunction with the filing of the 2024 Q3 10-Q on October 30, Compass hosted an earnings call (the "2024 Q3 Call"). On the call, Defendant Keller stated:

> As mentioned, **growth in the quarter was primarily driven by our branded consumer businesses with Lugano, BOA PrimaLoft and Honeypot all delivering double digit growth**.
>
> . . .
>
> While our year-over-year performance benefited from the acquisition of Honeypot, **growth in our adjusted EBITDA was primarily driven by strong operational performance across most of our subsidiaries with Lugano, BOA, PrimaLoft and Arnold all significantly expanding adjusted EBITDA margins in the quarter.**
>
> . . .
>
> **Our cash usage was primarily driven by the extraordinary growth at Lugano** where we used around $60 million in cash in the quarter **to support this highly profitable fast-growing business**.

391.    Defendant Keller's statement in ¶ 390 attributing Compass's supposed growth to Lugano's "strong operational performance" was false and misleading when made. As disclosed in the Restatement, Lugano actually detracted from Compass's overall growth in the third quarter of 2024; as a result, Compass lost $65,546,000 in the third quarter of 2024, necessitating an almost $100 million

negative adjustment to the $31,461,000 positive net income Compass initially reported. In addition, Defendant Keller's statement describing Lugano as a "highly profitable, fast-growing business" was false and misleading when made because, as disclosed in the Restatement, Lugano was neither profitable nor fast-growing, as indicated by Lugano's negative operating income of $61,841,000 in 2024. Defendant Keller knew or recklessly disregarded Lugano's financial irregularities and their effect on Compass's financial reporting because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Keller on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Keller lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) FE 10's and Lugano Controller Perushek's whistleblower reports to Compass detailing Lugano's financial irregularities; and (4) the sheer magnitude of Compass's restated financial statements for the third fiscal quarter of 2024, *see supra* ¶ 373, underscoring the blatant disparity between the "strong operational performance" described in Keller's statement and Lugano's true financial state.

392.   Later in the call, an analyst asked a question regarding Compass's capital allocation priorities. Defendant Sabo responded:

We think we would be getting on that capital that's being used. I also want to point out one of the comments that I made in the script is that we use, we raised $17 million of preferred capital in the third quarter. We have also raised capital in the fourth quarter. We don't disclose how much until the following. That's preferred capital we raised in the fourth quarter.

So far before the window was shut in October, we would anticipate as long as that product is available to us at reasonable cost which it is right now that we would continue to raise that as a form of equity capital that can be used to either invest in Lugano.

It could be used theoretically to buy back shares, right? Money is fungible. So wherever the highest in you know return on invested capital is, **I can tell you in our opinion right now, nothing is as attractive as investing in Lugano because the returns that gets are really exceptional.** And so that raising preferred can be, there can buy back our stock. It can be part of the acquisition capital that we have to go buy new companies that we view as a viable source or just general deleveraging.

393.   Defendant Sabo's statement in ¶ 392 that "nothing is as attractive as investing in Lugano" because of Lugano's "really exceptional returns" was false and misleading and lacked a reasonable basis when made. As Compass admitted in the Restatement, due to Lugano's financial irregularities that Compass failed to prevent, Lugano was not generating positive returns on Compass's investment in 2024, let alone "exceptional" or "attractive" returns. Defendant Sabo knew or recklessly disregarded the effect of Lugano's financial irregularities on Lugano's actual returns because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which

put Defendant Sabo on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i, such that Defendant Sabo lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons; (4) FE 10's and Controller Perushek's whistleblower reports to Compass detailing Lugano's financial irregularities; and (5) the sheer magnitude of Compass's restated financial statements for the third quarter of 2024, *see supra* ¶ 373, underscoring the blatant disparity between the "exceptional returns" trumpeted in Sabo's statement and Lugano's true financial state.

### (4) Additional False and Misleading Statements Concerning Compass's Fourth Quarter and 2024 Year-End Financial Results

394.  In conjunction with the filing of the 2024 10-K on February 27, 2025, Compass hosted an earnings call for the fourth quarter of 2024 (the "2024 Q4 Call"). On the call, Defendant Sabo stated:

> **Lugano continues to post exceptional results, with annual sales growth of more than 50%. For the full year 2024, Lugano delivered adjusted EBITDA of $195 million an increase of 76.4% versus the prior year**. **This performance is a direct result of the company's disruptive business model**, redefining the greater than $160 billion dollar luxury collectibles market.

> As we've discussed, Lugano continues to consume significant amounts of working capital as they invest in their long-term growth. Lugano plans to open one new salon in the first half of the year, and two more in the second half of 2025. We are excited about the continued growth potential at Lugano and believe the momentum will continue.

395. Defendant Sabo's statement in ¶ 394 attesting to Lugano's "exceptional results" and recounting Lugano's supposed adjusted EBITDA figures for 2024 was false and misleading and lacked a reasonable basis when made because, as disclosed in the Restatement, Lugano's financial results for 2024 were materially misstated due to Lugano's financial irregularities. Indeed, as revealed in the Restatement, Lugano actually posted an operating *loss* of almost $62 million in 2024. Moreover, Defendant Sabo's statement that Lugano's purported "performance" was "a direct result of the company's disruptive business model" was false and misleading when made as, in reality, Lugano's ostensibly strong performance was due to Lugano's financial irregularities rather than Lugano's supposedly innovative practices. Defendant Sabo knew or recklessly disregarded that Lugano's supposedly strong financial performance were caused by Lugano's financial irregularities because of, *inter alia*, (1) tensions between Compass's internal audit team and Lugano regarding Lugano's failure to implement adequate SOX procedures, which put Defendant Sabo on notice of the unreliability of Lugano's financial reporting; (2) the Company's inadequate due diligence during the Lugano acquisition, *see supra* Section IV.e.i,

such that Defendant Sabo lacked a reasonable basis to trust that Lugano's financial reporting accurately represented Lugano's true financial condition; (3) inconsistencies between Lugano's purported growth and traffic at Lugano's salons, which Defendant Sabo would have noticed through his frequent visits to Lugano salons; (4) FE 10's and Controller Perushek's whistleblower reports to Compass detailing Lugano's financial irregularities; and (5) the sheer magnitude of Compass's restated financial statements for the fourth quarter of 2024, *see supra* ¶ 373, underscoring the blatant disparity between the "exceptional results" trumpeted in Sabo's statement and Lugano's true financial state.

### b. Defendant Grant Thornton's Materially False and Misleading Statements and Omissions

396.   GT issued an unqualified audit report for each of Compass's financial statements included in the 2022, 2023, and 2024 Forms 10-K. In these audit reports, GT represented that: (1) **it had audited Compass's 2022, 2023, and 2024 financial statements "in accordance with the standards of the Public Company Accounting Oversight Board"**; (2) **it had planned and performed its audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement**, whether due to error or fraud"; and (3) **its audits provided a "reasonable basis" for its reports**. GT further stated that the financial statements included in the Company's 2022, 2023, and 2024 Forms 10-K "**present fairly, in**

**all material respects, the financial position" of Compass "in conformity with accounting principles generally accepted in the United States of America.**"

397.   GT's statements in ¶ 396 that it had audited Compass's 2022, 2023, and 2024 financial statements "in accordance with the standards of the Public Company Accounting Oversight Board" were materially false and misleading when made because GT did not conduct its audit in accordance with PCAOB Standards. *See supra* Section IV.f. GT failed to detect and/or act on numerous readily apparent red flags concerning Lugano's financial irregularities, all of which would have been visible had GT conducted its audits in accordance with PCAOB Standards. Specifically, GT's audits failed to detect and/or act on red flags showing that, *inter alia*, (a) Moti withheld inventory and sales transaction documentation from Lugano's internal accounting personnel, (b) Compass and Lugano personnel struggled to implement SOX procedures at Lugano, and (c) Compass failed to act on at least two whistleblower reports concerning Lugano's financial irregularities. *See supra* ¶ 243. Moreover, GT's audits failed to detect and/or act on the presence of multiple "risk factors relating to misstatements arising from fraudulent financial reporting" identified in AS 2401.85 (A.2), *see supra* Section IV.f.i.(1).(d), including, *inter alia*, (a) "[r]apid growth or unusual profitability, especially compared to that of other companies in the same industry," (b) "[d]omination of management by a single person or small group (in a nonowner-managed business) without

221

compensating controls[,]" (c) "[h]igh turnover rates or employment of ineffective accounting, internal audit, or information technology staff[,] and (d) "[t]he relationship between management and the current or predecessor auditor is strained, as exhibited by . . . [f]requent disputes with the current or predecessor auditor on accounting, auditing, or reporting matters[.]"

398.   Similarly, GT's statements in ¶ 396 that it had planned and performed its audits "to obtain reasonable assurance about whether [Compass's] financial statements are free of material misstatement" were false and misleading when made. In reality, GT knew or recklessly disregarded multiple red flags apparent in Compass's 2022, 2023, and 2024 financial statements, *see supra* ¶ 243, such that Compass's audits were neither planned nor performed in a manner likely to provide reasonable assurance about whether the Company's financial statements were free of material misstatement, including either not identifying areas of high risk of material misstatement in the financial statements or ignoring such risks when identified..

399.   Likewise, GT's statements in ¶ 396 that its audits provided a "reasonable basis" for its unqualified audit reports of Compass's 2022, 2023, and 2024 financial statements were false and misleading when made. In reality, GT knew or recklessly disregarded that its audits failed to act on multiple red flags apparent in Compass's 2022, 2023, and 2024 financial statements, as described in ¶ 398.

400.   Moreover, GT's statements in ¶ 396 that the financial statements in Compass's 2022, 2023, and 2024 Forms 10-K "present fairly, in all material respects, the financial position" of Compass "in accordance with [GAAP]" were false and misleading when made. In reality, Compass's 2022, 2023, and 2024 financial statements were riddled with material misstatements concerning the Company's and Lugano's net revenues, cost of revenues, gross profit, operating income, income from continuing operations, and net income, such that Compass's financial statements ultimately required material restatement. GT knew or recklessly disregarded that Compass's 2022, 2023, and 2024 financial statements did not present Compass's financial position fairly in accordance with GAAP because GT knew or recklessly disregarded the red flags described in ¶ 243.

401.   For each of Compass's 2022, 2023, and 2024 Forms 10-K, GT also issued an unqualified report as to the Company's ICFR. Specifically, each of GT's unqualified reports stated that Compass, "[i]n our opinion . . . **maintained, in all material respects, effective internal control over financial reporting as of December 31 [of 2022, 2023, and 2024]**, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by COSO."

402.   GT's statements in ¶ 401 that Compass "maintained, in all material respects, effective control over financial reporting" across 2022, 2023, and 2024 were false and misleading and lacked a reasonable basis when made. As admitted in

the Restatement, GT failed to disclose at least ten material weaknesses in Compass's and Lugano's ICFR in 2022, 2023, and 2024. *See supra* ¶¶ 299–300. GT knew or recklessly disregarded that the Company failed to maintain effective control over internal reporting because it knew or recklessly disregarded "red flags" casting doubt on the fitness of Compass's financial statements and internal controls. *See supra* ¶ 243.

403.    Additionally, the financial statements in Compass's quarterly reports on Form 10-Q in 2022, 2023, and 2024 contained material misstatements concerning, *inter alia*, the Company's and Lugano's net revenues, cost of revenues, gross profit, operating income, income from continuing operations, and net income. *See supra* Section VI.a. Either GT failed to undertake analytical procedures, make inquiries, and interview responsible Lugano and Compass personnel on a quarterly basis, such that GT recklessly disregarded the truth of the financial statements in Compass's quarterly reports, or GT knew of the falsity of the financial statements in Compass's quarterly reports but failed to require Compass management to correct these representations.

## VII.    SUMMARY OF SCIENTER ALLEGATIONS

### a.    Scienter Allegations Against the Compass Defendants

404.    At all relevant times, Defendants acted with scienter. The Company possesses the scienter of its management-level employees, including each of the

Individual Defendants. During the Class Period, Compass and the Individual Defendants overlooked ample signs of financial irregularities at Lugano. Indeed, due to the Company's since-reformed method of compensating management level-employees through management fees and fees derived from subsidiaries' contributions to Compass's apparent profit, the Individual Defendants and other management-level employees possessed a direct and concrete motive to ignore the red flags concerning Lugano's financial irregularities. When viewed holistically, the facts below support a strong inference of scienter.

405. *First*, Compass's executive management possessed a direct and concrete financial motive to recklessly disregard Lugano's financial irregularities. Compass's executive management are compensated by CGM, which in turn is funded by management fees from Compass. Under the MSA in effect between CGM and Compass during the Class Period, Compass paid CGM a quarterly management fee equal to 0.5% of Compass's adjusted net assets. Thus, Compass's executive management had a motive to increase Lugano's apparent adjusted net assets (and, by extension, Compass's own adjusted net assets), as increases in Compass's adjusted net assets increased the compensation paid to Compass's executive management via the Company's management fees to CGM. This is a distinct financial benefit that only the Individual Defendants enjoyed from the fraud alleged herein.

406.    As disclosed in Compass's Form 10-Q for the quarter ended June 30, 2025, that was filed on December 29, 2025, Compass "currently estimates the aggregate amount of overpaid management fees [due to Lugano's financial irregularities] as of March 31, 2025 at approximately $43.1 million[.]" In other words, Compass's concealment of Lugano's fiscal irregularities enabled CGM (and, by extension, Compass's executive management) to earn $43 million in management fees in excess of the amount justified by Compass's actual net assets.

407.    Under the terms of its current forbearance agreement, Compass is now restricted from paying more than $10.5 million in management fees to CGM per fiscal quarter. Indeed, Compass acknowledged in the Restatement that "our management fees . . . may induce [CGM] to make suboptimal operations decisions[.]" This disclosure and Compass's post-Class Period reform of its management fee payments support the inference that Compass's management fees to CGM provided a direct and concrete financial motive for Defendants to commit fraud.

408.    In a similar vein, key members of Compass's executive management— including Defendants Sabo, Keller, and Faulkingham—stood to collect fees through their shares in Sostratus if Compass sold Lugano or retained Lugano as a subsidiary for five years. *See supra* ¶¶ 66–67. Indeed, Compass was actively considering selling Lugano during the Class Period, as indicated by Defendants' comments to analysts,

see supra ¶¶ 95–97, Moti's statements to Lugano's creditors Champion and Avina, see supra ¶¶ 93–94, and Compass's track record of selling or divesting from subsidiaries after roughly four years of ownership, see supra ¶ 62. Even without a sale, holders of Sostratus shares stood to receive payments on the fifth anniversary of Compass's acquisition of Lugano—September 7, 2026, a mere 16 months from when Lugano's financial irregularities were revealed to the market.

409. Compass's fees to Sostratus are calculated based on a subsidiary's "aggregate contribution to the Company's profit." Because Lugano's financial irregularities increased Lugano's apparent aggregate contribution to Lugano's profit, Lugano's financial irregularities increased the potential fees Compass's executive management stood to gain from their shares in Sostratus when Compass sold Lugano and/or retained Lugano until September 7, 2026.

410. Indeed, Compass's own public filings concede that the ability of Compass's executive management to receive payments through Sostratus may cause Compass executives to "make suboptimal decisions regarding our operations." Specifically, the 2022 10-K states:

> **Our profit allocation may induce our Manager to make suboptimal decisions regarding our operations.**
>
> Sostratus LLC, as holder of our Allocation Interests, will receive a profit allocation based on ongoing cash flows and capital gains in excess of a hurdle rate. Certain persons who are employees and partners of our Manager are owners of Sostratus LLC. In this respect, a calculation and

> payment of profit allocation may be triggered upon the sale of one of our businesses. As a result, our Manager may be incentivized to recommend the sale of one or more of our businesses to the Company's board of directors at a time that may not be optimal for our shareholders.

411. Like the management fees paid by Compass to CGM, the fees paid to Compass's executive management based on shares in Sostratus constituted a direct and concrete financial motive for Defendants to commit fraud.

412. On top of the financial incentive provided by management fees and Sostratus payments, Compass's executive management received discounts on Lugano jewelry, which constituted yet another direct and concrete motive for Defendants to commit fraud. *See supra* ¶ 125.

413. **Second**, Compass's executive management knew or had access to ample information indicating that Lugano's apparent financial growth was the product of fraud and other financial irregularities.

414. Most directly, Compass received, but did not act on, at least two whistleblower reports concerning Lugano's financial irregularities. First, FE 10 submitted an anonymous whistleblower report to Compass via whistleblowerservices.com, which Compass acknowledged receipt of on June 12, 2024. FE 10's report stated that "[t]he sales reported by Lugano are not accurate" and laid out specific deficiencies in Lugano's sales reporting. As a whistleblower report concerning alleged fraud at Compass's most important subsidiary, *see infra*

¶¶ 425–428, FE 10's report should have been shared with Compass's executive management. Indeed, to be in compliance with SOX Section 301, Compass was required to route the whistleblower complaints to the Audit Committee which is composed of Compass's executive and board management.[104]

415.   Second, in the Fall of 2024, Lugano's then-Controller, Dan Perushek, presented the results of his and FE 12's investigation into Lugano's financial irregularities to Compass's internal audit team. Perushek and FE 12's investigation encompassed the two improperly recorded investment diamond transactions that Perushek and FE 12 directly observed, as well as the third suspected improperly recorded investment diamond transaction Perushek and FE 12 noticed shortly before FE 12's termination. As a whistleblower report concerning alleged fraud at Compass's most important subsidiary, *see infra* ¶¶ 425–428, Perushek's report should have been shared with Compass's executive management.

416.   In addition to direct whistleblower reports detailing Lugano's financial irregularities, Compass's executive management had ample access to Lugano's financial reporting and operations, such that Compass's executive management could directly observe the vast disparity between Lugano's reported growth and Lugano's actual financial state. For instance, Compass's internal audit team worked

---

[104]   *See* 15 U.S.C. §§ 78k-1(m)(4)–(B) ("Each audit committee shall establish procedures for . . . the confidential, anonymous submission of employees of the issuer of concerns regarding questionable accounting of audit matters.").

with Lugano to implement SOX procedures at Lugano. *See supra* IV.e.iii.(3). Lugano's failure to quickly and adequately implement and follow SOX procedures was a consistent source of tension between Lugano and Compass, with, as FE 3 recalled, Compass's Head of Risk and Controls "directly confront[ing] Moti on several occasions regarding his failure to provide adequate documentation." *See supra* ¶ 144. In a similar vein, FE 12 recalled that Moti and Lugano's sales team "dragged their feet" in providing supporting documentation. Separate from the tensions regarding Lugano's compliance with SOX, FE 1 recalled "disagreements" between Moti and Compass's executive management—including Defendants Sabo, Keller, and Maciariello—in the fourth fiscal quarter of 2024 regarding Lugano's financing requests. *See supra* ¶ 142. Each of the Individual Defendants knew or recklessly disregarded that Lugano was struggling to implement adequate SOX procedures under the oversight of Compass's internal audit team. *See supra* ¶¶ 149–151. These tensions between Compass and Lugano regarding Lugano's financial reporting and financing requests are strong evidence that Compass knew or recklessly disregarded Lugano's financial irregularities.

417. Compass's executive management also had access to information regarding Lugano's financial reporting and operations through their frequent visits to Privé and shopping trips at Lugano salons. FE 9 recalled that Compass executives Defendant Sabo, Defendant Maciariello, and Dalal were Privé members who visited

Privé as frequently as once a week. *See supra* ¶ 126. Similarly, FE 5 recalled that Defendant Sabo, Defendant Keller, Enterline, and Dalal visited his salon, and that these executives purchased Lugano jewelry at discounted rates and placed special orders. *See supra* ¶ 125. Indeed, FE 5 even recalled that Enterline expressed suspicion about Lugano's numbers, telling him in April 2025 that Lugano's reported figures seemed "crazy high" and overblown. *See supra* ¶ 135.

418.    As an additional basis for Compass's executive management's knowledge or reckless disregard of Lugano's financial irregularities, Compass employees were intimately involved in Lugano's operations. Defendant Maciariello served as the Chair of Lugano's Board of Directors, of which Dalal was also a member. Moreover, Compass's internal audit team worked with high-level Lugano employees, including FE 12 and Lugano's Controller Dan Perushek, to implement SOX procedures at Lugano. Through Compass's interactions with Lugano's employees and participation in Lugano's implementation of SOX procedures, Compass possessed a window into Lugano's operations sufficient to detect signs of Lugano's rampant financial irregularities.

419.    Indeed, according to Moti himself, "Compass knew of [the investment diamond contracts] and inventory practices that Lugano was using from the beginning. Compass was aware of the practices it now conveniently calls

'misconduct' but left them in place." Mot. for Relief ¶ 41, *In re Lugano*, No. 25-12055-BLS (Jan. 27, 2026), ECF No. 312; *see supra* ¶¶ 295–297.

420.  **Third**, Defendants' false statements regarding Compass's and Lugano's financial performance were extensive in scope and duration, therefore negating the inference that Defendants' false statements arose out of negligence or innocent reporting mistakes. Defendants' false and misleading statements regarding Compass's and Lugano's financial performance spanned three years and twelve consecutive fiscal quarters, ultimately causing a massive Restatement. The extensive scope and duration of the Defendants' false statements and the magnitude of the Restatement are evidence of scienter as to each of the Individual Defendants.

421.  The Company's false statements, moreover, involved relatively simple accounting principles, including clear and long-standing principles of cost accounting and revenue recognition. *See supra* Section IV.f.iv. Every single one of the Company's accounting errors, moreover, cut in its favor, undercutting any inference that these errors were innocent mistakes.

422.  **Fourth**, Compass employees abruptly left the Company or were phased out of the Company's operations after Lugano's financial irregularities came to light. According to FE 1, in August 2025—a mere three months after Lugano's financial irregularities initially came to light—Compass circulated an internal communication announcing that Defendant Maciariello would be retiring from his position as COO,

and that his responsibilities would be handled on an interim basis by another employee. Maciariello officially left the Company in December 2025 but, according to FE 1, he ceased performing duties for Compass in August 2025. *See supra* ¶ 287. Defendant Maciariello's highly unusual and suspiciously timed departure is strong evidence of scienter.

423.    Similarly, Defendant Faulkingham stepped down from his position as Compass's CFO in August 2024, just two months after FE 10's whistleblower complaint and the same month that Compass informed FE 10 that his complaint had been "dismissed." *See supra* ¶ 118. Defendant Faulkingham's highly unusual and suspiciously timed departure is strong evidence of scienter.

424.    Ami Vearrier left her position as Compass's Senior Director of Internal Audit & SOX in November 2025, while Compass was in the midst of investigating Lugano's financial irregularities. According to FE 3, Vearrier led Compass's internal audit team's interactions with Lugano and expressed frustrations related to Lugano's failure to follow SOX procedures. Moreover, Vearrier led Compass's internal audit team when Lugano's then-Controller, Dan Perushek, informed Compass's internal audit team of Lugano's improper recording of investment diamond transactions as revenue without a corresponding liability. Vearrier's highly unusual and suspiciously timed departure is also strong evidence of scienter.

425.    ***Fifth***, Lugano's financial reporting was critical to Compass's revenue and overall operations. For example, Lugano's share of Compass's reported operating income more than doubled over the Class Period from 24% in 2022 to more than 57% in 2024. Moreover, Lugano was Compass's most profitable subsidiary, increasing the management fees paid by Compass to CGM and making up for the disappointing performance of Compass's other subsidiaries.

426.    Lugano's vital contribution to Compass's apparent financial success was noted by analysts. For example, a Roth MKM analyst described Lugano as the "engine driving CODI's outperformance[.]" In a similar vein, in a different report the same Roth MKM analyst called Lugano a "monster" that "continues to drive substantial sales and adj[usted] EBITDA growth." *See supra* ¶ 88.

427.    Moreover, Compass's own executives made remarks acknowledging Lugano's importance to the Company's operations. For example, Defendant Faulkingham stated that Lugano was "obviously" a "pretty, pretty significant percentage of our business now." Similarly, in his interview with *Forbes*, Defendant Sabo described Lugano's growth as "really amazing" and acknowledged that Lugano was "the fastest growing company we've ever had in our first 3 years of ownership of a business." Moreover, Compass even held its 2024 Investor Day at Privé, at which Compass allowed Moti to address and field questions from Compass's investors directly. *See supra* ¶¶ 89–90.

428.    In light of Lugano's importance to Compass's overall operations, each of the previously discussed false and misleading statements, *see supra* Section VI, concern "core matters" of central importance to Compass, and thus Plaintiff has also established scienter by way of the core operations inference. Compass's post-Class Period financial distress further justifies this inference, as, without Lugano's ostensible growth propping up Compass's financial performance, Compass has been forced to agree to a highly restrictive forbearance agreement with the Company's lenders, *see supra* ¶ 271, has pursued the sale of profitable subsidiary The Honey Pot, *see supra* ¶ 286, and has even disclosed that its current financial condition "raise[s] substantial doubt about the Company's ability to continue as a going concern[,]" *see supra* ¶ 290.

429.    ***Sixth***, as Compass's senior-most officers, the Individual Defendants exercised control over and were responsible for the material misstatements and omissions alleged in Section VI.a, by virtue of their positions within the Company.

430.    The facts set forth above, when viewed holistically and together with the other allegations in this Complaint, support a strong and compelling inference that each of the Compass Defendants knew or was severely reckless in not knowing that each of the misrepresentations and omissions alleged herein were materially false and misleading at the time they were made.

### b.    Scienter Allegations Against Defendant Grant Thornton

431.    At all relevant times, GT acted with scienter. During the Class Period, GT overlooked ample signs of financial irregularities at Lugano that would have been visible had GT adhered to PCAOB Standards. Moreover, Compass's violations of GAAP were of a significant magnitude and concerned basic, straightforward, and longstanding accounting principles, such that GT knew or recklessly disregarded the likelihood that these violations were ongoing. Indeed, during the Class Period, GT was the subject of a PCAOB investigation finding numerous "significant" instances of deficient auditing practices resembling the deficient practices that GT employed in its audits of Compass, further supporting the inference that GT knew or recklessly disregarded the likelihood that its audits of Compass were marred by similar errors. When viewed holistically, the facts below support a strong inference of scienter.

432.    ***First***, had GT adhered to PCAOB Standards, it would have conducted interviews of Lugano personnel, interviewed Moti, made site visit(s) to Lugano, reviewed Lugano's large sales transactions, and tested Lugano's accounting processes to gather sufficient audit evidence.

433.    Moreover, had GT conducted the above audit procedures in accordance with PCAOB Standards, it would have gathered evidence showing that Lugano's and Compass's ICFR were fundamentally flawed. *See supra* ¶ 243. GT's repeated issuance of "clean" audits, despite these ample red flags, indicates that GT knew or recklessly disregarded that its audit procedures were neither compliant with PCAOB

Standards nor sufficient to gauge the accuracy of Compass's and Lugano's financial statements.

434. ***Second***, Compass's violations of GAAP resulted in a massive Restatement and involved basic, straightforward, and longstanding accounting principles. The size of the Restatement is one indication that GT knew or recklessly disregarded that Compass's financial statements were false and not prepared in accordance with GAAP. Most notably, the Restatement revealed that Compass's net sales were misstated ***by almost $850 million*** over a mere three years of financial statements. Had GT undertaken appropriate audit procedures, performed appropriate risk assessment procedures, and applied "professional skepticism," it would have discovered such a massive disparity between Compass's reported and restated financial statements.

435. Moreover, Compass's GAAP violations primarily concerned two of the most basic areas of GAAP, revenue recognition and internal controls and procedures. Given the rudimentary nature of the GAAP violations that caused Compass to materially misstate its 2022, 2023, and 2024 financial statements, GT— a globally established accounting firm with over 8,500 employees in the United States alone—possessed the experience and sophistication to know or to have recklessly disregarded that Compass's financial statements violated GAAP.

436. ***Third***, GT was repeatedly inspected and cited for similar violations of GAAP and PCAOB Standards during the Class Period. During the Class Period, the PCAOB inspected a sample of integrated audits that GT had conducted of public companies. PCAOB's 2023 and 2024 inspection reports (which included historical findings from 2022) found that GT engaged in widespread deficient auditing practices during the Class Period. In particular, the PCAOB found that, *inter alia*, GT (a) "[d]id not perform sufficient testing related to a significant account or disclosure or to address an identified risk"; (b) "[d]id not identify and test any controls that addressed the risks related to a significant account or relevant assertion"; and (c) "[d]id not identify and/or sufficiently test controls over the accuracy and completeness of data or reports that the issuer used in the operation of controls." *See supra* Section IV.f.v.

437. The widespread existence of these deficient audit practices at GT during the Class Period furthers the inference that GT's violations of PCAOB Standards in its audits of Compass were not accidental or negligent, but rather part of a broader pattern or practice of knowingly or recklessly failing to conduct audits in compliance with PCAOB Standards. Moreover, given that GT received notice of at least some of the PCAOB's inspection report findings during the Class Period, GT knew or recklessly disregarded the possibility that its audit reports of Compass were tainted by the same deficiencies identified in the PCAOB's inspection reports.

438.   The facts set forth above, when viewed holistically and together with the other allegations in this Complaint, support a strong and compelling inference that Defendant GT knew or was severely reckless in not knowing that each of the misrepresentations and omissions alleged herein were materially false and misleading at the time they were made.

## VIII. LOSS CAUSATION

439.   Plaintiff incorporates by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning Compass's financial performance, Lugano's compliance with applicable accounting rules, and the Company's failure to implement effective internal controls over the Company's financial reporting.

440.   The conduct alleged and the materially false and misleading statements and omissions made during the Class Period caused Compass's securities to trade at artificially inflated prices, with the price of Compass's common stock reaching as high as $24 per share during the Class Period. When the truth was gradually revealed through disclosures on May 7, May 28, and December 4, 2025, Compass's securities price declined significantly, as the artificial inflation was removed from the securities' prices. As a result of these disclosures, the price of Compass's common stock declined by approximately *76%* from a closing price of $23.71 per share on February 22, 2022—the first day of the Class Period—to a closing price of $5.73 per

share on December 5, 2025, the next trading day following the final corrective disclosure.

441.    Compass's preferred shares also declined in price during the Class Period. For example, the price of Compass's Series A preferred shares dropped from $24.42 per share on February 22, 2022 to $16.06 per share on December 5, 2025, a decline of approximately 34%. Likewise, the price of Compass's Series B preferred shares dropped from $26.40 per share on February 22, 2022 to $18.10 per share on December 5, 2025. The price of Compass's Series C preferred shares similarly dropped from $25.63 per share on February 22, 2022 to $17.65 per share on December 5, 2025.

442.    Analysts expressed shock and surprise in reaction to these disclosures, underscoring their significance to investors. For example, analysts at William Blair called Compass's May 7 announcement "disappointing," noting that the news contradicted Compass's "long-term record of strong investment performance [] while providing good disclosure and lowering its cost of capital[.]" William Blair analysts further remarked that Compass's announcement "reduce[d] visibility and raise[d] various operational and financial risks." Analysts at Roth Capital Partners reacted to the May 7 announcement similarly, changing Roth's rating of Compass's stock from "Buy" to "Under Review" and noting that, without Lugano's subsidiary EBITDA, CODI would likely "exceed[] the 5.0x limit on gross debt-to-EBITDA in

its final covenants[.]" Roth Capital analysts further noted that the pending restatements made it "difficult to place a definitive rating on CODI's equity at this time," a far cry from Roth's previous description of Lugano as a "monster" driving "substantial sales and adj[usted] EBITDA growth" at Compass. *See supra* ¶ 88.

443.   Similarly, in a report published after Compass's December 4 investor call, William Blair's analysts noted that Compass's "[e]levated leverage and the restatement of financial statements reduce visibility and raise various operational and financial risks."

444.   The timing and magnitude of Compass's securities price declines evidences the impact that Defendants' statements had on the Company's securities price during the Class Period and negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions and macroeconomic, industry, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX.   PRESUMPTION OF RELIANCE

445.   To the extent that Plaintiff alleges that Defendants made affirmative misstatements, Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

241

b.      the omissions and misrepresentations were material;

c.      Compass's securities traded in an efficient market;

d.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Compass securities;

e.      Plaintiff and other members of the Class purchased Compass securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

f.      Compass securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

g.      as a regulated issuer, Compass filed periodic public reports with the SEC and the NYSE;

h.      Compass regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

i.      Compass was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those

brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

j.     unexpected material news about Compass was reflected in and incorporated into the Company's stock price during the Class Period.

446.   As a result of the foregoing, the market for Compass securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Compass's securities. All persons and entities who or which purchased or otherwise acquired Compass's securities during the Class Period suffered similar injuries through their purchase of Compass's securities at artificially inflated prices, and thus, the presumption of reliance applies.

447.   A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X.    CLASS ACTION ALLEGATIONS

448.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Compass securities during the Class Period and

were damaged upon the revelation of the alleged fraud. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

449.    The members of the Class are so numerous that joinder is impracticable. Compass's securities are actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of members in the Class. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

450.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

451.    Plaintiff will fairly and adequately protect interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

Case 3:25-cv-00758-AWT    Document 68    Filed 02/06/26    Page 251 of 262

452.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Compass;

c.    whether the Individual Defendants caused Compass to issue false and misleading statements during the Class Period;

d.    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

e.    whether the prices of Compass securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

453.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## XI. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

454. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

455. Statements complained of herein were not forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time each statement was made and/or statements that omitted material current or historical facts necessary to make the statements made not misleading.

456. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

457. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement

was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

458.   To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, did not actually believe the statement, had no reasonable basis for making the statement, or the statement was authorized and approved by an executive officer of Compass who knew that such statement was false or misleading.

## XII.   CLAIMS

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

459.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

460.    Plaintiff asserts this Count on behalf of itself and all other members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

461.    As alleged herein, throughout the Class Period, the Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

462.    During the Class Period, Defendants disseminated or approved the false and/ or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

463.    As alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

       a.    employed devices, schemes, and artifices to defraud;

b. made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

464. The Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially inflate the price of the Company's securities and maintain the Company's securities at artificially inflated prices; and (iii) cause Plaintiff and the other members of the Class to purchase or otherwise acquire the Company's securities at artificially inflated prices.

465. The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein. The Compass Defendants and Defendant Grant Thornton engaged in a plan, scheme, and course of conduct designed to deceive Plaintiff and the other members of the Class, by virtue of making public statements and preparing, approving, signing, and/or disseminating documents that contained false statements of material

fact and/or omitted material facts necessary to make the statements therein not misleading.

466.   As set forth above, Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's securities during the Class Period.

467.   Plaintiff and Class members have suffered damages in that, in ignorance of the materially false and misleading nature of Defendants' statements and omissions, and in reliance on the integrity of the market, they paid artificially inflated prices for Compass's securities. Plaintiff and Class members would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

468.   As alleged herein, when the true facts were subsequently disclosed, or the risks concealed by Defendants' public statements materialized, the price of the Company's securities declined precipitously. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered

damages in connection with their purchases of Compass's securities during the Class Period.

469.   This claim is timely within the applicable statute of limitations and repose.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

470.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

471.   Plaintiff asserts this Count on behalf of itself and all other members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

472.   The Individual Defendants—Defendants Sabo, Faulkingham, Keller, and Maciariello—by virtue of their positions and specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.

473.   By reason of their high-level positions of control and authority as Compass's most senior officers, Defendants Sabo, Faulkingham, Keller, and Maciariello had the authority to influence and control, and did influence and control, the day-to-day decision-making and activities of Compass and its employees, and to cause Compass to engage in the wrongful conduct complained of herein. The Individual Defendants were able to influence and control, and did influence and

control, directly and indirectly, the content and dissemination of the public statements made by Compass during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

474.   The Individual Defendants communicated with investors or the public on behalf of Compass during the Class Period. Defendants Sabo, Faulkingham, Keller, and Maciariello were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be materially false or misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Therefore, Defendants Sabo, Faulkingham, Keller, and Maciariello were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by the Company during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

475.   The Individual Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

476. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

477. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Compass's securities.

478. This claim is timely within the applicable statutes of limitations and repose.

## XIII. PRAYER FOR RELIEF

479. WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

  a. determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

  b. awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

  c. awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

d.    awarding such other, further, and/or different relief as this Court

deems just and proper.

## XIV.  JURY DEMAND

Plaintiff hereby demands a jury trial of all issues so triable.

DATED: February 6, 2026
            Milford, CT

Respectfully submitted,

*/s/ David A. Slossberg*
**HURWITZ SAGARIN & SLOSSBERG, LLC**
David A. Slossberg (ct13116)
Erica O. Nolan (ct31097)
135 Broad St.
Milford, CT 06460
Tel.: (203) 877-8000
Fax: (203) 878-9800
dslossberg@hss.law
enolan@hss.law

*Liaison Counsel for EAS Carpenters and the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll*
S. Douglas Bunch (*pro hac vice* forthcoming)
Nathan L. Weiser (*pro hac vice* forthcoming)
1100 New York Ave., N.W., Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com
nweiser@cohenmilstein.com

Christina D. Saler*
100 N. 18th St., Suite 1820
Philadelphia, PA 19103
Tel.: (267) 479-5707
Fax: (267) 479-5701
csaler@cohenmilstein.com

*Attorneys for EAS Carpenters and Lead
Counsel for the Class*

\* admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

This is to certify that on February 6, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing. Parties may access this filing through the Court's electronic system.

*/s/ Erica O. Nolan*
Erica O. Nolan