**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| IN RE COMPASS DIVERSIFIED HOLDINGS SECURITIES LITIGATION | Civil No. 3:25-cv-00758 (AWT) |

**PLAINTIFF'S OPPOSITION TO THE CODI DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.     Preliminary Statement.................................................................................................. 1

II.    Factual Background ...................................................................................................... 4
       A.     Defendant CODI and Its Business .................................................................. 4
       B.     CODI's Investment in Lugano......................................................................... 4
       C.     CODI's Knowledge of Lugano's Irregularities and Refusal to Investigate
              Obvious Signs of Moti's Misconduct ............................................................. 5
              1.     Whistleblower Reports......................................................................... 7
              2.     Tensions with Moti Over Lugano's Poor SOX Compliance .................... 7
              3.     Access to Lugano and Moti's Inner Circle ............................................ 8
              4.     CODI's Pre-Acquisition Due Diligence ................................................ 8
       D.     Defendants' Fraud Is Gradually Revealed, Culminating in a Seismic $750
              Million Write Down of CODI's Net Operating Income ...................................... 9

III.   The AC Adequately Pleads the CODI Defendants' Scienter...................................... 11
       A.     The AC Adequately Pleads the CODI Defendants' Motive to Defraud .............. 12
              1.     Defendants' Motive to Profit from Lugano's Anticipated Sale
                     Through Their Shares in Sostratus..................................................... 13
              2.     Defendants' Motive to Increase Their Compensation by Increasing
                     CGM's Management Fees .................................................................. 15
              3.     The AC's Lack of Insider Trading Allegations Does Not Negate
                     the Strong Inference of Scienter ....................................................... 17
       B.     The AC Alleges Strong Circumstantial Evidence of the CODI Defendants'
              Conscious and Reckless Disregard of Lugano's Irregularities ........................... 18
              1.     The AC's Former Employee Allegations Should Be Credited................. 18
              2.     The CODI Defendants' Knowledge of and Access to Facts
                     Contradicting Their False and Misleading Statements .......................... 21
              3.     Defendant Maciariello's Departure and Other Suspicious Personnel
                     Changes Strengthen the Inference of Fraud........................................ 29
              4.     The Inference of Scienter Is Strengthened by the Size of CODI's
                     Restatement and the Importance of Lugano to CODI's Operations ......... 31
              5.     CODI's Corporate Scienter Can Be Imputed from the Scienter of
                     the Company's Agents, Including Moti................................................. 34
       C.     The Most Plausible Explanation for CODI's Failure to Disclose Lugano's
              Irregularities Is Deliberate or Reckless Intent ............................................... 38

IV.    The AC Presents No Additional Grounds for Dismissal .............................................. 39
       A.     The AC Pleads the Reasons for Defendants' Scienter with Sufficient
              Particularity................................................................................................. 39
       B.     The Section 20(a) Claim Should Not Be Dismissed......................................... 39

V.     If Necessary, The Court Should Grant Leave to Amend the AC................................... 40

VI.    Conclusion ................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........................................................................................17

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)........................................................................19

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).............................................................20, 32, 33

*In re Avon Sec. Litig.*,
No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ...............................21

*In re B. Riley Fin., Inc. Sec. Litig.*,
No. 2:24-CV-00662-SPG-AJR, 2025 WL 3637602 (C.D. Cal. Dec. 12, 2025)......................26

*Barrett v. PJT Partners Inc.*,
No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)...........................34, 37

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008) ........................................................................18

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010)..........................................................................28

*Benjamin v. Kim*,
No. 95 CIV. 9597 (LMM), 1999 WL 249706 (S.D.N.Y. Apr. 28, 1999)..............................26

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
No. 3:16-cv-2127(AWT), 556 F. Supp. 3d 100 (D. Conn. Aug. 19, 2021).................... *passim*

*In re CarLotz, Inc. Sec. Litig.*,
No. 21-CV-5906 (AS), 2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) .................................15

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) ....................................................................................37

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)..........................................................................25

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)..........................................................................20

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................................12, 14

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)....................................................................37, 39

*Cruz v. Zucker*,
    116 F. Supp. 3d 334 (S.D.N.Y. 2015)..........................................................................11

*Damri v. Liveperson, Inc.*,
    No. 25-964-CV, 2026 WL 668890 (2d Cir. Mar. 10, 2026)........................................40

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    816 F. Supp. 3d 449 (S.D.N.Y. Jan. 16, 2026) ....................................................20, 22

*Diabat v. Credit Suisse Grp. AG*,
    No. 23 CIV. 5874 (CM), 2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)...................31

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).........................................................................13, 14, 15

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008).........................................................................16

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015).........................................................................................18

*In re Five Below, Inc. Sec. Litig.*,
    No. CV 24-3638, 2025 WL 2447794 (E.D. Pa. Aug. 25, 2025)..................................26

*Fouad v. Isilon Sys., Inc.*,
    No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ......................30

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017).........................................................................33

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).............................................................12, 18, 26

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012).........................................................................31

*Gimpel v. Hain Celestial Grp., Inc.*,
    156 F.4th 121 (2d Cir. 2025) ............................................................................. *passim*

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................20, 23

*Greco v. Qudian Inc.*,
 No. 1:20-CV-577-GHW, 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ...............................17

*In re Grupo Televisa Sec. Litig.*,
 368 F. Supp. 3d 711 (S.D.N.Y. 2019).................................................................................36

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
 20 F.4th 131 (2d Cir. 2021) ...............................................................................................18

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
 422 F. Supp. 3d 821 (S.D.N.Y. 2019).................................................................................32

*In re Hi-Crush Partners L.P. Sec. Litig.*,
 No. 12 CIV. 8557 CM, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...................................31

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016)...........................................................................................15, 16

*In re JP Morgan Chase Sec. Litig.*,
 363 F. Supp. 2d 595 (S.D.N.Y. 2005).................................................................................34

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001)....................................................................................2, 3, 12, 14

*Kempen Int'l Funds v. Syneos Health, Inc.*,
 No. 23-CV-8848 (AS), 2025 WL 949576 (S.D.N.Y. Mar. 28, 2025) ...................................39

*Leshinsky v. Telvent GIT, S.A.*,
 873 F. Supp. 2d 582 (S.D.N.Y. 2012).................................................................................22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015)..........................................................................................34, 40

*Lozada v. TaskUs, Inc.*,
 710 F. Supp. 3d 283 (S.D.N.Y. 2024).................................................................................21

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
 501 F. Supp. 2d 452 (S.D.N.Y. 2006)............................................................................35, 36

*In re MBIA, Inc., Sec. Litig.*,
 700 F. Supp. 2d 566 (S.D.N.Y. 2010).................................................................................36

*McGreevy v. Digital Currency Grp., Inc.*,
 No. 3:23-CV-00082(SRU), 2026 WL 508339 (D. Conn. Feb. 24, 2026) .............................16

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
 988 F. Supp. 2d 406 (S.D.N.Y. 2013).................................................................................33

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................18, 21, 28

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) .................................................................................................34

*In re Omnicom Grp., Inc. Sec. Litig.*,
No. 02 Civ. 4483(RCC), 2005 WL 735937 (S.D.N.Y. 2001) ...................................................17

*Ontario Teachers' Pension Plan Bd. v. Teva Pharms. Indus. Ltd.*,
No. 3:17-cv-558(SRU), 432 F. Supp. 3d 131 (D. Conn. Sept. 25 2019).................................17

*Patel v. L-3 Commc'ns Holdings Inc.*,
No. 14-CV-6038 (VEC), 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)...........................24, 35

*Patriot Expl., LLC v. SandRidge Energy, Inc.*,
No. 3:11-cv-01234(AWT), 951 F. Supp. 2d 331 (D. Conn. June 29, 2013) .....................14, 38

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006)......................................................................................16

*Perez v. Higher One Holdings, Inc.*,
No. 3:14-CV-755(AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016)................................40

*Perez v. Higher One Holdings, Inc.*,
No. 3:14-CV-755(AWT), 2017 WL 4246775 (D. Conn. Sept. 25, 2017)................................12

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)......................................................................................37

*In re PG&E Corp. Sec. Litig.*,
806 F. Supp. 3d 962 (N.D. Cal. 2025) .....................................................................................32

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................................................21

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of
Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................................27

*In re Qutoutiao, Inc. Sec. Litig.*,
No. 20 CV. 6707 (VM), 2026 WL 309234 (S.D.N.Y. Feb. 5, 2026) ......................................20

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................................18

*Reider v. Arthur Andersen, LLP*,
784 A.2d 464 (Conn. Super. Ct. 2001) ....................................................................................37

*Reilly v. U.S. Physical Therapy, Inc.*,
No. 17 CIV. 2347 (NRB), 2018 WL 3559089 (S.D.N.Y. July 23, 2018) ...............................33

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000).......................................................................................................33

*S.A. Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024)............................................................................. *passim*

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)......................................................................................23

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)................................................................................35, 36

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007).....................................................................................30

*SEC v. Im*,
No. 17-CV-3613 (JPO), 2018 WL 840094 (S.D.N.Y. Feb. 12, 2018) ...................................13

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
No. 3:09-CV-2083(RNC), 2018 WL 1587457 (D. Conn. Mar. 31, 2018) ..............................19

*Sherman v. Abengoa, S.A.*,
156 F.4th 152 (2d Cir. 2025) ............................................................................................28, 29

*Stream SICAV v. Wang*,
989 F. Supp. 2d 264 (S.D.N.Y. 2013)......................................................................................37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..........................................................................................................2, 12

*Tung v. Bristol-Myers Squibb Co.*,
412 F. Supp. 3d 453 (S.D.N.Y. 2019)......................................................................................40

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022).........................................................................22, 23, 26

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
No. 13 CIV 8846(LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) .................................33

*United States v. Gupta*,
747 F.3d 111 (2d Cir. 2014)....................................................................................................29

*In re Veon Ltd. Sec. Litig.*,
No. 15-CV-08672 (ALC), 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ..............................24

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................................................14

*In re Winstar Commc'ns*,
  No. 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .............................................34

*Woolgar v. Kingstone Cos., Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)......................................................................................23

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)......................................................................................25

Lead Plaintiff Eastern Atlantic States Carpenters Pension Fund and Eastern Atlantic Carpenters Annuity Fund ("Plaintiff"), by and through the undersigned counsel, hereby respectfully submit this memorandum of law in opposition to the motion to dismiss the Amended Complaint, ECF 68 (the "AC"),[1] filed by Defendants Compass Diversified Holdings, Compass Group Diversified Holdings LLC (with Compass Diversified Holdings, "CODI" or the "Company"), Elias J. Sabo, Stephen Keller, Ryan J. Faulkingham, and Patrick Maciariello (collectively the "Individual Defendants," and with CODI, the "CODI Defendants" or "Defendants"[2]).

## I.    PRELIMINARY STATEMENT

For more than three years, CODI deliberately looked the other way as its largest subsidiary, Lugano Diamonds & Jewelry Inc. ("Lugano"), flagrantly defied basic accounting principles and falsely inflated CODI's financial statements. Lugano's customers lost millions, and CODI's investors lost millions upon millions more. This was securities fraud, pure and simple. CODI's executives knew and recklessly disregarded signs of Lugano's irregularities yet continued to tell investors the subsidiary was a profitable, fast-growing success.

Tellingly, Defendants' Motion to Dismiss, ECF 91,[3] does not dispute the AC's allegations that CODI's statements were false or misleading, material, and a legally sufficient cause of Plaintiff's losses. Instead, Defendants bet the farm on a single argument, asserting that the AC fails to plead the strong inference of scienter required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). As they see it, CODI and its executives were unwitting victims who

---

[1] References to the AC appear as "¶ __."

[2] For the purposes of this Memorandum, the term "Defendants" does not include Defendant Grant Thornton. Plaintiff has simultaneously filed herewith a separate memorandum in opposition to Defendant Grant Thornton's Motion to Dismiss.

[3] References to the CODI Defendants' MTD appear as "MTD __."

negligently (but not culpably) placed excessive trust in Lugano's CEO, Mordechai "Moti" Ferder ("Moti").

The PSLRA's scienter inquiry boils down to a simple question: considering all of the AC's well-pled factual allegations, is the inference that Defendants knowingly or recklessly disregarded Lugano's irregularities "at least as compelling as any opposing inference one could draw from the facts alleged[?]"[4] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The answer to that question is a resounding "yes." The AC is replete with allegations that CODI and its officers "ignored obvious signs of fraud, and hence should have known that they were misrepresenting material facts." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, No. 3:16-cv-2127(AWT), 556 F. Supp. 3d 100, 130 (D. Conn. Aug. 19, 2021) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).

Start with Defendants' motive to defraud investors. While CODI's executives never sold the Company's stock at inflated prices, they exploited Lugano's irregularities to increase management fees that were tied to CODI's net assets; the more Lugano's irregularities inflated CODI's net assets, the more CODI's executives made in ill-gotten fees. The $43 million in undeserved management fees Defendants received constitutes a "concrete and personal benefit" from the fraud sufficient to infer Defendants' scienter at the pleading stage. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citing *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)). But that's not all. Certain CODI officers also stood to receive shares of the Company's profits if CODI sold Lugano or retained Lugano until September 2026. Had CODI completed its anticipated multi-billion-dollar sale of Lugano before the scale of Moti's misconduct made divesting the subsidiary

---

[4] Unless otherwise specified, all quotations have been edited to omit ellipses and internal quotation marks, and any emphasis in quotations has been added by Plaintiff.

2

impossible, these officers would have reaped yet larger sums—another "concrete and personal benefit" sufficient to plead scienter against these officers. *Id*.

On top of sufficiently alleging Defendants' motive to defraud, the AC pleads ample facts showing CODI's knowing and reckless disregard of Lugano's irregularities. Most salient, the AC alleges that CODI received two whistleblower reports from Lugano employees, imploring CODI to act on Lugano's obvious irregularities, nearly a *year* before CODI disclosed Lugano's misconduct to investors. Similarly, CODI's own internal audit team regularly confronted Moti over Lugano's poor internal controls, but CODI management—per the Company's own post-Class Period admission—inappropriately "deferred" to Moti on audit matters. The inference of scienter is even more compelling in light of Lugano's importance to CODI as the Company's most profitable subsidiary. Indeed, CODI's executives enmeshed themselves in Moti's inner circle and played active roles in Lugano's oversight, with CODI's COO Maciariello and a CODI Partner, Raj Dalal, serving as Chair and as a member of Lugano's Board of Directors, respectively. The cherry on top: Moti's own repeated allegations, cited in the AC but completely ignored in Defendants' brief, that CODI "knew of the financing and inventory practices that Lugano was using from the beginning" but "left them in place" to reap the fraudulent benefits.

In light of these and other allegations in the AC, the inference that CODI knowingly or recklessly disregarded Lugano's irregularities is not merely equal in plausibility to Defendants' preferred nonculpable inference—it is the single most rational way to read the AC's 255-page testament to corporate recklessness. Accordingly, the Court should deny Defendants' Motion to Dismiss in its entirety.

3

## II.     FACTUAL BACKGROUND

### A.     Defendant CODI and Its Business

Defendant CODI is a publicly traded company that operates like a private equity firm, acquiring and managing middle-market businesses across various industries. ¶ 57. It typically divests profitable subsidiaries after roughly four years of ownership. ¶ 62. Exclusive of Lugano, CODI presently consists of eight operating subsidiaries, including a crossbow manufacturer, a magnet company, and a manufacturer of feminine care products. ¶ 58.

The Company does not have any employees of its own; instead, CODI is managed by non-party Compass Group Management (or "CGM"), which operates CODI in exchange for a quarterly management fee equal to 0.5% of the Company's consolidated adjusted net assets. ¶ 26. Current and former employees of CGM include Defendant Sabo, CODI's CEO throughout the Class Period; Defendant Faulkingham, CODI's CFO from the start of the Class Period until August 30, 2024; Defendant Keller, who replaced Faulkingham as CFO and still serves in that role; and Defendant Maciariello, CODI's former COO. ¶¶ 29–33.

### B.     CODI's Investment in Lugano

On September 3, 2021, CODI acquired a 60% stake in Lugano, an Orange County-based luxury jewelry chain founded by Mordechai "Moti" Ferder ("Moti"). ¶ 69. Despite taking a controlling interest in Lugano, CODI left Moti and his wife, Idit Ferder, as Lugano's CEO and COO, respectively. ¶ 78. CODI also installed Defendant Maciariello and another CODI executive, Raj Dalal, as Lugano's Chair and as a member of Lugano's Board, respectively. ¶ 79.

On top of the $265.1 million it paid to acquire Lugano, CODI subsequently invested hundreds of millions more to grow the subsidiary's assets, repeatedly amending Lugano's intercompany credit agreement to permit greater capital infusions. ¶¶ 69, 82. During the Class Period, shareholders believed this investment was extremely profitable for the Company, as

4

Lugano quickly became CODI's largest and most profitable subsidiary. ¶ 86. By 2024, Lugano accounted for 57% of CODI's reported operating income—more than double its 2022 share—and 26.5% of CODI's total assets—nearly double the percentage of CODI's next-largest subsidiary. ¶ 85. Lugano's strong returns buoyed CODI's overall financial performance in a dismal economic climate, helping the Company deliver respectable growth despite the disappointing results of CODI's other subsidiaries. ¶ 85. As one analyst put it, Lugano appeared to be the "engine driving CODI's outperformance." ¶ 88.

CODI's investment and Lugano's apparent strong financial performance increased the management fees CGM received from CODI, which grew from $35 million in 2020 to $75 million in 2024. ¶ 87. Defendants Sabo, Keller, and Faulkingham also owned shares in an entity, Sostratus LLC, that was entitled to receive profit allocation payments whenever CODI held a subsidiary for five years or divested a subsidiary. ¶¶ 27, 66–67. With Lugano recording quarter after quarter of increasing profits, CODI explored the possibility of divesting the subsidiary, which it estimated to be worth as much as $2.5 billion. ¶¶ 92–97. Indeed, as late as January 2025, Moti showed a business associate "messages" between him and CODI "regarding the potential sale of Lugano." ¶ 93. In a similar vein, *Forbes* reported in April 2025 that CODI would "look either to spin [Lugano] off or sell [it] to a luxury giant such as LVMH." ¶ 92. Had CODI successfully divested Lugano, Sostratus—and, by extension, Sabo, Keller, and Faulkingham—would have received a share of CODI's profits calculated based on Lugano's "aggregate contribution to the Company's profits" and "the Company's cumulative gains and losses to date." ¶ 66.

C.    CODI's Knowledge of Lugano's Irregularities and Refusal to Investigate Obvious Signs of Moti's Misconduct

Behind the scenes, however, Lugano was not the highly profitable subsidiary depicted in Defendants' statements to investors. In reality, Lugano was a hotbed of financial irregularities,

where Moti and others ignored basic principles of accounting, revenue recognition, and inventory management. ¶¶ 175–81. The centerpiece of this misconduct was Lugano's reliance on so-called "investment diamond transactions," whereby an investor would contribute funds for Lugano to purchase a diamond, in exchange for a share in Lugano's profits from the diamond's eventual sale. ¶¶ 154–56. Crucially, the terms of these transactions allowed investors to demand the return of their investments at any point, with exorbitant interest, without any significant preconditions. *Id.*; ¶ 156 (10% interest *per month*). According to former Lugano employees, Lugano recorded these transactions as pure revenue without acknowledging Lugano's obligation to repay the investor, thereby inflating Lugano's revenues and operating income and obscuring the extent of Lugano's debts. *Id.*; ¶¶ 101–04, 154–55. This scheme was "common knowledge" among Lugano employees, ¶ 259, and ultimately led CODI to omit at least ***$318 million in unrecorded debt***. ¶ 174.

Defendants' proposition is that CODI and its executives were the unwitting victims of an elaborate fraud perpetrated by Moti and his associates. This narrative is simply incompatible with the AC's well-pled factual allegations. For starters, CODI's executives had an extraordinary and unusual financial motive for turning a blind eye to Lugano's misconduct, as the subsidiary's inflated net assets increased CGM's management fees (and thus money to the Individual Defendants) by at least ***$43 million*** over three years. ¶¶ 26, 406. The irregularities also positioned Lugano for a lucrative sale in which Sabo, Keller, and Faulkingham would have earned many millions through their shares in Sostratus. ¶¶ 66–67, 98, 408–11.

Given their personal financial stake in Lugano's apparent success, it is not surprising that CODI's executives were aware of, overlooked, or outright disregarded numerous signs of Lugano's misconduct, including the following:

6

### 1.    Whistleblower Reports

CODI received two whistleblower reports about Lugano's irregularities in 2024, almost a year before it disclosed these irregularities to investors. The first whistleblower report was submitted by FE 10, a Lugano salesperson, on June 4, 2024, via CODI's compliance reporting system. ¶ 183. FE 10's report stated that "[t]he sales reported by Lugano are not accurate" and "[n]o one" could verify Moti's reported sales numbers. ¶ 184. On August 26, 2024, CODI responded to FE 10's submission, saying it had "conducted an internal evaluation" but would be dismissing his[5] concerns. ¶ 186. Despite claiming it had "conducted an internal evaluation," CODI never interviewed FE 10 or requested documents related to his claims. ¶ 185.

Second, Lugano's CFO FE 12 detected at least two improperly recorded diamond transactions that he investigated alongside Lugano's Controller Dan Perushek. ¶¶ 164–66. While FE 12 was terminated before he could disclose the duo's findings to CODI, Perushek subsequently confirmed to FE 12 that he relayed their concerns to CODI's internal audit team in Fall 2024. ¶ 190. When CODI's response to Perushek's report was "inadequate" and "did not go anywhere," Perushek resigned in protest. ¶ 191. Basically, CODI whitewashed both reports.

### 2.    Tensions with Moti Over Lugano's Poor SOX Compliance

Beginning in 2022, an "internal audit team" consisting of three CODI employees worked tirelessly to bring Lugano's financial reporting into compliance. ¶ 143. But instead of providing the materials CODI needed to test Lugano's controls, Moti and Lugano repeatedly "dragged their feet" when asked to provide sales documentation. ¶¶ 143, 145, 147–48. CODI grew so frustrated that the Company's Head of Risk and Controls "directly confronted Moti on several occasions regarding his failure to provide adequate documentation." ¶ 144. Gradually, however, CODI

---

[5] As noted in the AC, the FEs are referred to with male pronouns regardless of their gender. ¶ 39 n.4.

tolerated and let slide Lugano's shoddy SOX compliance, although the members of CODI's internal audit team remained uneasy with Moti's practices. ¶ 147. CODI subsequently admitted to investors that the Company's management "too often deferred" to Moti on internal audit matters, "creating a perceived lack of support for the internal audit team, and creating an environment where Lugano could fail to fully implement, adhere to, or enforce SOX controls." ¶ 299.

### 3.    Access to Lugano and Moti's Inner Circle

Befitting Lugano's status as the Company's most important subsidiary, CODI's top executives cultivated close personal relationships with Lugano's CEO, Moti. For example, Defendant Maciariello introduced Moti to a group of investors as "our partner and my friend." ¶ 90. Indeed, in the wake of Moti's resignation, Defendant Maciariello quietly "retired" from his position at CODI in August 2025; suspiciously, CODI did not officially disclose Maciariello's departure until December 2025. ¶ 287. In the words of FE 1, CODI put Maciariello "on the backseat" due to his perceived role in concealing Lugano's irregularities. *Id*.

In addition to joining Moti's social circle, CODI executives were frequent shoppers at Lugano, with one member of the Company's Board of Directors spending $500,000 on Lugano jewelry in a single year. ¶ 125. As multiple former employees ("FEs") recalled, traffic at Lugano's stores was meagre, leading many to question whether CODI's financial reporting actually reflected Lugano's sales activity. ¶¶ 135–40. Indeed, CODI's own board chair Larry Enterline shared these concerns, telling a Lugano salesperson during a store visit that Lugano's reported figures seemed "crazy high" and overblown. ¶ 135.

### 4.    CODI's Pre-Acquisition Due Diligence

In 2022, CODI told investors that its "management team" had conducted "rigorous due diligence" into Lugano and other subsidiary acquisitions. ¶ 306. As multiple FEs attest, Moti was already engaging in illicit investment diamond transactions prior to the acquisition, ¶¶ 101–04,

fueling Lugano's exponential growth from 2016 (when it reported just $10 million in annual sales revenue) to 2021 (when it ostensibly recorded $125 million in net sales and $29 million in income from operations), ¶ 104. During due diligence, CODI had access to Lugano's books and records, customer list, and inventory. ¶ 77. Indeed, during the due diligence Dalal spoke with Champion Force, a Lugano supplier to whom Moti owed millions for unpaid goods. ¶ 116. For unclear reasons, however, CODI never contacted Lugano's first-ever CFO, FE 6, whose termination agreement suspiciously indemnified FE 6 in the case that Lugano was sued for misusing his signature on financial documents. ¶ 117. As the member of CODI's Investment Committee in charge of recommending acquisitions to the Company, Defendant Maciariello was responsible for monitoring "red flags" that emerged during CODI's due diligence. ¶ 60.

D.    Defendants' Fraud Is Gradually Revealed, Culminating in a Seismic $750 Million Write Down of CODI's Net Operating Income

The narrative of Lugano's unstoppable success abruptly faltered on May 7, 2025, when CODI announced that its 2024 financial statements could no longer be relied upon in light of "irregularities in Lugano's non-CODI financing, accounting, and inventory practices . . . ." ¶ 267. CODI's press release credited the discovery to an unspecified "concern" about Lugano to which CODI "reacted swiftly and decisively," "elevating [the concern] immediately to [CODI's] Audit Committee." ¶ 268. That same day, Moti resigned his position as Lugano's CEO, effective immediately and without severance. ¶ 269. On this news, the share price of CODI's common stock plummeted from $17.25 per share at close of trading on May 7 to $6.55 per share on May 8, 2025. ¶ 270. CODI's share price fell even further on May 27, when CODI disclosed that the fallout from Lugano's irregularities would require the Company to impose limits on its investments and borrowing. ¶¶ 271–72, 274.

9

The truth was fully revealed to investors at the close of trading on December 4, 2025, when CODI held a call to discuss the Company's soon-to-be filed restatement of its 2022, 2023, and 2024 financial statements (the "Restatement"). ¶ 276. Speaking to investors, Defendant Sabo acknowledged that Lugano's financial irregularities "persisted for multiple reporting periods and increased in magnitude" over time. ¶ 277. Defendant Keller then admitted that Lugano's revenues "declined by more than 85% from previously recorded levels following the removal of the fraudulent revenue." ¶ 278. Keller further warned that the write-down corresponding to Lugano's irregularities would represent, "by a wide margin," "the most significant loss CODI has experienced since its inception." ¶ 278. On this news, the price of CODI's common stock dropped from $7.38 per share at close of trading on December 4 to $5.73 per share on December 5. ¶ 280.

CODI filed the Restatement on December 8, 2025. ¶ 298. The Restatement confirmed that Lugano's irregularities had grossly inflated the Company's financial statements, ***necessitating a more than $750 million write-down of CODI's operating income***. ¶ 10. The Restatement further acknowledged ten previously undisclosed material weaknesses in CODI's and Lugano's internal controls, including CODI's "incomplete risk assessments concerning Lugano," CODI's "inadequate monitoring controls and control environment for Lugano," and CODI's inappropriate "deference" to Moti regarding internal audit matters. ¶ 299.

The disclosure of Lugano's irregularities set off a chain of other crises, putting CODI's very future into doubt. In November 2025, Lugano filed for Chapter 11 bankruptcy. ¶ 285. A month later, CODI disclosed in its late-filed 2025 Q1 Form 10-Q that Lugano's irregularities "rais[ed] substantial doubt about the Company's ability to continue as a going concern." ¶ 290. In the meantime, Lugano's irregularities have been investigated by the FBI, the SEC, and the Financial Industry Regulatory Authority, ¶ 289, and many of Lugano's investors have filed civil

10

fraud lawsuits against Moti and CODI, ¶ 292. For its part, Lugano filed its own lawsuit against Moti, alleging that the former CEO conspired with his son, Tom Ferder, to conceal Lugano's investment diamond transactions. ¶ 294. While Lugano's claims against Moti have not yet been adjudicated, Moti has signaled that he intends to file counterclaims alleging that CODI knowingly benefited from Lugano's irregularities, stating:

> Claims of ignorance by Compass, the 60% controlling shareholder of Lugano[,] are simply not credible. **Compass knew of the financing and inventory practices that Lugano was using from the beginning. Compass was aware of the practices it now conveniently calls "misconduct" but left them in place**.

¶ 296.

### III.    THE AC ADEQUATELY PLEADS THE CODI DEFENDANTS' SCIENTER

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and the PSLRA, the Court "must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff." *Alexion Pharms., Inc.*, 556 F. Supp. 3d at 117 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Dismissal is not warranted if the AC pleads "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Put differently, "[t]he issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *Id.* (quoting *U.S. v. Yale New Haven Hosp.*, 727 F. Supp. 784, 786 (D. Conn. 1990)).

Defendants' motion to dismiss rests entirely[6] on the PSLRA's requirement that Plaintiff "allege facts giving rise to a strong inference that [Defendants] acted with scienter . . . ." *Gimpel v. Hain Celestial Grp., Inc.*, 156 F.4th 121, 143 (2d Cir. 2025) (quoting 15 U.S.C. § 78u-

---

[6] As Defendants acknowledge, the MTD "do[es] not challenge the elements of [Plaintiff's] claims besides scienter . . . ." MTD 12 n.2. Accordingly, for purposes of the instant Motion, Defendants waive any argument that the AC fails to adequately plead the PSLRA's other required elements. *See Cruz v. Zucker*, 116 F. Supp. 3d 334, 349 n.10 (S.D.N.Y. 2015) (arguments not raised in the opening brief are "waived").

11

4(b)(2)(A)). While the AC's inference of scienter "must be more than merely plausible or reasonable" to satisfy the PSLRA, it need not be "irrefutable," of the "smoking gun genre," or even the "most plausible of competing inferences." *Tellabs Inc.*, 551 U.S. at 324 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)). Rather, Plaintiff's burden at the pleading stage is only to allege an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *accord Perez v. Higher One Holdings, Inc.*, No. 3:14-CV-755(AWT), 2017 WL 4246775, at *8 (D. Conn. Sept. 25, 2017) ("Ultimately, even if a plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the tie goes to the plaintiff.") (quoting *Poptech, L.P. v. Stewardship Inv. Advisors, LLC*, 849 F. Supp. 2d 249, 269 (D. Conn. 2012)). The AC satisfies this standard because it pleads both "strong circumstantial evidence of conscious misbehavior or recklessness" and that Defendants had a "motive and opportunity to commit fraud"—either of which is sufficient on its own to plead scienter. *Gimpel*, 156 F.4th at 144 (citing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)).

A.    The AC Adequately Pleads the CODI Defendants' Motive to Defraud

While allegations that Defendants possessed motive and opportunity to commit fraud are "not required" to plead scienter under the PSLRA, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010), Plaintiff may satisfy the scienter requirement by "assert[ing] a concrete and personal benefit to the [I]ndividual [D]efendants resulting from the fraud," *Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307–08). The PSLRA's motive analysis is "extremely contextual," and the plaintiff's burden is to allege "a sufficient reasonable possibility of developing proof that a motive in fact existed." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993)). While compensation-related motives that are "common to most corporate officers" fail to

12

strengthen the inference of scienter, courts infer "the defendants' motive to sweep problems under the rug" if the allegations support "a direct link between the [defendants'] compensation package and the fraudulent statements . . . ." *JP Morgan Chase Co.*, 553 F.3d at 198, 201. The AC satisfies this standard by pleading not one, but two aspects of CODI's executive compensation package that motivated the Individual Defendants to conceal Lugano's financial irregularities: (1) the opportunity to profit from Lugano's anticipated sale, and (2) the opportunity to earn inflated management fees.

        1.        Defendants' Motive to Profit from Lugano's Anticipated Sale Through Their Shares in Sostratus

Certain CODI insiders—including Defendants Sabo, Faulkingham, and Keller—owned shares in an entity, Sostratus, that received part of CODI's profits whenever the Company divested a subsidiary or retained a subsidiary for five years. ¶ 66. As Defendants acknowledge, these shares "positioned" Sabo, Faulkingham, and Keller "to make more money—*and thereby benefit in a concrete and personal way*—when [Lugano] contributed to the Company's profit and either was (i) sold or divested by CODI or (ii) remained within the CODI corporate family for more than five years." MTD 15–17. In other words, the AC pleads a "direct link" between Defendants' payments through Sostratus—which were calculated based on Lugano's apparent contribution to CODI's profits—"and the fraudulent statements"—which inflated Lugano's financial performance and, in turn, Lugano's apparent contribution to CODI's overall profits. *JP Morgan Chase Co.*, 553 F.3d at 201; *see also Gimpel*, 156 F.4th at 145 (affording "weight" to allegations defendants "had the motive to commit fraud because bonuses they received were tied to the very metrics that Hain admittedly overstated"); *SEC v. Im*, No. 17-CV-3613 (JPO), 2018 WL 840094, at *3 (S.D.N.Y. Feb. 12, 2018) (inferring scienter from defendant's "$3.79 million in bonuses . . . based in significant part on the performance of the CMBS desk, which was inflated through the alleged

13

fraud") (citing *JP Morgan Chase Co.*, 553 F.3d at 201); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (inferring motive from defendant's $3 million bonus tied to fraudulently inflated EBITDA).

Other allegations in the AC strengthen the "extremely contextual" inference that Sabo, Faulkingham, and Keller were motivated to commit fraud by the opportunity to earn Sostratus payments. *In re Complete Mgmt. Inc.*, 153 F. Supp. 2d. at 328. Far from being a motive "generally possessed by most corporate directors and officers," *Kalnit*, 264 F.3d at 139, the motive to earn part of CODI's profits from a Lugano sale was not even common amongst CODI's executive leadership, as only three high-ranking insiders—Sabo, Faulkingham, and Keller—owned shares in Sostratus. Thus, the anticipated payments were "concrete personal benefits" to Sostratus's owners, "extrinsic to the performance" of CODI's share price or CODI's overall performance, in which neither shareholders nor most members of the Company's senior management would share. *Patriot Expl., LLC v. SandRidge Energy, Inc.*, No. 3:11-cv-01234(AWT), 951 F. Supp. 2d 331, 352 (D. Conn. June 29, 2013). What is more, Sabo, Faulkingham, and Keller would have reaped blockbuster sums from the divestment, as CODI aimed to sell Lugano for as much as $2.5 billion, ¶ 94—nearly ten times what it paid for its stake in the subsidiary. *JP Morgan Chase Co.*, 553 F.3d at 201 (inference of scienter strengthened by "magnitude" of defendant's compensation tied to fraud). Moreover, given that CODI's other subsidiaries struggled during the Class Period, ¶ 85, it is plausible to infer that Sabo, Faulkingham, and Keller saw Lugano's anticipated sale as their best (if not only) opportunity to trigger Sostratus payments through the Company's then-current suite of businesses. *See Gimpel*, 156 F.4th at 145 (fact that defendant "would not have hit" metrics for bonuses absent fraudulent statements supported inference of scienter).

Defendants maintain that the opportunity to profit personally from CODI's anticipated sale of Lugano cannot support a strong inference of scienter because "CODI disclosed the fraud" before the conditions triggering Sostratus payments occurred. MTD 16. As a basic legal matter, "this argument confuses expected with realized benefits," given the plausible inference that the Individual Defendants believed they could hide Lugano's irregularities until after the subsidiary either was divested or remained part of CODI until 2026. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016); s*ee also S.A. Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024) (inferring scienter based on defendants' performance-based bonuses although company's board ultimately revoked most of defendants' bonuses). Furthermore, the AC is replete with allegations that CODI was actively attempting to sell Lugano in the months leading up to the Company's first disclosure of the fraud. ¶¶ 92–97. These allegations "suggest[] that Defendants did not come clean willingly," but rather tried to cash in on their Sostratus shares until Lugano's irregularities proved too large to conceal from potential purchasers. *In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906 (AS), 2024 WL 1348749, at *14 (S.D.N.Y. Mar. 29, 2024).

2.    Defendants' Motive to Increase Their Compensation by Increasing CGM's Management Fees

As explained in the AC, the Individual Defendants were not employed directly by CODI; instead, they were employees of CGM, an entity that managed CODI's operations in exchange for a quarterly management fee equal to 0.5% of the Company's adjusted net assets. ¶ 405. By inflating Lugano's net assets, Defendants' fraud inflated CGM's management fees (and, in turn, the Individual Defendants' compensation) by at least $43 million. ¶ 406. The AC thus draws a "direct link" between Defendants' fraud—which increased CODI's purported net assets and thus CGM's management fees—"and the fraudulent statements"—which concealed Lugano's

15

irregularities and their artificial inflation of CODI's reported net assets. *JP Morgan Chase Co.*, 553 F.3d at 201; *see also McGreevy v. Digital Currency Grp., Inc.*, No. 3:23-CV-00082(SRU), 2026 WL 508339, at \*21 (D. Conn. Feb. 24, 2026) (inferring scienter from defendants' motive to "maximize . . . management fees" from subsidiary).

Despite CODI's concession that these fees were overpaid as a direct result of Lugano's irregularities, Defendants maintain that CGM's management fees cannot support an inference of fraud because the motive to increase compensation based on the Company's improved performance is "endemic to most corporate officers." MTD 17. Not so. "Unlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees based on inflated NAV [net asset value] figures [is] a concrete and personal benefit to the individual defendants resulting from the fraud." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 187 (S.D.N.Y. 2006) (quoting *Kalnit*, 264 F.3d at 139).[7] It is no surprise, then, that CODI belatedly disclosed in its 2025 Form 10-K that CGM's management fees may induce CODI's executives "to make suboptimal decisions regarding our operations." ¶ 410.

Defendants also highlight CODI's ostensible plan to recover the overpaid management fees from CGM. MTD 18. Again, this argument "confuses expected with realized benefits." *SAIC, Inc.*, 818 F.3d at 97 (quoting *Tellabs*, 513 F.3d 702, 710 (7th Cir. 2008)). Whether the Individual Defendants will disgorge their ill-gotten gains *in the future* bears little on whether they had a motive to commit fraud *during the Class Period. See Dentsply Sirona Inc.*, 732 F. Supp. 3d at 318

---

[7] Courts sometimes hold that management fees do not support an inference of scienter when the defendant is a fund manager, because "[t]he desire to earn management fees is a motive generally possessed by hedge fund managers . . . ." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) (citing *Kalnit*, 264 F.3d at 139). This rationale is inapplicable to CODI, which is not an asset or fund manager but rather a majority shareholder that actively directs the operations of its investment subsidiaries.

(defendants' performance-based bonuses supported inference of fraud, even though company's board ultimately reduced defendants' bonus payments in light of fraud allegations).

### 3. The AC's Lack of Insider Trading Allegations Does Not Negate the Strong Inference of Scienter

Defendants make much of the fact that the AC does not allege insider stock sales, insisting that this omission "essentially defeats any inference of motive and opportunity." MTD 14–15. Yet courts in the Second Circuit routinely find a strong inference of scienter through motive and opportunity absent allegations that the defendants sold stock at a profit. *See, e.g.*, *Dentsply Sirona Inc.*, 732 F. Supp. 3d at 318 (inferring scienter where plaintiff asserted that "Defendants' fraud translated into millions in performance-based pay"); *Ontario Teachers' Pension Plan Bd. v. Teva Pharms. Indus. Ltd.*, No. 3:17-cv-558(SRU), 432 F. Supp. 3d 131, 169–70 (D. Conn. Sept. 25 2019) (motive sufficiently pled that "defendants' price-hike strategy was implemented to increase revenue and increase the price of their stocks to use as currency to acquire" another company); *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483(RCC), 2005 WL 735937, at *13 (S.D.N.Y. 2001) (similar). Indeed, the edited quotation that Defendants include from *Greco v. Qudian Inc.* reads in full, "[T]he absence of stock sales by insiders, *or any other evidence of pecuniary gain by company insiders at shareholders' expense*, is inconsistent with an intent to defraud shareholders." No. 1:20-CV-577-GHW, 2022 WL 4226022, at *25 (S.D.N.Y. Sept. 13, 2022) (quoting *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000)). In other words, Plaintiff may demonstrate (and, indeed, has demonstrated) motive in the form of pecuniary gain other than stock sales. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021) (insider stock sales "are not a sine qua non" for pleading scienter).[8]

---

[8] Defendants also ask this Court to consider external documents purportedly showing that the Individual Defendants bought stock during the Class Period. MTD 14 n.3. While the Court may take judicial notice of these documents, these documents "may not be considered to establish the truth of the matters asserted in them," but rather to show what

B.    The AC Alleges Strong Circumstantial Evidence of the CODI Defendants'
Conscious and Reckless Disregard of Lugano's Irregularities

In addition to pleading the CODI Defendants' motive to commit fraud,[9] the AC satisfies

the PSLRA's scienter requirement independently by "alleging facts . . . constituting strong

circumstantial evidence of conscious misbehavior or recklessness." *Alexion Pharms., Inc.*, 556 F.

Supp. 3d at 130 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).

This is because the AC pleads both that Defendants had direct knowledge of Lugano's

irregularities and that Defendants "ignored obvious signs of fraud, and hence should have known

that they were misrepresenting material facts." *Id.* (citing *Hennessee Grp. LLC*, 573 F.3d at 109).

1.    The AC's Former Employee Allegations Should Be Credited

The AC demonstrates Defendants' scienter through a mix of publicly available sources and

allegations by 12 former employees of CODI and Lugano. The AC describes where the FEs

worked, their dates of employment, and each FE's title or job duties. ¶¶ 39, 46–56. This is more

than enough information "to support the probability that a person in the position occupied by the

source would possess the information alleged." *Novak*, 216 F.3d at 314; *see also Emps.' Ret. Sys.

of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (crediting FEs when

plaintiffs "specifie[d] each witness's position, length of employment, and job responsibilities").

---

might have been in the public realm at the time these documents were filed. *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 338 (W.D.N.Y. 2008) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). Even if it were alleged that the Individual Defendants purchased CODI stock during the Class Period, such behavior is not "wholly inconsistent with fraudulent intent," MTD 14 n.3, but rather consistent with the inference that CODI's officers "believed that [they] could eventually sell [their] shares at a profit by continuing to hide the fraud or by resolving undisclosed problems without the public learning of the true facts . . . ." *Freudenberg*, 712 F. Supp. 2d at 201; *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 647 (S.D.N.Y. 2007) (similar).

[9] Even if the AC's motive allegations fail to establish scienter standing alone, Plaintiff's allegations that Defendants possessed a financial motive to conceal Lugano's irregularities strengthen the "cumulative weight" of the AC's circumstantial evidence of scienter. *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021); *see also Dentsply Sirona Inc.*, 732 F. Supp. 3d at 317 (plaintiffs' allegations of motive to defraud, though "insufficient to establish scienter" standing alone, lessened plaintiffs' burden of pleading scienter through circumstantial evidence).

Defendants argue that certain Lugano FEs cannot be credited because they "left [Lugano] well before the Class Period began[,]" and that others cannot be credited because they "did not occupy positions that could have exposed them to Moti's sophisticated fraudulent activities." MTD 28. Neither argument hits the mark. To the former argument, the AC quotes FEs that worked at Lugano before the Class Period to demonstrate that Lugano was already a hotbed of financial irregularities at the time it was acquired by CODI. ¶¶ 100–17. Thus, these FEs are plainly relevant to Defendants' scienter at the time Defendants made the statement that CODI "perform[ed] rigorous due diligence" into the acquisition. ¶ 306. And while some of the Lugano FEs worked in relatively junior sales roles, their mutually corroborating accounts of Lugano's rampant irregularities "support an inference of company-wide problems" that would not have escaped the notice of Lugano's Chair, Defendant Maciariello, or Lugano's majority shareholder CODI. *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 263 (S.D.N.Y. 2023). What is more, because Moti's sales practices defied the most basic principles of revenue recognition, it is far from implausible that a salesperson would recognize these practices as improper. *See Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, No. 3:09-CV-2083(RNC), 2018 WL 1587457, at *7 (D. Conn. Mar. 31, 2018) (crediting FEs' allegations about company's improper revenue recognition practices "even if they were not involved in financial reporting and had little contact with the individual defendants").[10]

Defendants focus particular ire on FE 1, MTD 28, a former CODI employee whom the AC cites as a source concerning CODI's acquisition practices, ¶ 60, CODI's financing negotiations with Lugano, ¶ 142, and Defendant Maciariello's suspicious departure from the Company, ¶ 287.

---

[10] Indeed, Lugano's culture of financial misconduct was so flagrant that a Lugano director "openly bragg[ed]" about participating in Lugano's improper investment diamond schemes. ¶ 169.

While the AC omits FE 1's job title, the PSLRA does not require a plaintiff to plead an FE's "exact job title[]," *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004), especially when "independent adequately [pled] factual allegations corroborate" the FE's statements, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011). Here, FE 1's allegations about CODI's negotiations with Lugano are corroborated by the AC's reference to language in the Company's Q2 2025 Form 10-Q confirming that these negotiations took place. ¶ 82. Nor is it problematic that FE 1's statements partially contain "hearsay" accounts of information FE 1 learned from coworkers, MTD 28, as the PSLRA does not prohibit such allegations. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) ("[T]he Court may properly take account of the alleged testimony of CW-1, even though some of his testimony is based on hearsay and indirect knowledge"); *In re Qutoutiao, Inc. Sec. Litig.*, No. 20 CV. 6707 (VM), 2026 WL 309234, at *12 (S.D.N.Y. Feb. 5, 2026) (similar). In any event, the AC adequately pleads the probability that FE 1 knew about CODI's and Lugano's disputes over financing based on his attendance at investment team meetings where topics related to Lugano—CODI's largest and most important investment—were naturally discussed. ¶ 142; *World Wrestling Ent. Inc.*, 477 F. Supp. 3d at 132 (crediting FE's statement incorporating information the FE learned by "talk[ing] to others about developments . . . during his time at [the company]").[11]

---

[11] Defendants further argue that FE 1's observations about Defendant Maciariello's authority over CODI's subsidiary acquisitions "were not directed to the 2021 Lugano acquisition" because FE 1 joined CODI in 2024. MTD 28. But the AC presents no plausible reason to infer that Maciariello's role in CODI's acquisitions was any different in 2021, given, among other things, his subsequent appointment as Chair of Lugano's Board of Directors, which would befit an executive who oversaw Lugano's integration into the Company. *See, e.g.*, *In re Dentsply Sirona, Inc. Sec. Litig.*, 816 F. Supp. 3d 449, 481 n.28 (S.D.N.Y. Jan. 16, 2026) ("Although [FE] retired from Dentsply before the Class Period, his seniority and knowledge of ongoing reporting procedures renders his testimony still probative, as there is no reason to believe those procedures abruptly ended after his departure.").

Defendants also assert that the FEs are irrelevant to scienter because none had "direct contacts . . . with any of the Individual Defendants . . . ." MTD 27. This is not the law. *See Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (no "baseline requirement" that FEs discuss matters with individual defendants to be relevant to PSLRA's scienter analysis); *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 324 (S.D.N.Y. 2024) (FE's information was "sufficiently reliable," and ultimately relevant to strong inference of scienter, "even in the absence of . . . having direct contact" with the individual defendants); *In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) ("The notion that the CWs cannot be believed [or considered in scienter analysis] because none had direct contact with any individual Defendant is contrary to law"). In any event, nearly all of the Lugano FEs allege direct contact with CODI's agent Moti, thus making them plainly relevant to CODI's corporate scienter. *See* Section III(b)(5) *infra*.

### 2. The CODI Defendants' Knowledge of and Access to Facts Contradicting Their False and Misleading Statements

The AC is replete with allegations that the CODI Defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . ." *Novak*, 216 F.3d at 311.

#### a. *Whistleblower Reports*

The AC alleges that CODI received, but failed to act on, at least two whistleblower reports about Lugano's irregularities it received from employees of the subsidiary. *See* Section II(c)(i) *supra*. FE 10's and Perushek's whistleblower reports directly contradicted Defendants' statements about Lugano to investors, which hinged on the purported accuracy of Lugano's revenue and sales numbers.

21

According to Defendants, these whistleblower reports do not strengthen the inference of scienter because the AC does not expressly plead that CODI executives received them. MTD 20–24. This argument overstates Plaintiff's burden at the motion to dismiss stage, which is merely to establish an inference that Defendants "had access to contrary facts," not that Defendants "actually viewed a specific document." *In re Dentsply Sirona, Inc. Sec. Litig.*, 816 F. Supp. 3d at 480; *accord In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 245 (S.D.N.Y. 2022) (PSLRA allows plaintiff to plead defendant's scienter "in the form of allegations supporting that the information and the context were such that the [defendant] would have had to be informed").

Defendants' argument also glosses over three significant facts that, viewed together, solidify the inference that FE 10's and Perushek's reports were viewed by senior CODI management. First, the AC does not merely allege that FE 10's report was submitted to a generic "third-party website," MTD 20–21, but that FE 10 used the compliance reporting system mandated in CODI's guidance to subsidiary employees, ¶ 182. Indeed, the AC alleges that CODI was required by Section 301 of the Sarbanes-Oxley Act to route all whistleblower reports to the Company's Audit Committee. ¶ 414[12]; *see Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 599 (S.D.N.Y. 2012) ("no serious dispute" that Section 301's whistleblower requirements "cover[] employees throughout the publicly traded company's entire corporate family," including subsidiaries). Second, both whistleblower reports led to internal reviews by CODI: the "internal evaluation" mentioned in CODI's response to FE 10, ¶ 186, and the inadequate response to Perushek's concerns that "did not go anywhere," ¶ 191. Third, CODI's own press release announcing Moti's May 2025 resignation acknowledges that the Company "reacted swiftly and

---

[12] The AC mistakenly cites 15 U.S.C. §§ 78k-l(m)(4)-(B) as authority for this proposition; the proper citation is 15 U.S.C. §§ 78j-1(m)(4)-(B).

decisively to a concern regarding Lugano, elevating it immediately to our Audit Committee." ¶ 268. Given that CODI had mechanisms to investigate concerns about Lugano's financial statements, and that these mechanisms indisputably resulted in CODI management learning about Lugano's irregularities in Spring 2025, there is no plausible reason to infer that these mechanisms were not in place in 2024 when FE 10 and Perushek submitted reports about those very same irregularities to appropriate authorities at CODI. *See In re Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d at 245 ("natural to infer" that subordinate elevated reports about fraud-ridden project to superior).

These facts also distinguish the AC's whistleblower allegations from the cases cited in Defendants' brief. Whereas the plaintiffs in *Woolgar v. Kingstone Companies, Inc.* did not allege the "specific information" contained in the whistleblower's reports, 477 F. Supp. 3d 193, 237 (S.D.N.Y. 2020), the AC includes full screenshots of FE 10's whistleblower report, ¶¶ 184, 186, and describes the dates of the improperly recorded investment diamond transactions that motivated Perushek's and FE 12's investigation, ¶¶ 163–66. In *Glaser*, the court justifiably disregarded an FE's conclusory statement that the defendant "would have known" about developments at *another* company; here, in contrast, the AC expressly alleges that CODI received the whistleblowers' concerns and had working mechanisms for elevating such concerns by subsidiary employees to senior management. 772 F. Supp. 2d at 594. Similarly, the *In re Sanofi Securities Litigation* plaintiffs "d[id] not reference any specific report or statement that was produced as a result of" the alleged whistleblower investigations, whereas here the AC alleges that both FE 10's and Perushek's complaints led to internal reviews (albeit incomplete ones). 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016).[13]

---

[13] Another crucial difference is that, while the *In re Sanofi* court found that the alleged kickbacks described in whistleblower reports were too "speculative" and "conclusory" to consider under the PSLRA, *id.* at 399, 400, here

Meanwhile, the purported whistleblower allegations in *Patel v. L-3 Communications Holdings Inc.* were premised on the admitted conjecture of another anonymous former employee, who, among other leaps of logic, inferred that one of his colleagues relayed concerns to an executive because the colleague "wore a suit to work on one of the days of [the executive's] visit . . . ." No. 14-CV-6038 (VEC), 2016 WL 1629325, at *9 (S.D.N.Y. Apr. 21, 2016). The AC relies on no such flights of fancy—instead, it alleges that Perushek explicitly told FE 12 that he relayed findings from FE 12's own investigation to CODI's internal audit team. ¶ 190. And while the *In re Veon Ltd. Securities Litigation* court refused to impute knowledge of whistleblower reports to a defendant based solely on his position as CEO, that case lacked the AC's specific allegations demonstrating that CODI was manifestly capable of elevating concerns about Lugano to senior management, as indicated by the Company's self-described "swift[]" and "decisive[]" internal review of Lugano-related allegations in Spring 2025. No. 15-CV-08672 (ALC), 2018 WL 4168958, at *18 (S.D.N.Y. Aug. 30, 2018).

b.    *CODI's Oversight of Lugano's Financial Reporting*

Even before it received FE 10's whistleblower report, CODI knew that Lugano was failing to comply with the Company's SOX procedures. *See* Section II(c)(ii) *supra*. For starters, CODI itself has acknowledged that "Company management too often deferred to" Moti in audit matters, "creating a perceived lack of support for the internal audit team, and creating an environment where Lugano could fail to fully implement, adhere to, or enforce SOX controls." ¶ 299. Indeed, Lugano's financial reporting was so dire that an upper-level CODI manager, the Company's "Head of Risk and Controls," repeatedly intervened to "directly confront[]" Moti about his failure to

---

there can be no dispute that the AC's whistleblower reports concerned the precise financial irregularities CODI ultimately disclosed to investors in May 2025.

24

provide adequate documentation. ¶ 144. What is more, in its 2022 Proxy Statement, CODI told investors it had "familiariz[ed]" Lugano's "management team with the Company's periodic reporting, corporate governance and [SOX]" obligations, and that it had likewise "familiariz[ed]" itself with Lugano's "business, operations, properties, financial condition, and prospects . . . ." ¶ 64. Lugano paid CGM $9.2 million for these so-called "integration services." ¶ 80. That CODI publicly claimed to have "familiariz[ed]" Moti and itself with Lugano's financial reporting requirements, and indeed accepted almost $10 million for its ostensible efforts, belies any notion that CODI's executives were unaware of Moti's obvious failure to abide by SOX procedures. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 241 (S.D.N.Y. 2010) (inferring scienter from defendant's statements acknowledging familiarity with topic).

Moreover, CODI continued to provide "hundreds of millions of dollars to fund Lugano's purported expansion" *after* the Company's Head of Risk and Controls confronted Moti about the subsidiary's poor internal controls. ¶¶ 6, 144. It defies belief that CODI repeatedly invested considerable sums in Lugano and indeed amended Lugano's intercompany credit agreement to permit more investment, ¶ 82, without checking in with the Head of Risk and Controls and CODI's internal audit team about the reliability of Lugano's financial reporting. This inference is corroborated by the Restatement's admission that "Company management" weakened Lugano's controls by siding with Moti and thus "creating a perceived lack of support for the internal audit team . . . ." ¶ 299.

> c. *The Individual Defendants' Relationships with Moti and Access to Lugano Stores*

The AC alleges that certain CODI executives were Moti's close associates, *see* Section II(c)(iii) *supra*, affording the Company yet more access to Lugano's irregularities. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 402 (S.D.N.Y. 2003) (defendant's "close

relationship" with fraudster strengthened inference he was "aware of WorldCom's fraudulent accounting practices"); *In re B. Riley Fin., Inc. Sec. Litig.*, No. 2:24-CV-00662-SPG-AJR, 2025 WL 3637602, at \*9 (C.D. Cal. Dec. 12, 2025) (inferring scienter from defendant's "close relationship" with bad actor who was "significant source of the Company's business"). This is especially true of Defendant Maciariello, as he worked closely with Moti in both his capacity as CODI's COO and in his position as Lugano's Chair. *In re Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d at 244 (allegations that defendant sat on fraud-ridden mine's Board of Directors supported inference of scienter).

In a similar vein, the AC alleges that various CODI insiders—including Sabo, Maciariello, Dalal, and CODI's Chair Larry Enterline—were frequent shoppers at Lugano, with one member of CODI's Board of Directors purchasing \$500,000 in jewelry in a single year. ¶ 125. *See Freudenberg*, 712 F. Supp. 2d at 198 (defendants' "visits" to office of fraud-ridden mortgage division "demonstrate their access to and actual knowledge of facts which contradicted their public statements"); *Benjamin v. Kim*, No. 95 CIV. 9597 (LMM), 1999 WL 249706, at \*9 (S.D.N.Y. Apr. 28, 1999) (at summary judgment stage, inferring circumstantial evidence of scienter from defendant's "half-dozen" visits to office). Contrary to Defendants' assertions, MTD 26, the fact that these visits were "personal" does not lessen the inference of scienter. Even when they visited Lugano's stores in a personal capacity, CODI's executives and board members observed that salon traffic was inconsistent with Lugano's reported high sales, a disparity that was noticeable even to Lugano's junior sales staff. ¶¶ 135–39; *see In re Five Below, Inc. Sec. Litig.*, No. CV 24-3638, 2025 WL 2447794, at \*26 (E.D. Pa. Aug. 25, 2025) (inferring defendant's awareness of inventory issues from visit to store that was experiencing stocking problems). Indeed, Enterline himself

26

confessed to a Lugano salesperson that the subsidiary's reported figures seemed "crazy high" and overblown. ¶ 135.

### d.    *CODI's Pre-Acquisition Due Diligence*

Critically, the AC alleges that CODI's access to Lugano's irregularities began before the Class Period, when CODI performed what it described as "rigorous due diligence" into the Lugano acquisition. *See* Section II(c)(iv) *supra*. By this point, Lugano was already manipulating its financial statements through investment diamond schemes, which Moti "openly discussed" with staff. ¶¶ 101–03. Lugano also used fake shipping labels to avoid California sales tax, ¶ 111, a practice that prompted investigation by Lugano's secure shipper, ¶ 113, and sparked FE 6 to refuse to sign tax returns, which were instead signed by the assistant of Lugano's outside accountant, ¶ 114. Yet despite representing that it had conducted "rigorous due diligence" into Lugano and other acquisitions, CODI either knew about and ignored these obvious red flags or simply failed to detect them. In "deliberately shut[ting] their eyes" to red flags that were visible during due diligence, Defendants acted with scienter. *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 298 (S.D.N.Y. 2010) (quoting *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368–69 (S.D.N.Y. 2001)).

Defendants cite two authorities for the proposition that allegations of inadequate due diligence are "generally insufficient" to plead scienter. MTD 34. What distinguishes the AC's due diligence allegations from the garden-variety cases cited in Defendants' brief is that CODI itself told investors it had conducted "rigorous due diligence" into Lugano. ¶¶ 305–07. Either CODI conducted "rigorous" diligence—which would have exposed it to rampant irregularities including, *inter alia*, sales inconsistent with slow salon traffic and FE 6's suspicious resignation—or it did not, making CODI's contrary statement at least recklessly misleading. *See Dentsply Sirona Inc.*, 732 F. Supp. 3d at 319 (Defendants were reckless if they "didn't monitor" key topics "but made

27

definitive statements as if they did") (citing *Novak*, 216 F.3d at 309); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 413 (S.D.N.Y. 2010) (finding scienter when fund promised to conduct due diligence into investment manager but failed to do so); *Novak*, 216 F.3d at 308–09 (reaffirming pre-PSLRA caselaw inferring scienter where defendant "consistently reassured the plaintiff" he was monitoring investment advisor, but "never actually investigated the advisor's decision") (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47–48 (2d Cir. 1978)). And while Plaintiff need not "specifically identify the reports or statements" CODI reviewed in its purported due diligence, *Dentsply Sirona Inc.*, 732 F. Supp. 3d at 320, the AC specifically alleges that CODI had access to Lugano's books and records as well as the names of customers and suppliers with aggregate purchases of over $500,000 per year, ¶ 77, information that would surely lead to discovery of Lugano's investment diamond transactions.

e.    *Moti's Allegations That CODI Knew About Lugano's Irregularities*

Glaringly, Defendants' brief does not acknowledge the proverbial elephant in the room. Moti claims in his litigation against Lugano that CODI "knew of the financing and inventory practices that Lugano was using from the beginning . . . but left them in place," ¶ 296, and knowingly benefitted from Lugano's misconduct, ¶¶ 295–97. While Moti's allegations have yet to be adjudicated, they are plausible in light of, and fully consistent with, the AC's many well-pled allegations that CODI either knew or had access to facts demonstrating Lugano's irregularities.

Although the AC adequately pleads Defendants' scienter without taking Moti's allegations into consideration, the Court should still afford probative weight to Moti's claims. A securities complaint "may rely on factual allegations or reports incorporated from other proceedings, subject . . . to the limitations of Federal Rule of Civil Procedure 11." *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 166 (2d Cir. 2025). This is a "case-dependent inquiry that … turn[s] on the nature of the allegations contained in the other proceeding . . . ." *Id*. Here, the credibility of Moti's allegations

28

is strengthened because they acknowledge Moti's own role in Lugano's irregularities, a concession that could harm Moti in his civil suit against Lugano and even expose him to criminal liability. *Cf. United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014) ("reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true") (quoting *Williamson v. United States*, 512 U.S. 594, 599 (1994)). And Moti's allegation that CODI knowingly benefited from Lugano's irregularities is corroborated by the AC's other well-pled allegations about Defendants' motive to commit fraud. *See* Section III(a) *supra*; *Sherman*, 156 F.4th at 166 (crediting allegations in Spanish National Court filings that were corroborated by other allegations in the plaintiff's complaint).

### 3.    Defendant Maciariello's Departure and Other Suspicious Personnel Changes Strengthen the Inference of Fraud

Contrary to Defendants' assertions, the AC is replete with "additional factual allegations" linking the departures of three CODI employees—Defendant Macariello, Defendant Faulkingham, and Senior Director of Internal Audit Ami Vearrier—"to the alleged fraud . . . ." MTD 33 (quoting *Woolgar*, 477 F. Supp. 3d at 240). As to Defendant Maciariello: FE 1 explained that although Defendant Maciariello publicly left CODI in December 2025, his "retirement" was internally announced to employees months earlier. ¶ 422. Why would CODI present the departure as a retirement and hide it from the public for nearly half a year? *Cf. Gimpel*, 156 F.4th at 148 ("Such secrecy insinuates knowledge of wrongdoing"). The inference that Maciariello left CODI as punishment for knowingly or recklessly tolerating Lugano's irregularities is further enhanced by the AC's allegations that Maciariello spearheaded the Lugano acquisition, ¶ 60, frequently attended events at Privé, ¶ 126, served as Chair of Lugano's Board of Directors, ¶ 79, and proudly called Moti "my friend" and "amongst the most generous people I think I have ever met," ¶ 90. The implication is obvious: Defendant Maciariello was simply too close to Moti and Lugano to

29

plausibly deny awareness of Lugano's irregularities or justify his continued employment at the Company.

Likewise, the AC alleges that Defendant Faulkingham departed from CODI in August 2024, the same month that CODI dismissed FE 10's whistleblower complaint. ¶ 423. As the C-suite employee with ultimate authority over Lugano's SOX procedures, ¶ 149, Faulkingham's departure just as CODI hastily dismissed a whistleblower complaint concerning the internal controls of CODI's most important subsidiary was suspiciously timed to say the least. *See Dentsply Sirona Inc.*, 732 F. Supp. 3d. at 321–22 (inferring scienter from allegations that executives departed amid internal investigation); *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) (inferring scienter from allegations that executives departed "while Isilon was preparing its own internal investigation of revenue recognition practices"). And Defendants completely ignore the AC's allegation that Vearrier, the CODI auditor who oversaw Lugano's inadequate implementation of SOX procedures and received Controller Perushek's whistleblower complaint, left CODI in November 2025. ¶ 424; *see In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 395 (S.D.N.Y. 2007) (inferring scienter from dismissal of employee "in charge of maintaining financial reporting systems").

These departures are even more suspicious in light of the Restatement's admission that CODI implemented "inadequate monitoring controls" at Lugano and "allowed [Moti] to operate with elevated autonomy." ¶ 299; *see Alexion Pharms., Inc.*, 556 F. Supp. 3d at 136 (inference that key officers resigned because of involvement in fraud was at least as compelling as opposing nonculpable inference, "particularly when viewed in combination with [Defendant's] statements about the tone at the top") (citing *In re Salix Pharm., Ltd.*, No. 140CV08925 (KMW), 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016)). It is also significant that these departures were

accompanied by major reforms in how CODI acquires and monitors subsidiaries, including efforts aimed at "ensuring proper tone at the top . . . ." ¶ 301; *see Dentsply Sirona Inc.*, 732 F. Supp. 3d at 322 ("house-cleaning and reforms" at company, combined with impending restatement of company's financials, suggested "systematic and fraudulent abuse of internal financial controls" rather than mere "innocent mistakes"). Considering all the AC's well-pled allegations, the most plausible inference is that Maciariello, Faulkingham, and Vearrier left CODI because of their knowledge or reckless disregard of the fraudulent conduct.

4.    The Inference of Scienter Is Strengthened by the Size of CODI's Restatement and the Importance of Lugano to CODI's Operations

Allegations that Defendants' fraud concerned "areas of critical import" to CODI's business "[b]olster[] the scienter inference" for the common-sense reason that CODI's executives, like executives at any company, were "likely to know more about things central to their business." *Gimpel*, 156 F.4th at 148 (quoting *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No 22-cv-6978, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024)).[14] The AC alleges that Lugano was CODI's most important subsidiary by far, accounting for as much as 57% of CODI's operating income and almost double the net assets of CODI's next-largest subsidiary. ¶ 85; *see Diabat v. Credit Suisse Grp. AG*, No. 23 CIV. 5874 (CM), 2024 WL 4252502, at *145 (S.D.N.Y. Sept. 19, 2024) (inferring defendants' scienter with respect to statements about company's wealth management business because "nearly 61%" of the company's net revenues derived from wealth management); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 CIV. 8557 CM, 2013 WL 6233561, at *26 (S.D.N.Y. Dec.

---

[14] As Defendants note, the Second Circuit has left it uncertain whether allegations about an activity's "core" importance to the company, standing alone, independently justify a strong inference of scienter. MTD 30. Yet even if the so-called "core operations" inference is no longer good law, "in employing a holistic analysis [of scienter], surely an inference of knowledge may be appropriate, even if not determinative, where it would be absurd to suggest that management was without knowledge of the matter" based on the matter's importance to the company. *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009)).

31

2, 2013) (inferring defendants' scienter with respect to statements about transaction that made up 18% of company's projected yearly revenues). What is more, Lugano's purportedly strong financial results were integral to CODI's success, given the underwhelming performance of CODI's other subsidiaries, ¶ 85, the market's perception of Lugano as the "engine driving CODI's outperformance," ¶ 88, and CODI's own view that Lugano's affluent customer base made it immune from the macroeconomic headwinds facing other consumer businesses, ¶ 89. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 853 (S.D.N.Y. 2019) (inference of scienter with respect to AMC's acquisition of rival theater company strengthened by allegations that acquisition "was the biggest part of AMC's ambitious growth strategy" that would "constitute a significant source of income") (quoting *In re Supercom Inc. Sec. Litig.*, No. 15 CV 9650 (PGG), 2018 WL 4926442, at \*31 (S.D.N.Y. Oct. 10, 2018)). Lugano was so important to CODI's existence that, without the subsidiary's apparent profits propping up the Company's financial health, CODI was forced to include a going concern warning in its late-filed 2025 Q1 Form 10-Q. ¶ 290; *see In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 1000 (N.D. Cal. 2025) ("PG&E's being compelled to declare bankruptcy is further evidence that its noncompliance with vegetation management regulations was mission-critical information that top level management must have known"). This inference is especially warranted for Defendants Faulkingham and Keller, who as CFOs "had a duty to familiarize [themselves] with the facts relevant to the core operations of the company and the financial reporting of those operations." *In re Atlas Air Worldwide Holdings*, 324 F. Supp. 2d at 491 (citing *Howard v. Everex Sys.*, 228 F.3d 1057, 1062 (9th Cir. 2000)).

In a similar vein, the inference of scienter is strengthened by the magnitude of the Restatement, which wiped out nearly $750 million of CODI's recorded net income between 2022

and 2024. ¶ 10; *see In re Atlas Air Worldwide Holdings*, 324 F. Supp. 2d at 491 (inference of scienter strengthened by company's $281.4 million restatement); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (collecting cases for proposition that "the size of the purported fraud may contribute to an inference of scienter").[15] The Restatement did not concern a mere "disputed technical accounting issue," but rather a "large-scale accounting fraud that undermined the ongoing viability of the Company's core business." *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 CIV. 2347 (NRB), 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018). And the Restatement disclosed ten previously unknown material weaknesses in CODI's and Lugano's internal controls, including CODI's "[i]nadequate [m]onitoring [c]ontrols" and inappropriate deference to Moti. ¶¶ 299–300; *Dentsply Sirona Inc.*, 732 F. Supp. 3d at 321 ("Courts in this district have repeatedly held that improper tone at the top and poor internal controls support an inference of scienter."). In light of "the size of the [R]estatement" and Lugano's importance to CODI's overall operations, "it would strain credulity to conclude" that the CODI Defendants were unaware of the sales and inventory irregularities driving Lugano's ostensibly strong financial performance. *Gimpel*, 156 F.4th at 149.[16]

---

[15] Defendants cite *In re Turquoise Hill* for the proposition that the size of a restatement is not "suggestive of scienter" when misstatements are initially made in a subsidiary's financial statements. MTD 31. But this is not what the case states. Rather, *In re Turquoise Hill* explicitly recognized that "the magnitude of a restatement *can* be relevant to the scienter inquiry" when "presented in tandem with other circumstantial evidence." *In re Turquoise Hill*, No. 13 CIV. 8846(LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014). In that case, a subsidiary recognized revenue for coal sales incorrectly for several years, an error the court found to be unintentional. *Id.* at *3, 6. The nature and scale of this fraud is easily distinguishable from Lugano's misconduct, which concerned basic issues of revenue recognition and caused obvious warning signs that were repeatedly brought to Defendants' attention. Further, the court in *In re Turquoise Hill* did not attribute its holding on scienter to a single factor as defendants' motion implies; rather, the court undertook a "holistic view of the Complaint" in finding it did "not support an inference of scienter." *Id.* at *8.

[16] Contrary to Defendants' assertion, MTD 35, it is of little moment that Grant Thornton LLP ("GT") issued "clean" audits of CODI's financial statements and internal controls during the Class Period. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88, 90 (2d Cir. 2000) (inferring scienter of corporation despite "clean" audit reports by independent auditor); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) ("While the defendants assert that no inference of scienter is warranted because their independent auditors continued to certify New Oriental's financials, reliance on an independent accountant cannot completely absolve the defendants of their obligation to ensure the sufficiency of contracts upon which New Oriental's financial viability is contingent."). CODI's attempt to shield itself behind GT's audits makes even less sense in light of the AC's well-pled allegations that GT also acted

5.    CODI's Corporate Scienter Can Be Imputed from the Scienter of the Company's Agents, Including Moti

As a corporate defendant, Defendant CODI's scienter is established by allegations "sufficient to create a strong inference . . . that someone whose intent could be imputed to the corporation acted with the requisite scienter . . . ." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008)). While "courts have generally found that 'management-level' employees can serve as proxies for the corporation" in the scienter analysis, "[t]he knowledge of more junior officers may be attributable to the company if they had direct involvement in the aspect of the business at issue or the company's disclosure functions." *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (collecting cases).

In addition to pleading the scienter of the Individual Defendants, whose scienter can be imputed to CODI as its senior-most officers, the AC adequately pleads the scienter of other supervisory CODI employees whose intent can be imputed to the Company. The Chair of CODI's Board of Directors, Larry Enterline, regularly shopped at Lugano, ¶ 125, and admitted to FE 5 during one such visit that Lugano's figures were "crazy high" and overblown, ¶ 135; *see In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (imputing scienter of "Vice Chairman" to corporation); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) (scienter of "member of the board of directors who . . . tolerated the misrepresentation after its utterance or issuance" can be imputed to corporation). CODI Partner Raj Dalal interviewed at least one of Lugano's creditors during the acquisition due diligence, ¶ 116, participated in Moti's social

---

with scienter in failing to disclose Lugano's irregularities. *See In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006) (inferring defendant's scienter despite purported reliance on GT's audit, in part because plaintiffs alleged that GT itself acted with scienter).

circle as a member of Lugano Privé, ¶ 126, and served as a member of Lugano's Board of Directors, ¶ 79. Also attributable to CODI is the scienter of the members of its internal audit team, which included CODI's "Manager" and "Senior Manager" of Internal Audit operations, who observed Lugano's deficient internal controls and received Controller Perushek's whistleblower report, ¶¶ 38, 143–48, 190–91, as well as the "Head of Risk and Controls" who confronted Moti about Lugano's inadequate controls, ¶ 143; *see Patel*, 2016 WL 1629325, at *14 (scienter of managers imputed to corporation despite being "below the corporate level").

Importantly, Moti's scienter can be imputed to CODI as the senior-most officer of the Company's largest and most important subsidiary. To "impute the scienter of an officer of a subsidiary to the subsidiary's parent corporation," a plaintiff may allege either that the officer "serve[d] as a 'proxy' for the parent" or that the parent corporation "possessed some degree of control over, or awareness about, the fraud." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 302 (S.D.N.Y. 2019). Both grounds are present here. Courts routinely find that a subsidiary's officer acted as the parent's proxy when the subsidiary comprises a "large portion of [the parent's] overall business . . . ." *Id.*; *see also Patel*, 2016 WL 1629325, at *14 (imputing scienter to parent company based on scienter of CFO of business segment that comprised 36% of parent's net sales); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (imputing scienter of subsidiary company to parent company when subsidiary was "the largest and most prominent of [the parent's] businesses"). Here, Lugano was not only CODI's most profitable subsidiary, generating as much as 57% of the Company's operating income, but also CODI's biggest subsidiary by far, nearly doubling the total assets of CODI's next-largest subsidiary. ¶ 3; *cf. Schiro*, 396 F. Supp. 3d at 302–03 (refusing to impute scienter of subsidiary that constituted only 15% of the parent's net assets, much less than a "more central" subsidiary that constituted

35

44% of company's assets). Indeed, as a holding company with no profit centers of its own, CODI relied on Moti to manage Lugano's day-to-day operations the way a typical corporation would defer such matters to the head of a segment or division. *See, e.g.*, *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (imputing to corporation scienter of "Head of Structured Finance Insured Portfolio Management").

The AC also pleads that CODI "possessed some degree of control over, or awareness about," Lugano's irregularities such that Moti's scienter can be imputed to CODI. *Schiro*, 396 F. Supp. 3d at 302 (quoting *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011)); *accord In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 722 (S.D.N.Y. 2019) (imputing subsidiary's scienter to parent "where the subsidiary is at the center of the alleged fraud") (citing *In re Marsh & McLennan Cos.*, 501 F. Supp. 2d at 482–83). CODI knew about Lugano's irregularities, *see* Section III(b)(2) *supra*, and was familiar with Lugano's financial reporting given the involvement of CODI employees in setting up Lugano's internal controls, ¶¶ 143–53, and the presence of Defendant Maciariello and Dalal on Lugano's Board of Directors, ¶ 79; *see In re Marsh & McLennan Cos.*, 501 F. Supp. 2d at 483 (imputing subsidiary's scienter to parent based on parent's "familiarity with the subsidiary's operations and, ultimately, its misconduct"). CODI also represented to investors that they were aware of Lugano's operations, as exemplified by Defendant Sabo's description of Moti as "one of the most visionary CEOs that I've ever had the pleasure of working with," ¶ 89, an observation he could not have made without knowing how Moti conducted business. *See In re Marsh & McLennan Cos.*, 501 F. Supp. 2d at 483 (imputing subsidiary's scienter to parent based on parent CEO's comment that parent was "knowledgeable about" subsidiary).

36

While courts sometimes decline to impute the scienter of corporate officers that engage in "bad acts," this so-called "adverse interest exception" is "narrow" and only applies "where the fraud is committed against a corporation rather than on its behalf." *PJT Partners Inc.*, 2017 WL 3995606, at \*8 (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 64 (2d Cir. 2013)). "So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—this test is not met." *Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013) (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467–68 (N.Y. Ct. App. 2010)).[17] While Moti's misconduct ultimately harmed CODI by pushing Lugano into bankruptcy, his actions also benefited CODI during the Class Period by propping up the Company's financial condition and share price while other subsidiaries were struggling. Thus, Moti's knowledge of his own bad acts can be imputed to Lugano's parent corporation, CODI. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382–83 (S.D.N.Y. 2015) (imputing scienter of executives who committed bribery, as their "failure to correct Petrobras' various statements about its integrity . . . clearly benefitted the Company, which was able to continue to attract investment"); *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 549 (S.D.N.Y. 2020) (imputing to corporation scienter of executive who "tried to frustrate the Company's internal investigations to protect himself").[18]

---

[17] While *Wang* applied New York agency law, Connecticut's version of the adverse interest exception is similar. *See Reider v. Arthur Andersen, LLP*, 784 A.2d 464, 470 (Conn. Super. Ct. 2001) (exception inapplicable when "agent's activity in pursuit of [fraudulent] scheme somehow benefits the corporation").

[18] Further, the adverse interest exception does not apply to innocent third parties—such as Plaintiff and other investors—that "dealt with the principal [CODI] in good faith." Restatement (Third) of Agency § 504 (A.L.I. 2006); *see In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015) (explaining that "the adverse interest rule collapses in the face of an innocent third party who relies on the agent's apparent authority").

C.    The Most Plausible Explanation for CODI's Failure to Disclose Lugano's Irregularities Is Deliberate or Reckless Intent

As Defendants correctly note, the AC satisfies the PSLRA if the inference of scienter is "strong" and "at least as compelling as any opposing inference one could draw from the facts alleged." MTD 37–38 (quoting *Tellabs*, 551 U.S. at 322). To Defendants, the most compelling explanation of the AC's factual allegations is that CODI and its executives were unwitting victims of a clandestine, sophisticated fraud. *Id.* This narrative collapses under basic scrutiny. For one, it gives Moti far too much credit: Lugano's financial irregularities violated simple principles of revenue recognition, were widely known even among Lugano's junior-most salespeople and were reported directly to CODI by at least two Lugano employees. It also ignores the many other red flags CODI knew of but disregarded, starting as early as the Company's 2021 due diligence into the Lugano acquisition. It ignores the fraud's whopping size (more than *$750 million* wiped off CODI's books), Defendant Maciariello's suspicious departure, and Moti's insistence that CODI knew about Lugano's investment diamond deals but "left them in place [to] enjoy the operational benefits." ¶ 297. Most of all, it ignores the millions of dollars Defendants gained and stood to further gain because of Lugano and its "visionary" CEO, ¶ 91, a man Defendant Maciariello proudly called "our partner and my friend," ¶ 90.[19] It comes down to this: the CODI Defendants knew about or at least failed to act on obvious signs of Lugano's irregularities, yet they continued to promote the fiction of Lugano's success. That is textbook securities fraud.

---

[19] Nor is the inference of scienter somehow defeated because CODI "invest[ed] heavily into Lugano." MTD 37–38. Since CODI's investment in Lugano positioned the subsidiary for a lucrative sale, the Individual Defendants stood to personally benefit from CODI's massive infusions of capital regardless of the harm CODI and its shareholders suffered as a result. *See* Section III(a)(2) *supra*; *see also Patriot Expl., LLC*, 951 F. Supp. 2d at 351–52 (inferring scienter of defendants who "invested three times as much" as plaintiffs in allegedly fraudulent energy securities because defendants would realize "concrete and personal benefits" from their investments). Indeed, CODI repeatedly revised its intercompany credit agreement to permit more investment in Lugano including in each quarter of 2024. ¶ 82. That CODI enthusiastically *increased* its investment in Lugano after receiving two whistleblower reports about Moti's misconduct (not to mention many other red flags of Lugano's irregularities) belies any inference of nonfraudulent intent.

38

## IV.   THE AC PRESENTS NO ADDITIONAL GROUNDS FOR DISMISSAL

### A.   The AC Pleads the Reasons for Defendants' Scienter with Sufficient Particularity

As a purported additional grounds for dismissal, Defendants argue that the AC can be "rejected on its face" because it "repeats, with minimal variation, the same list of 3-6 reasons why the Defendants 'knew or recklessly disregarded' the falsity" of each statement. MTD 36. But the AC is nothing like the complaint in Defendants' sole cited authority, *Kempen Int'l Funds v. Syneos Health, Inc.*, which lumped together multiple allegedly false and misleading statements without "engag[ing] with the substance of any specific statement." No. 23-CV-8848 (AS), 2025 WL 949576, at *2 (S.D.N.Y. Mar. 28, 2025). In contrast, the AC identifies each allegedly false and misleading statement and provides specific (albeit repetitive) reasons why each statement was made with scienter. *Compare* ¶¶ 322–26 (explaining why particular language from Defendant Sabo's earnings call statement was false and misleading and made with scienter) *with Syneos Health*, 2025 WL 949576, at *2 (faulting plaintiffs for not "explain[ing] why each statement was false or misleading").[20] The AC complies with the PSLRA by "identif[ying] statements and omissions, describ[ing] relevant predicate events, and alleg[ing] how those events make the statements and omissions" knowingly or recklessly false. *CBS Corp.*, 433 F. Supp. 3d at 530.

### B.   The Section 20(a) Claim Should Not Be Dismissed

Because the AC adequately states a claim under Section 10(b), Plaintiff's claim under Section 20(a) of the Exchange Act should not be dismissed for lack of a "primary" Section 10(b) violation – which is the only grounds for dismissal Defendants assert as to Plaintiff's Section 20(a)

---

[20] Defendants cherry-pick language in the AC they construe as imputing liability to Defendant Keller for statements made before he joined the Company. MTD 37. Rest assured, Plaintiff readily stipulates that Defendant Keller cannot be liable for statements prior to August 2024. And it is not "implausible" that Defendant Keller knew of CODI's "inadequate due diligence during the Lugano acquisition," *id.*, as Keller could have learned about CODI's failure to adequately investigate Lugano from Defendant Maciariello or another coworker.

39

claim. *See Alexion Pharms., Inc.*, 556 F. Supp. 3d at 142 (denying motion to dismiss Section 20(a) claims against defendants as to whom "scienter has been adequately pled").

## V.    IF NECESSARY, THE COURT SHOULD GRANT LEAVE TO AMEND THE AC

Defendants' Motion should be denied in its entirety. However, should the Court by chance grant any portion of Defendants' Motion, it should also grant Plaintiff leave to amend, consistent with the "liberal spirit" of Federal Rule of Civil Procedure 15 and the Second Circuit's "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 190 (quoting *Williams v. Citigroup Inc.*, 650 F.3d 208, 212–13 (2d Cir. 2011)). Indeed, courts typically "grant plaintiffs at least one opportunity to plead fraud with greater specificity" after granting dismissal. *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 462 (S.D.N.Y. 2019) (quoting *ATSI*, 493 F.3d at 108); *see also Perez v. Higher One Holdings, Inc.*, No. 3:14-CV-755(AWT), 2016 WL 6997160, at *18 (D. Conn. Sept. 13, 2016) (dismissing amended complaint *without* prejudice after finding plaintiffs had not stated a claim for relief under the PSLRA).[21]

## VI.    CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court deny the CODI Defendants' Motion to Dismiss in its entirety.

---

[21] If by chance the Court dismisses the AC, amendment is warranted in light of emerging information that further bolsters the already strong inference of Defendants' scienter. For example, Moti is due to soon file counterclaims in Lugano's fraud lawsuit; per statements he made in previous filings referenced in the AC, these counterclaims will describe how CODI "was aware of what was happening" but "left [Lugano's irregularities] in place so they could enjoy the operational benefits" ¶ 297; *Damri v. Liveperson, Inc.*, No. 25-964-CV, 2026 WL 668890, at *1 (2d Cir. Mar. 10, 2026) (reversing district court's denial of leave to amend securities complaint due to "new materials . . . that have come to light" in a related case).

Dated: May 7, 2026

Respectfully submitted,

*/s/ Erica O. Nolan*

**HURWITZ SAGARIN & SLOSSBERG, LLC**
David A. Slossberg (ct13116)
Erica O. Nolan (ct31097)
135 Broad St.
Milford, CT 06460
Tel.: (203) 877-8000
Fax: (203) 878-9800
dslossberg@hss.law
enolan@hss.law

*Liaison Counsel for EAS Carpenters and the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (phv08964)
S. Douglas Bunch (phv209208)
Nathan L. Weiser (phv209207)
1100 New York Ave., N.W., Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com
nweiser@cohenmilstein.com

Christina D. Saler (phv208825)
100 N. 18th St., Suite 1820
Philadelphia, PA 19103
Tel.: (267) 479-5707
Fax: (267) 479-5701
csaler@cohenmilstein.com

Brendan R. Schneiderman (phv208835)
88 Pine St., 14th Floor
New York. NY 10005
Tel.: (212) 838-7797
Fax.: (212) 838-7745
bschneiderman@cohenmilstein.com

*Attorneys for EAS Carpenters and Lead Counsel for the Class*

41

## **<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on May 7, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic system.

*/s/ Erica O. Nolan*
Erica O. Nolan